Christopher P. Schueller, Esquire
New York Bar No. 2582914
**BUCHANAN INGERSOLL & ROONEY PC**
640 5th Avenue, 9th Floor
New York, NY  10019
Telephone:  (212) 440-4400
Fax:  (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Plaintiff, McCormick 103, LLC*


UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCCORMICK 103, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION,<br><br>and<br><br>"JOHN DOE", "JANE DOE", "DOE ASSOCIATES", and "DOE CORP.", the names being fictitious and being intended to refer to any and all adult natural persons and to all partnerships, corporations and other legal entities having, or which may claim to have, any lien against or interest in the Real Property described in the complaint in this action, other than persons or entities already defendants herein,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00944-AMN-TWD |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
### FOR THE APPOINTMENT OF A RECEIVER

Plaintiff McCormick 103, LLC ("**Plaintiff**"), respectfully submits this Memorandum of Law in

Support of its Emergency Motion for the Appointment of Receiver over Greg Beeche, Logistics, LLC

("**GBL**") and Greg Logistics, LLC ("**GL**" together with GBL, "**Logistics**") and the real estate owned by Gregory L. Beeche ("**Beeche**," together with GBL and GL, the "**Defendants**").

## I.    INTRODUCTION

Plaintiff respectfully requests the appointment of a receiver on an emergency basis.  Plaintiff is the senior secured lender of the Defendants.  GBL is the main operating company and is in the business of providing scaffolding and other equipment to construction sites throughout the country.  Beeche leases real estate to GBL.  GBL's financial performance is the key to the financial success or failure of all the Defendants.

GBL's financial situation has deteriorated rapidly and dramatically over the past two years.  On annual revenues of approximately $10 million, GBL has lost on average approximately $5 million a year.  GBL's income has decreased 30%, operating expenses have increased 190% and overall financial performance has declined a staggering 950%.  GBL's loans matured on September 30, 2023 and remain unpaid.  GBL has not made any debt service payments for nearly two years.  Over $1,000,000 in interest has accrued and remains unpaid.  Meanwhile, two judgment creditors have entered over $2.6 million in judgments against the Defendants, and the Defendants have failed to pay $407,000 in real estate taxes over the past three years.  All the financial headwinds appear to have finally broken GBL's back.  In early June 2025, Defendants contacted the Plaintiff and said that they were running out of cash and would need to close their doors in approximately 90 days.  Exacerbating these tensions, the Defendants have refused to provide basic financial reporting to the Plaintiff in 2025.

Most of GBL's assets consist of equipment with a book value of $13.8 million.  However, for years the Defendants have failed to provide an equipment list to its lenders to verify this equipment inventory and the location of the equipment.  Plaintiff is justifiably concerned that this mobile equipment has been or will be diverted, concealed or transferred to third parties.

Under these circumstances, a receiver should be appointed. There is a material risk of a substantial and preventable decline in the value of Plaintiff's collateral unless a receiver is appointed. A receiver will (i) secure all collateral, especially the mobile scaffolding; (ii) properly account for all collateral, (iii) stabilize operations or shut down operations in a safe manner, (iv) attempt a going concern sale to save jobs and maximize a recovery from the assets, or (iv) as a last resort, conduct an orderly liquidation sale to maximize a recovery.

All equitable factors in favor of a receiver are present. Furthermore, Defendants consented under the loan documents to the appointment of a receiver after an event of default. As a matter of law, this means that the Court's analysis of the equities should decisively tilt in favor of the Plaintiff.

For these and other reasons discussed in more detail below, Plaintiff respectfully requests that a receiver be appointed over GBL and GL and their assets and over the real estate owned by Beeche.

## II.     FACTUAL BACKGROUND

### A.     DEFENDANTS

GBL (www.gregbeeche.com) is a construction company which designs, manufactures, delivers, erects, supervises, uses, and then dismantles its adaptable, modular scaffolding and other work access systems. The company provides logistics planning, master rigging services, professional engineering services, field training and project oversight. Beeche is the majority owner of GBL. Beeche's son Kirk Beeche ("**Kirk Beeche**") currently runs the day-to-day operations of GBL. As far as Plaintiff can discern, GL is either a non-operating shell company or its operations are insignificant.

