Christopher P. Schueller, Esquire
New York Bar No. 2582914
**BUCHANAN INGERSOLL & ROONEY PC**
640 5th Avenue, 9th Floor
New York, NY 10019
Telephone: (212) 440-4400
Fax: (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Plaintiff, McCormick 103, LLC*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCCORMICK 103, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION,<br><br>and<br><br>"JOHN DOE", "JANE DOE", "DOE ASSOCIATES", and "DOE CORP.", the names being fictitious and being intended to refer to any and all adult natural persons and to all partnerships, corporations and other legal entities having, or which may claim to have, any lien against or interest in the Real Property described in the complaint in this action, other than persons or entities already defendants herein,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00944-AMN-TWD |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO AMEND THE RECEIVERSHIP ORDER TO ADD CERTAIN REAL PROPERTY OWNED BY THE DEFENDANT GREGORY L. BEECHE TO THE RECEIVERSHIP**

Plaintiff McCormick 103, LLC ("**Plaintiff**") respectfully submits this Memorandum of Law in Support of its Motion to Amend the Receivership Order (“**Motion**”) to Add Certain Real Property owned by the Defendant Gregory L. Beeche ("**Beeche**") to the Receivership.

## I. INTRODUCTION

The Court already appointed Dotan Melech (“**Receiver**”) as receiver over the assets (“**Receivership Assets**”) of the Defendants Greg Beeche, Logistics, LLC ("**GBL**") and Greg Logistics, LLC ("**GL**" together with GBL, "**Logistics”**). Plaintiff now asks for the commercial real estate owned by the Defendant Beeche and mortgaged to Plaintiff (“**Real Property**”) to be placed into the same receivership. That way the Receiver will protect the Real Property and market the Real Property and the Receivership Assets together for sale. This joint marketing could generate a higher purchase price by attracting an operator which might be interested in opening a new scaffolding business at the same physical location.

The same reasoning which compelled the Court to appoint the Receiver over the Assets of Logistics applies to the Real Estate. Beeche consented to the appointment of a receiver under his mortgages. Those loan provisions should be enforced. Moreover, Logistics is no longer operating and neither Logistics nor Beeche are able to make any mortgage payments or cover any property taxes. Real estate taxes continue to accrue and this results in tax liens which have priority over the Plaintiff’s lien position. In addition, a receiver is needed to secure, insure and maintain the Real Property pending a sale.

For these and other reasons discussed below, Plaintiff respectfully requests that the Court place the Real Property into receivership with an amendment to the existing receivership order.

## II. FACTUAL BACKGROUND

### A. DEFENDANTS

GBL (www.gregbeeche.com) was a construction company which designed, manufactured, delivered, erected, supervised, used, and then dismantled its adaptable, modular scaffolding and other work access systems. [ECF 6-1] The company provided logistics planning, master rigging services, professional engineering services, field training and project oversight. [ECF 6-1] Beeche is the majority owner of GBL. [ECF 6-1] As far as Plaintiff can discern, GL is either a non-operating shell company or its operations are insignificant. [ECF 6-1] Logistics is no longer in operation.

### B. DEFENDANTS BORROW FROM BANK OF AMERICA, N.A.

1. *The First Loan*

On April 20, 2017, Beeche obtained a term loan ("**First Loan**") in the amount of $3,600,000 from Bank of America, N.A. ("**Original Lender**"), and in connection with this loan executed a Mortgage Term Loan Agreement dated April 20, 2017 ("**First Loan Agreement**") [ECF 6-1, Exhibit A]. Beeche further executed a Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**First Mortgage**") which granted the Original Lender a first priority lien on certain real property located at 356 Hudson River Road, Waterford, New York 12188 (the "**Real Property**"). [ECF 6-1, Exhibit B].

