UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| MCCORMICK 103, LLC,<br><br>                  Plaintiff,<br><br>          v.<br><br>GREG BEECHE, LOGISTICS, LLC,<br>GREG LOGISTICS, LLC, and<br>GREGORY L. BEECHE<br><br>                  Defendants. | **DECLARATION OF DOTAN Y. MELECH IN SUPORT OF EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANT, GREGORY L. BEECHE, SHOULD NOT BE HELD IN CONTEMPT**<br><br>1:25-cv-00944-AMN-CBF |

---

I, Dotan Y. Melech, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the President of United AMS, LLC and I am the court-appointed receiver ("Receiver") of Greg Beeche, Logistics, LLC ("GBL") and Greg Logistics, LLC ("GL" and together with GBL, the "Receivership Entities").

2. I submit this declaration in support of the emergency motion by Order to Show Cause ("Motion") to hold defendant, Gregory L. Beeche ("Beeche"), in contempt of the Court's Order Appointing Receiver dated January 30, 2026 ("Permanent Order"[1]) (Dkt. No. 63) and for entry an Order directing Beeche to immediately turn over to the Receiver the following Receivership Assets, *viz*., (i) administrator login credentials and passwords for the server(s) located at 356 Hudson River Rd., Waterford, NY 12188 ("GBL Facility"), (ii) any and all data, hardware, or software Beeche removed or caused to be removed from the server(s) located at the GBL Facility, (iii) that certain 2014 Porsche

---

[1] All defined terms not otherwise defined herein shall have the meaning given to them in the Permanent Order.

Panamera, VIN WP0BC2A75EL077136, owned by GBL ("Porsche"), and (iv) all funds Beeche transferred or withdrew from GBL's TD Bank, N.A. business checking account on or after August 8, 2025 without authority totaling at least $71,000.00 ("Wrongfully Transferred Funds").

   3. In the performance of my duties as Receiver, I have access to and am familiar with business records maintained by the Receivership Entities. As Receiver, I have personal knowledge of the manner in which these business records are maintained. These records (which include data compilations, electronically imaged documents, and other business records) were/are: (a) made at or near the time of the occurrence of the matters set forth by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records; and (b) kept as a regular practice and in the ordinary course of business conducted by the Receivership Entities. To the extent records in the Receivership Entities' possession come from another entity, those records were received by the Receivership Entities in the ordinary course of their business, have been incorporated into and maintained as part of the Receivership Entities' business records, and have been routinely relied on by the Receivership Entities as part of the regular course of their business. In connection with making this declaration and Receivership Reports (as defined herein), I reviewed and relied on the Receivership Entities' business records.

I. **Background**

**A.** **Appointment as Receiver**

   4. On August 8, 2025, this Court entered its Memorandum Decision & Order, as amended on August 11, 2025, appointing me as temporary Receiver for the Receivership Entities ("Interim Order"). Dkt. Nos. 28 & 29.

5.  On January 30, 2026, the Court entered the Permanent Order. Dkt. No. 63.

6.  In furtherance of my duties as Receiver, I caused four status reports to be filed in this case (collectively, the "Receivership Reports"). Dkt. Nos. 37-1, 39-1, 49-1, & 74-1.

7.  The Receivership Reports are true and accurate and are incorporated herein in their entirety.

B.  **The Receiver's Authority**

8.  Pursuant to the Interim Order, I was authorized (but not obligated) to, among other things, (i) take possession, custody, and control of all Receivership Assets, and (ii) manage and operate the Receivership Entities' business(es), employ and terminate personnel, collect income, administer accounts, engage professionals, enter into agreements as necessary, and, subject to entry of a permanent receivership order, liquidate Receivership Assets, all for the purpose of securing, preserving, and maximizing the value of the Receivership Estate. Dkt. No. 28 at 18-20.

9.  In accordance with the Permanent Order, I am obligated to, among other things, take immediate control of all Receivership Assets, wherever located, and without further Order of the Court I am authorized to "market, sell or otherwise dispose of the Receivership Assets, in its entirety or in one or more parcels" as set forth in the Permanent Order. Dkt. No. 63 ¶ 4(i), (viii).

