Answer to Memorandum Decision and Order

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

APR 1 0 2026

AT____O'CLOCK

John M. Domurad  Clerk - Albany

**Honorable Judge Nardacci,**

I respectfully submit this statement pro se following the termination of my relationship with prior counsel. I am actively seeking new representation; however, due to the urgency of the circumstances, I am submitting this information directly and appreciate the Court's consideration.

## 1. Response to Contempt Issues

Your Honor, I respectfully state that I did not knowingly or intentionally violate any court order.

At the time the Receiver assumed control, I did not fully understand the legal process and believed I was required to continue operating in the ordinary course. I acted in good faith and without intent to disregard the Court's authority.

- **Vehicle:** The vehicle referenced was returned on March 23, 2026. It was not in use and required significant repairs. I had previously expressed interest in purchasing it in the future for approximately $8,000.
- **Funds ($71,000):** These funds were used in the ordinary course of business to meet company obligations. I did not intend any misuse of funds. During this period, I continued operating under the same practices that existed prior to the Receivership, without a clear understanding of restrictions. Supporting documentation can be provided (Exhibit A). Your Honor, I have no funds to be able to paid this $71K order above. This much less $1,000 per day penalty until I find resources. This is impossible for me to comply, at this time.
- **Financial Hardship:** My personal income significantly reduced around May 2024. Since then, I have relied on limited Social Security income (approximately $3,500 per month) and financial assistance from family and friends. I have also incurred over $140,000 in legal fees in an effort to defend the company.
- **Server Access:** In accordance with prior counsel's recommendation at the March 18 hearing, administrative credentials and passwords for the GBL servers are being submitted directly to the Court. I respectfully request that these not be provided to the Receiver and instead remain under Court control.

## 2. Current Business Opportunity (Material to Creditor Recovery)

I respectfully inform the Court that I am engaged in active discussions with **BrandSafway** regarding a potential joint venture and investment.

Key developments include:

- Due diligence discussions have been ongoing since approximately February, 2026. We went to their offices on March 16, 2026.

- A meeting was held with BrandSafway's technical and business leadership team
- BrandSafway has expressed interest in:
  - Partnering with GBL
  - Investing in GBL's proprietary access systems

Additionally:

- A high-rise project in New York City has preliminarily selected GBL-designed systems
- BrandSafway met with project consultants on March 30, 2026
- On April 3, 2026, BrandSafway representatives indicated intent to pursue collaboration

This opportunity is estimated at approximately **$18.64 million**, First 12 months, of a 29-month schedule; this with potential mobilization funding of approximately **$4.5 million**, subject to final agreements.

Supporting correspondence is attached as Exhibit B. Additional details can be provided to the Court for in camera review due to confidentiality.

## 3. Impact on Creditors and Estate Value

This opportunity, along with additional pending work, provides a viable path to:

- Repay creditors, including McCormick
- Address employee wage obligations (approximately $600,000)
- Preserve enterprise value significantly above current liquidation levels

By contrast, ongoing asset sales appear to reflect pricing substantially below prior stated valuations, which will reduce overall recovery. In this sale basis, no other creditors will be paid and the company will not continue.

## 4. Good Faith Efforts

From the outset, my objective has been to:

- Preserve GBL as a going concern
- Secure investors or partners to satisfy creditor obligations
- Maintain long-standing client relationships

At the time operations were halted, GBL had approximately **$10 million in active work**.

## 5. Insurance and Operational Shutdown

GBL maintained insurance coverage through September 25, 2025. We had also developed a revised operating structure that would have reduced insurance costs by over 60%.

Despite this, operations were discontinued citing lack of insurance while projects and revenue opportunities remained active.

## 6. Asset Ownership Clarification

I respectfully clarify:

- The Waterford facility is personally owned by me, not GBL
- The intellectual property (developed over approximately 40 years) is also my personal property

These distinctions are central to the issues before the Court.

## 7. Procedural and Participation Clarification

I have acted in good faith throughout these proceedings and made consistent efforts to comply with instructions.

To the extent there have been misunderstandings regarding my actions or participation, I respectfully request the opportunity to clarify those matters before the Court.

