

## Phillips Lytle LLP

**Via CM/ECF**                                                                                    April 24, 2026

Hon. Anne M. Nardacci
United States District Court
Northern District of New York
James T. Foley Courthouse
445 Broadway
Albany, NY 12207

Re:     *McCormick 103, LLC v. Greg Beeche, Logistics, LLC, et al.,*
        Civil Action No. 1:25-cv-00944-AMN-CBF
        **BGLift Mini Cranes (Enclos Corp.) and Hoist Update**

Dear Judge Nardacci:

As the Court is aware, we represent Dotan Y. Melech, court-appointed receiver in this action ("Receiver"). By this letter, and in accordance with Your Honor's Text Order (Dkt. No. 114), we provide the Court with (i) the Receiver's position regarding the seven (7) BGLift mini cranes ("Mini Cranes") Greg Beeche, Logistics, LLC ("GBL") purportedly sold to Enclos Corp. ("Enclos") in May 2024 for $500,000, and (ii) an update concerning the Receiver's efforts to account for outstanding hoists by accessing the GBL servers.

### Mini Cranes

The Receiver is in receipt of defendant, Gregory L. Beeche's, submissions with respect to the Mini Cranes (e.g., Dkt. No. 115), one (1) of which is in Enclos' possession and six (6) of which remain onsite at the GBL facility at 356 Hudson River Road, Waterford, NY 12188. Based on a review of GBL's books and records (including those contained within Mr. Beeche's submissions), the Mini Cranes were the personal property of GBL subject to GBL's security agreement with plaintiff, McCormick 103, LLC, as successor in interest to Bank of America, N.A. By that agreement, a true copy of which is enclosed, GBL agreed "not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in any Collateral, except sales of inventory to

ATTORNEYS AT LAW

**TODD A. RITSCHDORFF   PARTNER   DIRECT 518 618 1212   TRITSCHDORFF@PHILLIPSLYTLE.COM**

**3 WINNERS CIRCLE SUITE 306 ALBANY, NEW YORK 12205-1161** PHONE **(518) 472-1224** FAX **(518) 472-1227 | PHILLIPSLYTLE.COM**

**NEW YORK:** ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER | **CHICAGO, IL** | **WASHINGTON, DC** | **CANADA:** WATERLOO REGION



Hon. Anne M. Nardacci                                                    April 24, 2026
Page 2

buyers in the ordinary course of [GBL's business] . . . . " (Security Agreement ¶ 3(b)(vii)).  The Mini Cranes were equipment utilized in GBL's business, not inventory.  In addition, at all relevant times, plaintiff had a duly perfected security interest in all personal property assets of GBL, including the Mini Cranes.  A true copy of plaintiff's filed UCC-1 financing statement, as continued, is also enclosed for Your Honor's reference.  As a result, to the extent GBL sold the Mini Cranes to Enclos, the sale violated GBL's security agreement with plaintiff and the Mini Cranes were transferred to Enclos subject to plaintiff's duly recorded lien.  N.Y. U.C.C. § 9-315(a)(1).

Although the Receiver has confirmed a GBL QuickBooks entry reflecting GBL's receipt of $500,000 on May 14, 2024, which appears to relate to the Mini Cranes, those funds were not segregated by GBL and are no longer available.  Thus, a priority dispute exists between plaintiff and Enclos relating to the Mini Cranes.  In early March 2026, the Receiver communicated with Enclos and invited Enclos to seek relief from this Court if Enclos believed that it had a superior interest in the Mini Cranes.  The Receiver also consented to Enclos filing a motion on an emergency basis.  Enclos never sought relief in this Court concerning the Mini Cranes.

Accordingly, the Receiver respectfully submits that plaintiff and Enclos should be heard on the issue of priority with respect to the Mini Cranes.  In the interim, the Receiver will continue to safeguard the Mini Cranes pending further direction from the Court.

