**Honorable Anne M. Nardacci**
United States District Court
Northern District of New York
James T. Foley Courthouse
Albany, New York 12207



U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

MAY 0 6 2026

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

**Re:** *McCormick 103 LLC v. Greg Beeche Logistics LLC, et al.*
Civil Action No. 1:25-cv-00944-AMN-CBF, answers to files 126,127,128.

**Submission of Gregory L. Beeche (Pro Se)**

Your Honor:

I, Gregory L. Beeche, respectfully submit this statement pro se, as I have not yet retained counsel, in response to matters presently before the Court, including, but not limited to, filings related to BG Lift hoists, Enclos Corp.

---

## I. BG Hoists Transaction

With respect to the BGLift hoists purchased by Enclos prior to the appointment of the Receiver, I state that such transactions were conducted in the ordinary course of business. The hoists at issue were designed and invented by me and manufactured in Italy.

Greg Beeche Logistics LLC ("GBL") originally ordered 24 units and paid a 30% deposit. Prior to finalizing the purchase, GBL sought financing from Bank of America for the remaining 70% balance. However, due to the global COVID-19 pandemic, manufacturing delays extended for more than one year, during which time the financing offer expired.

As a result, GBL was required to self-finance the purchase and could only afford to acquire 12 units. The remaining 12 units were forfeited along with the associated deposit, despite having already been manufactured. This outcome demonstrates that the lender declined to recognize the equipment as acceptable collateral, contrary to assertions made by Mr. Todd Ritschdorff.

However, McCormick's attorney, Mr. Schueller, submitted the BofA UCC filing recently, noted that in the Bank of America's Security Agreement on page 3 (document 121) which states as follows:

*"(vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of the Pledgor's business;"*

BofA's security agreement allows the sales of inventory to buyers in the ordinary course of the Pledgor's business. It hasn't any restrictions regarding sale of GBL rental equipment in any of the

historical BofA documents, we've attached more BofA amendment documents, as Exhibits in this file.

The BGLifts hoists are similar to other rental equipment owned by GBL such as Lissmac hoists, Tractel hoists, etc. As such, the BGLifts hoists were sold to Enclos in the normal course of GBL's business, just as the Tractel hoists, hoist conveyors and powered wire rope winders were sold to BrandSafway while GBL was under the control of the receiver. There are no differences between the Enclos transaction and the BrandSafway transaction.

As a matter of fact, there is no difference between Tractel hoists and the BGLifts as they are both hoisting machines in GBL's rental equipment inventory.

McCormick's allegation that GBL used the BGLifts to perform lifting as a service like a crane company such as Bay Crane is not accurate. GBL did not provide lifting services. The BGLifts are exactly the same use as rental equipment like every other product GBL provided.

All of the equipment, including the BGLifts is for rent and can also be sold in the normal course of GBL's business.

This transaction is consistent with prior sales conducted by GBL, including a $450,000 sale of Tractel hoists to BrandSafway during the period in which the Receiver had assumed control of GBL's accounts and operations. As a matter of fact, the Receiver didn't oppose this sale; he used the proceeds as well.

I respectfully submit that the Receiver's characterization of these transactions constitutes an overreach and is part of a broader pattern of conduct intended to undermine both GBL and myself personally.

It is fair to mention Your Honor, that I am for honesty and justice and that in as much as the receiver is taking all assets and although selling for 5% of its discounted values does reduce my 'debt' if we do not allow this company to take what It bought. But Your Honor the right thing to do is give this company its property; they trusted us to do the proper fair thing.

## II. Procedural History and Due Process Concerns

On July 17, 2025, McCormick initiated proceedings seeking the appointment of a Receiver, with a return date approximately 21 days later. On or about July 23, 2025, I was served with over 500 pages of filings. Shortly thereafter, an emergency motion was filed requiring a response within two days and scheduling a hearing for August 1, 2025.

Due to the volume and timing of these filings, it was not feasible to retain counsel within the allotted timeframe. Multiple (3) attorneys advised me to file for Chapter 13 bankruptcy protection, which I did. That filing triggered an automatic stay pursuant to federal law under the jurisdiction of the Honorable Judge Patrick G. Radel.