### B.     DEFENDANTS BORROW FROM BANK OF AMERICA, N.A.

#### 1.     *The First Loan*

On April 20, 2017, Beeche obtained a term loan ("**First Loan**") in the amount of $3,600,000 from Bank of America, N.A. ("**Original Lender**"), and in connection with this loan executed a Mortgage Term Loan Agreement dated April 20, 2017 ("**First Loan Agreement**") [Exhibit A]. Beeche further executed a

Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**First Mortgage**") which granted the Original Lender a first priority lien on certain real property located at 356 Hudson River Road, Waterford, New York 12188 (the "**Real Estate**"). [Exhibit B].

    2.    *The Second Loan*

On April 20, 2017, Beeche obtained a $1,500,000 loan ("**Second Loan**" together with the First Loan, the "**Real Estate Loans**") from the Original Lender, and in connection with this loan, executed a Construction Loan Agreement ("**Second Loan Agreement**"). [Exhibit C] To secure this loan, Beeche executed another Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**Second Mortgage**") which granted the Original Lender a second lien against the Real Estate. [Exhibit D]

    3.    *The Third Loan*

On April 20, 2017, GBL obtained from the Original Lender a line of credit in the amount of $4,000,000 and a term loan in the amount of $1,350,000 (collectively the "**Third Loan**"). In connection with these financings, GBL executed a Loan Agreement dated April 20, 2017 ("**Third Loan Agreement**"). [Exhibit E] GBL also executed a Security Agreement dated April 13, 2017 which granted the Original Lender a first lien on all business assets of GBL. [Exhibit F] As further security for repayment of the Third Loan, Beeche executed in favor of the Original Lender a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated on or about July 6, 2021 ("**Third Mortgage**") on the Real Estate. [Exhibit G]

    4.    *The Fourth Loan*

On or about November 8, 2017, GBL duly executed and delivered that Amendment to Loan Agreement ("**Amendment to Third Loan Agreement**") to add a $2,5000,000 line of credit which converted to a term loan ("**Fourth Loan**" together with third Loan the "**Operating Company Loans**" together with the Real Estate Loans, the "**Loans**") in favor of the Original Lender. [Exhibit H]

5. *Guaranties by Logistics and Beeche*

GL personally guaranteed the payment of all Loans by the Original Lender to Beeche and GBL. [Exhibit I] Beeche personally guaranteed all the Loans to GBL. [Exhibit J] GBL personally guaranteed the payment of all Loans by the Original Lender to Beeche. [Exhibit K]

6. *Assignment of all Loans by Original Lender to Plaintiff*

On June 2, 2025, Original Lender assigned all its rights under the Loans to the Plaintiff. [Exhibit L]

C. **COLLATERAL FOR THE LOANS AND LOAN BALANCES**

The primary collateral for the Loans falls into four general categories: (i) accounts receivable of GBL, (ii) personal property of GBL consisting of scaffolding, equipment, cranes, hoisting equipment, machine shop equipment, forklifts and trucks, (iii) contractual rights of GBL to license intellectual property owned by Beeche, and (iv) the Real Estate. The balance of the Loans as of July 14, 2025 is:

- **First Loan**: Principal of $2,583,614.96 and interest of $69,050.18.
- **Second Loan**: Principal of $785,833.08 and interest of $19,654.21.
- **Third Loan**: Principal of $6,550,000 and interest of $1,037,535.51.
- **Fourth Loan**: Principal of $323,989.98 and interest of $62,020.15.

D. **THE DEFENDANTS' FINANCIAL CONDITION DETERIORATES**

GBL has not produced audited financial statements covering any time frame after December 31, 2022. [Exhibit M] For the fiscal years 2023 and 2024, GBL has only provided internally prepared financial statements. [Exhibits N and O] The information contained in those statements is disturbing.

For the fiscal year ending December 31, 2022, GBL reported gross revenues of $14,520,584, operating expenses of $2,227,061 and positive net income of $772,891. [Exhibit M] In 2023, however, there was a steep decline in performance. GBL reported lower revenues of $10,113,653 (a devastating decline from the prior year of around $4,406,931 which equates to a 30.03% decline), higher operating

expenses of $6,477,315 (a staggering increase of $4,250,254 which equates to a 190.85% increase) and a net loss of $6,569,572 (compared to the prior year, a swing downward of $5,796,681 which equates to a 949.8% decrease in net income). [Exhibit N] The situation is even more bleak than the numbers appear because GBL failed to make any payments on the Operating Company Loans after they matured on September 23, 2023. Had those debt service payments been made after September 23, 2023, the operating losses would have been even higher.