2. *The Second Loan*

On April 20, 2017, Beeche obtained a $1,500,000 loan ("**Second Loan**" together with the First Loan, the "**Real Estate Loans**") from the Original Lender, and in connection with this loan, executed a Construction Loan Agreement ("**Second Loan Agreement**"). [ECF 6-1, Exhibit C] To secure this loan, Beeche executed another Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**Second Mortgage**") which granted the Original Lender a second lien against the Real Property. [ECF 6-1, Exhibit D]

3. *The Third Loan*

On April 20, 2017, GBL obtained from the Original Lender a line of credit in the amount of $4,000,000 and a term loan in the amount of $1,350,000 (collectively the "**Third Loan**"). In connection with these financings, GBL executed a Loan Agreement dated April 20, 2017 ("**Third Loan Agreement**"). [ECF 6-1, Exhibit E] GBL also executed a Security Agreement dated April 13, 2017 which granted the Original Lender a first lien on all business assets of GBL. [ECF 6-1, Exhibit F] As further security for repayment of the Third Loan, Beeche executed in favor of the Original Lender a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated on or about July 6, 2021 ("**Third Mortgage**") on the Real Property. [ECF 6-1, Exhibit G]

4. *The Fourth Loan*

On or about November 8, 2017, GBL duly executed and delivered that Amendment to Loan Agreement ("**Amendment to Third Loan Agreement**") to add a $2,5000,000 line of credit which converted to a term loan ("**Fourth Loan**" together with third Loan the "**Operating Company Loans**" together with the Real Estate Loans, the "**Loans**") in favor of the Original Lender. [ECF 6-1, Exhibit H]

5. *Guaranties by Logistics and Beeche*

GL personally guaranteed the payment of all Loans by the Original Lender to Beeche and GBL. [Exhibit I] Beeche personally guaranteed all the Loans to GBL. [ECF 6-1, Exhibit J] GBL personally guaranteed the payment of all Loans by the Original Lender to Beeche. [ECF 6-1, Exhibit K]

6. *Assignment of all Loans by Original Lender to Plaintiff*

On June 2, 2025, Original Lender assigned all its rights under the Loans to the Plaintiff. [ECF 6-1, Exhibit L]

## C. COLLATERAL FOR THE LOANS AND LOAN BALANCES

The primary collateral for the Loans falls into four general categories: (i) accounts receivable of GBL, (ii) personal property of GBL consisting of scaffolding, equipment, cranes, hoisting equipment, machine shop equipment, forklifts and trucks, and (iii) the Real Property. The balance of the Loans as of July 14, 2025 is:

- **First Loan**: Principal of $2,583,614.96 and interest of $69,050.18.
- **Second Loan**: Principal of $785,833.08 and interest of $19,654.21.
- **Third Loan**: Principal of $6,550,000 and interest of $1,037,535.51.
- **Fourth Loan**: Principal of $323,989.98 and interest of $62,020.15.

[ECF 6-1]

## D. THE DEFENDANTS' FINANCIAL CONDITION DETERIORATES

The financial deterioration of GBL was well documented in prior proceedings before this Court. The Court has already ruled that Defendants have defaulted on their loan obligations and are in a dire financial condition. [ECF 8, p.12] This was confirmed by the Receiver who shortly

after his appointment had to shut down GBL because GBL was unable to pay its employees or insurance. [ECF 37, 39 and 49]

Similarly, the Real Estate Loans are also distressed. Beeche failed to pay $407,139.24 property taxes on the Real Estate in 2023, 2024 and 2025. [ECF 6-1] The Real Estate is now on tax foreclosure status with the county. [ECF 6-1] These tax liens are damaging to Plaintiff's interest in the Real Estate because a tax lien primes the Plaintiff's mortgages on the Real Estate. Furthermore, if a tax foreclosure takes place, the Plaintiff's mortgages will be extinguished. [ECF 6-1] As a further indication of Beeche's unsustainable financial crisis, Beeche stopped making payments on the Real Estate Loans in July of 2025. [ECF 6-1]

**E. JUDGMENTS**

On July 12, 2024, judgment creditor 49-47 31st Street, LLC entered a confession of judgment against Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF202422 in the amount of $1,235,225. [ECF 6-1, Exhibit P] On July 31, 2024, judgment creditor William J. Cade entered a confession of judgment against Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242275 in the amount of 1,602,225. [ECF 6-1, Exhibit Q]