10. Paragraph 5 of the Permanent Order provides, in pertinent part:

> Defendants (and, where applicable, Defendants' officers, shareholders, directors, partners, assigns, agents, servants, employees, accountants, and attorneys), all persons and entities claiming by or through Defendants, and all other persons and entities:

(i) shall surrender possession of all of the Receivership Assets to Receiver, of whatever nature and wherever located, whether such Receivership Assets are in the possession of Defendants or any affiliate of Defendants, or any of their officers, directors, partners, shareholders, representatives, professionals, employees, or agents, or any other person or entity, and all of such Receivership Assets shall be, on the Effective Date, placed in custodia legis of the Court;

(ii) shall be enjoined, restrained, stayed, and prohibited from (a) using, possessing, transferring or disposing of any Receivership Assets or negotiating on behalf of the Defendants for any use, possession, transfer or disposition of any Receivership Asset . . . (f) doing any act to interfere with the taking of control, possession, management, or sale by Receiver of any portion of the Receivership Assets . . .;

(iii) shall be required to immediately provide access, means of access, and make available to Receiver all keys, codes, passwords, books, records, computer hardware and software (including all computer programs, data bases, disks, and other media owned or licensed by Defendants or upon which information regarding the property, assets, accounts, and businesses of Defendants are stored, recorded, or located) . . .;

(iv) shall immediately disclose to Receiver the nature, amount, and location of any and all Receivership Assets, including, books, records, computer programs, and media owned by Defendants or connected with businesses of Defendants, and shall immediately be turnover to Receiver all Receivership Assets forthwith;

(v) shall cooperate with Receiver and abide by Receiver's requests for information and documentation so that Receiver may perform Receiver's function with full information and knowledge; and

(vi) shall return any monies taken from the Defendants' deposit accounts on or after August 8, 2025 without the authorization of the Receiver.

*Id.* ¶ 5.

## C.  The Receiver's Outstanding Requests to Beeche Concerning Receivership Assets

11.     My requests to Beeche concerning the Receivership Assets that have gone unanswered fall into three categories—the server(s) located at the GBL Facility, the Porsche, and the Wrongfully Transferred Funds.

     i.     **The server(s) located at the GBL Facility**

12. On August 21, 2025, I wrote a letter to the Receivership Entities and Beeche requesting that Beeche make available, among other things, all books/records, banking information, and "**[a]ccess to [c]omputer [s]ystems**, servers, and/or software, including any cloud storage or cloud/remote based programs, intellectual property rights, and websites (with all associated system access information, passwords, alarm codes, keys, keycards, software, or similar items) that may be used in connection with the Receivership estate, wherever located in and whatever mode maintained." A true copy of this letter is attached as **Ex. A** (emphasis in original).

13. At no time after I caused the letter attached as **Ex. A** to be sent to the Receivership Entities and Beeche did Beeche provide full access to the server(s) at the GBL Facility.

14. Following a delay in the administration of the Receivership Estate due to Beeche placing GBL in a bankruptcy case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of New York on October 24, 2025, Case No. 25-11257-1-pgr, and promptly after the Permanent Order was entered, I renewed my request to Beeche for full access to the GBL server(s).

15. On February 10, 2026, I directed Mitch Harhay, United AMS, LLC's Chief Technology Officer, who was onsite at the GBL Facility, to contact Beeche to obtain the administrator login credentials and passwords for the GBL server(s).

16. Although I understand that Mr. Harhay spoke with Beeche that day, the administrator login credentials and passwords for the GBL server(s) were not provided.

17. As a result, I directed my attorneys, Phillips Lytle LLP, to send Beeche an email ("Turnover Email") on February 10, 2026 requesting the immediate production of the administrator login credentials and passwords for the GBL server(s) and to advise Beeche that if this information was not provided I would be forced to remove the server drives and ship them offsite to a digital forensic laboratory to extract the data. I further instructed my attorneys to advise Beeche that such an effort would come at a significant cost to the Receivership Estate, which I was hoping to avoid. A true copy of the Turnover Email is attached as Ex. 1 to the declaration of Todd A. Ritschdorff, Esq. dated March 6, 2026 ("Ritschdorff Decl.").