## 8. Request for Relief

In light of the above, I respectfully request that the Court:

1. Allow a limited period (approximately 90–120 days) to:
   - Finalize the BrandSafway partnership
   - Secure investor participation
   - Develop a structured repayment plan
2. Permit efforts to maximize enterprise value rather than proceed with distressed liquidation
3. Allow submission of additional supporting documentation for in camera review as appropriate

       o   Develop a structured repayment plan

2. Permit efforts to maximize enterprise value rather than proceed with distressed liquidation
3. Allow submission of additional supporting documentation for in camera review as appropriate

## 9. Closing

I respectfully submit that my actions have been taken in good faith, with the consistent goal of preserving value and satisfying creditor obligations.

I apologize for any procedural deficiencies in this pro se submission and appreciate the Court's time and consideration.

**Sworn under penalty of perjury, I declare that the foregoing is true and correct to the best of my knowledge, April 10 2026.**

Respectfully submitted,

**Gregory L. Beeche**
Pro Se

- Attach:
    - o **Exhibit A:** Use of funds documentation
    - o **Exhibit B:** BrandSafway communication.
    - o **Exhibit C:** Attorney/CPA David Evans letter dated March 22nd 2023. updated on November 4th 2025
    - o **Exhibit D:** McCormick v. Beeche - FILED - D. Evans Decl in Opp to Receiver's Motion - 03.11.2026(69032176.1.
    - o **Exhibit E:** Email from Tom Morgan 9-28-2025
    - o **Exhibit F:** Letters of support of long-standing clients and Affidavit of Mike Budd from New Hudson Facades.

# Exhibit A.

## Greg Beeche Logistics' payments made by Gregory L. Beeche

### Insurances

| | | |
|---|---|---:|
| 9/26/2025 | Car insurance Porsche (on name of GBL) | 268.91 |
| 12/2/2025 | Car insurance Porsche (on name of GBL) | 515.00 |
| 11/6/2026 | Selective Insurance for Buildings and Inventory | 6,315.25 |
| 12/4/2025 | J&J Insurance for Buildings and Inventory | 4,855.25 |
| 2/5/2026 | Selective Insurance for Buildings and Inventory | 1,325.00 |
| 2/5/2026 | American Life Financial Loan Fee, Loan negotiated to pay off McCormick. | 10,000.00 |

### Lawyers and Court Fees

| | | |
|---|---|---:|
| 8/28/2025 | Elizabeth Fletcher | 6,000.00 |
| 11/13/2025 | Elizabeth Fletcher | 3,000.00 |

**Note:** We are not including previous Payment to Ms. Fletcher before Receiver was appointed. On September 1st 2025 Ms. Fletcher filed an answer to District Court: "MOTION FOR LIMITED INTERVENTION" because GBL wasn't appropriated represented by the Receiver.

| | | |
|---|---|---:|
| 10/1/2025 | Mr. Orville Ch11 Lawyer | 300.00 |
| 10/3/2025 | Mr. Orville Ch11 Lawyer | 5,000.00 |
| 10/10/2025 | Mr. Orville Ch11 Lawyer | 15,000.00 |
| 12/19/2025 | Mr. Orville Ch11 Lawyer | 2,500.00 |

### Other Company payments

| | | |
|---|---|---:|
| 9/9/2025 | Lunch for our meeting with the Investor Fairfield-Maxwell, at the plant | 68.42 |
| 8/29/2025 | UPS Send an information for a client | 135.83 |
| 8/11/2025 | Agreement with Amex for GBL Credit card payment. Note: It is an agreement with Amex to paid company debt, Amex is going to keep discounting this every month. | 475.44 |
| 9/11/2025 | UPS Send an information for a client | 126.93 |
| 9/11/2025 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 10/14/2025 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 11/18/2025 | Staples. Ink and paper for our preparation of Ch11 hearing | 392.66 |
| 11/12/2025 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 11/26/2025 | E-Pass NY Payment, it was due for a long time, so we paid from our money before a trip to NYC | 115.00 |
| 11/26/2025 | BP# 1124501 Tolls NJ | 49.42 |
| 12/12/2025 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 1/12/2026 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 1/21/2026 | Amtrak train to NYC for a meeting about 432 Park Ave | 209.00 |
| 2/12/2026 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 3/3/2026 | Car insurance Porsche Greg Beeche Logistics | 472.49 |