### Efforts to Locate Outstanding Hoists Via Server Access

Following the conference before Your Honor on April 17, 2026, the Court provided me with the administrator login credentials for three (3) GBL servers, *viz.*, GBSERV1, GBSERV2, and GBSERV3.  The following is a brief summary of the Receiver's preliminary findings concerning the GBL servers, specifically as it relates to locating GBL equipment, including hoists.

- GBSERV1 - the Receiver was able to access GBSERV1 with the credentials provided.  GBSERV1 appears to be GBL's primary server, which signaled drive failure warnings due to the system crash detailed in the Receiver's Interim Status



Hon. Anne M. Nardacci                                                    April 24, 2026
Page 3

Report dated October 24, 2025.  Dkt. No. 49-1.  GBSERV1 contains roughly one (1) terabyte of data consisting of mostly computer-aided design/drafting files; the process to export this data has commenced.  At this time, there is no indication that GBSERV1 contains information that will assist the Receiver in locating equipment outside the GBL facility, including hoists, but a review is ongoing.  In addition, it appears that GBSERV1 regularly ran a mirror backup to two (2) Network Attached Storage (NAS) devices.  The Receiver has confirmed that one of the NAS devices contains no data, and a review of the other NAS device is in progress.

- GBSERV2 contained the drives that were removed due to the system crash detailed in the Receiver's Interim Status Report dated October 24, 2025.  Dkt. No. 49-1.  As reported, these drives were sent to a secure digital forensic laboratory in February 2026.  Dkt. No. 74-1.  Based on the data contained on GBSERV1, the Receiver believes that GBSERV2 contains QuickBooks and Windows Server operating system files, but this cannot be confirmed until the data on GBSERV2 drives is retrieved.  Unfortunately, the administrator login credentials will not provide access to the GBSERV2 drives unless they are shipped back to the GBL facility, successfully reinstalled, and determined to be operational.  The Receiver believes that there is an increased risk of data loss associated with shipping the drives back to the GBL facility and attempting reinstallation.  As a result, the Receiver has engaged the digital forensic laboratory to extract the data on the GBSERV2 drives as described in the Receiver's Interim Status Report dated February 20, 2026. Dkt. No. 74-1.

- GBSERV3 - the Receiver was able to access GBSERV3 with the credentials provided.  GBSERV3's operating system was intact but the data drive (D:) had no directories or files listed.  Based on the Receiver's review, it appears that GBSERV3 contains no data.

The Receiver will continue his efforts to confirm the status of GBL equipment, including hoists, and will provide the Court with an update following a review of the remaining



Hon. Anne M. Nardacci                                                    April 24, 2026
Page 4

NAS device in connection with GBSERV1 and the results of the digital forensic laboratory's data extraction on GBSERV2.

Finally, the Receiver has not located any emails on GBSERV1, and he believes that there could be information in GBL emails relative to locating outstanding hoists. GBL emails appear to be housed externally with Microsoft, and the Receiver has requested that Mr. Beeche and his daughter, Kim Covert (Beeche), transfer control of the Microsoft account to the Receivership Estate.

Thank you for the Court's time and attention to these matters.

Respectfully submitted,

Phillips Lytle LLP

By  */s/ Todd A. Ritschdorff*

Todd A. Ritschdorff
TAR/

Enclosures

CC:    All counsel of record
       (via CM/ECF)

       Gregory L. Beeche
       (via email: gregbeeche@gmail.com)



**Bank of America**

## SECURITY AGREEMENT
### (Multiple Use)

1. THE SECURITY. The undersigned **Greg Beeche, Logistics, LLC** and **Greg Logistics, LLC** (jointly, the "Pledgor") hereby assigns and grants to **Bank of America, N.A.**, its successors and assigns ("BANA"), and to Bank of America Corporation and its subsidiaries and affiliates (BANA and all such secured parties, collectively, the "Bank") a security interest in the following described property now owned or hereafter acquired by the Pledgor (the "Collateral"):

(a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account.

(b) All inventory.

(c) All equipment and fixtures now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).

(d) All of the Pledgor's deposit accounts with the Bank. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e) All instruments, chattel paper, documents, certificates of deposit, securities and investment property of every type.