Notwithstanding the automatic stay, the August 1, 2025 hearing proceeded in my absence, I was told this hearing was cancelled. I was therefore unable to present any defense on behalf of myself or GBL. The Court subsequently ruled against both the company and me personally.

During the same proceeding, I was removed as a party to the litigation, and the matter proceeded without my personal participation thereafter.

## III. Actions of the Receiver

Following the appointment of the Receiver, Mr. Dotan Y. Melech, actions were taken that, in my view, exceeded the scope of his authority.

Representatives of the Receiver entered GBL's premises, altered physical locks to prevent others' access, assumed control over company bank accounts, and directed access to company servers through a former IT subcontractor, Mr. Tom Morgan.

From the outset, Mr. Melech repeatedly demanded that I relinquish proprietary intellectual property, consisting of approximately 3.2 terabytes of data developed over a 40-year period, as well as ownership of real property located at 356 Hudson River Road. These demands were accompanied by statements to the effect that failure to comply would result in the shutdown of the company, among other threats.

These communications caused significant distress to my staff and family members, including my wife, and assistant, who was present during certain interactions.

## IV. Server Access and Damage

Approximately one month after access was granted to the Receiver's representatives, and beyond the initial 45-day receivership period, unauthorized activity to extract IP owned by me occurred on GBL's servers during the night of September 24–25, 2025.

Software designed to rapidly extract data was installed by an individual associated with the Receiver, after which the servers were subjected to sustained activity that resulted in system failure within approximately two hours. Activity reportedly continued for an additional 20 hours thereafter. This was not just a mere visit of need to see. This was the first time they entered our server after Mr. Morgan gave them access. This was an attempted theft per Mr. Morgans' expert opinion; and was done after the 45 days of the receiver time had expired. No one asked us for the confidential passwords needed to get legally into where they wanted to get to.

Subsequently, I was informed by counsel for the Receiver that the servers are now substantially damaged such that the IP may be permanently lost. I have also learned that company email systems and the corporate website have been deliberately disabled.

## V. Liquidation of Assets

The Receiver proceeded to liquidate GBL's rental/lease/sale inventory, including approximately $19.5 million in steel and aluminum equipment Already discounted, they deliberately sold for SCRAP price garnering approximately 5% of its value. Dotan is expert in these court processes and knows you can obtain auctions above 20% or its true value. Dotan called me bragging how he sold all our-plant's assets for SCRAP prices on purpose. On September 2025, he told us more than once: "*transfer the IP or you will see* what happen next". He destroyed GBL and my life's work not to mention my family future. As an honest person, I personally guaranteed by co-signs debt.

This inventory included a substantial fleet of patented aluminum extrusion ADT systems, totaling approximately 17 miles 90,000 ln ft., which historically generated rental income at a rate of approximately $7 per linear foot per month. Based on past utilization, this equipment was capable of generating substantial recurring monthly revenue of over $600,000 per month if fully rented at historical pricing.

Mr. Schuellers motion (document 128 to shut down my Pro se status because I am harassing the Receiver is not true, Your Honor; I'm not harassing; I am telling to total exact truth. My methods are not as an attorney and I apologize.

Mr. Dotan; Mr. Schueller; Mr. Ritschdorff all are deliberately withholding my right to know what was paid to what assets and to whom did they "SELL" them to. This is unfair as they know I am personally attempting to work with BrandSafway on a large NYC project that yields $4.66M in advance payment. I personally have been working on their project and I might mention that the company, GBL, stopped regular payments to me of my income in May 2024: and my assistants' income stopped altogether more than 4 years ago. I did receive some compensation when available.

Judge Anne M. Nardacci; I am not an attorney; I apologize for incorrect presentations; but Judge, I am not harassing anyone: I am begging the court to see the truth and to give all the creditors including unpaid employees what they are due, as best as can occur.

## VI. Valuation and Allegations

The Receiver has represented in writing that GBL was valued at approximately $40 million, while McCormick allegedly settled its claims for approximately $10 million in related proceedings; the receiver under oath.

Despite these valuations, actions taken by the Receiver have resulted in the effectively dismantling of the company and severe financial harm to me personally as well as the creditors of GBL.