The Defendants reported another dismal financial performance in 2024. GBL reported a further decrease in revenues ($9,899,199), high operating expenses of $6,450,795 (still approximately $4.2 million higher than the operating expenses in 2022) and another net loss of $3,552,365. [Exhibit O] Again, the actual economics are bleaker than what was reported because GBL failed to make any debt service payments to the Original Lender in 2024. Had those payments been made, the financial losses would have been even higher. In fact, GBL has now missed over $900,000 in interest payments on the Operating Company Loans in 2023, 2024 and 2025.

There are other disturbing facts about the Defendants' financial dealings. For example, in the 2023 financial statements, Defendants show a debt owed to GBL from a "related party" in the amount of $36,996,598. Then that debt appears to have been mysteriously written off with an "elimination entry." [Exhibit N] This seems to indicate that some type of insider debt was forgiven. Yet Defendants will not provide any details about this transaction.

As another example, GBL disclosed to Plaintiff that it has over $1 million in unpaid payroll on its books. Defendants will not provide details on these alleged unpaid wages. However, the Defendants admit GBL is paying Beeche and his son an undisclosed sum each month for unpaid wages.

On the Real Estate front, Beeche is either up to no good or is similarly cash strapped. Beeche failed to pay $407,139.24 property taxes on the Real Estate in 2023, 2024 and 2025. The Real Estate is now on tax foreclosure status with the county. These tax liens are damaging to Plaintiff's interest in the Real Estate

because a tax lien primes the Plaintiff's mortgages on the Real Estate. Furthermore, if a tax foreclosure takes place, the Plaintiff's mortgages will be extinguished. As a further indication of the Defendants' unsustainable financial crisis, Beeche stopped making payments on the Real Estate Loans in July of 2025.

**E.    JUDGMENTS**

On July 12, 2024, judgment creditor 49-47 31st Street, LLC entered a confession of judgment against the Defendants in the New York State Supreme Court, Saratoga County, under Index Number EF202422 in the amount of $1,235,225. [Exhibit P] On July 31, 2024, judgment creditor William J. Cade entered a confession of judgment against Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242275 in the amount of 1,602,225. [Exhibit Q]

**F.    DEFENDANTS' LACK OF TRANSPARENCY**

In 2025, the financial situation is so harrowing that Defendants have refused to provide any financial statements and other important information. For example, on June 13, 2025, the Plaintiff requested that GBL provide the following standard accounting information which should be readily available and, in any event, must be disclosed to the Plaintiff pursuant to the terms of the Loan Documents:

- 13-week cash flow forecast
- 2025 detailed budget
- Trailing 12-month operating statements
- Updated contract backlog report including deposit amounts for work not yet completed
- Debt schedule, including current balances, maturity dates, payment amounts and delinquency status
- Equipment schedule
- Inventory schedule
- Payroll arrearages
- Accounts receivable and accounts payable agings
- List of pending litigation

- List of known judgments including the amounts and parties owed

Despite initially promising to deliver this information, the Defendants have failed to provide Plaintiff with even one of these requested items. Defendants are clearly concealing information from their senior secured lender.

### G.  MISSING AND UNACCOUNTED FOR EQUIPMENT

As of December 31, 2023, the Defendants allege in their financial statements that GBL owned equipment with a book value of $13,787,2289. However, when the Original lender sent an appraiser out to verify this equipment in April of 2024, the appraiser only found equipment with an orderly liquidation value of $2,080,060 on site. [Exhibit R] The appraiser asked for a more complete equipment list and the locations of that equipment, and the Defendants refused to provide this information. This lack of transparency of the Defendants raises some hard questions about whether the Defendants have falsified their financial statements or have been secreting assets.

### H.  IN JUNE OF 2025, THE DEFENDANTS DECLARE AN INSURMOUNTABLE LIQUIDITY CRISIS.

In early June of 2025, Plaintiff and Defendants participated in a telephone call during which Defendants disclosed that GBL was running out of cash and was about to shut its doors in approximately 90 days. Moreover, Defendants advised that there were not enough cash flows in the company to even file a Chapter 11 bankruptcy case or hire an investment banker to run a sale process. Defendants stated that the only hope for GBL as a going concern was to complete a sale to an interested third-party buyer on an emergency basis as soon as possible. Defendants further alleged that they were in communications with such a buyer who wanted to purchase GBL assets immediately through an emergency Chapter 7 bankruptcy proceeding. As part of this transaction, Kirk Beeche was supposed to receive an ownership interest in the purchasing entity.