**F. DEFAULTS UNDER THE LOAN DOCUMENTS**

Defendants are in default under the terms and conditions of the Loan Documents as a result of, among other things, (a) GBL's failure to pay all amounts due under the Third and Fourth Loans by the maturity date of September 30, 2023 as required under Section 9.1 of the Third Loan Agreement and the Fourth Loan Agreement; (b) GBL's failure to comply with Section 7.5 Basic Fixed Charge Coverage Ratio for the periods ending on March 31, 2023 and June 30, 2023 under

the Third Loan Agreement; (c) the Maturity Defaults and Covenant Default constitute an event of default under the Section 8.4 of the First Loan Agreement and an event of default under Section 10.1(d) of the Second Loan Agreement; (d) Beeche's failure to pay taxes on the Real Property for tax years 2023, 2024, and 2025 as required under Sections 8.3 and 8.4 of the First Loan Agreement, Sections 10.1(c) and (d) under the Second Loan Agreement, and Section 9.4 of the Third Loan Agreement; and (e) Beeche's failure to make any of the debt service payments as of June 2025 under the First Loan and Second Loan. [ECF 6-1]

## G. RECEIVERSHIP ORDER

On July 17, 2025, the Plaintiff commenced this action in the United States District Court for the Northern District of New York to foreclose on all its collateral and obtain money judgments ("**Receivership Action**"). [ECF 1] On July 18, 2025, the Plaintiff filed an emergency motion to appoint a receiver. [ECF 5] On July 31, 2025, Beeche filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York under Case No. 25-10879 ("**Beeche Bankruptcy Case**"). In response to the Beeche Bankruptcy Case, on August 6, 2025, the Plaintiff amended its complaint in the Receivership Action and removed Beeche as a defendant. [ECF 23]

On August 1, 2025, the Court held a hearing on the Receivership Motion. [ECF 28] The Defendants did not appear at the hearing. [ECF 28] Given the expedited hearing schedule, the Court noted at the hearing that it was contemplating the entry of an initial receivership order which contained fewer terms than what the Plaintiff proposed. [ECF 28, at p. 13] The idea was for the Plaintiff to be given an opportunity to propose another order at the end of the interim period which would expand the terms governing the receivership. [*Id.*] At that time, the Defendants would be given an opportunity to object to the entry of the final modified order. [*Id.*]

On August 8, 2025, the District Court entered the Receivership Order appointing Dotan Melech as receiver over all the Receivership Assets and operations of Logistics ("**Receiver**"). [ECF 28] Pursuant to the Receivership Order, the Receiver was given authority to take possession, custody, and control of all Receivership. [*Id.*] The Court held that the Plaintiff's collateral was in "imminent danger." [*Id.* at p. 14] Consistent with the discussion at the hearing on August 1, 2025, the Court provided a process for the entry of a subsequent modified receivership order after GBL was given the right to object to any of those modified terms. [*Id.* at p. 21]

As contemplated at the hearing on August 1, 2025 and as memorialized in the Receivership Order, on September 10, 2025, Plaintiff submitted to the Court another receivership order with expanded powers for the receiver ("**Modified Order**") [ECF 38]. GBL never objected to this order and never submitted a competing order.

By letters to the Court dated September 22, 2025 and October 6, 2025, the Plaintiff notified the Court of settlement discussions concerning a modified receivership order. [ECF 41, 43] However, on October 22, 2025, Plaintiff notified the Court that the settlement discussions had fallen apart and requested that the Court enter the Modified Order. [ECF 48]

## H. THE RECEIVER'S INITIAL INVENTORY AND LIABILITIES REPORT

The Receiver has never stopped acting as receiver after his appointment. After the entry of the Receivership Order, the Receiver swiftly took control over the Receivership Assets. On September 2, 2025, the Receiver filed his Inventory and Liabilities Report in the Receivership Action. [ECF 37]. In this report, the Receiver noted that "the Receivership Entities are not in a position to sustain ongoing operations. Insurance coverage has lapsed, the workforce has

diminished with employees unpaid for several months, and there is no cash flow to support payroll, insurance, or other operating expenses." [*Id*. at p. 8].

With respect to insurance specifically, the Receiver confirmed that "the absence of active insurance coverage while projects are ongoing . . . presents a substantial liability exposure to the Receivership Estate. An immediate resolution will be required—either by bringing existing policies current or by securing alternative coverage. If coverage cannot be restored promptly, the Receiver may have no choice but to suspend operations, including active contracts, to avoid compounding the Receivership Estate's exposure." [*Id*]. The Receiver also identified a number of improper transfers from GBL's bank account after the Receivership Order was entered, including a $50,000 wire transfer to Beeche individually on August 13, 2025. [*Id*. at p. 4]. Given these issues, the Receiver's preliminary recommendation was to pursue an expedited and orderly liquidation of the Receivership Entities as a going concern, or alternatively, liquidation through asset sale(s). [*Id*].