18. I understand that Beeche did not respond to the Turnover Email.

19. Having received no response from Beeche, I instructed Mr. Harhay to remove the drives from the main GBL server at the close of business on February 10, 2026. Thereafter, Mr. Harhay sent the drives to a digital forensic lab where they await data extraction, which will cost more than $15,000.00.

20. On February 13, 2026, I directed my attorneys, Phillips Lytle LLP, to send Beeche a letter ("Turnover Letter") requesting, among other things, administrator login credentials and passwords for the GBL server(s), as well as any and all data, hardware, or software Beeche removed or caused to be removed from the GBL server(s). A true copy of the Turnover Letter is attached as Ex. 2 to the Ritschdorff Decl.

21. I understand that Beeche did not respond to the Turnover Letter.

22. As of the date of this declaration, Beeche has not provided the administrator login credentials and passwords for the GBL server(s).

23. This information is critical to a successful sale of the Receivership Assets, the marketing campaign for which is set to begin on March 6, 2026.[2]

24. I believe that the GBL server(s) contain key data and shop drawings with respect to GBL inventory (primarily its scaffolding systems) that could significantly increase the amount for which I am able to sell that inventory.

### ii. The Porsche

25. Based on my review of GBL's books and records shortly after my appointment as Receiver, I identified the Porsche as a Receivership Asset.

26. As detailed in my October 24, 2025 Interim Status Report, the Porsche was a material term of the settlement reached (but not completed) between plaintiff and Beeche whereby Beeche agreed to surrender possession of the Porsche to the Receiver. Dkt. No. 49-1 at Point IV(ii) ("Greg Beeche shall immediately surrender to the Receiver possession of the Porsche Panamera, VIN WP0BC2A75EL077136, titled in . . . [GBL].").

27. By the Turnover Letter, my attorneys demanded that Beeche surrender the Porsche. Ritschdorff Decl. Ex. 2.

28. To date, Beeche has not surrendered the Porsche, which, upon information and belief, is in Beeche's possession.

29. I intend to sell the Porsche along with all other Receivership Assets.

### iii. Wrongfully Transferred Funds

30. As set forth in my Inventory and Liabilities Report Dated September 2, 2025, I identified $71,000.00 in improper transfers to Beeche from GBL's TD Bank, N.A.

---

[2] More information concerning the sale of the Receivership Assets is set forth in my Interim Status Report dated February 20, 2026. Dkt. No. 74-1.

business checking account that occurred after the Interim Order was entered. Dkt. No. 37-1 Ex. 3.

31.     The following chart identifies the Wrongfully Transferred Funds:

| Transaction Date | Description | Amount | Running Total of Wrongfully Transferred Funds |
|---|---|---|---|
| 8/11/2025 | Debit to Beeche | $7,500.00 | $7,500.00 |
| 8/13/2025 | Wire Transfer to Beeche | $50,000.00 | $57,500.00 |
| 8/13/2025 | Debit to Beeche | $2,500.00 | $60,000.00 |
| 8/15/2025 | Debit to Beeche | $7,000.00 | $67,000.00 |
| 8/18/2025 | Debit to Beeche | $4,000.00 | $71,000.00 |

32.     I did not authorize any of these transactions.

33.     By the Turnover Letter, my attorneys demanded that Beeche return the Wrongfully Transferred Funds to the Receivership Estate. Ritschdorff Decl. Ex. 2.

34.     To date, Beeche has not returned the Wrongfully Transferred Funds or provided an accounting of the Wrongfully Transferred Funds.

D.     **Harm to the Receivership Estate**

35.     Despite the Permanent Order and numerous requests to Beeche, he has refused and continues to refuse to turn over the administrator login credentials and passwords for the GBL server(s), the Porsche, and Wrongfully Transferred Funds.

36.     Beeche's continued refusal to comply is materially impairing my ability to administer the Receivership Estate. Moreover, by disregarding the Receiver's repeated requests, Beeche is causing the Receivership Estate to incur unnecessary expenses in the pursuit of Receivership Assets that Beeche, pursuant to the Permanent Order, is obligated to provide immediately upon request. Dkt. No. 63 ¶ 5.

- 9 -

Dated:  March 6, 2026       By: _____
                                Dotan Y. Melech