| | | |
|---|---|---|
| 3/6/2026 | Payment for a former worker James Pai, after we agree to pay in a local Court and he tried multiples times to get pay with the Receiver and the Receiver lawyer, we are paying him to the best our possibilities. | 200.00 |
| 3/6/2026 | Payment for a former worker James Pai. | 200.00 |
| 3/16/2026 | Agreement with Amex for GBL Credit card payment | 475.44 |
| 4/8/2026 | Payment for a former worker James Pai. | 200.00 |
| 4/10/2026 | Agreement with Amex for GBL Credit card payment | 475.44 |
| **TOTAL** | | **61,528.12** |

**Note:** This list does not included payments made by Kim Covert, our Office Manager, she has been doing to from her payments to keep: Quickbooks, company email, etc., which she is trying to get a reimbursement for more than $5,000 USD.

# Exhibit B.

**From:** Molloy, Conal <███████████████████>
**Sent:** Thursday, April 9, 2026 2:35 PM
**To:** Greg Beeche <gregbeeche@gmail.com>
**Cc:** ██████████@safwayatlantic.com>; ████████████@safwayatlantic.com>
**Subject:** 432 Park

Hi Greg,

Following on from our recent meeting, we are currently reviewing a suspended access option at the 432 Park project.

We also will explore a potential partnership with you to leverage your knowledge and equipment as we move this forward.

We can discuss further at a later date

Best regards,
Conal

**Conal Molloy | SVP, Northeast**
700 Commercial Ave | Carlstadt, NJ 07072

**BRAND⟩SAFWAY.**

CONFIDENTIALITY NOTICE: This email may contain information that is proprietary, confidential, and/or privileged. If you are not the intended recipient, please do not disseminate, distribute or copy this communication. Instead, please notify me immediately by return email (including the original message in your reply) and then delete and discard all copies of the email. Thank you.

Exhibit C.

# DAVID L. EVANS

*ATTORNEY AT LAW*

P.O. Box 1047, 313 Ushers Road (Suite 33)
Clifton Park, NY 12065
(518) 453-6000 Fax (518)406-3123

Direct Dial:
(518) 469-6339

Sender's Email:
DLEVANS.ESQ@GMAIL.COM

March 22, 2023

Gregory L. Beeche
65 Smith Road
Mechanicville, NY 12118

**Re: Historical Summary of Intellectual Property**

Dear Greg:

Mr. Beeche has been engaged in the creative access business for more than 40 years. Beginning in the early 1980's up to the recent past I have represented Mr. Beeche individually and the various business entities that he has started and nurtured over the years.

As a general statement, over the course of a forty plus year career Mr. Beeche has created and developed significant intellectual property in and around the creative access business. From the beginning it was the established practice that all intellectual property that he created, remained his separate identifiable property. This intellectual property was consistently and specifically represented as his own personal property for all use purposes, financial statement purposes, and tax purposes.

Mr. Beeche, himself has been designing and inventing technological creative access equipment since 1977. Such designs have permitted over the years to facilitate and otherwise permitted workers to safely perform work in difficult places, typically at great heights, promoting worker safety and efficient ways to work on Buildings, Bridges, Structures and other difficult to access places. While many of his designs and developments have been patented in his name, Mr. Beeche always maintained his personal ownership of his specific designs whether patented or not.

Specifically, Mr. Beeche thought out, designed and applied the system of work place access now known as the "ADT Access System". This system was used by his own controlled business known as Greg Beeche Logistics LLC but again, the intellectual rights of the ADT Access System, while used by Greg Beeche Logistics LLC the ownership of the intellectual property rights whether reduced to a patent or reserved in his individual name were consistently reported for financial and tax purposes as his property and his alone.

Case 1:25-cv-00944-AMN-CBF    Document 100-3    Filed 04/10/2026    Page 2 of 2

Gregory L. Beeche
Intellectual Property
November 4, 2025
Page 2

We are available to discuss the above at your convenience and, if you request additional information, we will supplement this response to the maximum extent within our means that is possible.