(f) All general intangibles. The Collateral shall include all good will connected with or symbolized by any of such general intangibles.

(g) All negotiable and nonnegotiable documents of title covering any Collateral.

(h) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.

(j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("Books and Records").

2. THE INDEBTEDNESS. The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness of the Pledgor to the Bank; (b) all obligations of the Pledgor and rights of the Bank under this Agreement; and (c) all present and future obligations of the Pledgor to the Bank of other kinds. Each party obligated under any Indebtedness is referred to in this Agreement as a "Debtor." "Indebtedness" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of the Debtor, now or hereafter existing, absolute or

- 2 -

contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative, foreign exchange, hedge, or other arrangement ("Swap"), deposit, treasury management or other similar transaction or arrangement, and whether the Debtor may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of such Pledgor shall not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by such Pledgor to the Bank of, or the grant by such Pledgor of a security interest to the Bank to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of such Pledgor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

Except as otherwise agreed in writing by the Bank and the Pledgor, if the Indebtedness includes, now or hereafter, any Special Flood Zone Loan, then the following shall apply: The Special Flood Zone Loan shall not be secured under this Agreement by any Collateral which would constitute "contents" located within the Flood Zone Improvements. Notwithstanding the foregoing, all of the Collateral covered by this Agreement, including "contents," shall secure the following specific loan which is secured by improved real property, including any amendments, renewals or replacements thereof: Loan Agreement among Pledgor and Bank dated on even date herewith. For the purposes of this subparagraph, (a) "Flood Zone Improvements" means any "improved" real property that is located within a Special Flood Hazard Area; (b) a "Special Flood Zone Loan" means a loan or line of credit which is secured by Flood Zone Improvements; and (c) the terms "improved" real property, "Special Flood Hazard Area," and "contents" shall have the meaning ascribed to them by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001 *et seq.*, and implementing regulations, 44 C.F.R. Parts 59 *et seq.,* and/or the Federal Emergency Management Agency ("FEMA").

3.  <u>PLEDGOR'S COVENANTS</u>.  The Pledgor represents, covenants and warrants that unless compliance is waived by the Bank in writing:

(a)  The Pledgor agrees: (i)  to indemnify the Bank against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit the Bank to exercise its rights under this Agreement; (iii) to execute and deliver such documents as the Bank deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name (including, for an individual, the Pledgor's name on any driver's license or special identification card issued by any state), and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered or its business structure without giving the Bank at least 30 days prior written notice; (v) not to change the places where the Pledgor keeps any Collateral or the Pledgor's Books and Records concerning the Collateral without giving the Bank prior written notice of the address to which the Pledgor is moving same; and (vi) to cooperate with the Bank in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as the Bank deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

(b)  The Pledgor agrees with regard to the Collateral, unless the Bank agrees otherwise in writing:  (i) that the Bank is authorized to file financing statements in the name of the Pledgor to perfect the Bank's security interest in the Collateral; (ii) that the Bank is authorized to notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral; (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Pledgor's premises except in the ordinary course of the Pledgor's business; (v) to pay when due all license fees, registration fees

- 3 -

and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of the Bank; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of the Pledgor's business; (viii) to permit the Bank to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit the Bank to inspect the same and make copies at any reasonable time; (x) if requested by the Bank, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of the Bank, and to immediately endorse as appropriate and deliver such Collateral to the Bank daily in the exact form in which they are received together with a collection report in form satisfactory to the Bank; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise the Bank thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by the Bank, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to the Bank all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event the Bank elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by the Bank, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

(c)  If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Pledgor shall immediately deliver such document to the Bank, together with any necessary endorsements.

(d)  The Pledgor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation flood, windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to the Bank, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to the Bank and include a lender loss payable endorsement and additional insured endorsement in favor of the Bank in a form acceptable to the Bank.  Upon the request of the Bank, the Pledgor will deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

(e)  The Pledgor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless the Pledgor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by the Bank of the Collateral from such real property or fixture.  Such written consent shall be in form and substance acceptable to the Bank and shall provide that the Bank has no liability to such owner, holder of any lien, or any other person.