Additionally, I have reason to believe that attempts were made to access and appropriate proprietary intellectual property without authorization, as indicated by statements from Mr. Morgan. The Receiver wrote a report that the IP is worth almost $3M.

## VII. Conclusion

In light of the foregoing, I respectfully request that the Court review the actions taken by the Receiver, Mr. Melech; this, including but not limited to the handling of company assets, access to proprietary IP systems, and the circumstances under which these events occurred. Mr. Melech the receiver should be removed and be accountable for his illegal actions.

Your Honor; I respectfully request that as I am the sole owner of the plant/office facility, that I am allowed to enter my property at any time that I need; there are 34 cameras observing activity 24 hours per day.

I further reserve the right to seek appropriate relief and to refer certain matters to relevant authorities, as warranted.

Respectfully submitted,

**Gregory L. Beeche**
Pro Se Litigant

May 6, 2026

# Exhibit A

 **Bank of America**

## THIRD AMENDMENT TO LOAN AGREEMENT

This Third Amendment (the "Amendment") dated as of February __ 2020, is between **BANK OF AMERICA, N.A.** (the "Bank") and **GREG BEECHE, LOGISTICS, LLC** (the "Borrower").

### RECITALS

A.      The Bank and the Borrower entered into a certain Loan Agreement dated as of April 20, 2017 (as it may be amended from time to time, the "Agreement") pursuant to which the Bank extended various credit facilities to the Borrower.

B.      The Bank and the Borrower desire to amend the Agreement to modify the repayment terms applicable to the Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) Equipment Line of Credit, which has an outstanding principal balance as of the date of this Amendment of One Million Twenty Three Thousand One Hundred Twenty Six and 49/100 Dollars ($1,023,126 49).

### AGREEMENT

1.      Definitions. Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2.      Amendments. The Agreement is hereby amended as follows:

A.   Subsection 2A.2 of the Agreement is hereby amended and restated in its entirety and shall read as follows

**"2A.2   Availability Period.**

The Equipment Line of Credit is available between November 8, 2017 and February 29, 2020 (the "Availability Period"), or such earlier date as the availability may terminate as provided in this Agreement (the "Facility No. 3 Expiration Date")."

B   Subsection 2A.3 of the Agreement is hereby amended and restated in its entirety and shall read as follows

**"2A.3   Repayment Terms.**

(a)      The Borrower will pay interest on December 1, 2017, and then on the same day of each month thereafter until payment in full of any principal outstanding under this facility

(b)      The Borrower will repay the principal amount outstanding on the Facility No. 3 Expiration Date in equal installments beginning on March 1, 2020, and on the same day of each month thereafter, and ending on November 1, 2023 (the "Repayment Period"). Each principal installment shall be in an amount equal to (i) the principal amount outstanding on the Facility No. 3 Expiration Date, divided by (ii) 60. On the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due "

3      Conditions Precedent   The effectiveness of this Amendment is conditioned upon

a       the Bank's receipt of a fully executed counterpart of this Amendment from the Borrower,

and

b      if applicable, Borrower's compliance with Subsection 7.22(b) of the Agreement.

4      Fees and Expenses. The Borrower acknowledges and confirms that the Bank has incurred certain fees in connection with this Amendment. The Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees.

5      Representations and Warranties. When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, and (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers.

6      Effect of Amendment. Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to the Waiver of Jury Trial provision, shall remain in full force and effect.

7      Counterparts. This Amendment may be executed in multiple counterparts, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically, and each such executed counterpart (and any copy of an executed counterpart that is an electronic record) shall be deemed an original of this Amendment.

8.      FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

The parties executed this Amendment as of the date stated at the beginning of this Amendment, intending to create an instrument executed under seal

BANK OF AMERICA, N.A.

By _____
Typed Name _____
Title _____


GREG BEECHE, LOGISTICS, LLC

By _____
Typed Name _____
Title _____

## CONSENT AND REAFFIRMATION
## OF GUARANTORS AND PLEDGORS

Each of the undersigned (collectively referred to as the "Credit Support Providers") is a guarantor of, and/or is a pledgor of collateral for, the Borrower's obligations to the Bank under the Agreement. Each Credit Support Provider hereby (i) acknowledges and consents to the foregoing Amendment, (ii) reaffirms its obligations under its respective guaranty in favor of the Bank and/or under any agreement under which it has granted to the Bank a lien or security interest in any of its real or personal property, and (iii) confirms that such guaranty and other agreements, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, remain in full force and effect, without defense, offset, or counterclaim. (Capitalized terms used herein shall have the meanings specified in the foregoing Amendment.)