Within days, at Defendants' request, Plaintiff scheduled a call with the buyer and buyers' counsel. During that call, the buyer said that it was nowhere close to proposing a letter of intent or closing a sale

transaction with the Defendants. In fact, the buyer explained that it had requested financial information from the Defendants and, despite the desperate financial straits of GBL, Defendants had not yet provided any of the requested financial information. The buyer's assertions surprised the Plaintiff. Defendants had identified an insuperable liquidity crisis, yet Defendants were not taking responsible steps to pursue a sale.

### I. DEFAULTS UNDER THE LOAN DOCUMENTS

Defendants are in default under the terms and conditions of the Loan Documents as a result of, among other things, (a) GBL's failure to pay all amounts due under the Third and Fourth Loans by the maturity date of September 30, 2023 as required under Section 9.1 of the Third Loan Agreement and the Fourth Loan Agreement; (b) GBL's failure to comply with Section 7.5 Basic Fixed Charge Coverage Ratio for the periods ending on March 31, 2023 and June 30, 2023 under the Third Loan Agreement; (c) the Maturity Defaults and Covenant Default constitute an event of default under the Section 8.4 of the First Loan Agreement and an event of default under Section 10.1(d) of the Second Loan Agreement; (d) Beeche's failure to pay taxes on the Real Property for tax years 2023, 2024, and 2025 as required under Sections 8.3 and 8.4 of the First Loan Agreement, Sections 10.1(c) and (d) under the Second Loan Agreement, and Section 9.4 of the Third Loan Agreement; and (e) Beeche's failure to make any of the debt service payments as of June 2025 under the First Loan and Second Loan.

### III.    ARGUMENT

**A.    A RECEIVER SHOULD BE APPOINTED BECAUSE UNDER THE LOAN DOCUMENTS THE OBLIGORS CONSENTED TO THE APPOINTMENT OF A RECEIVER AFTER AN EVENT OF DEFAULT, AND ALL APPLICABLE EQUITABLE FACTORS FAVOR THE APPOINTMENT OF A RECEIVER.**

*1.    Legal Standard*

Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver in federal cases. Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought . . ."); *SEC Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("There is no question that district courts may appoint receivers . . ."); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 257 (S.D.N.Y. 2012) ("The Court's equitable power to appoint a receiver extends to situations where a plaintiff who is a

secured creditor seeks the appointment of a receiver to avoid a substantial and preventable decline in the value of its collateral"); *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ("A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property").

A court has the discretion to appoint a receiver when certain equitable factors are present. *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (citing *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997)). In determining whether to appoint a receiver based on the equities, courts in this Circuit generally consider the following factors:

1) any fraudulent conduct on the part of the defendant;

2) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;

3) the inadequacy of the available legal remedies;

4) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and,

5) in more general terms, the plaintiff's probable success in the action and the possibility of irreparable injury to its interests in the property.

*Id.* (*citing* 12 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2983 (1999)); *see also e.g.*, *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 606 n.293 (S.D.N.Y. 2023); *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 249-50. None of these factors standing alone are dispositive. *SEC v. GPB Cap. Holdings, LLC*, No. 21-CV-583 (MKB) (VMS), 2023 U.S. Dist. LEXIS 218226, 2023 WL 8468467, at *14 (E.D.N.Y. Dec. 7, 2023). "The dispositive issue is whether the appointment of a receiver is clearly necessary to protect [a party's] interests in the property." *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 254 (internal quotation marks and citation omitted). A party seeking the appointment of a receiver bears the burden to make an "adequate showing" of need for the appointment. *Id.* at 250.

The Second Circuit has held that when (i) the parties' contract contemplates a receivership in the event of default, and (ii) there are multiple defaults, the combination "strongly supports the appointment of a receiver." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988). The contractual factor is

so paramount that the other factors "may be applied in a less stringent manner if a loan agreement expressly allows for the lender to apply for a receiver in the event of a default." *Id.* (citing *Wells Fargo Plaintiff, NA. v. CCC Atl., LLC*, 905 F. Supp. 2d604, 615 (D.N.J. 2012)) ("The importance of these contractual provisions cannot be underestimated because they set apart this commercial foreclosure case from the traditional scenario in which a receiver is sought at equity and no such contractual provisions exist").Concurring on the importance of contractual consent, other federal courts have held that when parties contractually agree in advance to the appointment of a receiver, courts may, at their discretion, dispense with analyzing equitable considerations, and find that the contractual provision is a sufficient basis for a court to appoint a receiver. *See, e.g., Britton v. Green*, 325 F.2d 377, 382 (10th Cir. 1963); *Am. Plaintiff & Tr. Co. v. Bond Int'l Ltd.*, No. 06-CV-0317-CVE-FMH, 2006 WL 2385309, at *7-8 (N. D. Okla. Aug. 17, 2006); *Connolly v. Gishwiller*, 162 F.2d 428,435 (7th Cir. 1947).