## I. MISMANAGEMENT INCLUDING LIFE THREATENING WORK CONDITIONS

After the appointment of the Receiver, the Receiver and the Plaintiff discovered disturbing information about the prior mismanagement of GBL by Beeche. For example, the Receiver and the Plaintiff discovered that on December 10, 2024, OSHA issued a decision to address unsafe work sites operated by GBL. In its decision, OSHA found multiple "serious" safety violations in the Debtor's scaffolding which created a "***substantial probability that death or serious physical harm could result***." [GBL Bankruptcy ECF 17-1, Exhibit A, p.21] (emphasis added) These violations endangered the safety of Debtor's former employees at ***seven*** different construction sites. [*Id*.]

As another example, in August of 2025, the Receiver and a representative of the Plaintiff met with Beeche to discuss one of the large projects GBL had been working on called the MARTA contract. [GBL Bankruptcy ECF 13] GBL was supposed to receive $9 million under that contract in 2025. [*Id.*] At the meeting, Beeche confessed that the general contractor Skansa terminated GBL earlier in 2025 because Skansa lost confidence in GBL and its ability to perform. [*Id.*] To settle with Skansa, GBL simply gave all the equipment and scaffolding it had on site to Skansa. [*Id.*] In effect, GBL was paying for its poor performance by giving away the Plaintiff's collateral. [*Id.*]

During the same meeting, Beeche admitted that he was offering substantial discounts to customers for completed work in order to collect outstanding accounts receivable. [*Id.*] Furthermore, Beeche said that most of the jobs that GBL was then working on were not based on any written agreements. [*Id.*] Beeche only had verbal agreements the with most of its customers and Beeche claimed this is historically how he ran his business. [*Id.*] In fact, only 3 of the 9 projects that were open at the time were based on written contracts. [*Id.*] Needless to say, to conduct a construction business based largely on verbal agreements is gross negligence of the highest degree.

**J. THE RECEIVER'S SUPPLEMENTAL REPORT AND EMERGENCY NOTICE**

On September 10, 2025, the Receiver filed his Supplemental Report and Emergency Notice in the Receivership Action. [ECF 38]. In this report, the Receiver identified four material concerns that made continued operation impractical, and on this basis ceased GBL's operations, *viz.*:

a. The GBL had no active insurance coverage.

b. The Receiver could not confirm that the GBL's customer contracts were being performed reliably because employees were not paid for several months and only limited personnel remained available.

c. The GBL had no liquidity and no certainty of collections.

d. All key managers, including the last project supervisor, departed, leaving only a small number of part-time personnel who were inadequate to perform ongoing projects. As a result, the GBL's workforce and management structure were no longer sufficient to sustain operations. In addition, employees and union obligations remained substantially in arrears, and payroll exposure under state labor law continued to grow without any available funds to satisfy it.

[*Id*. at 1-3].

Therefore, the Receiver noted that the only realistic plan for GBL consisted of (i) freezing all expenses while earned revenues (excluding deposits) are collected, (ii) ceasing all operations immediately with notice provided to the District Court, employees, and customers, and (iii) focusing all efforts on liquidating GBL's assets, whether in one sale or in pieces, the proceeds of which would then be distributed to creditors. [*Id*. at 3].

**K. THE RECEIVER'S INTERIM STATUS REPORT AND BEECHE DESTROYS POTENTIAL SETTLEMENT**

On October 24, 2025, the Receiver filed his Interim Status Report. [ECF 49] In this report, the Receiver detailed, among other things, his effort to facilitate a global resolution with the Plaintiff and Beeche in September 2025, which would have benefitted the Receivership Estate. [*Id*. at p. 3] Indeed, after significant effort, Beeche and GBL agreed in writing to the following material terms of settlement on September 22, 2025:

a. Beeche shall immediately dismiss his Ch. 13 bankruptcy case (Case No. 25-10879 (NDNY)).