Respectfully submitted,

David L. Evans

Case 1:25-cv-00944-AMN-CBF    Document 78-5    Filed 03/11/26    Page 1 of 3
Case 1:25-cv-00944-AMN-CBF    Document 101    Filed 04/10/26    Page 12 of 21
Case 1:25-00944-AMN-CBF    Document 100-4    Filed 04/10/2026    Page 1 of 3

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

MCCORMICK 103, LLC,

        Plaintiff,

    v.

GREG BEECHE, LOGISTICS, LLC;
GREG LOGISTICS, LLC; and
GREGORY L. BEECHE,

        Defendants.

1:25-cv-00944-AMN-CBF

**DECLARATION OF
DAVID L. EVANS, ESQ. IN
OPPOSITION TO RECEIVER'S
MOTION AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION**

**DAVID L. EVANS**, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1. I am an attorney admitted to practice law in the State of New York. In that capacity, I have represented both the defendant Gregory L. Beeche, individually, as well as the various business entities that he has started and nurtured since the early 1980s, including Greg Beeche, Logistics, LLC ("GBL") and Greg Logistics, LLC ("Logistics"). As such, I am fully familiar with the facts and circumstances recited herein.

2. Mr. Beeche has been engaged in the creative access business for more than forty years. Specifically, he began designing and inventing creative access equipment, technologies, and systems in approximately 1977.

3. Over the years, the equipment, technologies, and designs Mr. Beeche has developed have permitted workers to safely perform work in difficult places, typically at great heights, providing efficient ways to work on buildings, bridges, structures and other difficult-to-access places. They have also created significant, cost-saving efficiencies for notable development projects the world over.

Case 1:25-cv-00944-AMN-CBF    Document 101    Filed 04/10/26    Page 13 of 21
Case 1:25-cv-00944-AMN-CBF    Document 78-5    Filed 03/11/26    Page 2 of 3
Case 1:25-00944-AMN-CBF    Document 100-4    Filed 04/10/2    Page 2 of 3

4. Given his singular command of these unique designs and systems, which he has created through his own effort and at his own expense, Mr. Beeche has become a sought-after partner in the construction industry.

5. Together, these designs, technologies, and systems comprise a substantial body of intellectual property, from which Mr. Beeche has derived significant personal economic value, often by forming and running successful companies to manage contracts for his products and services with those third parties who have sought him out to benefit from the efficiencies afforded by the use of his creations.

6. Two such companies are GBL and Logistics, both of which Mr. Beeche formed in 2002.

7. While Mr. Beeche has patented many of his developments and designs, he has always maintained personal ownership of his specific designs, whether patented or not.

8. One such design is known as the "ADT Access System," a system of workplace access that Mr. Beeche alone conceived of, designed, and applied.

9. While Mr. Beeche made the ADT Access System available to customers of GBL, the intellectual property itself was consistently reported for financial and tax purposes as belonging to Mr. Beeche only.

10. Neither GBL nor Logistics has ever filed a financial statement or tax filing that claims ownership of the ADT Access System, or any of the other intellectual property conceived of or designed by Mr. Beeche.

11. Nor is there any agreement memorializing any assignment to GBL or Logistics of the considerable intellectual property Mr. Beeche has created since he began inventing creative access systems in 1977.

12.     Mr. Beeche has always strictly guarded the secrecy of his non-patented intellectual property by maintaining it as separate property as paper files and, in recent years, on a secure server, to which only he and a select group of key employees had access.

13.     Most recently, Mr. Beeche has maintained much of this intellectual property on a secure server belonging to GBL.

14.     Again, while the server on which the intellectual property is presently stored belongs to GBL, the intellectual property itself belongs to Mr. Beeche and Mr. Beeche alone.

15.     This is and always has been the understanding between Mr. Beeche and any company he has formed, including GBL and Logistics. Mr. Beeche, GBL, and Logistics have always treated the intellectual property on the server as the sole and exclusive property of Mr. Beeche.