4.  BANK RIGHTS.  The Pledgor appoints the Bank its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement

Doc #01-3009560.1

- 4 -

and may be exercised from time to time by the Bank's officers and employees, or any of them, whether or not the Pledgor is in default: (a) to perform any obligation of the Pledgor hereunder in the Pledgor's name or otherwise; (b) to release persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release the Bank's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which the Bank is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by the Bank, at the Bank's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto the Pledgor's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which the Bank is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of the Pledgor or otherwise, deemed by the Bank as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

5. <u>DEFAULTS</u>. Any one or more of the following shall be a default hereunder:

(a) The occurrence of any defined or described event of default under, or any default in the performance of or compliance with any obligation, agreement, representation, warranty, or other provision contained in (i) this Agreement, or (ii) any other contract or instrument evidencing the Indebtedness.

(b) Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

6. <u>BANK'S REMEDIES AFTER DEFAULT</u>. In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:

(a) Declare any Indebtedness immediately due and payable, without notice or demand.

(b) Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c) Enforce the security interest of the Bank in any deposit account of the Pledgor maintained with the Bank by applying such account to the Indebtedness.

(d) Require the Pledgor to obtain the Bank's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e) Require the Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind.

(f) Require the Pledgor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Bank's exclusive control.

Doc #01-3009560.1

- 5 -

(g) Give notice to others of the Bank's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

(h) Require the Pledgor to assemble the Collateral, including the Books and Records, and make them available to the Bank at a place designated by the Bank.

(i) Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of the Pledgor's equipment, if the Bank deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(j) Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Pledgor irrevocably authorizes the Bank to endorse or sign the Pledgor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Pledgor and remove therefrom any payments and proceeds of the Collateral.

(k) Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Pledgor.

(l) Use or transfer any of the Pledgor's rights and interests in any Intellectual Property now owned or hereafter acquired by the Pledgor, if the Bank deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Pledgor agrees that any such use or transfer shall be without any additional consideration to the Pledgor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Pledgor has any right or interest, whether by ownership, license, contract or otherwise.

(m) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(n) Take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Pledgor hereby irrevocably constitutes and appoints the Bank as the Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(o) Without notice or demand to the Pledgor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Bank or any of the Bank's agents or affiliates to or for the credit of the account of the Pledgor or any guarantor or endorser of the Pledgor's Indebtedness.

(p) Exercise all rights, powers and remedies which the Pledgor would have, but for this Agreement, with respect to all Collateral.

Doc #01-3009560.1

- 6 -

(q) Receive, open and read mail addressed to the Pledgor.

(r) Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

(s) Exercise any other remedies available to the Bank at law or in equity.

7. ENVIRONMENTAL MATTERS.

(a) The Pledgor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b) The Pledgor shall deliver to the Bank, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to the Pledgor's property, activities, or operations, or (ii) any claim against the Pledgor regarding hazardous substances.

(c) The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Pledgor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests. The Pledgor shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with the Pledgor's use of the Collateral. The Bank is under no duty to observe the Collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") will (i) result in a waiver of any default of the Pledgor; (ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Pledgor or any other party, the Pledgor authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Pledgor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Pledgor by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Pledgor) by the Pledgor without advice or assistance from the Bank.

(d) The Pledgor will indemnify and hold harmless the Bank from any loss or liability the Bank incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about the Pledgor's property or operations or

Doc #01-3009560.1

- 7 -

property leased to the Pledgor. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.  **WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

9.  WAIVER OF CLASS ACTIONS.  The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

10.  MISCELLANEOUS.

(a)  Any waiver, express or implied, of any provision hereunder and any delay or failure by the Bank to enforce any provision shall not preclude the Bank from enforcing any such provision thereafter.

(b)  The Pledgor shall, at the request of the Bank, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as the Bank may reasonably deem necessary.

(c)  All notes, security agreements, subordination agreements and other documents executed by the Pledgor or furnished to the Bank in connection with this Agreement must be in form and substance satisfactory to the Bank.