Although each of the undersigned has been informed of the terms of the Amendment, each understands and agrees that the Bank has no duty to so notify it or any other guarantor/pledgor or to seek this or any future acknowledgment, consent or reaffirmation, and nothing contained herein shall create or imply any such duty as to any transactions, past or future.

Dated as of February __, 2020.

Credit Support Provider:

**GREGORY L. BEECHE**

_____

**GREG LOGISTICS, LLC**

By _____
Typed Name _____
Title _____

Doc #4341990 1

# Exhibit B

**BANK OF AMERICA** 

## AMENDMENT NO. 5 TO LOAN AGREEMENT

This Amendment No. 5 (the "Amendment") dated as of May 31, 2023, is between Bank of America, N.A. (the "Bank") and Greg Beeche, Logistics, LLC (the "Borrower").

### RECITALS

A.  The Bank and the Borrower entered into a certain Loan Agreement dated as of April 20, 2017 (together with any previous amendments, the "Agreement") pursuant to which the Bank extended various credit facilities to the Borrower.  As of May 2, 2023, the current commitment amount of Facility No. 1 Line of Credit (the "LOC Loan") is $6,550,000.00 and the current commitment amount of Facility No. 3 Equipment Line of Credit (the "ELOC Loan") is $392,198.42.

B.  The Bank and the Borrower desire to amend the Agreement.  This Amendment shall be effective as of the date hereof, subject to any conditions stated in this Amendment.

### AGREEMENT

1.  **Definitions**.  Capitalized terms used but not defined in this Amendment shall have the meanings given to such terms in the Agreement.

2.  **Amendments**.  The Agreement is hereby amended as follows:

    2.1    Paragraph 1.2 (**Availability Period**.) is hereby amended to read in its entirety as follows:

"The Line of Credit is available between the date of this Agreement and September 30, 2023, or such earlier date as the availability may terminate as provided in this Agreement (the "Facility No. 1 Expiration Date")."

    2.2    In Sub-Paragraph (b) of Paragraph 2A.3 (**Repayment Terms**.) the date "November 1, 2023" is changed to "September 30, 2023."

    2.3    Paragraph 2A.4 (**Interest Rate**.) is hereby amended to read in its entirety as follows:

**"2A.4    Interest Rate.**

(a)    During the Repayment Period, the interest rate is a rate per year equal to the sum of (i) the greater of the Term SOFR Daily Floating Rate or the Index Floor, plus (ii) 3.25 percentage point(s).  For the purposes of this paragraph, "Index Floor" means 0 percent.

(b)    The "Term SOFR Daily Floating Rate" is a fluctuating rate of interest which can change on each banking day.  The rate will be adjusted on each banking day to equal the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the date of determination for a one month term beginning on that date; provided that if such rate is not published prior to 11:00 a.m. Eastern time on such determination date then the Term SOFR Daily Floating Rate will be the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto for a one month term beginning on that date, in each case, plus the SOFR Adjustment.  If at any time the Term SOFR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  For purposes of this paragraph only:

    (i)    "CME" means CME Group Benchmark Administration Limited.

Amendment 5 to Loan Agreement
Greg Beeche, Logistics, LLC                    - 1 -

(ii)    "SOFR" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

(iii)    "SOFR Adjustment" with respect to the Term SOFR Daily Floating Rate, means 0.11448%.

(iv)    "Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Bank) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time).

(v)    "U.S. Government Securities Business Day" means any banking day, except any banking day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable."