   2.  *Plaintiff is Entitled to the Appointment of a Receiver Under the Loan Documents.*

Defendants agreed to the appointment of a receiver after a default. For example, Section 6 of the Third Loan Agreement states as follows with respect to the personal property of GBL:

> 6. <u>BANK'S REMEDIES AFTER DEFAULT</u>. In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:
>
>   (m) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

[Exhibit E] In addition, Section 6.3 of the First Mortgage states as follows with respect to the Real Estate:

> Section 6.3 <u>Remedies</u>. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.
>
>   • Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.

      •   Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property

[Exhibit B]

Here, there are multiple defaults which cannot be disputed. Among other things, the Operating Company Loans matured on September 30, 2023 and were never repaid. In fact, the Defendants made no payments on these loans after September of 2023. Likewise, the Real Estate Loans are in default. Beeche has failed to pay $407,139.24 in real estate taxes. Also, Beeche stopped making any payments on the Real Estate Loans in July of 2025.

Based on the Loan Documents and the indisputable events of default, the record "strongly supports the appointment of a receiver." *Citibank,* 839 F.2d at 97. At a minimum, because the Defendants agreed under the Loan Documents to the appointment of a receiver after an event of default, the equitable factors "may be applied in a less stringent manner." *Id.*

    3.    *All The Equitable Factors Overwhelmingly Favor the Appointment of a Receiver.*

        a.   **The Plaintiff Faces Imminent Danger of its Collateral Being Lost, Concealed, Injured, Diminished in Value, or Squandered.**

Absent the appointment of a receiver, there is a material risk that Plaintiff's collateral will be lost, concealed, injured, diminished in value or squandered during the pendency of this action. For example:

- GBL's finances are rapidly deteriorating. GBL is in an emergency-level liquidity crisis. Defendants themselves confess that they cannot continue operating past August of 2025. GBL has negative cash flows and that is eating away at the value of all GBL's assets.

- By their own admission, the Defendants are insolvent and cannot pay all creditors including the Plaintiff and multiple judgment creditors who have already entered over $2.6 million in judgments.

- Defendants have not, and perhaps cannot, provide an updated equipment list which discloses the location of its equipment. Much of the equipment consists of scaffolding at construction sites all over the country, and the scaffolding can be easily moved or concealed. The mobility of this equipment, and the Defendants' failure to properly account for the equipment, is of deep concern.

- Typically, a going concern sale is the best way to maximize the value of a company for creditors. Here, however, the opportunity to save GBL as a going concern may be irretrievably lost in the next 30 to 60 days. Defendants are on the verge of going out of business. Despite this, Defendants are not running a sale process even though they argue that a sale is the only salvation of GBL as a going concern. Defendants are also badly mismanaging the potential sale to an interested buyer by not providing in a timely manner the financial information the buyer requested. Defendants are not behaving responsibly.

- Defendants are concealing financial information from the Plaintiff. This secretive behavior is evidence that the Defendants cannot be trusted. Worse, Defendants could actively be covering up gross mismanagement or self-dealing by the owners.

- GBL's management is not managing overhead responsibly. For example, even though annual revenues have dropped from approximately $14.2 million in 2022 to around $10 million a year thereafter, Defendants have failed to contain GBL overhead expenses which have skyrocketed over 190.85%.

- The Real Estate is at risk from growing tax liens which take priority over the Plaintiff's lien. Also, the Real Estate will be at risk of a tax foreclosure unless these taxes are paid.

- Beeche and his son are trying to negotiate equity interests in the company that may purchase the GBL assets. This means the Beeches may be more interested in preserving the value of their equity instead of promoting the recovery of creditors.

- Beeche and his son are making what they describe as "catch-up" payments to themselves for "unpaid payroll". This appears to be nothing more than a cash grab by the owners while their company sinks into oblivion.

- Beeche licenses important intellectual property to GBL. That valuable license could be imperiled by any self-dealing between Beeche and GBL.