b. Beeche shall immediately surrender to the Receiver possession of the Porsche, VIN WP0BC2A75EL077136, titled in Greg Beeche, Logistics, LLC.

c. Beeche shall intervene in the receivership action (Civ. Action No. 25-00944 (NDNY)) solely to the extent of his ownership of (i) the Real Estate and (ii) all patents and other intellectual property utilized in connection with the operation GBL and GL, and such property shall become assets of the receivership estate.

d. To the extent necessary, Beeche and the Defendants consent to, and shall in every way cooperate with, the Receiver's sale and/or Plaintiff's disposition of all assets of the receivership estate, including, but not limited to, those assets set forth in the. . . letter of intent dated as of September 18, 2025.

e. On the express condition that items 1-4 are fully satisfied, Plaintiff shall release Beeche from personal liability on any debt owed to Plaintiff.

[*Id.*] These material terms of settlement followed the Receiver's receipt of a letter of intent from a buyer (the, "**Interested Buyer**") in purchasing the Receivership Assets and Real Estate, and this letter of intent was referenced in the material terms of settlement. [*See id.*] The Interested Buyer was willing to pay $5 million for the GBL's assets and $5 million for the Real Estate owned by Beeche and not the GBL. [GBL Bankruptcy ECF 13] Although this purchase price was less than the $11,760,774.20 secured claim of the Plaintiff, the Plaintiff was willing to release its liens at this price. [*Id.*]

In reliance on the consent of Beeche and the Defendants to these material terms of settlement, on September 22, 2025, the Receiver negotiated and entered into a non-binding letter of intent with the Interested Buyer. [ECF 49, at p. 3] The Receiver was going to be a signatory to the final Settlement Agreement. Unfortunately, despite the Defendants' and Beeche's consent to the material terms of settlement with the Plaintiff, GBL and Beeche refused to honor this agreement and execute a formal agreement. [*Id.* at 7]

At the last minute before signing a Settlement Agreement, Beeche demanded that the Plaintiff pay off nearly $3 million in judgments which are junior liens on Beeche's personal residences. [GBL Bankruptcy ECF 13] Plaintiff rejected this unreasonable proposal. [GBL Bankruptcy ECF 13]

**L. BEECHE OBSTRUCTS AND HARASSES THE RECEIVER**

Beyond Beeche's failure to keep his agreement, the Receiver, in his Interim Status Report, also detailed other forms of Beeche's ongoing interference with the Receiver's administration of the Receivership Estate. [ECF 49*,* at p. 5-7]. For example, in emails and text messages to the Receiver, Beeche (i) demanded that the Receiver cover the payment of all payroll (even though there were insufficient funds to do so), (ii) demanded that the Receiver allow GBL to "live on" while recognizing that the Interested Buyer was going to make an offer to purchase the Receivership Assets, and (iii) called the receivership process "an abomination." [*Id*. at 6]. In addition, on September 11, 2025—a month after the Receivership Order was entered—Beeche appeared in the Town of Halfmoon (New York) Justice Court before the Honorable Katherine Suchocki and purported to enter into a "So Ordered" Stipulation of Settlement as GBL's "Member, Manager, Owner" obligating GBL to pay $2,750 to a former employee without the approval of, or any notice to, the Receiver. [*Id*. at 6].

Beeche also communicated directly with the Interested Buyer on October 1, 2025, in writing, in which he referred to the Receiver as a criminal and suggested that the Interested Buyer should not engage in further discussions with the Receiver. [*Id*. at 6-7]. Finally, Beeche initiated unauthorized transfers totaling approximately $74,000 from the GBL's operating account—including a $50,000 wire to himself—after the Receivership Order was entered. [*Id*. at 7].

**M. BANKRUPTCY CASES DISMISSED**

On October 24, 2025, GBL (through Beeche) filed a Chapter 11 bankruptcy case in the Bankruptcy Court for the Northern District of New York ("**Bankruptcy Court**") under case number 25-11257-1-pgr ("**Bankruptcy Case**"). Under 11 U.S.C. Section 543, unless otherwise excused by the Bankruptcy Court, a pre-petition receiver is required to turnover receivership assets to the bankruptcy debtor.