16.     Forcing Mr. Beeche to disclose that intellectual property, or worse—sell it—would jeopardize his ability to make a living, as well as any legal protections that attach to the trade secret information contained on the GBL server.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 11th day of March, 2026.

_____
David L. Evans, Esq.

3

69019355v2



# Exhibit E.

**From:** Tom Morgan <​███████████████████​>
**Sent:** Sunday, September 28, 2025 4:09 PM
**To:** Dotan Melech <dotan.melech@gregbeeche.com>
**Cc:** Mitch Harhay <mharhay@unitedams.com>; Thomas Stenz <thomas.stenz@gregbeeche.com>
**Subject:** GBL server crash report

Report of the server crash at Greg Beeche Logistics on 9/25/2025
By Thomas Morgan SE, SA, CSEP - at the request of United AMS

The data systems at Greg Beeche Logistics (GBL) were configured with a high level of security to prevent the theft of intellectual property. When a certain threshold combination of bandwidth and data is reached, the systems will make attempts to block users, applications and IP addresses involved in the breach. Since becoming live in January of 2021, these systems were carefully maintained and have run flawlessly since.

At approximately 2:19 PM on Thursday, 9/25, the server at GBL crashed. Within the hour it was reported to me by both AMS and GBL employees that VPN access was unavailable. Since VPN access requires authentication from the server, both GBL and United AMS users lost access when the server crashed.

An arrangement was made for me to enter the GBL property on Friday 9/26 to assess the severity of the problem and possibly repair it. Upon arriving at 10 AM the video monitor was displaying a message indicating that the drives were not available (photo attached). Despite the message, no drives were removed. Several attempts to restart the server were unsuccessful. I removed the server cover and blew out any dust and re-plugged connections to the drive but boot was unsuccessful.

I did not immediately make an attempt to access the back end BMU as doing so in itself may potentially change configurations and cause more problems.

I turned to the logs of the unified threat system to determine what was occurring at the time of the crash. The logs showed that more than 20 hours after the crash that something was still persistently trying log onto the server. The Intrusion Prevention System (IPS) identified the attack as coming from an internal computer designated BEECHE70 with internal IP address 192.168.50.178 and logged in as user mharhay, and coming from external IP address 184.182.82.205. The log further showed files attempted to be copied with the destination of Google Drive with an unknown intermediary program driving the downloads.

Although the IPS had already blocked VPN user mharhay and IP address 184.182.82.205 some hours earlier, BEECHE70 was still attempting to connect to the crashed server in short intervals.

Upon logging into BEECHE70, Google Drive and several processes were found running (screen capture attached). Also running was a log window showing thousands of files that had failed to download (partial text log of last 3,000 failures attached). Another program installed called GoodSync, a backup and synchronizing software, may have been responsible for the persistent attempts to obtain server access. All programs were shut down, GoodSync was removed on this computer. From the screen capture, it appears that the downloads started on the 24th.

The server is configured with two RAID arrays comprising 2 drives for the system files (~300GB) and 6 drives for data storage (8TB). Properly diagnosing and repairing a RAID failure is a complex task which

takes time and money, and potentially having to reinstall/configure the server operating system and/or replacing identified drives and rebuilding the RAID configuration.

Potential failure points:
• The IPS and server, attempting to block the many thousands of files, in combination with persistent attempts by the backup software to reconnect and download, caused a file corruption condition on the server drive(s) causing the server to crash. This may have occurred on one or more drives in the arrays.

• The RAID controller may have stopped functioning for same the reasons as above which also would have produced the message "no drives present".

Possible costs (not including tax or shipping):
• Drives for 1st array ~$250 each
• Drives for 2nd array ~$450 each
• RAID controller card ~$780

Had this been a purely external attack, the IPS would have blocked it successfully with no consequence. If it had been a virus infection, then the redundant anti-malware systems would have shut it down. This was however, an internal attack with brute-force tendencies installed on a local computer. The reckless and irresponsible attempt to steal this intellectual property without first knowing the technical aspects of the systems you were raiding puts the liability solely with United AMS.