(d)  Governing Law.  Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

Doc #01-3009560.1

- 8 -

(e) The Pledgor agrees that the Collateral may be sold as provided for in this Security Agreement and expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law, including the New York Lien Law.

**11. FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

12  NOTICES. Unless otherwise provided in this Agreement or in another agreement between the Bank and the Pledgor, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as the Bank and the Pledgor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

13. COUNTERPARTS. This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

14. AMENDMENTS. This Agreement may only be amended by a writing signed by the parties hereto.

Doc #01-3009560.1

[Signature Page Follows]

Doc #01-3009560.1

**GREG BEECHE, LOGISTICS, LLC**

By: _____ [(Seal)]
Name: _Gregory L. Beeche_____
Title:  _Managing Member_____

**GREG LOGISTICS, LLC**

By: _____ [(Seal)]
Name: _Gregory L. Beeche_____
Title:  _Managing Member_____

Pledgor's Location:
356 Hudson River Road
Waterford, New York 12188

Pledgor's state of incorporation
or organization: New York.

[Signature Page 2 - Security Agreement]

The parties executed this Agreement as of April 13, 2017, intending to create an instrument executed under seal.

BANK OF AMERICA, N.A.

By: _____

Name: _Tim Kensky_____

Title: _Vice President_____

Address for Notices:
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT  06032

[Signature Page 1 - Security Agreement]

**415741**     **2017 Apr 20 AM11:49**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Aidan Campbell, 716-847-8302**

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Phillips Lytle LLP
One Canalside, 125 Main Street
Buffalo, NY 14203, USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | |
|---|---|
| 1a. ORGANIZATION'S NAME   **Greg Beeche, Logistics, LLC** | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS   **356 Hudson River Road** | CITY   **Waterford** | STATE **NY** | POSTAL CODE **12188** | COUNTRY **USA** |
|---|---|---|---|---|

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION **limited liability** | 1f. JURISDICTION OF ORGANIZATION **New York** | 1g. ORGANIZATIONAL ID #, if any **NONE** | X NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | |
|---|---|
| 2a. ORGANIZATION'S NAME | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | |
|---|---|
| 3a. ORGANIZATION'S NAME   **Bank of America, N.A.** | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS   **70 Batterson Park Road** | CITY   **Farmington** | STATE **CT** | POSTAL CODE **06032** | COUNTRY **USA** |
|---|---|---|---|---|

4. This FINANCING STATEMENT covers the following collateral:
**All of Debtor's assets, including but not limited to, all now owned or hereafter acquired, created or arising accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts and investment property, and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds.**

5. ALTERNATIVE DESIGNATION [if applicable]:   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA **NY SOS; #3031698.1**

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# Filing Number-201704208164063

**0871540        2021 Oct 25 AM08:10**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Lien Solutions 800-331-3282**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐ **Lien Solutions**
**P.O. Box 29071**
**Glendale, CA 91209-9071, USA**
**uccfilingreturn@wolterskluwer.com**
**(Fax)818-662-4141**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE #   201704208164063 Filedate: 20-APR-17 | 1b.   This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c, also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME **BANK OF AMERICA, N.A.** | | | |
|---|---|---|---|
| OR  9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA NY-0-83090421-62432901- DEBTOR: GREG BEECHE, LOGISTICS, LLC

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

**Filing Number-20211025 6709994**

209907

2025 JUN 20 PM 1:30

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation - Brandi Kirsch
4400 Easton Commons, Suite 125
Columbus, Ohio 43219

Drawdown #30

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #

201704208164063 filed 04/20/17

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | FIRST NAME | MIDDLE NAME | SUFFIX |
| OR 6b. INDIVIDUAL'S LAST NAME | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| McCormick 103, LLC | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Executive Plaza II, Suite 902, 11350 McCormick Road | Hunt Valley | MD | 21031 | USA |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

Debtor: Greg Beeche, Logistics, LLC

NEW YORK DEPARTMENT OF STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

NYUCC3PNAT - 7/15/2014 Wolters Kluwer Online

# FILING NUMBER: 202506200222832