2.4    The following Paragraph 4.9 (**Successor Rate.**) is hereby added:

**"4.9    Successor Rate.**

If at any time an interest rate index provided for in this Agreement (a "Reference Rate") is not available at such time for any reason or the Bank makes the determination to incorporate or adopt a new interest rate index to replace such Reference Rate in credit agreements, then the Bank may replace such Reference Rate with an alternate interest rate index and adjustment, if applicable, as reasonably selected by the Bank, giving due consideration to any evolving or then existing conventions for such interest rate index and adjustment (any such successor interest rate index, as adjusted, the "Successor Rate"). In connection with the implementation of any Successor Rate, the Bank will have the right, from time to time, in good faith to make any conforming, technical, administrative or operational changes to this Agreement as may be appropriate to reflect the adoption and administration thereof and, notwithstanding anything to the contrary herein or in any other loan document, any amendments to this Agreement implementing such conforming changes will become effective upon notice to the Borrower without any further action or consent of the other parties hereto. If at any time any Successor Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement."

3.   Representations and Warranties.  When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers, (e) the information included in the Beneficial Ownership Certification most recently provided to the Bank, if applicable, is true and correct in all respects, and (f) as of the date of this Amendment and throughout the term of the Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA.

4.   Conditions.  The effectiveness of this Amendment is conditioned upon the Bank's receipt of the following items, in form and content acceptable to the Bank:

4.1    A fully executed counterpart of this Amendment from the Borrower and each guarantor and/or collateral pledgor (collectively, a "Credit Support Provider") in form satisfactory to the Bank.

Amendment 5 to Loan Agreement
Greg Beeche, Logistics, LLC         - 2 -

4.2    KYC Information.

(a)    Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)    If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

4.3    If the Borrower or any Credit Support Provider is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such Credit Support Provider of this Amendment and any instrument or agreement required under this Amendment have been duly authorized.

4.4    Payment by the Borrower of all costs, expenses and attorneys' fees incurred by the Bank in connection with this Amendment as of May 2, 2023, in the amount of $1,873.00. Upon execution of this Amendment, the Borrower hereby authorizes the Bank to debit such amount from the Borrower's deposit account ending in x0494. The Bank expressly reserves the right to reimbursement of, and the Borrower agrees to promptly reimburse upon demand by Bank, any additional legal fees and costs that may be incurred by the Bank in connection with this Amendment and the Loan Documents from on and after May 3, 2023.

5. Effect of Amendment. Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, shall remain in full force and effect.

6.    Electronic Records and Signatures.    This Amendment and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Amendment (each a "Communication"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf. The Borrower agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Borrower to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Bank's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Obligor without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

7. FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES

Amendment 5 to Loan Agreement
Greg Beeche, Logistics, LLC                          - 3 -

WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

The parties executed this Amendment as of the date stated at the beginning of this Amendment, intending to create an instrument executed under seal.

Bank:

**Bank of America, N.A.**

By: _____
Matthew J. Hyland, Senior Vice President

Borrower:

**Greg Beeche, Logistics, LLC**

By: _____ (Seal)
Gregory L. Beeche, Managing Member

Amendment 5 to Loan Agreement
Greg Beeche, Logistics, LLC                    - 4 -

### CONSENT AND REAFFIRMATION
### OF GUARANTORS AND PLEDGORS

Each of the undersigned (collectively referred to as the "Credit Support Providers") is a guarantor of, and/or is a pledgor of collateral for, the Borrower's obligations to the Bank under the Agreement. Each Credit Support Provider hereby (i) acknowledges and consents to the foregoing Amendment, (ii) reaffirms its obligations under its respective guaranty in favor of the Bank and/or under any agreement under which it has granted to the Bank a lien or security interest in any of its real or personal property, and (iii) confirms that such guaranty and other agreements, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, remain in full force and effect, without defense, offset, or counterclaim. (Capitalized terms used herein shall have the meanings specified in the foregoing Amendment.)

Although each of the undersigned has been informed of the terms of the Amendment, each understands and agrees that the Bank has no duty to so notify it or any other guarantor/pledgor or to seek this or any future acknowledgment, consent or reaffirmation, and nothing contained herein shall create or imply any such duty as to any transactions, past or future.

Dated as of May 31st, 2023.

Credit Support Providers:

**Greg Logistics, LLC**

By: _____

Gregory L. Beeche, Managing Member

Individual Guarantor:

_____

Gregory L. Beeche, Individually

Individual Mortgagor:

_____

Gregory L. Beeche, Individually