In sum, there is a material risk of a substantial and preventable decline in the value of Plaintiff's collateral unless a receiver is appointed.

### b. Legal Remedies are Not Adequate Because of the Delay in Obtaining a Judgment and the Limited Execution Options Available to a Judgment Creditor.

A money judgment is not an adequate remedy. For starters, it will take some time before a judgment is entered in this case. Plaintiff does not have the luxury of time. GBL's financial condition continues to rapidly deteriorate each day and GBL is on the verge of going out of business. Plaintiff needs to protect its collateral before it is too late.

Even after a judgment is entered, Plaintiff as a judgment creditor will not have the same powers as a receiver. Unlike a judgment creditor, a receiver can (i) take control over all assets including cash and protect those assets against concealment or diversion, (ii) protect employees and make sure all employees are being paid; (iii) ensure that vendors are paid, (iv) ensure that all real estate taxes are paid, (v) stabilize business operations, (vi) correct inaccurate accounting records and maintain accurate accounting records going forward, (vii) conduct an inventory of all assets, and (viii) run a going concern sale through an

investment banker or a liquidation sale through a liquidator. This is not a close call. There is a material benefit here to the Plaintiff to have a receiver appointed instead of waiting to obtain and enforce a judgment.

      c.      **Absent the Appointment of a Receiver, the Probability of Harm to the Plaintiff is Far Greater than any Potential Harm to the Defendants.**

The Defendants are insolvent. They cannot repay the debts they owe to the Plaintiff and many other creditors. Given this insolvency, the Beeches are clearly out of the money and therefore any lost value in the collateral will be a loss to the Plaintiff and no one else.

      d.      **Plaintiff will Probably Prevail on the Merits.**

Plaintiff will prevail on the merits. The Loans are indisputably in default. The Operating Company Loans matured in September of 2023 and remain unpaid. The Real Estate Loans are in default by virtue of the unpaid real estate taxes and payment defaults. Defendants have no valid defenses to these defaults.

      e.      **There is a Strong Risk of Fraudulent Conduct.**

The risk is very high that Defendants and the Beeches have engaged in fraudulent conduct. For example:

- Defendants refuse to produce important financial records.

- There is a severe disconnect between the equipment that can be verified and the equipment on the books of GBL. Defendants are not being transparent with their equipment list and there must be a reason for that. Probably, the Defendants have diverted the equipment in some manner and have fraudulently inflated the existence and value of the equipment on the balance sheet.

- Beeche and his son are repaying themselves for past "unpaid payroll' they are owed and yet they refuse to provide an accounting of these payments or any documentation supporting these payments. These are likely fraudulent conveyances or improper dividends from an insolvent entity.

Given the significant risk that Defendants have engaged in fraud or other wrongdoing, a receiver should be appointed.

**B.     THE PROPOSED RECEIVER**

Plaintiff respectfully requests that Dotan Melech of United AMS ("**Mr. Melech**") be appointed as receiver in this case. Mr. Melech is an experienced, nationally recognized, and well-respected management and restructuring professional. [Exhibit S]

Mr. Melech and United AMS have served as receiver or restructuring professionals in dozens of complex receiverships and restructuring matters, including engagements involving construction companies. Mr. Melech even has an engineering degree and at one time was active in construction management in Las Vegas.  Mr. Melech and United AMS have advised that they have no conflict of interest precluding their appointment in this case. United AMS professionals engaged on this matter have agreed to charge the following hourly rates for their services:

- Mr. Melech $495.00
- Senior Consultant: Project Management $395.00
- Senior Consultant: IT $375.00
- Senior Consultant: Reporting $350.00
- Senior Consultant: Security $325.00
- Accounting and Bookkeeping $295.00
- Project Coordinator/Analyst $195.00
- Administrator $100.00

Plaintiff is prepared to assure payment of the costs of the receivership from the proceeds of the collateral or loans made by it pursuant to appropriate orders of this Court.

**IV.     CONCLUSION**

Plaintiff respectfully requests that the Court enter an order appointing a receiver over the assets of GBL and Logistics, as well as the real estate owned by Beeche, and award other and further relief.  .

Dated: July 18, 2025 　　　　　　　　　　　Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ Christopher P. Schueller
Christopher P. Schueller (NY I.D. No. 509543)
640 5th Ave. 9th Floor
New York, NY 10019
T 212 440 4400
F 212 440 4401
christopher.schueller@bipc.com

*Attorneys for Plaintiff*