On December 23, 2025, the Bankruptcy Court dismissed the GBL Chapter 11 bankruptcy case [GBL Bankruptcy ECF 55]. On January 21, 2026, the Bankruptcy Court dismissed Beeche's Chapter 13 bankruptcy case. [Beeche Bankruptcy ECF 81] Given that the automatic stay against Beeche is no longer in effect, on January 23, 2026 Plaintiff filed a Second Amended Complaint to add Beeche as a Defendant and to foreclose on the Real Property. [ECF 59] On January 30, 2026, the Court entered a final receivership order ("**Final Receivership Order**"). [ECF 63]

## III. ARGUMENT

### A. A RECEIVER SHOULD BE APPOINTED OVER THE REAL PROPERTY BECAUSE UNDER THE LOAN DOCUMENTS BEECHE CONSENTED TO THE APPOINTMENT OF A RECEIVER AFTER AN EVENT OF DEFAULT, AND ALL APPLICABLE EQUITABLE FACTORS FAVOR THE APPOINTMENT OF A RECEIVER.

1. *Legal Standard*

Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver in federal cases. Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought . . ."); *SEC Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("There is no question that district courts may appoint receivers . . ."); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 257 (S.D.N.Y. 2012) ("The Court's equitable power to appoint a receiver extends to situations where a plaintiff who is a secured creditor seeks the appointment of a receiver to avoid a substantial and preventable decline in the value of its collateral"); *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ("A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property").

A court has the discretion to appoint a receiver when certain equitable factors are present. *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (citing *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997)). In determining whether to appoint a receiver based on the equities, courts in this Circuit generally consider the following factors:

> 1) any fraudulent conduct on the part of the defendant;
>
> 2) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;
>
> 3) the inadequacy of the available legal remedies;
>
> 4) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and,
>
> 5) in more general terms, the plaintiff's probable success in the action and the possibility of irreparable injury to its interests in the property.

*Id.* (*citing* 12 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2983 (1999)); *see also e.g.*, *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 606 n.293 (S.D.N.Y. 2023); *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 249-50. None of these factors standing alone are dispositive. *SEC v. GPB Cap. Holdings, LLC*, No. 21-CV-583 (MKB) (VMS), 2023 U.S. Dist. LEXIS 218226, 2023 WL 8468467, at *14 (E.D.N.Y. Dec. 7, 2023). "The dispositive issue is whether the appointment of a receiver is clearly necessary to protect [a party's] interests in the property." *U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 254 (internal quotation marks and citation omitted). A party seeking the appointment of a receiver bears the burden to make an "adequate showing" of need for the appointment. *Id.* at 250.

The Second Circuit has held that when (i) the parties' contract contemplates a receivership in the event of default, and (ii) there are multiple defaults, the combination "strongly supports the

appointment of a receiver." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988). The contractual factor is so paramount that the other factors "may be applied in a less stringent manner if a loan agreement expressly allows for the lender to apply for a receiver in the event of a default." *Id.* (citing *Wells Fargo Plaintiff, NA. v. CCC Atl., LLC*, 905 F. Supp. 2d604, 615 (D.N.J. 2012)) ("The importance of these contractual provisions cannot be underestimated because they set apart this commercial foreclosure case from the traditional scenario in which a receiver is sought at equity and no such contractual provisions exist").Concurring on the importance of contractual consent, other federal courts have held that when parties contractually agree in advance to the appointment of a receiver, courts may, at their discretion, dispense with analyzing equitable considerations, and find that the contractual provision is a sufficient basis for a court to appoint a receiver. *See, e.g., Britton v. Green*, 325 F.2d 377, 382 (10th Cir. 1963); *Am. Plaintiff & Tr. Co. v. Bond Int'l Ltd*., No. 06-CV-0317-CVE-FMH, 2006 WL 2385309, at *7-8 (N. D. Okla. Aug. 17, 2006); *Connolly v. Gishwiller*, 162 F.2d 428,435 (7th Cir. 1947).