I retired 2023 from IT related endeavors after 45 years in technology, the final 20 being self-employed. But only at the request of Greg Beeche, I availed myself to occasionally assist with common IT issues for the last two years. I have largely moved on to other activities and I no longer accept new projects, particularly of this nature. Beyond what is provided in this report, I will not be further assisting in the diagnosis or repair of this equipment.



Exhibit F.

## AFFIDAVIT OF MICHAEL BUDD, MANAGING PARTNER OF NEW HUDSON FACADES, LLC

I, **Michael Budd**, being duly sworn, depose and state as follows:

1. **Position and Background.** I am the Managing Partner of New Hudson Facades, LLC ("NHF"), a custom architectural façade company specializing in the design, engineering, manufacturing, and installation of complex building enclosures. Incorporated in 2014, NHF partners with leading architects and general contractors to deliver innovative cladding solutions for some of the most architecturally significant and technically demanding projects being built today. NHF is among the largest and most sophisticated façade contractors in the United States, with completed and ongoing projects spanning coast to coast. I submit this affidavit based on personal knowledge developed through more than twenty-five (25) years of professional interaction with Greg Beeche Logistics, LLC ("GBL") and its founder, Greg Beeche.

2. **Longstanding Working Relationship.** I have personally worked with GBL and Mr. Beeche for approximately twenty-five (25) years through my current role at NHF and prior leadership positions at other façade firms. Throughout that time, I have relied on Mr. Beeche and his company for specialized access systems, rigging, and scaffolding solutions on numerous major projects. Their teams have consistently delivered precise, dependable, and safety-driven services that have supported the successful execution of complex façade installations.

3. **Professional Reputation and Safety Record.** In every engagement with NHF, GBL has demonstrated a strong safety culture and innovative engineering approach. Their team has repeatedly delivered creative and dependable access solutions for some of the most complex façade installations in our industry, without serious incident. The company has earned a well-deserved reputation among general contractors, façade specialists, and labor partners as a safe and reliable collaborator.

4. **Current Industry Need.** The market currently faces a shortage of qualified firms capable of providing the level of design-build access expertise GBL offers. In New York City alone, several major upcoming high-rise projects along Park Avenue, as well as a new tower planned within the World Trade Center complex, will require precisely the type of custom access systems that GBL has supplied to NHF and other top-tier contractors for decades. A functioning GBL is therefore critical to maintaining safe, efficient execution on these complex, high-profile projects.

5. **Observations of GBL Facility.** I recently visited GBL's Waterford, New York plant. In my opinion, the site is well organized, the inventory and fabrication assets are in workable condition, and the company appears ready to resume operations promptly if

1

Docusign Envelope ID: CF995969-FBEF-4CB1-84AD-66F10AA6A796

permitted to do so by this Court. With employees recalled, GBL could quickly return to productive service.

6. **Management and Personnel.** The continued leadership of Greg Beeche and his technical team is essential to the company's success. Their decades of know-how, proprietary methods, and relationships with owners, architects, and contractors cannot easily be replicated. As mentioned, I have personally known Greg Beeche for more than two decades and can attest to his professionalism, creativity, and commitment to safe execution.

7. **Commercial Importance.** From NHF's perspective, GBL remains a valued strategic partner. We rely on GBL to provide safe access solutions that enable us to perform façade work on the nation's most technically demanding buildings. The loss of GBL would negatively affect not only NHF but also the broader construction ecosystem that depends on qualified specialty contractors.

8. **Prospective Investment Interest.** Subject to customary due diligence, internal approvals, and negotiation of definitive terms, NHF would be interested in exploring a potential investment or commercial partnership with GBL to help restore its solvency and operations and preserve this critical capability within the industry.

9. **Support for Reorganization.** In my view, GBL is not a defunct enterprise but a viable operating business constrained only by temporary financial and legal circumstances. If allowed to reorganize under Chapter 11 rather than being liquidated through a receivership, the company could promptly resume operations, meet current market demand, and continue contributing to safe and successful façade construction projects nationwide.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

**Executed on:** November 13, 2025
**Location:** Linwood, Pennsylvania

*Michael Budd*

**Michael Budd**
EVP and Managing Partner, New Hudson Facades, LLC