2. *Plaintiff is Entitled to the Appointment of a Receiver Under the Loan Documents.*

Beeche agreed to the appointment of a receiver after a default. Section 6.3 of the First Mortgage states as follows with respect to the Real Property:

> Section 6.3 <u>Remedies</u>. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.
>
> • Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.
>
> • Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property

[ECF 6-1, Exhibit B]

Here, there are multiple defaults under the Real Estate Loans which cannot be disputed. [ECF 6-1] Beeche has failed to pay $407,139.24 in real estate taxes. [*Id.*] Also, Beeche stopped making any payments on the Real Estate Loans in July of 2025. [*Id.*]

Based on the Loan Documents and the indisputable events of default, the record "strongly supports the appointment of a receiver." *Citibank,* 839 F.2d at 97. At a minimum, because the Defendants agreed under the Loan Documents to the appointment of a receiver after an event of default, the equitable factors "may be applied in a less stringent manner." *Id.*

3. *All The Equitable Factors Overwhelmingly Favor the Appointment of a Receiver.*

a. **The Plaintiff Faces Imminent Danger of its Collateral Being Lost, Concealed, Injured, Diminished in Value, or Squandered.**

Absent the appointment of a receiver, there is a material risk that Plaintiff's collateral will be lost, concealed, injured, diminished in value or squandered during the pendency of this action. Plaintiff’s collateral loses value each day as real estate taxes accrue and remain unpaid. [ECF 6-1] These unpaid taxes create tax liens which have priority over the Plaintiff’s lien position. In addition, Logistics has ceased operating and a receiver is needed to protect the Real Property during the pendency of this action by hiring security and dealing with any property maintenance issues.

b. **Legal Remedies are Not Adequate Because of the Delay in Obtaining a Judgment and the Limited Execution Options Available to a Judgment Creditor.**

A money judgment is not an adequate remedy. For starters, it will take some time before a judgment is entered in this case. Plaintiff does not have the luxury of time. Plaintiff needs to

protect its collateral before it is too late. Even after a judgment is entered, Plaintiff as a judgment creditor will not have the same powers as a receiver. Unlike a judgment creditor, a receiver can (i) ensure that all real estate taxes are paid, (ii) protect and secure the Real Property pending a sale, and (iii) sell the Real Property together with the personal property. This is not a close call. There is a material benefit here to the Plaintiff to have a receiver appointed instead of waiting to obtain and enforce a money judgment.

c. **Absent the Appointment of a Receiver, the Probability of Harm to the Plaintiff is Far Greater than any Potential Harm to the Defendants.**

Beeche is insolvent. Beeche cannot repay the debt he owes to the Plaintiff and many other creditors. Given this insolvency, Beeche is clearly out of the money and therefore any lost value in the collateral will be a loss to the Plaintiff and no one else.

d. **Plaintiff will Probably Prevail on the Merits.**

Plaintiff will prevail on the merits. The Real Estate Loans are indisputably in default by virtue of the unpaid real estate taxes and payment defaults. Beeche has no valid defense to these defaults.

e. **There is a Strong Risk of Fraudulent Conduct.**

Beeche has engaged in fraud. Given this fraud, Beeche cannot be trusted to operate and maintain the Real Property in a responsible manner. For example:

- Beeche made payments of $74,000 out of the receivership bank accounts without the receiver's permission including $50,000 to Beeche personally. [ECF 49]

- Beeche gave away Plaintiff's collateral without Plaintiff's permission to pay off debts. [ECF 49]

Aside from this fraudulent conduct, Beeche has proven himself to be an unreliable operator. For example, Beeche disrupted a sale which would have maximized the recovery of the Plaintiff by demanding the payment of over $3 million in judgment liens against him personally from other creditors. [ECF 49] In addition to Beeche's self-seeking conduct, Beeche also mismanaged his business by continuing operations without insurance and without paying employees. [ECF 38] The work of his companies was also sloppy and dangerous as demonstrated by the OSHA violations. [GBL Bankruptcy ECF 17-1, Exhibit A, p.21]

In sum, just as the Assets of Logistics needed protection by the Receiver, so too is the Real Property in need of such protection.

**B. PROPOSED ORDER**

Plaintiff proposes that the Final Receivership Order be modified to add the Real Property as a "Receivership Asset." That will bring the Real Property under the authority and protection of the Receiver.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court grant the Motion and award other and further relief.

Dated: February 4, 2026

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ Christopher P. Schueller
Christopher P. Schueller (NY I.D. No. 509543)
640 5th Ave. 9th Floor
New York, NY 10019
T 212 440 4400
F 212 440 4401
christopher.schueller@bipc.com

*Attorneys for Plaintiff*