# APPENDIX 1 (part 1)

Christopher P. Schueller, Esquire
New York Bar No. 2582914
**BUCHANAN INGERSOLL & ROONEY PC**
640 5th Avenue, 9th Floor
New York, NY 10019
Telephone: (212) 440-4400
Fax: (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Plaintiff, McCormick 103, LLC*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCCORMICK 103, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION,<br><br>and<br><br>"JOHN DOE", "JANE DOE", "DOE ASSOCIATES", and "DOE CORP.", the names being fictitious and being intended to refer to any and all adult natural persons and to all partnerships, corporations and other legal entities having, or which may claim to have, any lien against or interest in the Real Property described in the complaint in this action, other than persons or entities already defendants herein,<br><br>*Defendants*. | Civil Action No.1:25-cv-00944-AMN-TWD |

## SECOND AMENDED COMPLAINT

Plaintiff McCormick 103, LLC ("**Plaintiff**"), by and through its attorneys, Buchanan Ingersoll & Rooney PC, for its complaint, alleges as follows:

## PARTIES

1. Plaintiff is a Maryland limited liability company with its principal place of business at 11350 McCormick Road, Hunt Valley, Maryland 21031. The sole member of Plaintiff is McCormick Holdings, LLC which is a Maryland limited liability company. The sole member of McCormick Holdings, LLC is Beltway Capital, LLC which is a Maryland limited liability company.

2. Defendant Greg Beeche, Logistics, LLC ("**GBL**") is a New York limited liability company with its principal place of business at 356 Hudson River Road, Waterford, New York 12188.

3. Defendant Greg Logistics, LLC ("**GL**") is a New York limited liability company with its principal place of business at 356 Hudson River Road, Waterford, New York 12188.

4. Defendant Gregory L. Beeche ("**Beeche**", together with GBL and Greg Logistics, "**Defendants**" together with all other Defendants the "**Defendants**") is, upon information and belief, a New York resident with an address of 65 Smith Road, Mechanicville, New York 12118.

5. Defendant New York State Department of Taxation and Finance ("**NY State**") is made a party defendant herein due to any interest it may have in the Real Property (as defined below) by virtue of any unpaid taxes or other charges which may constitute a lien against the Real Property.

6. Defendants "John Doe", "Jane Doe", "Doe Associates" and "Doe Corp." are fictional names intended to include any and all parties having any interest in the Real Property (as defined below) not otherwise identified above.

7. Upon information and belief, the only members of GBL and GL are Beeche and his son Kirk Beeche, each of whom are residents of the State of New York. Therefore, for diversity purposes, the citizenship of the Defendants and the State of New York is New York.

8. There are dozens of members in the chain of ownership of Beltway Capital, LLC who are citizens of Maryland, Florida, Pennsylvania, Georgia and Washington D.C. All these members are investors in the Plaintiff. The identity of these investors is proprietary to the Plaintiff and there is a compelling business need to keep the identity of these investors secret from competitors of the Plaintiff. Accordingly, the Plaintiff will not name all of these investors in the complaint but will make an in camera presentation of the names of these investors to the Defendants and the Court. *E.g. Tennenbaum Capital Partners LLC v. Kennedy*, 2009 WL 2913679 (S.D.N.Y. Sept. 11, 2009).

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Complete diversity exists establishing subject matter jurisdiction with this Court in that none of the above-captioned defendants, nor their individual or entity members, where applicable, are citizens in the same state in which the Plaintiff and its individual or entity members is a citizen.

10. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, the collateral securing the

loans that are the subject of this dispute is located in this judicial district, and principal defendants are located in this judicial district.

## BACKGROUND

### The First Loan

11. On or about April 20, 2017, Beeche, individually, duly executed and delivered that certain Mortgage Term Loan Agreement (as amended or modified from time to time, the "**First Loan Agreement**") in the original principal amount of $3,600,000.00 ("**First Loan**") to Bank of America, N.A. ("**Original Lender**"). A true and correct copy of the First Loan Agreement is attached hereto as **Exhibit A**.

12. As further security for repayment of the Loan, Beeche executed and delivered to Original Lender a Mortgage Consolidation, Modification and Extension Agreement, Assignment of Rents, Security Agreement and Fixture Filing and Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated April 20, 2017 (and together with all modifications thereof, the "**First Mortgage**"), secured by a first priority lien on certain real property located at 356 Hudson River Road, Waterford, New York 12188 (the "**Real Property**"). The First Mortgage was recorded in the Office of Saratoga County Clerk (the "**Records**") on May 15, 2017, at Instrument #2017014776 and Instrument #2017014774. A true and correct copy of the First Mortgage is attached hereto as **Exhibit B.**

13. Original Lender perfected its security interest in and to Beeche's fixtures by filing UCC-1 fixture filings in the Records. A true and correct copy of the filed UCC-1 is attached hereto as **Exhibit C.**

### The Second Loan

14. On or about April 20, 2017, Beeche duly executed and delivered that certain Construction Loan Agreement (as amended or modified from time to time, the "**Second Loan Agreement**") in the original principal amount of $1,150,000.00 ("**Second Loan**") to Original Lender. A true and correct copy of the Second Loan Agreement is attached hereto as **Exhibit D**.

15. As further security for repayment of the Loan, Beeche executed and delivered to Original Lender a Construction Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated April 20, 2017 (together with all modifications thereof, the "**Second Mortgage**"), secured by a second priority lien on the Real Property. The Second Mortgage was recorded in the Records on May 15, 2017, at Instrument #2017014777. A true and correct copy of the Second Mortgage is attached hereto as **Exhibit E**.

16. Original Lender perfected its security interest in and to Beeche's fixtures by filing UCC-1 fixture filings in the Records. A true and correct copy of the filed UCC-1 is attached hereto as **Exhibit F.**

**The Third Loan**

17. On or about April 20, 2017, GBL duly executed and delivered that certain Loan Agreement (as amended or modified from time to time, the "**Third Loan Agreement**") for a line of credit in the amount of $4,000,000.00 and a term loan in the original principal amount of $1,350,000.00 ("**Third Loan**") to Original Lender. A true and correct copy of the Third Loan Agreement is attached hereto as **Exhibit G**.

18. The terms and conditions of the Loan are further governed by a Security Agreement (as amended or modified from time to time, "**Security Agreement**"), dated on or about April 13, 2017, executed by GBL, Greg Logistics, and Original Lender. A true and correct copy of the Security Agreement is attached hereto as **Exhibit H**.

19. As further security for repayment of the Loan, Beeche executed and delivered to Original Lender a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated on or about July 6, 2021 (together with all modifications thereof, the "**Third Mortgage**", and together with First Mortgage and Second Mortgage, the "**Mortgages**"), secured by a lien on the Real Property and a security interest in the personal property described therein (collectively, the "**Personal Property**", together with the Real Property, the "**Property**"). The Third Mortgage was recorded in the Records on September 6, 2024, at Instrument #2024022252. A true and correct copy of the Third Mortgage is attached hereto as **Exhibit I**.

20. Original Lender perfected its security interest in and to fixtures at the Real Property by filing UCC-1 fixture filings in the Records. A true and correct copy of the filed UCC-1 is attached hereto as **Exhibit J.**

**The Fourth Loan**

21. On or about November 8, 2017, GBL duly executed and delivered that Amendment to Loan Agreement (as amended or modified from time to time, the "**Amendment to Third Loan Agreement**") to add a $2,5000,000.00 line of credit which converted to a term loan ("**Fourth Loan**") to Original Lender. A true and correct copy of the Amendment to Third Loan is attached hereto as **Exhibit K**.

**Guaranties**

22. GL, in connection with and as additional security for the Loan, executed and delivered to Original Lender that certain Continuing and Unconditional Guaranty dated as of April 20, 2017 to personally guaranty all debts of GBL and Beeche to the Original Lender (the "**GL Guaranty**"). A true and correct copy of the GL Guaranty is attached hereto as **Exhibit L**.

Case 1:25-cv-00944-AMN-DJS Document 49 Filed 06/23/26 Page 7 of 15

23. GBL, in connection with and as additional security for the Loan, executed and delivered to Original Lender that certain Continuing and Unconditional Guaranty dated as of April 20, 2017 to personally guaranty all debts of Beeche to the Original Lender (the "**GBL Guaranty**"). A true and correct copy of the GBL Guaranty is attached hereto as **Exhibit M**.

24. Beeche, in connection with and as additional security for the Loan, executed and delivered to Original Lender that certain Continuing and Unconditional Guaranty dated as of April 20, 2017 to personally guaranty all the Loans to GBL(the "**Beeche Guaranty**", together with the GL Guaranty and GBL Guaranty, the "**Guaranties**"). A true and correct copy of the Beeche Guaranty is attached hereto as **Exhibit N**.

**Assignment by Original Lender to Plaintiff**

25. On or about June 2, 2025, effective as of May 21, 2025, Original Lender assigned all its right, title and interest to and under the foregoing documents to the Plaintiff pursuant to the following:

a. A Bill of Sale attached as **Exhibit O**;

b. an Assignment of Mortgage Consolidation, Modification and Extension Agreement, Assignment of Rents, Security Agreement and Fixture Filing, recording in the Records on June 17, 2025, at Instrument 2025015799, a true and correct copy of which is attached hereto as **Exhibit P;**

c. an Assignment of Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, recorded in the Records on June 17, 2025 at Instrument 2025015802, a true and correct copy of which is attached hereto as **Exhibit Q**;

d. an Assignment of Leases and Rents, recorded in the Records on June 17, 2025, at Instrument 2025015802, a true and correct copy of which is attached hereto as **Exhibit R**;

e. an Assignment of Leases and Rents, recorded in the Records on June 17, 2025 at Instrument 2025015801, a true and correct copy of which is attached hereto as **Exhibit S**; and

f. an Assignment of Construction Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, recorded in the Records on June 17, 2025, at Instrument 2025015800, a true and correct copy of which is attached hereto as **Exhibit T**.

g. Copies of UCC-3 assignments are attached as **Exhibit U**.

26. Plaintiff's interest in the Property remains perfected.

27. The foregoing documents, as they relate to the First Loan Agreement, First Loan, First Mortgage, Second Loan Agreement, Second Loan, Second Mortgage, Third Loan Agreement, Third Loan, Security Agreement, Third Mortgage, Amendment to Third Loan Agreement, Fourth Loan, and the Guaranties, as the same have been modified or amended from time to time, shall be referred to, collectively, as the "**Loan Documents**."

28. Plaintiff is the owner and holder of the Loan Documents.

29. Plaintiff's interest in the Personal Property and fixtures remains perfected.

30. Plaintiff is in possession of the original First Loan Agreement, Second Loan Agreement, Third Loan Agreement, and Amendment to Third Loan Agreement.

31. All mortgage taxes owing in connection with the Mortgage have been duly paid.

**The Defaults**

32. Events of Default have occurred and are continuing under the Loan Documents.

33. Borrower is in default under the terms and conditions of the Loan Documents as a result of, among other things, (a) Defendants' failure to pay all amounts due under the Third and Fourth Loans by the maturity date of September 30, 2023 under Section 9.1 of the Third Loan Agreement and the Fourth Loan Agreement ("**Maturity Defaults**"); (b) GBL's failure to comply with Section 7.5 Basic Fix Charge Coverage Ratio for the periods ending on March 31, 2023 and June 40, 2023 under the Third Loan Agreement ("**Covenant Default**"); (c) the Maturity Defaults and Covenant Default constitute an event of default under the Section 8.4 of the First Loan Agreement and an event of default under Section 10.1(d) of the Second Loan Agreement; (d) Beeche's failure to pay taxes on the Real Property for tax years 2023, 2024, and 2025 as required under Sections 8.3 and 8.4 of the First Loan Agreement, Sections 10.1(c) and (d) under the Second Loan Agreement, and Section 9.4 of the Third Loan Agreement; and (e) Beeche's failure to make any of the debt service payments as of July 2025 under the First Loan and Second Loan.

34. More specifically, Defendants have not made any payments on the Third and Fourth Loans since October of 2023. Defendants have failed to make any payments on the First and Second Loan since June of 2025.

35. As July 14, 2025, the balances due under the Loans are the following:

- **First Loan**: Principal of $2,583,614.96 and interest of $69,050.18.
- **Second Loan**: Principal of $785,833.08 and interest of $19,654.21.
- **Third Loan**: Principal of $6,550,000 and interest of $1,037,535.51.
- **Fourth Loan**: Principal of $323,989.98 and interest of $62,020.15.

36. By letters dated May 17, 2024, May 5, 2025, and May 15, 2025 ("**Notices of Default**"), Plaintiff notified Defendants of the defaults, accelerated the Loan, and demanded

payment in full of the Loan. True and correct copies of the Notice of Defaults are attached collectively hereto as **Exhibit V**.

37. As of the date hereof, Defendants' defaults are continuing.

38. As of the date hereof, the Loan has been accelerated, and the entire balance of the Loan is due and owing and has not been paid.

39. All conditions precedent to Plaintiff bringing this lawsuit have occurred, have been performed, or have been waived.

40. Plaintiff is entitled to all amounts due and owing under the Loan Documents, including, but not limited to, the payment of its attorneys' fees and other expenses for commencing and prosecuting this action.

41. Plaintiff may have previously expended funds and may hereafter expend funds for the purpose of paying real property taxes or insurance premiums, for the purpose of enforcing its interests pursuant to the Loan Documents, or for otherwise protecting or benefiting the Real Property in order to protect its lien under the Mortgages. Under the terms of the Mortgages, any such expenditures or payments may be added to the indebtedness, and Plaintiff will request that the amounts of such payments, with interest thereon, be adjudicated as part of the judgment of foreclosure and sale sought herein.

42. Upon information and belief, none of the defendants is a minor or incompetent.

43. No action is pending for the recovery of the indebtedness. No judgment has heretofore been entered in favor of Plaintiff and against any defendants for the indebtedness.

44. If a deficiency is incurred upon the disposition of the Real Property referred to herein, the same should be adjudicated against the Defendants, and a judgment in the amount of the deficiency should be entered in Plaintiff's favor.

**FIRST CAUSE OF ACTION AGAINST BEECHE AND NY STATE**
**(Foreclosure of the Mortgages)**

45. Plaintiff repeats and realleges all prior allegations.

46. Beeche is in default under the Loan Documents, including the Mortgages. The indebtedness has been accelerated and/or amounts due under the Loan Documents have been demanded and are due and owing. Accordingly, Plaintiff is entitled to proceed with a foreclosure of the Real Property under the Mortgages.

**SECOND CAUSE OF ACTION AGAINST DEFENDANTS**
**(Breach of Contract – Deficiency Judgment)**

47. Plaintiff repeats and realleges all prior allegations.

48. As set forth above, Beeche breached his obligations under Loan Documents including, without limitation, the Mortgages.

**49.** Pursuant to the Loan Documents, Beeche should be adjudged liable to Plaintiff for any deficiency that may be due to Plaintiff after the Real Property has been sold as described herein, and the proceeds thereof to which Plaintiff is entitled have been paid to Plaintiff.

**50.** Similarly, GBL and GL should be adjudged liable to Plaintiff under their personal guaranties for any deficiency that may be due to Plaintiff after the Real Property has been sold as described herein, and the proceeds thereof to which Plaintiff is entitled have been paid to Plaintiff.

**THIRD CAUSE OF ACTION AGAINST DEFENDANTS**
**(Breach of Contract – Money Judgment)**

51. Plaintiff repeats and realleges all prior allegations.

52. GBL is in default under all the Loan Documents pertaining to the Third and Fourth Loans.

53. The following amounts are due and owing under the Third and Fourth Loans as of May 2, 2025:

- **Third Loan**: Principal of $6,550,000 and interest of $879,660.70.
- **Fourth Loan**: Principal of $323,989.98 and interest of $47,039.15.

54. In addition, attorneys' fees, interest and other charges have accrued and continue to accrue under the Third and Fourth Loan Documents.

55. Plaintiff is entitled to a judgment against all GBL for all amounts due and owing under the Third and Fourth Loans.

56. Plaintiffs is also entitled to a judgment against Beeche and GL under their personal guaranties for all amounts due and owing under the Third and Fourth Loans.

**FOURTH CAUSE OF ACTION AGAINST GBL AND GL**
**(Replevin)**

57. Plaintiff repeats and realleges all prior allegations.

58. Plaintiff has a perfected security interest in the Personal Property.

59. Pursuant to the Loan Documents and the New York Uniform Commercial Code and by virtue of the Common Law of the State of New York, Plaintiff is entitled to possession of the Personal Property and to proceed with a sale of that Personal Property pursuant to Article 9 of the New York Uniform Commercial Code.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered as follows:

A. Upon the First Cause of Action against Beeche:

(a) that the Defendants and all persons whose lien or interest in the Real Property and any Personal Property related thereto first came into existence subsequent to the filing of the Notice of Pendency being filed simultaneously with the filing of this Complaint, be barred and foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption in and to the Real Property and such Personal Property; and

(b) that all amounts due to Plaintiff herein under the First and Second Mortgages (including attorneys' fees and advancements to benefit the Property) as it relates to the Real Property be adjudged and determined; and

(c) that the Real Property and any Personal Property related thereto be decreed to be sold according to law; and

(d) that the Real Property and the contents therein, secured by the First and Second Mortgage and perfected by the fixture filing and UCC filings described above, be sold subject to the following: any state of facts a personal inspection would reveal; the state of facts that a new and accurate survey thereof would show; rights, if any, of tenants or occupants not extinguished by this action; easements, covenants, restrictions and matters of record, if any, recorded prior to the Mortgages; vault taxes, zoning regulations and department orders and violations, if any; chattel mortgages, conditional bills of sale, security agreements and UCC filings, filed or recorded prior to the recording of the First and Second Mortgage and UCC filings; any right of redemption of the United States of America and/or its agencies; any violations in any federal, state, village or municipal department; and unpaid taxes, assessments and water charges, if any; and

(e) that the moneys arising from such sale be brought into this Court; and

(f) that Plaintiff be paid from the proceeds of such sale the amounts adjudged to be due to Plaintiff, with interest to the time of such payment, together with the costs, allowances and expenses of this action, expenses of the sale, any moneys advanced and paid pursuant to any provision of the First and Second Mortgage or to protect the lien of the First and Second Mortgage, and all other charges to be paid in connection with the Real Property, with interest on those amounts from the date of the respective payments, so far as the amount of such moneys properly applicable thereto will pay the same; and

Case 1:25-cv-00944-AMN-TWD Document 1 Filed 07/23/25 Page 14 of 15

(g) that if the proceeds of such sale be insufficient to pay the amounts described in the preceding subparagraph, the officer making the sale be required by the judgment of foreclosure and sale herein to specify the amount of such deficiency in his report of sale, so that application may be made by Plaintiff to this Court under Real Property Actions and Proceedings Law Section 1371 for a deficiency judgment against Beeche; and

(h) pursuant to New York Uniform Commercial Code §§9-601, 9-604, 9-607, 9-610 and any other relevant authority, an order compelling Beeche to surrender possession of the Personal Property to Plaintiff for the purpose of a judicial sale in conjunction with the foreclosure sale of the Real Property, or, alternatively, for a separate public sale pursuant to Article 9 of the New York Uniform Commercial Code; and

(i) that Defendants be enjoined from collecting any rents that may be due on the Real Property; and

(j) that Plaintiff shall have such other and further relief as the Court may deem just and proper.

B. Upon the Second Cause of Action against Defendants:

(a) a money judgment against Defendants for any deficiency that may be due to Plaintiff after the Real Property has been sold as described herein, and the proceeds thereof to which Plaintiff is entitled to have been paid.

C. Upon the Third Cause of Action against all Defendants

(a) a money judgment against Defendants for all amounts due and owing under the Third and Fourth Loans.

D. Upon the Fourth Cause of Action against GBL and GL:

(a) pursuant to New York Uniform Commercial Code §§9-601, 9-604, 9-607, 9-610 and any other relevant authority, an order compelling GBL and GL to surrender possession of the Personal Property to Plaintiff for the purpose of a judicial sale in conjunction with the foreclosure sale of the Property, or, alternatively, for a separate public sale pursuant to Article 9 of the New York Uniform Commercial Code.

E. Upon all Causes of Action:

(a) the appointment of a receiver over the Real Property, Personal Property, GBL and Greg Logistics; and

(b) for other and further appropriate relief including without limitation an award for legal fees and costs.

Dated: January 23, 2026

**BUCHANAN INGERSOLL & ROONEY PC**

By: /s/ Christopher P. Schueller
Christopher P. Schueller
N.Y. Bar No. 2582914
640 5th Avenue, 9th Floor
New York, NY 10019
Telephone: (212) 440-4400
Fax: (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Plaintiff*

# EXHIBIT A

Bank of America

# Loan Agreement

This Agreement dated as of April 20, 2017, is between **Bank of America, N.A.** (the "Bank") and **Gregory L. Beeche** (the "Borrower").

## 1. THE LOAN: FIXED RATE TERM LOAN AMOUNT AND TERMS

### 1.1 Loan Amount.

The Bank agrees to provide a term loan to the Borrower in the amount of Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00) (the "Loan").

### 1.2 Availability Period.

The Loan is available in one disbursement from the Bank on the date of this Agreement.

### 1.3 Interest Rate.

The interest rate is 4.90% per year.

### 1.4 Repayment Terms.

(a) The Borrower will repay principal and interest in one hundred nineteen (119) equal combined installments of Twenty-three Thousand Seven Hundred Thirty Nine Dollars and 17/100 cents ($23,739.17) beginning on June 1, 2017, and on the same day of each month thereafter, and ending on March 1, 2027, based on an amortization period of two hundred forty (240) months, with a final balloon payment of all unpaid principal and interest on May 1, 2027 (the "Repayment Period"). Each installment, when paid, will be applied first to the payment of interest accrued. The balance of each installment will be applied to the repayment of principal.

### 1.5 Prepayments.

(a) The Borrower may prepay the credit in full or in part at any time. The prepayment will be applied to the most remote payment of principal due under this Agreement. Each prepayment, whether voluntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid, and, if the prepayment is made prior to the expiration of the Fixed Rate Term with respect to any principal amount that accrues interest at a fixed rate, a prepayment fee calculated by the Bank. The prepayment fee will be equal to the present value of the difference, if positive, between (i) the sum of the interest payments that would have accrued through the end of the Fixed Rate Term on each prepaid installment of principal at a fixed interest rate for such installment equal to the Original Funding Rate, as if the prepayment had not been made, less (ii) the sum of the interest payments that would have accrued on each prepaid installment of principal at a fixed interest rate for such installment equal to the Reinvestment Rate, as if the prepayment had not been made.

(b) The following definitions will apply to the calculation of the prepayment fee: (i) "Fixed Rate Term" means the full term of the credit during which the interest rate was fixed on the principal amount prepaid, (ii) "Original Funding Rate" means with respect to any prepaid installment of principal, the Swap Rate on the date the interest rate was fixed by the Bank on the principal amount prepaid for a term corresponding to a period of time equal to the Fixed Rate Term, interpolated, if necessary, (iii) "Reinvestment Rate" means with respect to any prepaid installment of principal, the Swap Rate on the date the prepayment fee is calculated by the Bank for a term

corresponding to the period of time remaining until such principal installment was scheduled to be made, interpolated, if necessary, and (iv) "Swap Rate" means, as of any date, the offered U.S. Dollar interest rate swap rate for a fixed rate payer determined by the Bank on such date by reference to the Bloomberg service or such other similar data source then used by the Bank for determining such rate.

## 2. COLLATERAL

### 2.1 Real Property.

(a) The Borrower's obligations to the Bank under the Loan will be secured by a lien covering the following real property owned by Gregory L. Beeche:

356 Hudson River Road
Waterford, New York 12188.

## 3. LOAN ADMINISTRATION AND FEES

### 3.1 Fees.

The Borrower will pay to the Bank the fees set forth on Schedule A.

### 3.2 Collection of Payments.

(a) Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement, or by such other method as may be permitted by the Bank.

(b) Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Bank.

(c) All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.

### 3.3 Borrower's Instructions.

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Bank may honor instructions for advances or repayments and any other instructions under this Agreement given by the Borrower (if an individual), or by any one of the individuals the Bank reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "Authorized Individual"). The Bank may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank.

### 3.4 Direct Debit.

(a) The Borrower agrees that on the due date of any amount due under this Agreement, the Bank will debit the amount due from deposit account number 483043630494 (NY) with the Bank owned by Greg Beeche, Logistics, LLC (the "Designated Account"). Should there be insufficient funds in the Designated Account to pay all such sums when due, the full amount of such deficiency shall be immediately due and payable by the Borrower.

(b) The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.00) percentage point higher than the rate of interest otherwise provided under this Agreement.

**3.5 Banking Days.**

Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due or which are received on a day which is not a banking day will be due or applied, as applicable, on the next banking day.

**3.6 Interest Calculation.**

Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

**3.7 Default Rate.**

Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Bank bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

## 4. CONDITIONS

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

**4.1 Authorizations.**

If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**4.2 Guaranties.**

Guaranties signed by each of (i) Greg Beeche, Logistics, LLC, and (iii) Greg Logistics, LLC.

**4.3 Security Agreements.**

Signed original security agreements covering the personal property collateral which the Bank requires.

**4.4 Perfection and Evidence of Priority.**

Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Bank's interest.

**4.5 Payment of Fees.**

Payment of all fees and other amounts due and owing to the Bank, including without limitation payment of all accrued and unpaid expenses incurred by the Bank as required by the paragraph entitled "Expenses."

**4.6 Good Standing.**

Certificates of good standing for the Borrower from its state of formation and from any other state in which the Borrower is required to qualify to conduct its business.

**4.7 Legal Opinion.**

A written opinion from the Borrower's legal counsel, covering such matters as the Bank may require. The legal counsel and the terms of the opinion must be acceptable to the Bank.

**4.8 Landlord Agreement.**

For any personal property collateral located on real property which is subject to a mortgage or deed of trust or which is not owned by the Borrower (or the grantor of the security interest), an agreement from the owner of the real property and the holder of any such mortgage or deed of trust.

**4.9 Insurance.**

Evidence of insurance coverage, as required in the "Covenants" section of this Agreement.

**4.10 Environmental Information.**

An environmental site assessment prepared by a qualified third party consultant approved by the Bank concerning any potential toxic or hazardous condition with respect to the real property collateral, together with a certification signed by the Borrower regarding the environmental information provided to the Bank.

**4.11 Mortgage and Assignment of Leases and Rents.**

Signed and acknowledged original mortgage and assignment of leases and rents, as required by the Bank, encumbering the real property collateral.

**4.12 Title Insurance.**

An ALTA lender's title insurance policy (on a form acceptable to the Bank and from a title company acceptable to the Bank), for at least Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00), insuring the Bank's interest in the real property collateral, with only such exceptions as may be approved by the Bank and together with such endorsements as the Bank may require.

## 5. REPRESENTATIONS AND WARRANTIES

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

### 5.1 Formation.

If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

### 5.2 Authorization.

This Agreement, and any instrument or agreement required under this Agreement, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

### 5.3 Enforceable Agreement.

This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required under this Agreement, when executed and delivered, will be similarly legal, valid, binding and enforceable.

### 5.4 Good Standing.

In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

### 5.5 No Conflicts.

This Agreement does not conflict with any law, agreement, or obligation by which the Borrower is bound.

### 5.6 Financial Information.

All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the above representations shall also pertain to the trustor(s) of the trust.

### 5.7 Lawsuits.

There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

### 5.8 Collateral.

All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

## 5.9 Permits, Franchises.

The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

## 5.10 Other Obligations.

The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

## 5.11 Tax Matters.

The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

## 5.12 No Event of Default.

There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

## 5.13 Insurance.

The Borrower has obtained, and maintained in effect, the insurance coverage required in the "Covenants" section of this Agreement, including flood insurance to the extent required by the Bank under Section 6.16 hereof.

## 5.14 ERISA Plans.

(a) Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b) With respect to any Plan subject to Title IV of ERISA:

- (i) No reportable event has occurred under Section 4043(c) of ERISA which requires notice.
- (ii) No action by the Borrower or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

(c) The following terms have the meanings indicated for purposes of this Agreement:

- (i) "Code" means the Internal Revenue Code of 1986, as amended.
- (ii) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.
- (iii) "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code.

(iv) "Plan" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

**5.15 <u>Government Sanctions</u>.**

(a) The Borrower represents that neither the Borrower, any Obligor, nor any of their respective affiliated entities, including in the case of any Borrower or Obligor that is not a natural person, subsidiaries nor, to the knowledge of the Borrower, any owner, trustee, director, officer, employee, agent, affiliate or representative of the Borrower or any Obligor is an individual or entity ("Person") currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is the Borrower or any Obligor located, organized or resident in a country or territory that is the subject of Sanctions.

(b) The Borrower represents and covenants that it will not, directly or indirectly, use the proceeds of the credit provided under this Agreement, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

**5.16 <u>Location of Borrower</u>.**

The principal residence of the Borrower is located at the address listed under the Borrower's signature on this Agreement.

## 6. COVENANTS

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

**6.1 <u>Use of Proceeds</u>.**

(a) To use the proceeds of the Loan only for the refinance of existing debt.

(b) The proceeds of the credit extended under this Loan Agreement may not be used directly or indirectly to purchase or carry any "margin stock" as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System, or extend credit to or invest in other parties for the purpose of purchasing or carrying any such "margin stock," or to reduce or retire any indebtedness incurred for such purpose.

**6.2 <u>Financial Information - Entities</u>.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of the fiscal year end, the annual financial statements of Greg Beeche, Logistics, LLC, certified and dated by an authorized financial officer. These financial statements must be reviewed (with an opinion satisfactory to the Bank) by a Certified Public Accountant acceptable to the Bank. The statements shall be prepared on a consolidated/consolidating basis.

(b) Within 60 days after each period's end (excluding the last period in each fiscal year), quarterly financial statements of Greg Beeche, Logistics, LLC, certified and dated by an authorized financial officer. These financial statements may be company-prepared. The statements shall be prepared on a consolidated/consolidating basis.

(c) Within 120 days of the end of each fiscal year and within 60 days of the end of each quarter end (excluding the last quarter in each fiscal year), a compliance certificate of the Greg Beeche, Logistics, LLC, signed by an authorized financial officer and setting forth (i) the information and computations (in sufficient detail) to establish compliance with all financial covenants at the end of the period covered by the financial statements then being furnished and (ii) whether there existed as of the date of such financial statements and whether there exists as of the date of the certificate, any default under this Agreement applicable to the party submitting the information and, if any such default exists, specifying the nature thereof and the action the party is taking and proposes to take with respect thereto.

(d) A detailed receivables aging of Greg Beeche, Logistics, LLC by invoice or a summary aging by account debtor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(e) A detailed accounts payable aging of the Greg Beeche, Logistics, LLC by invoice or a summary aging by account creditor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(f) A detailed contracts in progress report of the Greg Beeche, Logistics, LLC within 120 days after the end of each fiscal year.

(g) Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each guarantor of the Borrower's obligations to the Bank as the Bank may request.

**6.3 <u>Financial Information - Individuals</u>.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of each calendar year-end, the annual financial statements of Gregory L. Beeche.

(b) Within 120 days of the calendar year end, copies of the federal income tax return(s) of Gregory L. Beeche, including copies of any K-1s and all other schedules, in the form filed with the Internal Revenue Service (as well as any subsequent amendments or supplements); and if requested by the Bank, authentications of such documents (whether in the form of signed copies or otherwise) satisfactory to the Bank or copies of any extensions of the filing date.

(c) Such additional financial information regarding the Borrower or any guarantor, pledgor, accommodation party or other obligor with respect to the loan as the Bank shall request.

The financial statements required above shall include a properly completed signed and dated personal financial statement on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the Borrower or other party uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

**6.4 Funded Debt to EBITDA Ratio.**

To maintain on a consolidated basis a ratio of Funded Debt to EBITDA not exceeding 3.75:1.00, with annual step down ratios indicated for each period specified below:

| Period | Ratios |
|---|---|
| From date hereof through December 30, 2017 | 3.75: 1.00 |
| From January 1, 2018 until December 30,2018 | 3.50: 1.00 |
| From January 1, 2019 and thereafter | 3.00: 1.00 |

"Funded Debt" means all outstanding liabilities for borrowed money.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization, plus Paid in Capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**6.5 Basic Fixed Charge Coverage Ratio.**

To maintain on a consolidated basis a Basic Fixed Charge Coverage Ratio of at least 1.25:1.00.

"Basic Fixed Charge Coverage Ratio" means the ratio of Cash Flow to the sum of the current portion of long-term debt and the current portion of capitalized lease obligations, plus interest expense on all obligations, plus lease and rent expense.

"Cash Flow" is defined as (a) net income, after income tax, (b) less income or plus loss from discontinued operations and extraordinary items, (c) plus depreciation, depletion, and amortization, (d) plus interest expense on all obligations, (e) minus dividends, withdrawals, and other distributions, (f) plus lease and rent expense, (g) minus unfinanced capital expenditures and non-cash income, and (h) plus paid in capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**6.6 Bank as Principal Depository.**

To maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

**6.7 Other Debts.**

Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a) Acquiring goods, supplies, or merchandise on normal trade credit.

(b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank in the Borrower's most recent financial statement.

(c) If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

**6.8 Other Liens.**

Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a) Liens and security interests in favor of the Bank or any affiliate of the Bank.

(b) Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

(c) Additional purchase money security interests in assets acquired after the date of this Agreement.

**6.9 Maintenance of Assets.**

(a) Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except inventory sold in the ordinary course of the Borrower's business.

(b) Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c) Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d) To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e) To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

**6.10 Investments.**

Not to have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

(a) Existing investments disclosed to the Bank in writing.

(b) Investments in any of the following:

(i) certificates of deposit;

(ii) U.S. treasury bills and other obligations of the federal government;

(iii) readily marketable securities (including commercial paper, but excluding restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission).

**6.11 Loans.**

Not to make any loans, advances or other extensions of credit to any individual or entity, except for:

(a) Existing extensions of credit disclosed to the Bank in writing.

(b) Extensions of credit to the Borrower's current subsidiaries.

(c) Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

**6.12 Change of Management.**

Not to make any substantial change in the present executive or management personnel of the Borrower.

**6.13 Change of Ownership.**

Not to cause, permit, or suffer any change in capital ownership such that there is a change of more than twenty-five percent (25%) in the direct or indirect capital ownership of the Borrower.

**6.14 Additional Negative Covenants.**

Not to, without the Bank's written consent:

(a) Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b) Acquire or purchase a business or its assets.

(c) Engage in any business activities substantially different from the Borrower's present business.

(d) Liquidate or dissolve the Borrower's business.

**6.15 Notices to Bank.**

To promptly notify the Bank in writing of:

(a) Any lawsuit in which the claim for damages exceeds $250,000.00 against the Borrower or any Obligor.

(b) Any substantial dispute between any governmental authority and the Borrower or any Obligor.

(c) Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(d) Any change in the Borrower's or any Obligor's name, legal structure, principal residence, or name on any driver's license or special identification card issued by any state (for an individual), state of registration (for a registered entity), place of business, or chief executive office if the Borrower or any Obligor has more than one place of business.

For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**6.16 Insurance.**

(a) General Business Insurance. To maintain insurance satisfactory to the Bank as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of the Borrower's properties, business interruption insurance, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for the Borrower's business. Each policy shall provide for at least thirty (30) days prior notice to the Bank of any cancellation thereof.

(b) Insurance Covering Collateral. To maintain all risk property damage insurance policies (including without limitation windstorm coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral. Each insurance policy must be in an amount acceptable to the Bank. The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c) Evidence of Insurance. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

**6.17 Compliance with Laws.**

To comply with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to cause a material adverse change in any Obligor's business condition (financial or otherwise), operations or properties, or ability to repay the credit, or, in the case of the Controlled Substances Act, result in the forfeiture of any material property of any Obligor.

**6.18 Books and Records.**

To maintain adequate books and records and allow the Bank and its agents to examine, audit and make copies of books and records at any reasonable time. If any of the Borrower's books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform examinations or audits and to respond to the Bank's requests for information concerning such books and records.

**6.19 Audits.**

To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

**6.20 Perfection of Liens.**

To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

### 6.21 Cooperation.

To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

### 6.22 Flood and Other Insurance.

If any improved real property collateral is located in a designated flood hazard area, or becomes located in a designated flood hazard area after the date of this Agreement as a result of any re-mapping of flood insurance maps by the Federal Emergency Management Agency, the Borrower will be required to maintain flood insurance on the real property and on any tangible personal property collateral located on the real property. In addition, the Borrower shall maintain such other insurance as the Bank may require to comply with the Bank's regular requirements and practices in similar transactions, which may include earthquake insurance and insurance covering acts of terrorism.

### 6.23 Inspections and Appraisals of Real Property.

To allow the Bank and its agents to visit the real property collateral at any reasonable time for the purpose of inspecting the real property and conducting appraisals, and deliver to the Bank any financial or other information concerning the real property as the Bank may request.

### 6.24 Use or Leasing of the Real Property Collateral.

To occupy the real property collateral for the conduct of its regular business. The Borrower will not change its intended use of the real property without the Bank's prior written approval.

### 6.25 Indemnity Regarding Use of Real Property.

To indemnify, defend with counsel acceptable to the Bank, and hold the Bank harmless from and against all liabilities, claims, actions, damages, costs and expenses (including all legal fees and expenses of Bank's counsel) arising out of or resulting from the construction of any improvements on the real property collateral, or the ownership, operation, or use of the real property collateral, whether such claims are based on theories of derivative liability, comparative negligence or otherwise. The Borrower's obligations to the Bank under this Paragraph shall survive termination of this Agreement and repayment of the Borrower's obligations to the Bank under this Agreement, and shall also survive as unsecured obligations after any acquisition by the Bank of the real property collateral or any part of it by foreclosure or any other means.

## 7. HAZARDOUS SUBSTANCES - REAL PROPERTY SECURITY

### 7.1 Indemnity Regarding Hazardous Substances.

The Borrower agrees to indemnify and hold the Bank harmless from and against all liabilities, claims, actions, foreseeable and unforeseeable consequential damages, costs and expenses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of the Bank's counsel) or loss directly or indirectly arising out of or resulting from any of the following:

(a) Any hazardous substance being present at any time, whether before, during or after any construction, in or around any part of the real property collateral securing this Agreement (the "Real Property"), or in the soil, groundwater or soil vapor on or under the Real Property, including those incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work, or any resulting damages or injuries to the person or property of any third parties or to any natural resources.

(b) Any use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous

substance is on, under or about any of the Borrower's property or operations or property leased to the Borrower, whether or not the property has been taken by the Bank as collateral.

Upon demand by the Bank, the Borrower will defend any investigation, action or proceeding alleging the presence of any hazardous substance in any such location, which affects the Real Property or which is brought or commenced against the Bank, whether alone or together with the Borrower or any other person, all at the Borrower's own cost and by counsel to be approved by the Bank in the exercise of its reasonable judgment. In the alternative, the Bank may elect to conduct its own defense at the expense of the Borrower. The Borrower's obligations to the Bank under this Article, except the obligation to give notices to the Bank, shall survive termination of this Agreement, repayment of the Borrower's obligations to the Bank under this Agreement, and foreclosure of the deed of trust or mortgage encumbering the Real Property or similar proceedings.

**7.2 Representation and Warranty Regarding Hazardous Substances.**

Before signing this Agreement, the Borrower researched and inquired into the previous uses and ownership of the Real Property. Based on that due diligence, the Borrower represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Real Property, except as the Borrower has disclosed to the Bank in writing.

**7.3 Compliance Regarding Hazardous Substances.**

The Borrower has complied, and will comply and cause all occupants of the Real Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). The Borrower shall promptly, at the Borrower's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Real Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Real Property; or (iii) maintain the fair market value of the Real Property. The Borrower acknowledges that hazardous substances may permanently and materially impair the value and use of the Real Property.

**7.4 Notices Regarding Hazardous Substances.**

Until full repayment of the loan, the Borrower will promptly notify the Bank in writing if it knows, suspects or believes there may be any hazardous substance in or around the Real Property, or in the soil, groundwater or soil vapor on or under the Real Property, or that the Borrower or the Real Property may be subject to any threatened or pending investigation by any governmental agency under any current or future law, regulation or ordinance pertaining to any hazardous substance.

**7.5 Site Visits, Observations and Testing.**

The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Borrower, to enter and visit the Real Property and any other locations where any personal property collateral securing this Agreement is located, for the purposes of observing the Real Property and the personal property collateral, taking and removing environmental samples, and conducting tests on any part of the Real Property. The Borrower shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with the Borrower's use of the Real Property and the personal property collateral. The Bank is under no duty, however, to visit or observe the Real Property or the personal property collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of the Borrower;

(ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Real Property or the personal property collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Borrower or any other party, the Borrower authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Borrower further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Borrower by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Borrower) by the Borrower without advice or assistance from the Bank.

### 7.6 Definition of Hazardous Substance.

"Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

## 8. DEFAULT AND REMEDIES

If any of the following events of default occurs, the Bank may do one or more of the following: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately and without prior notice. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy/Receivers," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

### 8.1 Failure to Pay.

The Borrower fails to make a payment under this Agreement when due.

### 8.2 Covenants.

Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article).

### 8.3 Other Bank Agreements.

Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any representation or warranty made by any guarantor is false when made or deemed to be made; or any default occurs under any other agreement the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has with the Bank or any affiliate of the Bank.

**8.4 Cross-default.**

Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

**8.5 False Information.**

The Borrower or any Obligor has given the Bank false or misleading information or representations.

**8.6 Bankruptcy/Receivers.**

The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of Borrower's or any Obligor's business; or the business is terminated, or such Obligor is liquidated or dissolved.

**8.7 Lien Priority.**

The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**8.8 Judgments.**

Any notice of judgment lien is filed against the Borrower or any Obligor; or a notice of levy and/or of a writ of attachment or execution, or other like process, is served against the assets of the Borrower or any Obligor in an aggregate amount of $250,000.00 or more; or any lawsuit or lawsuits are filed against the Borrower or any Obligor in which the claim for damages is in an aggregate amount of $250,000.00 or more.

**8.9 Death.**

If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent.

**8.10 Material Adverse Change.**

A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations or properties, or ability to repay the credit; or the Bank determines that it is insecure for any other reason.

**8.11 Government Action.**

Any government authority takes action that the Bank believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**8.12 Forfeiture.**

A judicial or nonjudicial forfeiture or seizure proceeding is commenced by a government authority and remains pending with respect to any property of Borrower or any part thereof, on the grounds that the property or any part thereof had been used to commit or facilitate the commission of a criminal offense by any person, including any tenant, pursuant to any law, including under the Controlled Substances Act or the Civil Asset Forfeiture Reform Act, regardless of whether or not the property shall become subject to forfeiture or seizure in connection therewith.

**8.13 ERISA Plans.**

A reportable event occurs under Section 4043(c) of ERISA, or any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan under Section 4041 or 4042 of ERISA occurs; provided such event or events could reasonably be expected, in the judgment of the Bank, to have a material adverse effect.

## 9. ENFORCING THIS AGREEMENT; MISCELLANEOUS

**9.1 GAAP.**

Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied; provided, however, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the financial statements of the Borrower for the fiscal year ended December 31, 2016 for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes.

**9.2 Governing Law.**

Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

**9.3 Venue and Jurisdiction.**

The Borrower agrees that any action or suit against the Bank arising out of or relating to this Agreement shall be filed in federal court or state court located in the Governing Law State. The Borrower agrees that the Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If the Bank does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Bank reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by the Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to the Bank's acceptance of this Agreement.

**9.4 Successors and Assigns.**

This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent. The Bank may sell participations in or assign this loan and the related loan documents, and may exchange information about the Borrower and any Obligor (including, without limitation, any information regarding any hazardous

substances) with actual or potential participants or assignees. If a participation is sold or the loan is assigned, the purchaser will have the right of set-off against the Borrower.

**9.5 Waiver of Jury Trial.**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

**9.6 Waiver of Class Actions.**

The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

**9.7 Severability; Waivers.**

If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**9.8 Expenses.**

(a) The Borrower shall pay to the Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Bank in connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Bank's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, (iii) the Bank's costs or losses arising from any changes in law which are allocated to this Agreement or any credit outstanding under this Agreement], and (iv) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by the Bank.

(b) The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by the

Bank to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from the Bank complying with instructions the Bank reasonably believes are made by any Authorized Individual. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents.

(c) The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with (i) the enforcement or preservation of the Bank's rights and remedies and/or the collection of any obligations of the Borrower which become due to the Bank and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Bank or any other person) relating to the Borrower or any other person or entity.

**9.9 <u>Set-Off</u>.**

Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes the Bank at any time without notice and whether or not the Bank shall have declared any amount owing by the Borrower to be due and payable, to set off against, and to apply to the payment of, the Borrower's indebtedness and obligations to the Bank under this Agreement and all related agreements, whether matured or unmatured, fixed or contingent, liquidated or unliquidated, any and all amounts owing by the Bank to the Borrower, and in the case of deposits, whether general or special (except trust and escrow accounts), time or demand and however evidenced, and (b) pending any such action, to hold such amounts as collateral to secure such indebtedness and obligations of the Borrower to the Bank and to return as unpaid for insufficient funds any and all checks and other items drawn against any deposits so held as the Bank, in its sole discretion, may elect. The Borrower hereby grants to the Bank a security interest in all deposits and accounts maintained with the Bank to secure the payment of all such indebtedness and obligations of the Borrower to the Bank.

**9.10 <u>One Agreement</u>.**

This Agreement and any related security or other agreements required by this Agreement constitute the entire agreement between the Borrower and the Bank with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**9.11 <u>Notices</u>.**

Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Bank and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**9.12 <u>Headings</u>.**

Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**9.13 Counterparts.**

This Agreement may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

**9.14 Borrower Information; Reporting to Credit Bureaus.**

The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports and other credit bureau information from time to time in connection with the administration, servicing and collection of the loans under this Agreement. The Borrower agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all guarantors as is consistent with the Bank's policies and practices from time to time in effect.

**9.15 Amendments.**

This Agreement may be amended or modified only in writing signed by each party hereto.

[Signature Page Follows]

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**Bank of America, N.A.**

By____________________
Typed Name______________
Title____________________

Address where notices to the Bank are to be sent:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

**Gregory L. Beeche**

____________________

Address where notices to the Borrower are to be sent:
Gregory L. Beeche
C/O Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

**AUTHORIZATION TO DEBIT ACCOUNT**

The undersigned acknowledges the provisions of Paragraph 5.3 of this Agreement, and agrees that the account shown therein may be debited as set forth therein. The undersigned is the owner of the account.

**Greg Beeche, Logistics, LLC**

By ____________________
Typed Name: **Gregory L. Beeche**
Title: Managing Member

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**Bank of America, N.A.**

By [signature]
Typed Name Tim Kensky
Title Vice President

Address where notices to the Bank are to be sent:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

**Gregory L. Beeche**

________________________

Address where notices to the Borrower are to be sent:
Gregory L. Beeche
C/O Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

**AUTHORIZATION TO DEBIT ACCOUNT**

The undersigned acknowledges the provisions of Paragraph 5.3 of this Agreement, and agrees that the account shown therein may be debited as set forth therein. The undersigned is the owner of the account.

**Greg Beeche, Logistics, LLC**

By ________________________
Typed Name: **Gregory L. Beeche**
Title: Managing Member

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following three notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

**(1) USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

***Notices #2 and #3 apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(2) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #3 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(3) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #3.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

## SCHEDULE A

## FEES

(a) Waiver Fee. If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(c) Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

Case 1:25-cv-00944-AMN-TWD Document 45-12 Filed 07/28/25 Page 1 of 45

# EXHIBIT B

SARATOGA COUNTY – STATE OF NEW YORK
SARATOGA COUNTY CLERK
CRAIG A. HAYNER
40 MCMASTER STREET, BALLSTON SPA, NY 12020

COUNTY CLERK'S RECORDING PAGE
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2017014776

Receipt#: 2017212115066
Clerk: GB
Rec Date: 05/15/2017 09:42:45 AM
Doc Grp: R
Descrip: MORTGAGE AGREEMENT
Num Pgs: 23

Party1: BEECHE GREGORY L AKA
Party2: BANK OF AMERICA

Recording:

| | |
|---|---|
| Pages | 110.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.00 |
| Markoffs | 2.50 |
| 255 Affidavit | 5.00 |
| Total: | 162.50 |

**** NOTICE: THIS IS NOT A BILL ****

Record and Return To:

BANK OF AMERICA NA
DOC RETENTION - GCF
CT2-515-BB-03
70 BATTERSON PARK ROAD
FARMINGTON CT 06032

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

2017014776
05/15/2017 09:42:45 AM
23 Pages RECORDED
MORTGAGE AGREEMENT
Saratoga County Clerk

## MORTGAGE CONSOLIDATION, MODIFICATION AND EXTENSION AGREEMENT, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Mortgage Consolidation, Modification and Extension Agreement, Assignment of Rents, Security Agreement and Fixture Filing (as the same may be modified, supplemented, amended or amended and restated from time to time, the "Mortgage"), dated as of April 20, 2017, is given by **Gregory L. Beeche**, as mortgagor ("Mortgagor"), to **Bank of America, N.A.**, a national banking association, as mortgagee ("Mortgagee").

1. GRANT.

1.1 The Property. For the purpose of securing payment and performance of the Secured Obligations defined in Section 2 below, Mortgagor does hereby irrevocably and unconditionally grant, bargain, sell, alien, demise, convey, assign, transfer, mortgage, grant a security interest in, hypothecate, pledge and set over to Mortgagee, with power of sale, all right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "Property"):

(a) All that certain plot, piece or parcel of land located in the County of Saratoga, State of New York, as described in Exhibit A hereto (the "Land");

(b) All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

(c) All easements, rights of way, servitudes, privileges, interests, tenements, hereditaments, and appurtenances relating or appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all development rights or credits and air rights; all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d) All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e) All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or

casualty insurance policies, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f) All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

TO HAVE AND TO HOLD the above-described Property unto Mortgagee, its successors and assigns, in fee simple, forever, and to warrant and defend the title thereto.

1.2 Fixture Filing. This Mortgage constitutes a financing statement filed as a fixture filing under the New York Uniform Commercial Code, as amended or recodified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2. THE SECURED OBLIGATIONS.

2.1 Purpose of Securing. Mortgagor makes the grant, conveyance, transfer and assignment set forth in Section 1, makes the irrevocable and absolute assignment set forth in Section 3, and grants the security interest set forth in Section 4, all for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Mortgagee may choose:

(a) Payment of all obligations of Gregory L. Beeche ("Obligor") to Mortgagee arising under the following instrument(s) or agreement(s) (collectively, the "Debt Instrument"):

(i) A certain Loan Agreement dated on even date herewith, between Obligor and Mortgagee which provides for a permanent mortgage loan in the original principal amount of Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00).

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument which arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument which amends and restates or otherwise supersedes the Debt Instrument in its entirety;

(b) Payment and performance of all obligations of Mortgagor under this Mortgage;

(c) Payment and performance of all obligations of Obligor under any Swap Contract with respect to which there is a writing evidencing the parties' agreement that said Swap Contract shall be secured by this Mortgage. "Swap Contract" means any document, instrument or agreement with Mortgagee, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time; and

(d) Payment and performance of all future advances and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument.

Notwithstanding any provision to the contrary, "Secured Obligations" secured hereby shall not include obligations arising under any Swap Contract to the extent that the grant of a lien hereunder to secure such Swap Contract would violate the Commodity Exchange Act by virtue of the Mortgagor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such grant of such lien becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.*, as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto.

2.2 Terms of Secured Obligations. All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in Paragraph 2.1(a) and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instrument which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3 Maximum Principal Amount. NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN OR IN THE DEBT INSTRUMENT AND ALL OTHER DOCUMENTS RELATING TO, GUARANTEEING OR OTHERWISE GIVEN IN CONNECTION WITH THE SECURED OBLIGATIONS (THE "LOAN DOCUMENTS") TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS **THREE MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($3,600,000.00)** PLUS ALL INTEREST PAYABLE UNDER THE DEBT INSTRUMENT AND ALL AMOUNTS EXPENDED BY MORTGAGEE AFTER DEFAULT BY OBLIGOR (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS MORTGAGE; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE PROPERTY AND UPHOLDING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY.

3. ASSIGNMENT OF RENTS.

3.1 Assignment. Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "Rents"), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property. In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also be considered Rents assigned under this Paragraph.

3.2 Grant of License. Notwithstanding the provisions of Paragraph 3.1, Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Paragraph 6.2, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

4. SECURITY INTEREST IN RELATED PERSONALTY.

4.1 Grant of Security Interest. This Mortgage is intended to be a security agreement pursuant to the New York Uniform Commercial Code for all items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the New York Uniform Commercial Code. Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "Personalty"):

(a) All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b) All crops growing or to be grown on the Land (and after severance from the Land); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c) All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them;

(d) All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without limitation, all general intangibles related to any of the above property and all proceeds of the above property.

5. RIGHTS AND DUTIES OF THE PARTIES.

5.1 Representations and Warranties. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements.

5.2 Taxes, Assessments, Liens and Encumbrances. Mortgagor shall pay or cause to be paid prior to the due date therefor all taxes, levies, charges and assessments, now or hereafter levied, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property which Mortgagee has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3 Damages and Insurance and Condemnation Proceeds.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "Claims"):

(i) all awards of damages and all other compensation payable directly or

indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

(iv) all interest which may accrue on any of the foregoing.

(b) Mortgagor shall immediately notify Mortgagee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Mortgagor in adjusting any loss covered by insurance.

(c) All proceeds of the Claims assigned to Mortgagee under this Paragraph shall be paid to Mortgagee. In each instance, Mortgagee shall apply those proceeds first toward reimbursement of all of Mortgagee's costs and expenses of recovering the proceeds, including attorneys' fees. Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor. If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds. If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

5.4 Insurance. Mortgagor shall provide and maintain in force at all times all risk property damage insurance (including without limitation windstorm coverage, and hurricane coverage as applicable) on the Property and such other type of insurance on the Property as may be required by Mortgagee in its reasonable judgment. At Mortgagee's request, Mortgagor shall provide Mortgagee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in an amount, for a term, and in form and content satisfactory to Mortgagee, and shall be written

only by companies approved by Mortgagee. In addition, each policy of hazard insurance shall include a Form 438BFU or equivalent loss payable endorsement and a standard "non-contributory mortgagee" endorsement, each in favor of Mortgagee.

5.5 Maintenance and Preservation of Property.

(a) Mortgagor shall keep the Property in good condition and repair and shall not commit or allow waste of the Property. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance.

(b) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under Paragraph 5.3.

(c) Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable law or order of any governmental authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d) If the Property is agricultural, Mortgagor shall farm the Property in a good and husbandlike manner. Mortgagor shall keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees or vines with new ones. Mortgagor shall prepare for harvest, harvest, remove and sell any crops growing on the Property. Mortgagor shall keep all buildings, fences, ditches, canals, wells and other farming improvements on the Property in first class condition, order and repair.

(e) Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6 Releases, Extensions, Modifications and Additional Security. Without affecting the personal liability of any person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a) release any person liable for payment of any Secured Obligation;

(b) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) alter, substitute or release any property securing the Secured Obligations;

(e) consent to the making of any plat or map of the Property or any part of it;

(f) join in granting any easement or creating any restriction affecting the Property;

(g) join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h) release the Property or any part of it from the lien of this Mortgage.

5.7 Satisfaction of Mortgage. Upon Mortgagee's determination in its sole good faith discretion that all sums secured hereby have been indefeasibly paid in full and no further commitment to extend credit continues, Mortgagee shall execute and deliver a satisfaction of the Mortgage to Mortgagor or, upon Mortgagor's written request, an assignment of Mortgage in recordable form to a party designated by Mortgagor, which assignment shall be made without any representation or warranty by Mortgagee. Mortgagor shall pay Mortgagee's costs incurred in connection with such assignment of this Mortgage.

5.8 Compensation and Reimbursement of Costs and Expenses.

(a) Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Mortgagee when the law provides no maximum limit, for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services.

(b) Mortgagor further agrees to pay or reimburse Mortgagee for all costs, expenses and other advances which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under Paragraph 6.3, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs and disbursements, costs of any sale of the Property and any cost of any appraisal and evidence of title.

(c) Mortgagor shall pay all obligations arising under this Paragraph immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations. If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9 Exculpation and Indemnification.

(a) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following:

(i) Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii) Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii) Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv) any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v) any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the rights or remedies afforded Mortgagee under Paragraph 6.3, unless the loss is caused by

the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b) Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of any appraisal or other evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by law or because of any failure of Mortgagor to perform any of its obligations. This agreement by Mortgagor to indemnify Mortgagee shall survive the release and cancellation of any or all of the Secured Obligations and the satisfaction or partial release of this Mortgage.

5.10 Defense and Notice of Claims and Actions. At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11 Representation and Warranty Regarding Hazardous Substances. Before signing this Mortgage, Mortgagor performed an environmental site assessment of, and researched and inquired into the previous uses and ownership of the Property. Based on that due diligence, Mortgagor represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as Mortgagor has disclosed to Mortgagee in writing. Mortgagor further represents and warrants that Mortgagor has complied, and will comply and cause all occupants of the Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). Mortgagor shall promptly, at Mortgagor's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. Mortgagor acknowledges that hazardous substances may permanently and materially impair the value and use of the Property. "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

5.12 Site Visits, Observation and Testing. Mortgagee and its agents and representatives shall have the right at any reasonable time, after giving reasonable notice to Mortgagor, to enter and visit the Property for the purposes of performing appraisals, observing the Property, taking and removing environmental samples, and conducting tests on any part of the Property. Mortgagor shall reimburse Mortgagee on demand for the costs of any such environmental investigation and testing. Mortgagee will make reasonable efforts during any site visit, observation or testing conducted pursuant this Paragraph to avoid interfering with Mortgagor's use of the Property. Mortgagee is under no duty, however, to visit or observe the Property or to conduct tests, and any such acts by Mortgagee will be solely for the purposes of protecting Mortgagee's security and preserving Mortgagee's rights under this Mortgage. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of Mortgagor; (ii) impose any liability on Mortgagee; or (iii) be a representation or warranty of any kind regarding the Property (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Mortgagee has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Mortgagor or any other party, Mortgagor authorizes Mortgagee to make such a disclosure. Mortgagee may also disclose an Environmental Report to any regulatory

authority, and to any other parties as necessary or appropriate in Mortgagee's judgment. Mortgagor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Mortgagor by Mortgagee or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Mortgagor) by Mortgagor without advice or assistance from Mortgagee.

5.13 Additional Provisions Relating to Condominiums. If the Property is subject to a condominium declaration of conditions, covenants and restrictions recorded in the official records of the county in which the Property is located (the "Declaration"), the following provisions shall apply.

(a) The provisions contained in this Mortgage are obligations of Mortgagor in addition to Mortgagor's obligations under the Declaration with respect to similar matters, and shall not restrict or limit Mortgagor's duties and obligations to keep and perform promptly all of its obligations as unit owner under the Declaration.

(b) Mortgagor shall at all times fully perform and comply with all the agreements, covenants, terms and conditions imposed upon unit owners under the Declaration, and if Mortgagor fails to do so, Mortgagee may (but shall not be obligated to) take any action Mortgagee deems necessary or desirable to prevent or cure any default thereunder. Mortgagee may also take such action as it deems necessary or desirable to cure a default under the Declaration by Mortgagor or any other party occupying the unit(s) (a "Unit Occupant") encumbered by this Mortgage, upon receipt by Mortgagee from the condominium association under the Declaration (the "Association") of written notice of such default, even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary to prevent or cure any default by Mortgagor or a Unit Occupant, and Mortgagor hereby agrees to pay to Mortgagee, immediately and without demand, all such sums so paid and expended by Mortgagee, together with interest thereon from the date of each such payment at the rate (the "Demand Rate") of two percent (2%) in excess of the then current rate of interest under the Debt Instrument. All sums so paid and expended by Mortgagee, and the interest thereon, shall be added to and be secured by the lien of this Mortgage. At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(c) At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(d) Mortgagor shall advise Mortgagee in writing of the giving of any notice to Mortgagor by the Association under the Declaration of any default by Mortgagor as unit owner or by a Unit Occupant thereunder in the performance or observance of any of the terms, conditions and covenants to be performed or observed by Mortgagor or such Unit Occupant thereunder, and Mortgagor shall deliver to Mortgagee a true copy of each such notice.

(e) If any action, proceeding, motion or notice shall be commenced or filed in respect of the Association in connection with any case (including a case commenced or filed under the Bankruptcy Code), Mortgagee shall have the option, to the exclusion of Mortgagor, exercisable upon notice from Mortgagee to Mortgagor, to conduct and control any such litigation with counsel of Mortgagee's choice. Mortgagee may proceed in its own name or in the name of Mortgagor in connection with any such litigation, and Mortgagor agrees to execute any and all powers, authorizations, consents or other documents required by Mortgagee in connection therewith. Mortgagor shall, upon demand, pay to Mortgagee all costs and expenses (including attorneys' fees) paid or incurred by Mortgagee in connection with the prosecution or conduct of any such proceedings. Any such costs or expenses not paid by Mortgagor as aforesaid shall be secured by the lien of this Mortgage and shall be added to the principal amount of the indebtedness secured hereby. Mortgagor shall not commence any action, suit, proceeding or

case, or file any application or make any motion, in respect of the Declaration in any such case without the prior written consent of Mortgagee.

(f) Mortgagor will use its best efforts to obtain and deliver to Mortgagee within twenty (20) days after written request by Mortgagee, an estoppel certificate from the Association setting forth (i) the name of the unit owner, (ii) that the Declaration has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the amount of common expenses and other assessments payable by Mortgagor as unit owner under the Declaration, (iv) the date to which all common expenses and other assessments have been paid by Mortgagor as unit owner under the Declaration, (v) whether there are any alleged defaults by Mortgagor or a Unit Occupant under the Declaration and, if so, setting forth the nature thereof in reasonable detail, and (vi) as to such other matters as Mortgagee may reasonably request.

(g) Mortgagor represents and warrants to Mortgagee that as of the date hereof, no default under the Declaration has occurred and is continuing.

(h) Mortgagor shall take such actions as may be reasonable to insure that the Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

(i) Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the condominium(s) encumbered by this Mortgage, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the Declaration, the Association's bylaws or articles or any rules and regulations promulgated by the Association;

(iii) termination of professional management and assumption of self-management of the Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Association unacceptable to Mortgagee.

6. <u>ACCELERATING TRANSFERS, DEFAULT AND REMEDIES</u>.

6.1 <u>Accelerating Transfers</u>

(a) "Accelerating Transfer" means any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property. If Mortgagor is a corporation, "Accelerating Transfer" also means any transfer or transfers of shares possessing, in the aggregate, more than fifty percent (50%) of the voting power. If Mortgagor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the partnership interests. If Mortgagor is a limited liability company, "Accelerating Transfer" also means withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the voting power or in the aggregate more than fifty percent of the ownership of the economic interest in the Mortgagor.

(b) Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by Paragraph 6.3 of this Mortgage.

6.2 Events of Default. The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("Event of Default") under this Mortgage:

(a) Obligor fails to make any payment, when due, under the Debt Instrument (after giving effect to any applicable grace period), or any other default occurs under and as defined in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations and such default continues beyond any applicable cure period;

(b) Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c) Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of Paragraph 6.1;

(d) Any representation or warranty made in connection with this Mortgage, the Secured Obligations, or in any Debt Instrument proves to have been false or misleading in any material respect when made;

(e) Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage; or

(f) An event occurs which gives Mortgagee the right or option to terminate any Swap Contract secured by this Mortgage.

6.3 Remedies. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately, and/or may terminate any Swap Contract secured by this Mortgage in accordance with its terms.

(b) Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security or lien of this Mortgage. Such other things may include: entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as

Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments. Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Paragraph.

(d) Mortgagee may cure any breach or default of Mortgagor (without waiving such breach or default), and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any person.

(e) Mortgagee may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Mortgage.

(f) Mortgagee may exercise the remedies contained in any Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g) Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties.

(h) Mortgagee may foreclose on this Mortgage non-judicially pursuant to the provisions of Article 14 of the Real Property Actions and Proceedings Law of New York, as such provisions may be extended, renewed, modified or replaced from time to time.

6.4 Application of Sale Proceeds and Rents.

(a) Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto.

(b) Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of any sale of the Property which Mortgagee may receive or collect under Paragraph 6.3, in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto. Mortgagee shall have no liability for any funds

which it does not actually receive.

7. MISCELLANEOUS PROVISIONS

7.1 No Waiver or Cure.

(a) Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b) If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i) Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii) Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii) Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv) Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v) Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations;

(vi) Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2 Powers of Mortgagee. Mortgagee may take any of the actions permitted under Paragraphs 6.3(b) and/or 6.3(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3 Nonborrower Mortgagor.

(a) If any Mortgagor ("Nonborrower Mortgagor") is not the Obligor under the Debt Instrument described in Paragraph 2.1(a), such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i) Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing

the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

(ii) Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii) Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv) Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v) Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi) Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b) Nonborrower Mortgagor waives:

(i) Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii) Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii) All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv) Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v) Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c) Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d) No provision or waiver in this Mortgage shall be construed as limiting the

generality of any other provision or waiver contained in this Mortgage.

(e) For purposes of this Paragraph 7.3, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of Paragraphs 2.1(c) and 2.1(d).

7.4 Merger. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5 Joint and Several Liability. If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6 Applicable Law. This Mortgage shall be governed by the laws of the State of New York.

7.7 Successors in Interest. The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties. However, this Paragraph does not waive the provisions of Paragraph 6.1.

**7.8 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

7.9 Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10 Interpretation. Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage. The Exhibits to this Mortgage are hereby incorporated in this

Mortgage.

7.11 In-House Counsel Fees. Whenever Mortgagor is obligated to pay or reimburse Mortgagee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel to the extent permitted by applicable law.

7.12 Waiver of Marshaling. Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.13 Severability. If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.14 Notices. Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below. That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code. Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

| | |
|---|---|
| Addresses for Notices to Mortgagor: | Gregory L. Beeche<br>356 Hudson River Road<br>Waterford, New York 12188 |
| Address for Notices to Mortgagee: | Bank of America, N.A.<br>Doc Retention - GCF<br>CT2-515-BB-03<br>70 Batterson Park Road<br>Farmington, CT 06032 |

8. NEW YORK STATE SPECIFIC PROVISIONS

8.1 Inconsistencies. In the event of any inconsistencies between the terms and conditions of this Section 8 and the other provisions of this Mortgage, the terms and conditions of this Section 8 shall control.

8.2 Trust Fund. In compliance with Section 13 of the New York Lien Law, as the same may be amended from time to time (the "Lien Law"), Obligor shall receive the advances secured hereby, and shall hold the right to receive such advances, as a trust fund to be applied first for the purpose of paying the cost of the improvement, and shall apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. Obligor shall comply strictly with Section 13-f of the Lien Law.

8.3 Real Property Law Section 291-f. The provisions of this Mortgage and/or the Loan Documents restrict (in accordance with their terms) the right or power of the Mortgagor, as against the holder of this Mortgage, without such holder's consent, to cancel, abridge, or otherwise modify tenancies, subtenancies, leases or subleases in existence on the date hereof (the "Existing Leases"), and the tenants or subtenants thereunder, (the "Existing Tenants"), or to accept prepayments of installments of rent to become due under the Existing Leases. Mortgagee shall have all of the rights as against the Existing Tenants as set forth in Section 291-f of the Real Property Law of the State of New York. Mortgagor covenants and agrees to send to each Existing Tenant on the date hereof, either by recognized overnight courier or by certified or registered mail, return receipt requested (and to provide promptly to Mortgagee copies of such letters and receipts) notice of the existence of this Mortgage, together with a copy of this Paragraph 8.3. Any cancellation, abridgment, modification or prepayment

made by any Existing Tenant of an Existing Lease in violation of the provisions of this Paragraph 8.3, after the written notice provided for herein, without the consent of Mortgagee shall be voidable by the holder of the Mortgage, as such holder may elect.

8.4 Type of Property. Mortgagor represents and warrants that this Mortgage does not cover real property principally improved by one or more structures containing in the aggregate not more than six residential units, each bearing its own cooking facilities.

8.5 Section 254 of the RPL. In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

8.6 Transfer Taxes.

(a) For as long as this Mortgage remains outstanding, Mortgagor covenants and agrees that, in the event of a sale of the Property or other Accelerating Transfer, it will duly complete, execute and deliver to Mortgagee contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate Accelerating Transfer taxes, including, without limitation, any real estate transfer taxes payable under Article 31 of the New York State Tax Law or under Title 11, Chapter 21 of the Administrative Code of the City of New York, if applicable, or any successor provisions thereto (collectively, "Transfer Taxes") by reason of such sale or other Accelerating Transfer or recording of the deed evidencing such sale or other Accelerating Transfer.

(b) Mortgagor shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Accelerating Transfer, and in default thereof Mortgagee may (but shall have no obligation to) pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage. The provisions of this Paragraph 8.6(b) shall survive any Accelerating Transfer and the delivery of the deed in connection with any Accelerating Transfer.

8.7 Covenants in Addition to RPL. All covenants hereof shall be construed as affording to Mortgagee rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable legal requirement.

8.8 Consolidation. This Mortgage consolidates, modifies and extends the lien of the following mortgages:

1. Mortgage made by **GREGORY L. BEECHE** to **HSBC BANK USA, NATIONAL ASSOCIATION**, in the original principal amount of $950,000.00, dated November 4, 2008 and recorded on November 6, 2008 in the Saratoga County Clerk's Office as Instrument Number 2008037652.

Note: The above mortgage was assigned to **FIRST NIAGARA BANK, N.A.** by Assignment of Mortgage, recorded on June 5, 2013 in the Saratoga County Clerk's Office as Instrument Number 2013024019.

Note: The above mortgage is being assigned by **KEYBANK NATIONAL ASSOCIATION (as successor by merger to FIRST NIAGARA BANK, N.A.)** to **BANK OF AMERICA, N.A.** by Assignment of Mortgage dated April ___, 2017 and intended to be recorded simultaneously herewith, which mortgage has a current principal balance of $693,804.97.

2. Mortgage made by **GREGORY L. BEECHE** to **EMPIRE STATE CERTIFIED DEVELOPMENT CORPORATION**, in the original principal amount of $783,000.00, dated November 4, 2008 and recorded on November 10, 2008 in the Saratoga County Clerk's Office as Instrument Number 2008038022. ✓

Note: The above mortgage was assigned by **EMPIRE STATE CERTIFIED DEVELOPMENT CORPORATION** to **U.S. SMALL BUSINESS ADMINISTRATION** by Assignment of Mortgage, recorded on November 10, 2008 in the Saratoga County Clerk's Office as Instrument Number 2008038023.

Note: The above mortgage is being further assigned by **U.S. SMALL BUSINESS ADMINISTRATION** to **BANK OF AMERICA, N.A.** by Assignment of Mortgage dated on or about even date herewith and intended to be recorded simultaneously herewith, which mortgage has a current principal balance of $567,115.32.

3. Mortgage and Security Agreement made by **GREGORY L. BEECHE** to **FIRST NIAGARA BANK, N.A.**, in the original principal amount of $1,448,575.00, dated December 12, 2014 and recorded on February 6, 2015 in the Saratoga County Clerk's Office as Instrument Number 2015003570. ✓

Note: The above mortgage is being assigned by **KEYBANK NATIONAL ASSOCIATION (as successor by merger to FIRST NIAGARA BANK, N.A.)** to **BANK OF AMERICA, N.A.** by Assignment of Mortgage dated April ___, 2017 and intended to be recorded simultaneously herewith, which mortgage has a current principal balance of $1,380,297.00.

4. Mortgage and Security Agreement made by **GREGORY L. BEECHE** to **NYBDC LOCAL DEVELOPMENT CORPORATION**, in the original principal amount of $1,346,000.00, dated December 12, 2014 and recorded on February 6, 2015 in the Saratoga County Clerk's Office as Instrument Number 2015003572. ✓

Note: The above mortgage was assigned by **NYBDC LOCAL DEVELOPMENT CORPORATION** to **U.S. SMALL BUSINESS ADMINISTRATION** by Assignment of Mortgage, recorded on March 1, 2016 in the Saratoga County Clerk's Office as Instrument Number 2016006281.

Note: The above mortgage is being further assigned by **U.S. SMALL BUSINESS ADMINISTRATION** to **BANK OF AMERICA, N.A.** by Assignment of Mortgage dated on or about even date herewith and intended to be recorded simultaneously herewith, which mortgage has a current principal balance of $913,369.87.

5. Gap Mortgage, Security Agreement, Assignment of Rents and Fixture Filing from **GREGORY L. BEECHE** to **BANK OF AMERICA, N.A.** in the amount of $45,412.84 dated on even date herewith and intended to recorded simultaneously herewith. inst. 2017014774 ✓

Mortgagor acknowledges and agrees that the above described mortgages at Nos. 1 thru 5 above be, and the same hereby are combined, consolidated and made an equal and coordinate first consolidated mortgage lien on the Property.

Mortgagor acknowledges and agrees that Mortgagee does hereby consolidate, modify and extend the terms of payment of the principal indebtedness secured by the mortgages, and the Mortgagor ratifies the obligations and agrees that it shall be obligated to and promises to pay to the Mortgagee, or its order, at its address above, the principal sum remaining unpaid, namely **$3,600,000.00**, with interest thereon at the rate and to be repaid in the manner set forth in the Loan Agreement dated on even date herewith.

Doc #01-3009538.4

[Signature Page Follows]

IN WITNESS WHEREOF, this Mortgage has been entered into by Mortgagor on the day and year above written.

MORTGAGOR:

GREGORY L. BEECHE

G. L. Beeche

State of New York )
) ss.:
County of Albany )

On the 13 day of April, in the year 2017 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

David L. Evans

(Signature and office of individual taking acknowledgment)

DAVID L. EVANS
Notary Public, State of New York
Qualified in S[illegible] County
No. 4[illegible]
Commission Expires [illegible] 30, 2019

MORTGAGEE:

**BANK OF AMERICA, N.A**

Name: Tim Kensky
Title: Vice President

State of New York )
) ss.:
County of Albany )

On the 13th day of April, in the year 2017 before me, the undersigned, personally appeared Tim Kensky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

(Signature and office of individual taking acknowledgment)

**EMILY C FRANZEN**
**Notary Public, State of New York**
**No. 01FR6254864**
**Qualified in Albany County**
**Commission Expires January 23, 2020**

**EXHIBIT A TO MORTGAGE**

Exhibit A to MORTGAGE dated as of April 20, 2017, given by **Gregory L. Beeche** as "Mortgagor" to **Bank of America, N.A.**, a national banking association, as "Mortgagee."

Description of Property

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon,

Saratoga County, N,Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast comer of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest comer of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly comer of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly comer of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly comer of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

Street Address of Property
356 Hudson River Road
Waterford, New York 12188

**SARATOGA COUNTY – STATE OF NEW YORK**
**SARATOGA COUNTY CLERK**
CRAIG A. HAYNER
**40 MCMASTER STREET, BALLSTON SPA, NY 12020**

**COUNTY CLERK'S RECORDING PAGE**
*****THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH*****

INSTRUMENT #: 2017014774

Receipt#: 2017212115066
Clerk: GB
Rec Date: 05/15/2017 09:42:44 AM
Doc Grp: X
Descrip: MORTGAGE
Num Pgs: 21

Party1: BEECHE GREGORY L AKA
Party2: BANK OF AMERICA
Town: HALFMOON

Recording:

| | |
|---|---|
| Pages | 100.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.00 |
| Sub Total: | 145.00 |
| Mortgage Tax | |
| Basic | 227.00 |
| SONYMA | 113.50 |
| CDTA | 113.50 |
| Local | 0.00 |
| Sub Total: | 454.00 |
| Total: | 599.00 |

**** NOTICE: THIS IS NOT A BILL ****

***** Mortgage Tax *****
Serial #: DI-0875
Commercial
Mtg Amt: 45412.84

| | |
|---|---|
| Basic | 227.00 |
| SONYMA | 113.50 |
| CDTA | 113.50 |
| Total: | 454.00 |

Record and Return To:

BANK OF AMERICA NA
DOC RETENTION - GCF
CT2-515-BB-03
70 BATTERSON PARK ROAD
FARMINGTON CT 06032

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

2017014774
05/15/2017 09:42:44 AM
21 Pages RECORDED
MORTGAGE
Saratoga County Clerk

## GAP MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (as the same may be modified, supplemented, amended or amended and restated from time to time, the "Mortgage"), dated as of April 20, 2017, is given by **Gregory L. Beeche**, as mortgagor ("Mortgagor"), to **Bank of America, N.A.**, a national banking association, as mortgagee ("Mortgagee").

1. GRANT.

1.1 The Property. For the purpose of securing payment and performance of the Secured Obligations defined in Section 2 below, Mortgagor does hereby irrevocably and unconditionally grant, bargain, sell, alien, demise, convey, assign, transfer, mortgage, grant a security interest in, hypothecate, pledge and set over to Mortgagee, with power of sale, all right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "Property"):

(a) All that certain plot, piece or parcel of land located in the County of Saratoga, State of New York, as described in Exhibit A hereto (the "Land");

(b) All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

(c) All easements, rights of way, servitudes, privileges, interests, tenements, hereditaments, and appurtenances relating or appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all development rights or credits and air rights; all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d) All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e) All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Mortgagee, and all

condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f) All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

TO HAVE AND TO HOLD the above-described Property unto Mortgagee, its successors and assigns, in fee simple, forever, and to warrant and defend the title thereto.

1.2 Fixture Filing. This Mortgage constitutes a financing statement filed as a fixture filing under the New York Uniform Commercial Code, as amended or recodified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2. THE SECURED OBLIGATIONS.

2.1 Purpose of Securing. Mortgagor makes the grant, conveyance, transfer and assignment set forth in Section 1, makes the irrevocable and absolute assignment set forth in Section 3, and grants the security interest set forth in Section 4, all for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Mortgagee may choose:

(a) Payment of all obligations of Gregory L. Beeche ("Obligor") to Mortgagee arising under the following instrument(s) or agreement(s) (collectively, the "Debt Instrument"):

(i) A certain Loan Agreement dated on even date herewith, between Obligor and Mortgagee which provides for a permanent mortgage loan in the original principal amount of Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00).

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument which arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument which amends and restates or otherwise supersedes the Debt Instrument in its entirety;

(b) Payment and performance of all obligations of Mortgagor under this Mortgage;

(c) Payment and performance of all obligations of Obligor under any Swap Contract with respect to which there is a writing evidencing the parties' agreement that said Swap Contract shall be secured by this Mortgage. "Swap Contract" means any document, instrument or agreement with Mortgagee, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time; and

(d) Payment and performance of all future advances and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument.

Case 1:25-cv-00944-AMN-DJS Document 149-1 Filed 01/28/26 Page 78 of 158

Notwithstanding any provision to the contrary, "Secured Obligations" secured hereby shall not include obligations arising under any Swap Contract to the extent that the grant of a lien hereunder to secure such Swap Contract would violate the Commodity Exchange Act by virtue of the Mortgagor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such grant of such lien becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.*, as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto.

2.2 Terms of Secured Obligations. All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in Paragraph 2.1(a) and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instrument which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3 Maximum Principal Amount. NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN OR IN THE DEBT INSTRUMENT AND ALL OTHER DOCUMENTS RELATING TO, GUARANTEEING OR OTHERWISE GIVEN IN CONNECTION WITH THE SECURED OBLIGATIONS (THE "LOAN DOCUMENTS") TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS FORTY-FIVE THOUSAND FOUR HUNDRED TWELVE AND 84/100 DOLLARS ($45,412.84) PLUS ALL INTEREST PAYABLE UNDER THE DEBT INSTRUMENT AND ALL AMOUNTS EXPENDED BY MORTGAGEE AFTER DEFAULT BY OBLIGOR (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS MORTGAGE; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE PROPERTY AND UPHOLDING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY.

3. ASSIGNMENT OF RENTS.

3.1 Assignment. Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "Rents"), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property. In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also be considered Rents assigned under this Paragraph.

3.2 Grant of License. Notwithstanding the provisions of Paragraph 3.1, Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Paragraph 6.2, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

4. SECURITY INTEREST IN RELATED PERSONALTY.

4.1 Grant of Security Interest. This Mortgage is intended to be a security agreement pursuant to the New York Uniform Commercial Code for all items specified above as part of the Property

which, under applicable law, may be subject to a security interest pursuant to the New York Uniform Commercial Code. Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "Personalty"):

(a) All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b) All crops growing or to be grown on the Land (and after severance from the Land); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c) All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them;

(d) All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without limitation, all general intangibles related to any of the above property and all proceeds of the above property.

5. RIGHTS AND DUTIES OF THE PARTIES.

5.1 Representations and Warranties. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements.

5.2 Taxes, Assessments, Liens and Encumbrances. Mortgagor shall pay or cause to be paid prior to the due date therefor all taxes, levies, charges and assessments, now or hereafter levied, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property which Mortgagee has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3 Damages and Insurance and Condemnation Proceeds.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "Claims"):

(i) all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

(iv) all interest which may accrue on any of the foregoing.

(b) Mortgagor shall immediately notify Mortgagee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Mortgagor in adjusting any loss covered by insurance.

(c) All proceeds of the Claims assigned to Mortgagee under this Paragraph shall be paid to Mortgagee. In each instance, Mortgagee shall apply those proceeds first toward reimbursement of all of Mortgagee's costs and expenses of recovering the proceeds, including attorneys' fees. Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor. If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds. If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

5.4 Insurance. Mortgagor shall provide and maintain in force at all times all risk property damage insurance (including without limitation windstorm coverage, and hurricane coverage as applicable) on the Property and such other type of insurance on the Property as may be required by Mortgagee in its reasonable judgment. At Mortgagee's request, Mortgagor shall provide Mortgagee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in an amount, for a term, and in form and content satisfactory to Mortgagee, and shall be written only by companies approved by Mortgagee. In addition, each policy of hazard insurance shall include a

Form 438BFU or equivalent loss payable endorsement and a standard "non-contributory mortgagee" endorsement, each in favor of Mortgagee.

5.5 Maintenance and Preservation of Property.

(a) Mortgagor shall keep the Property in good condition and repair and shall not commit or allow waste of the Property. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance.

(b) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under Paragraph 5.3.

(c) Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable law or order of any governmental authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d) If the Property is agricultural, Mortgagor shall farm the Property in a good and husbandlike manner. Mortgagor shall keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees or vines with new ones. Mortgagor shall prepare for harvest, harvest, remove and sell any crops growing on the Property. Mortgagor shall keep all buildings, fences, ditches, canals, wells and other farming improvements on the Property in first class condition, order and repair.

(e) Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6 Releases, Extensions, Modifications and Additional Security. Without affecting the personal liability of any person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a) release any person liable for payment of any Secured Obligation;

(b) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) alter, substitute or release any property securing the Secured Obligations;

(e) consent to the making of any plat or map of the Property or any part of it;

(f) join in granting any easement or creating any restriction affecting the Property;

(g) join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h) release the Property or any part of it from the lien of this Mortgage.

5.7 <u>Satisfaction of Mortgage</u>. Upon Mortgagee's determination in its sole good faith discretion that all sums secured hereby have been indefeasibly paid in full and no further commitment to extend credit continues, Mortgagee shall execute and deliver a satisfaction of the Mortgage to Mortgagor or, upon Mortgagor's written request, an assignment of Mortgage in recordable form to a party designated by Mortgagor, which assignment shall be made without any representation or warranty by Mortgagee. Mortgagor shall pay Mortgagee's costs incurred in connection with such assignment of this Mortgage.

5.8 <u>Compensation and Reimbursement of Costs and Expenses</u>.

(a) Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Mortgagee when the law provides no maximum limit, for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services.

(b) Mortgagor further agrees to pay or reimburse Mortgagee for all costs, expenses and other advances which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under Paragraph 6.3, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs and disbursements, costs of any sale of the Property and any cost of any appraisal and evidence of title.

(c) Mortgagor shall pay all obligations arising under this Paragraph immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations. If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9 <u>Exculpation and Indemnification</u>.

(a) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following:

(i) Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii) Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii) Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv) any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v) any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the

rights or remedies afforded Mortgagee under Paragraph 6.3, unless the loss is caused by the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b) Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of any appraisal or other evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by law or because of any failure of Mortgagor to perform any of its obligations. This agreement by Mortgagor to indemnify Mortgagee shall survive the release and cancellation of any or all of the Secured Obligations and the satisfaction or partial release of this Mortgage.

5.10 Defense and Notice of Claims and Actions. At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11 Representation and Warranty Regarding Hazardous Substances. Before signing this Mortgage, Mortgagor performed an environmental site assessment of, and researched and inquired into the previous uses and ownership of the Property. Based on that due diligence, Mortgagor represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as Mortgagor has disclosed to Mortgagee in writing. Mortgagor further represents and warrants that Mortgagor has complied, and will comply and cause all occupants of the Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). Mortgagor shall promptly, at Mortgagor's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. Mortgagor acknowledges that hazardous substances may permanently and materially impair the value and use of the Property. "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

5.12 Site Visits, Observation and Testing. Mortgagee and its agents and representatives shall have the right at any reasonable time, after giving reasonable notice to Mortgagor, to enter and visit the Property for the purposes of performing appraisals, observing the Property, taking and removing environmental samples, and conducting tests on any part of the Property. Mortgagor shall reimburse Mortgagee on demand for the costs of any such environmental investigation and testing. Mortgagee will make reasonable efforts during any site visit, observation or testing conducted pursuant this Paragraph to avoid interfering with Mortgagor's use of the Property. Mortgagee is under no duty, however, to visit or observe the Property or to conduct tests, and any such acts by Mortgagee will be solely for the purposes of protecting Mortgagee's security and preserving Mortgagee's rights under this Mortgage. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of Mortgagor; (ii) impose any liability on Mortgagee; or (iii) be a representation or warranty of any kind regarding the Property (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Mortgagee has a duty or obligation under applicable laws, regulations or other requirements to

disclose an Environmental Report to Mortgagor or any other party, Mortgagor authorizes Mortgagee to make such a disclosure. Mortgagee may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Mortgagee's judgment. Mortgagor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Mortgagor by Mortgagee or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Mortgagor) by Mortgagor without advice or assistance from Mortgagee.

5.13 Additional Provisions Relating to Condominiums. If the Property is subject to a condominium declaration of conditions, covenants and restrictions recorded in the official records of the county in which the Property is located (the "Declaration"), the following provisions shall apply.

(a) The provisions contained in this Mortgage are obligations of Mortgagor in addition to Mortgagor's obligations under the Declaration with respect to similar matters, and shall not restrict or limit Mortgagor's duties and obligations to keep and perform promptly all of its obligations as unit owner under the Declaration.

(b) Mortgagor shall at all times fully perform and comply with all the agreements, covenants, terms and conditions imposed upon unit owners under the Declaration, and if Mortgagor fails to do so, Mortgagee may (but shall not be obligated to) take any action Mortgagee deems necessary or desirable to prevent or cure any default thereunder. Mortgagee may also take such action as it deems necessary or desirable to cure a default under the Declaration by Mortgagor or any other party occupying the unit(s) (a "Unit Occupant") encumbered by this Mortgage, upon receipt by Mortgagee from the condominium association under the Declaration (the "Association") of written notice of such default, even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary to prevent or cure any default by Mortgagor or a Unit Occupant, and Mortgagor hereby agrees to pay to Mortgagee, immediately and without demand, all such sums so paid and expended by Mortgagee, together with interest thereon from the date of each such payment at the rate (the "Demand Rate") of two percent (2%) in excess of the then current rate of interest under the Debt Instrument. All sums so paid and expended by Mortgagee, and the interest thereon, shall be added to and be secured by the lien of this Mortgage. At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(c) At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(d) Mortgagor shall advise Mortgagee in writing of the giving of any notice to Mortgagor by the Association under the Declaration of any default by Mortgagor as unit owner or by a Unit Occupant thereunder in the performance or observance of any of the terms, conditions and covenants to be performed or observed by Mortgagor or such Unit Occupant thereunder, and Mortgagor shall deliver to Mortgagee a true copy of each such notice.

(e) If any action, proceeding, motion or notice shall be commenced or filed in respect of the Association in connection with any case (including a case commenced or filed under the Bankruptcy Code), Mortgagee shall have the option, to the exclusion of Mortgagor, exercisable upon notice from Mortgagee to Mortgagor, to conduct and control any such litigation with counsel of Mortgagee's choice. Mortgagee may proceed in its own name or in the name of Mortgagor in connection with any such litigation, and Mortgagor agrees to execute any and all powers, authorizations, consents or other documents required by Mortgagee in connection therewith. Mortgagor shall, upon demand, pay to Mortgagee all costs and expenses (including attorneys' fees) paid or incurred by Mortgagee in connection with the prosecution or conduct of

any such proceedings. Any such costs or expenses not paid by Mortgagor as aforesaid shall be secured by the lien of this Mortgage and shall be added to the principal amount of the indebtedness secured hereby. Mortgagor shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Declaration in any such case without the prior written consent of Mortgagee.

(f) Mortgagor will use its best efforts to obtain and deliver to Mortgagee within twenty (20) days after written request by Mortgagee, an estoppel certificate from the Association setting forth (i) the name of the unit owner, (ii) that the Declaration has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the amount of common expenses and other assessments payable by Mortgagor as unit owner under the Declaration, (iv) the date to which all common expenses and other assessments have been paid by Mortgagor as unit owner under the Declaration, (v) whether there are any alleged defaults by Mortgagor or a Unit Occupant under the Declaration and, if so, setting forth the nature thereof in reasonable detail, and (vi) as to such other matters as Mortgagee may reasonably request.

(g) Mortgagor represents and warrants to Mortgagee that as of the date hereof, no default under the Declaration has occurred and is continuing.

(h) Mortgagor shall take such actions as may be reasonable to insure that the Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

(i) Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the condominium(s) encumbered by this Mortgage, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the Declaration, the Association's bylaws or articles or any rules and regulations promulgated by the Association;

(iii) termination of professional management and assumption of self-management of the Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Association unacceptable to Mortgagee.

6. ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

6.1 Accelerating Transfers

(a) "Accelerating Transfer" means any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property. If Mortgagor is a corporation, "Accelerating Transfer" also means any transfer or transfers of shares possessing, in the aggregate, more than fifty percent (50%) of the voting power. If Mortgagor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the partnership interests. If Mortgagor is a limited

liability company, "Accelerating Transfer" also means withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the voting power or in the aggregate more than fifty percent of the ownership of the economic interest in the Mortgagor.

(b) Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by Paragraph 6.3 of this Mortgage.

6.2 Events of Default. The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("Event of Default") under this Mortgage:

(a) Obligor fails to make any payment, when due, under the Debt Instrument (after giving effect to any applicable grace period), or any other default occurs under and as defined in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations and such default continues beyond any applicable cure period;

(b) Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c) Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of Paragraph 6.1;

(d) Any representation or warranty made in connection with this Mortgage, the Secured Obligations, or in any Debt Instrument proves to have been false or misleading in any material respect when made;

(e) Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage; or

(f) An event occurs which gives Mortgagee the right or option to terminate any Swap Contract secured by this Mortgage.

6.3 Remedies. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately, and/or may terminate any Swap Contract secured by this Mortgage in accordance with its terms.

(b) Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security or lien of this Mortgage. Such other things may include: entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and

evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments. Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Paragraph.

(d) Mortgagee may cure any breach or default of Mortgagor (without waiving such breach or default), and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any person.

(e) Mortgagee may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Mortgage.

(f) Mortgagee may exercise the remedies contained in any Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g) Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties.

(h) Mortgagee may foreclose on this Mortgage non-judicially pursuant to the provisions of Article 14 of the Real Property Actions and Proceedings Law of New York, as such provisions may be extended, renewed, modified or replaced from time to time.

6.4 Application of Sale Proceeds and Rents.

(a) Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto.

(b) Mortgagee shall apply any and all Rents collected by it, and any and all sums

other than proceeds of any sale of the Property which Mortgagee may receive or collect under Paragraph 6.3, in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto. Mortgagee shall have no liability for any funds which it does not actually receive.

7. MISCELLANEOUS PROVISIONS

7.1 No Waiver or Cure.

(a) Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b) If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i) Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii) Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii) Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv) Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v) Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations;

(vi) Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2 Powers of Mortgagee. Mortgagee may take any of the actions permitted under Paragraphs 6.3(b) and/or 6.3(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3 Nonborrower Mortgagor.

(a) If any Mortgagor ("Nonborrower Mortgagor") is not the Obligor under the

Debt Instrument described in Paragraph 2.1(a), such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i) Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

(ii) Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii) Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv) Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v) Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi) Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b) Nonborrower Mortgagor waives:

(i) Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii) Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii) All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv) Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v) Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c) Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d) No provision or waiver in this Mortgage shall be construed as limiting the generality of any other provision or waiver contained in this Mortgage.

(e) For purposes of this Paragraph 7.3, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of Paragraphs 2.1(c) and 2.1(d).

7.4 Merger. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5 Joint and Several Liability. If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6 Applicable Law. This Mortgage shall be governed by the laws of the State of New York.

7.7 Successors in Interest. The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties. However, this Paragraph does not waive the provisions of Paragraph 6.1.

**7.8 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

7.9 Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10 Interpretation. Whenever the context requires, all words used in the singular will be

construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage. The Exhibits to this Mortgage are hereby incorporated in this Mortgage.

7.11 In-House Counsel Fees. Whenever Mortgagor is obligated to pay or reimburse Mortgagee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel to the extent permitted by applicable law.

7.12 Waiver of Marshaling. Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.13 Severability. If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.14 Notices. Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below. That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code. Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

| | |
|---|---|
| Addresses for Notices to Mortgagor: | Gregory L. Beeche<br>356 Hudson River Road<br>Waterford, New York 12188 |
| Address for Notices to Mortgagee: | Bank of America, N.A.<br>Doc Retention - GCF<br>CT2-515-BB-03<br>70 Batterson Park Road<br>Farmington, CT 06032 |

8. NEW YORK STATE SPECIFIC PROVISIONS

8.1 Inconsistencies. In the event of any inconsistencies between the terms and conditions of this Section 8 and the other provisions of this Mortgage, the terms and conditions of this Section 8 shall control.

8.2 Trust Fund. In compliance with Section 13 of the New York Lien Law, as the same may be amended from time to time (the "Lien Law"), Obligor shall receive the advances secured hereby, and shall hold the right to receive such advances, as a trust fund to be applied first for the purpose of paying the cost of the improvement, and shall apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. Obligor shall comply strictly with Section 13-f of the Lien Law.

8.3 Real Property Law Section 291-f. The provisions of this Mortgage and/or the Loan Documents restrict (in accordance with their terms) the right or power of the Mortgagor, as against the holder of this Mortgage, without such holder's consent, to cancel, abridge, or otherwise modify tenancies, subtenancies, leases or subleases in existence on the date hereof (the "Existing Leases"), and the tenants or subtenants thereunder, (the "Existing Tenants"), or to accept prepayments of installments of rent to become due under the Existing Leases. Mortgagee shall have all of the rights as against the Existing Tenants as set forth in Section 291-f of the Real Property Law of the State of New York. Mortgagor covenants and agrees to send to each Existing Tenant on the date hereof, either by recognized overnight courier or by certified or registered mail, return receipt requested (and to provide promptly to Mortgagee copies of such letters and receipts) notice of the existence of this Mortgage, together with a copy of this Paragraph 8.3. Any cancellation, abridgment, modification or prepayment made by any Existing Tenant of an Existing Lease in violation of the provisions of this Paragraph 8.3, after the written notice provided for herein, without the consent of Mortgagee shall be voidable by the holder of the Mortgage, as such holder may elect.

8.4 Type of Property. Mortgagor represents and warrants that this Mortgage does not cover real property principally improved by one or more structures containing in the aggregate not more than six residential units, each bearing its own cooking facilities.

8.5 Section 254 of the RPL. In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

8.6 Transfer Taxes.

(a) For as long as this Mortgage remains outstanding, Mortgagor covenants and agrees that, in the event of a sale of the Property or other Accelerating Transfer, it will duly complete, execute and deliver to Mortgagee contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate Accelerating Transfer taxes, including, without limitation, any real estate transfer taxes payable under Article 31 of the New York State Tax Law or under Title 11, Chapter 21 of the Administrative Code of the City of New York, if applicable, or any successor provisions thereto (collectively, "Transfer Taxes") by reason of such sale or other Accelerating Transfer or recording of the deed evidencing such sale or other Accelerating Transfer.

(b) Mortgagor shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Accelerating Transfer, and in default thereof Mortgagee may (but shall have no obligation to) pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage. The provisions of this Paragraph 8.6(b) shall survive any Accelerating Transfer and the delivery of the deed in connection with any Accelerating Transfer.

8.7 Covenants in Addition to RPL. All covenants hereof shall be construed as affording to Mortgagee rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable legal requirement.

Doc #01-3009537.3

[Signature Page Follows]

IN WITNESS WHEREOF, this Mortgage has been entered into by Mortgagor on the day and year above written.

MORTGAGOR:

**GREGORY L. BEECHE**

G. L. Beeche
_______________________________

State of New York )
) ss.:
County of Albany )

On the 13 day of April, in the year 2017 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

David L. Evans
_______________________________
(Signature and office of individual taking acknowledgment)

DAVID L. EVANS
Notary Public, State of New York
Qualified in Saratoga County
No. 4605776
Commission Expires April 30, 2019

[Signature Page - Gap Mortgage]

**EXHIBIT A TO MORTGAGE**

Exhibit A to MORTGAGE dated as of April 20, 2017, given by **Gregory L. Beeche** as "Mortgagor" to **Bank of America, N.A.**, a national banking association, as "Mortgagee."

Description of Property

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N,Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike,
as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast comer of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest comer of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly comer of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly comer of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly comer of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

# EXHIBIT C

Case 1:25-cv-00944-AMN-TWD Document 59-3 Filed 01/23/26 Page 2 of 2

[redacted]

**445861** **2014 Dec 16 AM11:47**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Kirby W. DiLorenzo, Esq. (518) 272-6565**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**MARTIN, SHUDT, WALLACE, DiLORENZO**
**258 Hoosick Street, Suite 201**
**Troy, NY 12180, USA**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME **BEECHE** | FIRST NAME **GREGORY** | MIDDLE NAME **L** | | SUFFIX |
| 1c. MAILING ADDRESS **356 Hudson River Road** | CITY **Waterford** | STATE **NY** | POSTAL CODE **12188** | COUNTRY **USA** |
| 1d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME **FIRST NIAGARA BANK, N.A.** | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS **P.O. BOX 28** | CITY **BUFFALO** | STATE **NY** | POSTAL CODE **14240-0028** | COUNTRY **USA** |

4. This FINANCING STATEMENT covers the following collateral:

**All of the following personal property, whether now owned or hereafter acquired, and all proceeds thereof:**
**(A)All furniture, fixtures and equipment in connection with the Project including all proceeds and products thereof, all insurance and condemnation claims and proceeds with respect to the Project and all building materials whether on or off the Property.**
**(B) All lease, rental and sale agreements covering any of the Project;**
**(C) All security deposits, down payments and other payments with respect to the sale or rental of any of the Project;**

**(D) All construction, marketing, management, engineering, architectural, service, and maintenance contracts and all other contracts relating to the Project;**
**(E) All books and records relating to the Project;**
**(F) All plans, specifications and permits for the construction of the Improvements;**
**(G) All options and agreements with respect to additional real property for use or development in connection with the Project; and**
**(H) All insurance proceeds and condemnation awards from the Project.**

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA



**Filing Number-201412168491664**

# EXHIBIT D

Bank of America

# Construction Loan Agreement

This Construction Loan Agreement ("Agreement"), dated as of April 20, 2017, is between **Bank of America, N. A.** (the "Bank") and **Gregory L. Beeche** (the "Borrower").

## 1. THE LOAN

### 1.1 Loan Amount and Purpose.

Subject to the terms and conditions set forth in this Agreement, the Bank agrees to advance up to One Million One Hundred Fifty Thousand and 00/100 Dollars ($1,150,000.00) (the "Loan") to be used by the Borrower to construct certain improvements on the real property located at 356 Hudson River Road, Waterford, New York (the "Property").The improvements consist of the following (the "Improvements"): the expansion of building number four located at the Property.

### 1.2 Availability Period.

The Loan is available during the period commencing on the date of this Agreement and ending on April 1, 2018 (the "Construction Period").

### 1.3 The Repayment Period.

The Loan is due and payable in full on the last day of the Construction Period. However, if on or before the last day of the Construction Period, the Borrower satisfies all the terms and conditions set forth in this Agreement, the Borrower may choose to repay the Loan in monthly amortizing payments during the period beginning on the first day following the end of the Construction Period and ending on April 1, 2027 (the "Repayment Period").

### 1.4 Failure to Satisfy Conditions.

If any of the conditions listed below to repay the Loan during the Repayment Period have not been satisfied by the end of the Construction Period, the Bank, in its sole discretion, may (a) require payment of the Loan in full on the last day of the Construction Period, (b) grant an extension of the Construction Period (for which the Bank may charge an extension fee or impose other conditions), or (c) waive the unsatisfied conditions and begin the Repayment Period. If the Bank chooses to begin the Repayment Period, the Borrower will begin making the monthly amortizing payments required during the Repayment Period. Unless the Bank otherwise agrees in writing, the Bank will have no further obligation to disburse Loan proceeds after the end of the Construction Period even if the Improvements have not been completed. In the event the Improvements have not been completed, the Borrower agrees to diligently complete the Improvements using the Borrower's own funds. The Bank, in its sole discretion, may make (but will not be obligated to make) further disbursements after the end of the Construction Period (for example, to pay mechanics' liens, respond to stop or mechanic notices or otherwise preserve its collateral), and all such disbursements will be deemed advances under this Agreement secured by the Property.

### 1.5 Interest Rate and Payments During Construction Period.

The following terms will apply to the Loan during the Construction Period:

(a) The LIBOR Rate plus 2.25 percentage points during the Construction Period.

The LIBOR Rate (Adjusted Periodically) is a rate of interest equal to the rate per annum equal to the London Interbank Offered Rate (or a comparable or successor rate which is approved by the

Bank), as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Rate (Adjusted Periodically) is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

The interest rate will be adjusted on April 1, 2017 and remain fixed until the next Adjustment Date, which shall be the first calendar day of each successive month thereafter (each, an "Adjustment Date"). If the Adjustment Date in any particular month would otherwise fall on a day that is not a banking day then, at the Bank's option, the Adjustment Date for that particular month will be the first banking day immediately following thereafter.

(b) During the Construction Period, the Borrower shall make interest only payments, in arrears, commencing on May 1, 2017 and continuing on the first day of each successive month thereafter.

**1.6 <u>Interest Rate During Repayment Period</u>.**

Interest shall continue to accrue at the LIBOR Rate plus 2.25 percentage points during the Repayment Period.

**1.7 <u>Payments During Repayment Period</u>.**

The following payment terms will apply to the Loan during the Repayment Period:

(a) During the Repayment Period, the Borrower will pay interest on May 1, 2018, and then on the same day of each month thereafter until payment in full of the principal balance of the Loan.

(b) The Borrower will repay principal in installments beginning on __________, ____, and on the same day of each month thereafter, until the last day of the Repayment Period. Each installment shall be in the amount set forth on Exhibit B attached hereto and by this reference incorporated herein. In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due.

**1.8 <u>Prepayments</u>.**

(a) The Borrower may prepay principal in full or in part at any time. The prepayment will be applied to the most remote payment of principal due under this Agreement. Each prepayment, whether voluntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid, and a prepayment fee. For purposes of this paragraph, "prepayment" means a payment of an amount on a date other than an Adjustment Date. The prepayment fee shall be in an amount sufficient to compensate the Bank for any loss, cost or expense incurred by it as a result of the prepayment, including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain the amount prepaid or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by the Bank in connection with the foregoing. For purposes of this paragraph, the Bank shall be deemed to have funded each prepaid amount by a matching deposit or other borrowing in the applicable interbank market, whether or not the amount was in fact so funded.

## 2. FEES AND EXPENSES

### 2.1 Fees.

(a) Waiver Fee. If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(b) Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late; provided that such late fee shall be reduced to two percent (2%) of any required principal and interest payment that is not paid within fifteen (15) days of the date it is due if the loan is secured by a mortgage on an owner-occupied residence. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

### 2.2 Expenses.

(a) The Borrower agrees to reimburse the Bank for any expenses it incurs in the preparation of this Agreement and any agreement or instrument required by this Agreement. Expenses include, but are not limited to, reasonable attorneys' fees, including any allocated costs of the Bank's in-house counsel to the extent permitted by applicable law.

(b) The Borrower also agrees to pay all costs and expenses incurred by the Bank in connection with the making, disbursement and administration of the Loan. Such costs and expenses include, but are not limited to, charges for title insurance, recording and escrow charges, fees for appraisal, architectural and engineering review and construction services, environmental services, and any other reasonable fees and costs for services, regardless of whether such services are furnished by the Bank's employees or by independent contractors.

(c) The Borrower acknowledges that the Loan fee does not include amounts payable by the Borrower under this paragraph. All such sums incurred by the Bank and not immediately reimbursed by the Borrower will be considered an additional loan to the Borrower bearing interest at the default rate provided in this Agreement and secured by the Real Estate Security Instrument described below.

## 3. COLLATERAL

### 3.1 Real Property.

All obligations of the Borrower under this Agreement will be secured by a mortgage (the "Real Estate Security Instrument") executed by Gregory L. Beeche covering the Property.

### 3.2 Personal Property.

The personal property listed below now owned or owned in the future by the parties listed below will secure the Borrower's obligations to the Bank under this Agreement. The collateral is further defined in security agreement(s) executed by the owners of the collateral.

(a) Equipment and fixtures owned by (i) Greg Beeche, Logistics, LLC, and (ii) Greg Logistics, LLC.

(b) Inventory owned by (i) Greg Beeche, Logistics, LLC, and (ii) Greg Logistics, LLC.

(c) Receivables owned by (i) Greg Beeche, Logistics, LLC, and (ii) Greg Logistics, LLC.

(d) Patents, trademarks and other general intangibles owned by (i) Greg Beeche, Logistics, LLC, and (ii) Greg Logistics, LLC.

## 4. CONSTRUCTION OF THE IMPROVEMENTS; DISBURSEMENT PROCEDURES

### 4.1 Construction of the Improvements.

The Borrower will construct the Improvements in accordance with the plans and specifications. The Borrower will complete the Improvements on or before the last day of the Construction Period in accordance with a construction schedule approved by the Bank.

### 4.2 Change Orders.

The Borrower will obtain the Bank's prior written approval of any material change in the plans and specifications, the construction contract, the construction schedule or other material contract or subcontract, schedule or plan, including any change which might delay construction of the Improvements beyond the last day of the Construction Period or cause the Loan to become "out of balance," as defined below. The Borrower will also obtain the Bank's prior written approval of any change in any work or materials which, together with all prior changes, causes any line item in the cost breakdown to increase by five percent (5%) or more. The Borrower acknowledges that delays may result from the Bank's review of such changes, and agrees that, so long as the delays are not unreasonable in duration, they shall not affect the Borrower's obligation to complete the Improvements by the end of the Construction Period.

### 4.3 Cost Breakdown; Draw Requests.

(a) The Borrower has delivered to the Bank a cost breakdown showing the costs to complete construction of the Improvements. The Bank will disburse Loan proceeds for the items and up to the amounts shown on the cost breakdown. Disbursements, when totaled, shall not exceed the amounts shown on the cost breakdown for each individual line item. Undisbursed Loan funds in one category or line item may not be applied to another category or line item without the Bank's written consent. If the Improvements cannot be completed in strict conformity with the cost breakdown, the Borrower will immediately submit to the Bank for its approval a revised cost breakdown which will supersede all previously approved cost breakdowns.

(b) The Borrower will request disbursements, no more frequently than once a month, by submitting a draw request accompanied by (i) AIA G702 and G703 application for payment forms, and (ii) such documentation and information as the Bank may require. If required by the Bank, the draw request will be accompanied by a certificate of the Borrower certifying that the Improvements have been constructed in accordance with the plans and specifications. Disbursements will be made to the Borrower's checking account, as designated in writing by the Borrower, or by such other means requested by the Borrower and acceptable to the Bank, to be used by the Borrower for the items reflected in the draw request. Alternatively, the Bank, in its sole discretion, may make disbursements directly to other persons furnishing goods or services with respect to the Improvements. Interest on each disbursement, whether initiated by the Borrower or the Bank, will be payable from the time the Bank debits the Loan funds in the amount of the disbursement. The Bank may use Loan funds to pay any fees owing to the Bank, interest on the Loan, legal fees and expenses of Bank's attorneys which are payable by the Borrower, and such other sums as may be owing from time to time by the Borrower to the Bank with respect to the Loan, all without further notice to or authorization by the Borrower. The Bank will have no obligation to make any advance from any contingency line item unless the Bank consents to such advance in its sole discretion.

**4.4 Borrower's Funds Account.**

If at any time the Bank determines that the Loan proceeds are insufficient to pay all the costs through the completion of the Improvements, the Bank may require the Borrower to deposit the amount of the shortfall into a non-interest-bearing account with the Bank (the "Borrower's Funds Account"), to be disbursed by the Bank in the same manner as Loan proceeds. Alternately, the Bank may agree that the Borrower may make up the shortfall by paying certain expenses incurred in connection with the construction of the Improvements as they come due. Any deposits required to be made to the Borrower's Funds Account at the closing of the Loan, or currently anticipated expenses that are to be paid by the Borrower as they come due, are reflected on the cost breakdown.

**4.5 Loan Out of Balance.**

If at any time the Bank determines that the amount of the undisbursed Loan funds, plus any sums on deposit in the Borrower's Funds Account, plus any sums the Bank has agreed may be paid by the Borrower as they come due, are insufficient to complete the Improvements and pay other expenses of the Property and the Loan, the Loan is considered to be "out of balance." If the Bank at any time determines that the Loan is out of balance, the Borrower will, upon the Bank's request, deposit into the Borrower's Funds Account an amount sufficient in the Bank's reasonable judgment to bring the Loan into balance. The Borrower acknowledges that the Loan may become out of balance in numerous ways, not all of which may now be foreseen.

**4.6 Security Interest; Disbursements.**

The Borrower hereby grants to the Bank a security interest in any funds now or hereafter deposited in the Borrower's Funds Account as additional collateral for the performance of the Borrower's obligations under this Agreement. Whenever the Bank is holding the Borrower's funds in the Borrower's Funds Account, the Bank will make all disbursements first from the Borrower's Funds Account until such funds are exhausted.

## 5. PAYMENTS AND COSTS

**5.1 Disbursements and Payments.**

(a) Each payment by the Borrower will be made in U.S. Dollars and immediately available funds, without setoff or counterclaim. Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement, or by such other method as may be permitted by the Bank.

(b) For any payment under this Agreement made by debit to a deposit account, the Borrower will maintain sufficient immediately available funds in the deposit account to cover each debit. If there are insufficient immediately available funds in the deposit account on the date the Bank enters any such debit authorized by this Agreement, the Bank may reverse the debit.

(c) Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank. In addition, the Bank may, at its discretion, require the Borrower to sign one or more promissory notes.

(d) Prior to the date each payment of principal and interest and any fees from the Borrower becomes due (the "Due Date"), the Bank will send to the Borrower a statement of the amounts that will be due on that Due Date (the "Billed Amount"). The calculations in the bill will be made on the assumption that no new extensions of credit or payments will be made between the date of the billing statement and the Due Date, and that there will be no changes in the applicable interest rate. If the Billed Amount differs from the actual amount due on the Due Date (the "Accrued Amount"), the discrepancy will be treated as follows:

(i) If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the discrepancy. The Borrower will not be in default by reason of any such discrepancy.

(ii) If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the discrepancy.

Regardless of any such discrepancy, interest will continue to accrue based on the actual amount of principal outstanding without compounding. The Bank will not pay the Borrower interest on any overpayment.

**5.2 <u>Borrower's Instructions</u>.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Bank may honor instructions for advances or repayments and any other instructions under this Agreement given by the Borrower (if an individual), or by any one of the individuals the Bank reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "Authorized Individual"). The Bank may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank.

**5.3 <u>Direct Debit</u>.**

(a) Except when the Bank disburses Loan proceeds from the interest reserve, if any, and in any case at all times during the Repayment Period, the Borrower agrees that on the Due Date the Bank will debit the Billed Amount from deposit account number 483043630494 (NY) with the Bank owned by Greg Beeche, Logistics, LLC (the "Designated Account").

(b) The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.00) percentage point higher than the rate of interest otherwise provided under this Agreement and the amount of each payment will be increased accordingly.

**5.4 <u>Banking Days</u>.**

Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due or which are received on a day which is not a banking day will be due or applied, as applicable, on the next banking day.

**5.5 <u>Interest Calculation</u>.**

Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

**5.6 Default Rate.**

Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Bank bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

**5.7 Additional Costs.**

The Borrower will pay the Bank, on demand, for the Bank's costs or losses arising from any Change in Law which are allocated to this Agreement or any credit outstanding under this Agreement. The allocation will be made as determined by the Bank, using any reasonable method. The costs include, without limitation, the following:

(a) any reserve or deposit requirements (excluding any reserve requirement already reflected in the calculation of the interest rate in this Agreement); and

(b) any capital requirements relating to the Bank's assets and commitments for credit.

"Change in Law" means the occurrence, after the date of this Agreement, of the adoption or taking effect of any new or changed law, rule, regulation or treaty, or the issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued in connection with that Act, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

**6. CONDITIONS TO DISBURSEMENT**

The Bank will have no obligation to make disbursements of the Loan or permit commencement of the Repayment Period until all applicable conditions listed in this Section are satisfied. These conditions are for the Bank's sole benefit. The Bank, in its sole discretion, may, therefore, from time to time, waive one or more of these conditions without affecting its right to fully enforce such condition or conditions with respect to any subsequent request for a disbursement. To be effective, each waiver by the Bank must be expressly made by the Bank in writing.

**6.1 First Disbursement.**

The first disbursement (unless otherwise indicated) is subject to the following conditions:

(a) Loan Documents. Receipt by the Bank of the following documents and other items, executed and acknowledged as appropriate, all in form and substance satisfactory to the Bank:

(i) this Agreement.

(ii) the Real Estate Security Instrument.

(iii) Guaranty in favor of Bank executed by (i) Greg Beeche, Logistics, LLC ,and (ii) Greg Logistics, LLC.

(iv) Evidence of the insurance coverage required under this Agreement, including flood insurance to the extent required by the Bank under Section 8.17

(v) If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

(vi) If required by the Bank, a copy of the guarantor's organizational documents.

(vii) Signed original security agreements covering the personal property collateral which the Bank requires.

(viii) Evidence that the security interests and liens in favor of the Bank in the personal property collateral are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing.

(ix) such other documents and assurances as the Bank may require, including not limited to, a valid building permit for the Improvements.

(b) Improvements and Other Information. Receipt by the Bank of all contracts, plans, budgets, schedules, and other information and documentation pertaining to the Improvements and the Property, including, without limitation, the following:

(i) The plans and specifications.

(ii) The cost breakdown.

(iii) If required by the Bank or the title insurer, a survey of the Property, prepared and certified by a qualified surveyor, showing that the Improvements, if constructed in accordance with the plans and specifications, will lie within the boundaries of the Property without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements.

(iv) The construction schedule.

(v) Evidence satisfactory to the Bank that no structures, building materials, contents, or any Improvements are or will be located in a Special Flood Hazard Area; provided that any of the foregoing are or will be located in such an area, a flood insurance policy must be delivered to the Bank in accordance with Section 8.17 hereof.

(vi) An environmental questionnaire prepared and certified by the Borrower, and, if the Bank requires, an environmental survey of the Property prepared by an environmental consultant satisfactory to the Bank.

(vii) Such financial information regarding the Borrower and any guarantors as the Bank may request.

(c) Permits and Licenses. Receipt by the Bank of satisfactory evidence that (i) the Property, the Improvements and the Borrower's business comply with all applicable laws, covenants and conditions, (ii) the Borrower has all necessary permits and approvals for the Improvements and for the Borrower's intended use of the Property, and (iii) the Property has or will have all easements, licenses, utilities and other rights and benefits necessary or desirable for the Improvements and the Borrower's intended use of the Property.

(d) Loan Fees and Expenses. Payment by the Borrower of the Bank's loan fee as required under this Agreement and all other costs and expenses incurred in connection with the Loan, and deposit by the Borrower of any required amount to the Borrower's Funds Account.

**6.2 Conditions to All Disbursements.**

All disbursements are subject to each of the following conditions:

(a) Receipt by the Bank of a draw request, accompanied by such documentation and information as the Bank may require.

(b) The Property must not be materially damaged by any casualty, or subject to any condemnation proceeding, unless the Bank has received insurance or condemnation proceeds sufficient in the Bank's judgment to pay for all repairs in a timely manner. The Bank must also be satisfied that the Borrower's intended use of the Property and ability to repay the Loan will not be materially impaired by such casualty or condemnation.

(c) Issuance by the title insurer of any title endorsement requested by the Bank.

(d) An independent inspection of the Property and the Improvements completed to date, at the sole cost of the Borrower, which shall be acceptable to the Bank in its sole discretion.

**6.3 Final Disbursement.**

The final disbursement of the Loan is subject to all of the following conditions:

(a) The Improvements must be fully completed, lien-free, and in accordance with the plans and specifications. The Borrower must furnish any title endorsement or other evidence of lien-free completion requested by the Bank.

(b) A final and unconditional certificate of occupancy for the Property.

**6.4 Commencement of Repayment Period.**

The Borrower's right to extend the Loan into the Repayment Period is subject to all of the following conditions:

(a) All conditions set forth above for the final disbursement of the Loan must be met.

(b) There must not be any event of default under this Agreement, or any material adverse change in the Borrower's or any guarantor's financial condition, or any event or condition that materially impairs the Borrower's intended use of the Property or the Borrower's ability to repay the Loan.

(c) In place of the builder's "all risk" coverage provided during construction, the Borrower must provide the all risk replacement cost insurance and such other insurance coverage required in the "Covenants" section of this Agreement.

(d) If the Bank, in its discretion, elects to have the Property reappraised, the Bank must be reasonably satisfied that the Property as improved has the same or greater value as was projected when appraised for the Bank's initial approval of the Loan. The Borrower agrees to pay the expense of appraising the Property, including any allocated cost of Bank's in-house appraisal staff.

## 7. REPRESENTATIONS AND WARRANTIES

The Borrower promises that each representation and warranty set forth below is true, accurate and correct as of the date of this Agreement. Each draw request will be deemed to be a reaffirmation of each and every representation and warranty made by the Borrower in this Agreement.

**7.1 Authorizations.**

If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**7.2 Enforceable Agreement.**

This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required under this Agreement, when executed and delivered, will be similarly legal, valid, binding and enforceable.

**7.3 No Conflicts/Violation.**

Neither the Borrower nor the Property is in violation of, and the terms of this Agreement do not conflict with, any regulation or ordinance, any order of any court or governmental entity, or any covenant or agreement affecting the Borrower or the Property. There are no claims, actions, proceedings or investigations pending or threatened against the Borrower or affecting the Property, except for those previously disclosed by the Borrower to the Bank in writing.

**7.4 Financial Information.**

All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

**7.5 Lawsuits.**

There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower or the Property which, if lost, would impair the Borrower's financial condition or ability to repay the Loan, except as have been disclosed in writing to the Bank.

**7.6 Collateral.**

All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

**7.7 Permits, Franchises.**

The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

**7.8 Other Obligations.**

The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

**7.9 Tax Matters.**

The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

**7.10 No Event of Default.**

There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

**7.11 Insurance.**

The Borrower has obtained, and maintained in effect, the insurance coverage required in the "Covenants" section of this Agreement, including flood insurance to the extent required by the Bank under Section 8.17 hereof.

**7.12 ERISA Plans.**

(a) Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b) With respect to any Plan subject to Title IV of ERISA:

(i) No reportable event has occurred under Section 4043(c) of ERISA which requires notice.

(ii) No action by the Borrower or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

(c) The following terms have the meanings indicated for purposes of this Agreement:

(i) "Code" means the Internal Revenue Code of 1986, as amended.

(ii) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(iii) "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code.

(iv) "Plan" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

**7.13 Government Sanctions.**

(a) The Borrower represents that neither the Borrower, any Obligor, nor any of their respective affiliated entities, including in the case of any Borrower or Obligor that is not a natural person, subsidiaries nor, to the knowledge of the Borrower, any owner, trustee, director, officer, employee, agent, affiliate or representative of the Borrower or any Obligor is an individual or entity ("Person") currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's

Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is the Borrower or any Obligor located, organized or resident in a country or territory that is the subject of Sanctions.

(b) The Borrower represents and covenants that it will not, directly or indirectly, use the proceeds of the credit provided under this Agreement, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

**7.14 Adequacy of Loan.**

The Loan is "in balance" and the undisbursed Loan funds, together with any sums on deposit in the Borrower's Funds Account, are sufficient to construct the Improvements through completion and to accomplish the purposes, plus any sums the Bank has agreed may be paid by the Borrower as they come due, contemplated by this Agreement.

**7.15 Location of Borrower.**

The principal residence of the Borrower is located at the address listed under the Borrower's signature on this Agreement.

## 8. COVENANTS OF BORROWER

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

**8.1 Use of Proceeds.**

To use the Loan proceeds for the purpose of financing the construction of the Improvements on the Property.

**8.2 Completion and Maintenance of Improvements.**

To promptly commence construction of the Improvements, and diligently continue construction of the Improvements to completion, in a good and workmanlike manner and in accordance with sound building practices. Construction of the Improvements must be completed on or before the end of the Construction Period. The Borrower will maintain the Property and the Improvements in good condition and repair.

**8.3 Financial Information - Entities.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of the fiscal year end, the annual financial statements of Greg Beeche, Logistics, LLC, certified and dated by an authorized financial officer. These financial statements must be reviewed (with an opinion satisfactory to the Bank) by a Certified Public Accountant acceptable to the Bank. The statements shall be prepared on a consolidated/consolidating basis.

(b) Within 60 days after each period's end (excluding the last period in each fiscal year), quarterly financial statements of Greg Beeche, Logistics, LLC, certified and dated by an authorized financial officer. These financial statements may be company-prepared. The statements shall be prepared on a consolidated/consolidating basis.

(c) Within 120 days of the end of each fiscal year and within 60 days of the end of each quarter end (excluding the last quarter in each fiscal year), a compliance certificate of the Greg Beeche, Logistics, LLC, signed by an authorized financial officer and setting forth (i) the information and computations (in sufficient detail) to establish compliance with all financial covenants at the end of the period covered by the financial statements then being furnished and (ii) whether there existed as of the date of such financial statements and whether there exists as of the date of the certificate, any default under this Agreement applicable to the party submitting the information and, if any such default exists, specifying the nature thereof and the action the party is taking and proposes to take with respect thereto.

(d) A detailed receivables aging of Greg Beeche, Logistics, LLC by invoice or a summary aging by account debtor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(e) A detailed accounts payable aging of Greg Beeche, Logistics, LLC by invoice or a summary aging by account creditor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(f) A detailed contracts in progress report of Greg Beeche, Logistics, LLC within 120 days after the end of each fiscal year.

(g) Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each guarantor of the Borrower's obligations to the Bank as the Bank may request.

**8.4 <u>Financial Information - Individuals</u>.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of each calendar year-end, the annual financial statements of Gregory L. Beeche.

(b) Within 120 days of the calendar year end, copies of the federal income tax return(s) of Gregory L. Beeche, including copies of any K-1s and all other schedules, in the form filed with the Internal Revenue Service (as well as any subsequent amendments or supplements); and if requested by the Bank, authentications of such documents (whether in the form of signed copies or otherwise) satisfactory to the Bank or copies of any extensions of the filing date.

(c) Such additional financial information regarding the Borrower or any guarantor, pledgor, accommodation party or other obligor with respect to the loan as the Bank shall request.

The financial statements required above shall include a properly completed signed and dated personal financial statement on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the Borrower or other party uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

**8.5 Funded Debt to EBITDA Ratio.**

To maintain on a consolidated basis a ratio of Funded Debt to EBITDA not exceeding 3.75:1.00, with annual step down ratios indicated for each period specified below:

| Period | Ratios |
|---|---|
| From date hereof through December 30, 2017 | 3.75: 1.00 |
| From January 1, 2018 until December 30,2018 | 3.50: 1.00 |
| From January 1, 2019 and thereafter | 3.00: 1.00 |

"Funded Debt" means all outstanding liabilities for borrowed money.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization, plus Paid in Capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**8.6 Basic Fixed Charge Coverage Ratio.**

To maintain on a consolidated basis a Basic Fixed Charge Coverage Ratio of at least 1.25:1.00.

"Basic Fixed Charge Coverage Ratio" means the ratio of Cash Flow to the sum of the current portion of long-term debt and the current portion of capitalized lease obligations, plus interest expense on all obligations, plus lease and rent expense.

"Cash Flow" is defined as (a) net income, after income tax, (b) less income or plus loss from discontinued operations and extraordinary items, (c) plus depreciation, depletion, and amortization, (d) plus interest expense on all obligations, (e) minus dividends, withdrawals, and other distributions, (f) plus lease and rent expense, (g) minus unfinanced capital expenditures and non-cash income, and (h) plus paid in capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**8.7 Bank as Principal Depository.**

To maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

**8.8 Other Debts.**

Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a) Acquiring goods, supplies, or merchandise on normal trade credit.

(b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank.

(c) If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

**8.9 Other Liens.**

Not to create, assume, or allow any security interest or lien (including judicial liens) on the Property, or any other real or personal property the Borrower now or later owns, except:

(a) Liens and security interests in favor of the Bank or any affiliate of the Bank.

(b) Liens for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty.

(c) Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

**8.10 Maintenance of Assets.**

(a) Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b) Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c) Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d) To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e) To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

**8.11 Investments.**

Not to have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

(a) Existing investments disclosed to the Bank in writing.

(b) Investments in any of the following:

(i) certificates of deposit;

(ii) U.S. treasury bills and other obligations of the federal government;

(iii) readily marketable securities (including commercial paper, but excluding restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission).

**8.12 Loans.**

Not to make any loans, advances or other extensions of credit to any individual or entity, except for:

(a) Existing extensions of credit disclosed to the Bank in writing.

(b) Extensions of credit to the Borrower's current subsidiaries.

(c) Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

**8.13 Change of Management.**

Not to make any substantial change in the present executive or management personnel of the Borrower.

**8.14 Change of Ownership.**

Not to cause, permit, or suffer any change in capital ownership such that there is a change of more than twenty-five percent (25%) in the direct or indirect capital ownership of the Borrower.

**8.15 Additional Negative Covenants.**

Not to, without the Bank's written consent:

(a) Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b) Acquire or purchase a business or its assets.

(c) Engage in any business activities substantially different from the Borrower's present business.

(d) Liquidate or dissolve the Borrower's business.

**8.16 Notices.**

(a) Any lawsuit in which the claim for damages exceeds $250,000.00 against the Borrower or any Obligor.

(b) Any substantial dispute between any governmental authority and the Borrower or any Obligor.

(c) Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(d) Any change in the Borrower's or any Obligor's name, legal structure, principal residence, or name on any driver's license or special identification card issued by any state (for an individual), state of registration (for a registered entity), place of business, or chief executive office if the Borrower or any Obligor has more than one place of business.

For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**8.17 Insurance.**

(a) To maintain the following insurance:

(i) Until the Improvements are completed, builder's all risk property damage insurance on the Property, with a policy limit equal to full replacement cost of improvements and personal property, including tenant improvements, if any. After the Improvements are completed, the Borrower will provide "all risk" coverage on the Property as specified above. The insurance must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(ii) Comprehensive general liability coverage with such limits as the Bank may require. This policy will include an additional insured endorsement in favor of Bank. Coverage will be written on an occurrence basis, not claims made. Until the Improvements are completed, the Borrower shall also cause the general contractor to maintain such insurance.

(iii) Workers' compensation insurance for all employees of the Borrower in such amount as is required by law. Until the Improvements are completed, the Borrower shall also cause the general contractor to maintain such insurance.

(iv) If at any time any Improvements or structure on the Property is, or in the future may be, under the Flood Insurance Laws, located in a Special Flood Hazard Area, flood insurance in an amount acceptable to the Bank as detailed below. "Flood Insurance Laws" means (a) the National Flood Insurance Act of 1968, (b) the Flood Disaster Protection Act of 1973, and (c) the National Flood Insurance Reform Act of 1994, each as amended and together with any successor law.

(v) Such other insurance as the Bank in its reasonable judgment may require to comply with the Bank's regular requirements and practices in similar transactions, which may include windstorm, hurricane, and earthquake insurance, and insurance covering acts of terrorism.

This paragraph applies in the event any portion of the Improvements or structure on the Property is, or in the future may be, under the Flood Insurance Laws, located in a Special Flood Hazard Area. The Borrower will obtain and maintain, at its own expense, a flood insurance policy on the Improvements and any such other structure in an amount acceptable to the Bank, but not less than is required to comply with existing and future law. The flood insurance policy must be obtained as a condition to closing the Loan, if existing improvements will be demolished before the Improvements are constructed or if the Start of Construction will occur within 90 days after the closing of the Loan. If the Start of Construction will occur more than 90 days after the closing of the Loan, the Borrower will deliver the flood insurance policy to the Bank at least 60 days before the first of the following to occur: (i) the Start of Construction; (ii) the Borrower commences to install the foundation slab, even if the construction work is funded with the Borrower's own funds, (iii) the Borrower submits the first draw request for hard construction costs (other than for costs of installing the foundation slab, performing preliminary site work such as laying utilities or clearing brush, or the purchase and/or delivery of building materials) (the "First Construction Draw"). In addition, if the lowest floor of the Improvements will be below the base flood elevation, the flood insurance policy must be obtained at least 60 days before the Improvements are walled and roofed and in any event at least 60 days before the First Construction Draw. Until the flood insurance policy is obtained, the Borrower will deliver to the Bank once per month, a completed and executed certificate (the "Pre-Construction Certificate") in a form and with supporting documentation acceptable to the Bank. The Pre-Construction Certificate will set forth the total amount spent or disbursed for the Property by the Borrower from the Borrower's own funds, together with the current cost breakdown, the related AIA Documents G-702 and G-703 or the equivalent executed by each contractor and approved by the architect, together with such supporting documentation as the Bank may require. Each Pre-Construction Certificate shall be deemed to ratify and confirm that, as of the date thereof, that the Pre-Construction Certificate and all supporting documentation are complete and correct, and in all respects what they purport and appear to be for the amount and period applicable to the Pre-Construction Certificate. In addition, the Borrower shall obtain and maintain at its own expense, a flood insurance policy on any

building materials and supplies and any Borrower-owned personal property contents serving as collateral in an amount required by the Bank, in at least the amount required to comply with existing and future law, as soon as a flood insurance policy on such building materials, supplies and contents can be obtained. For the purposes of this paragraph, "Start of Construction" means the earlier to occur of (a) the first placement of permanent construction of any Improvement on the Property, such as the pouring of a slab or footing, the installation of piles, the construction of columns, or any work beyond the stage of excavation, or (b) the placement of a manufactured (mobile) home, whether to be used for residential or business purposes, on a foundation on the Property.

(b) All policies of insurance required by the Bank must be issued by companies approved by the Bank and otherwise be acceptable to the Bank as to amounts, forms, risk coverages and deductibles. Upon the request of the Bank, the Borrower will deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

(c) If the Borrower fails to keep any such coverage in effect while the Loan is outstanding, the Bank may procure the coverage at the Borrower's expense. The Borrower will reimburse Bank, on demand, for all premiums paid by the Bank, which amounts may be added to the principal balance of the Loan and shall bear interest at the default rate provided in this Agreement.

**8.18 Compliance with Law.**

To comply with all existing and future laws, regulations, orders, building restrictions and requirements of, and all agreements with and commitments to, all governmental, judicial and legal authorities having jurisdiction over the Property, the Improvements and the Borrower's business and with all recorded covenants and restrictions affecting the Property.

**8.19 Books and Records.**

To maintain adequate books and records and allow the Bank and its agents to examine, audit and make copies of books and records at any reasonable time. If any of the Borrower's books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform examinations or audits and to respond to the Bank's requests for information concerning such books and records.

**8.20 Inspection of Property and Improvements.**

(a) To allow the Bank, its agents and representatives to enter and visit the Property at any reasonable time for the purposes of observing the construction work of the Improvements, performing appraisals, and inspecting the Property.

(b) If the Bank determines that any work or materials fail to conform to the approved plans and specifications, the recommendations of any service provider or sound building practices, or that they otherwise depart from any of the requirements of this Agreement, the Borrower agrees to correct the work as required by the Bank. The Bank may require the work to be stopped and may withhold disbursements until the work is corrected. No such action by the Bank will affect the Borrower's obligation to complete the Improvements by the end of the Construction Period.

(c) The Bank is under no duty to visit or observe the Property, or to supervise or observe any construction activity, and any such acts by the Bank are solely for the purpose of protecting the Bank's security and preserving the Bank's rights under the this Agreement. No site visit by the Bank will result in a waiver of any event of default or impose any liability on the Bank. The Bank owes no duty of care to protect the Borrower or any other party against, or to inform the Borrower or any other party of, any adverse condition affecting the Property, including any defects in the design or construction of the Improvements.

**8.21 Perfection of Liens.**

To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**8.22 Cooperation.**

To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

**8.23 Flood and Other Insurance.**

If any improved real property collateral is located in a designated flood hazard area, or becomes located in a designated flood hazard area after the date of this Agreement as a result of any re-mapping of flood insurance maps by the Federal Emergency Management Agency, the Borrower will be required to maintain flood insurance on the real property and on any tangible personal property collateral located on the real property. In addition, the Borrower shall maintain such other insurance as the Bank may require to comply with the Bank's regular requirements and practices in similar transactions, which may include earthquake insurance and insurance covering acts of terrorism.

**8.24 Permits, Licenses and Approvals.**

To properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to construct, occupy and operate the Improvements. The Borrower will promptly deliver copies of all such permits, licenses and approvals to the Bank.

**8.25 Personal Property Installed on Property.**

Without the Bank's prior written consent, not to purchase or contract to purchase any materials, equipment, furnishings, fixtures or other personal property to be placed on the Property or installed in any improvements on the Property if the seller of such personal property has retained a security interest therein.

**8.26 Protection Against Lien Claims.**

To promptly pay or otherwise discharge all claims and liens for labor done and materials and services furnished to the Property. The Borrower will have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to the Bank or delay in completing the Improvements. Upon the Bank's request, the Borrower will promptly provide a bond, cash deposit or other security satisfactory to the Bank.

**8.27 No Consumer Purpose.**

Not to use this loan for personal, family, or household purposes. The Bank may provide the Borrower (or any guarantor) with certain disclosures intended for loans made for personal, family, or household purposes. The fact that the Bank elects to make such disclosures shall not be deemed a determination by the Bank that the loan will be used for such purposes.

**8.28 Performance of Acts.**

Upon request by the Bank, to perform all acts which may be necessary or advisable to perfect any lien or security interest provided for in this Agreement or to carry out the intent of this Agreement.

**8.29 Use of the Property.**

(a) To occupy the Property for the conduct of its regular business. The Borrower will not change its intended use of the Property without the Bank's prior written approval.

**8.30 Indemnity.**

To indemnify, defend, and hold the Bank harmless from and against all liabilities, claims, actions, damages, costs and expenses (including all legal fees and expenses of the Bank's counsel) arising out of or resulting from the construction of the Improvements or the ownership, operation, use or development of the Property or the Improvements, or any claim or cause of action of any kind by any party that the Bank is liable for any act or omission committed or made by the Borrower or any other person or entity in connection with the ownership, operation, use or development of the Property or the Improvements, whether such claims are based on theories of derivative liability, comparative negligence or otherwise. The Borrower's obligations to the Bank under this Paragraph shall survive termination of this Agreement and repayment of the Borrower's obligations to the Bank under this Agreement, and shall also survive as unsecured obligations after any acquisition by the Bank of the Property or any part of it by foreclosure or any other means.

## 9. HAZARDOUS SUBSTANCES

**9.1 Indemnity Regarding Hazardous Substances.**

The Borrower agrees to indemnify and hold the Bank harmless from and against all liabilities, claims, actions, foreseeable and unforeseeable consequential damages, costs and expenses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of the Bank's counsel) or loss directly or indirectly arising out of or resulting from any of the following:

(a) Any hazardous substance being present at any time, whether before, during or after any construction, in or around any part of the Property, or in the soil, groundwater or soil vapor on or under the Property, including those incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work, or any resulting damages or injuries to the person or property of any third parties or to any natural resources.

(b) Any use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about any of the Borrower's property or operations or property leased to the Borrower, whether or not the property has been taken by the Bank as collateral.

Upon demand by the Bank, the Borrower will defend any investigation, action or proceeding alleging the presence of any hazardous substance in any such location, which affects the Property or which is brought or commenced against the Bank, whether alone or together with the Borrower or any other person, all at the Borrower's own cost and by counsel to be approved by the Bank in the exercise of its reasonable judgment. In the alternative, the Bank may elect to conduct its own defense at the expense of the Borrower. The Borrower's obligations to the Bank under this Article, except the obligation to give notices to the Bank, shall survive termination of this Agreement, repayment of the Borrower's obligations to the Bank under this Agreement, and foreclosure of the Real Estate Security Instrument encumbering the Property or similar proceedings.

**9.2 Representation and Warranty Regarding Hazardous Substances.**

Before signing this Agreement, the Borrower researched and inquired into the previous uses and ownership of the Property. Based on that due diligence, the Borrower represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as the Borrower has disclosed to the Bank in writing.

**9.3 Compliance Regarding Hazardous Substances.**

The Borrower has complied, and will comply and cause all occupants of the Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). The Borrower shall promptly, at the Borrower's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. The Borrower acknowledges that hazardous substances may permanently and materially impair the value and use of the Property.

**9.4 Notices Regarding Hazardous Substances.**

Until full repayment of the Loan, the Borrower will promptly notify the Bank in writing if it knows, suspects or believes there may be any hazardous substance in or around the Property, or in the soil, groundwater or soil vapor on or under the Property, or that the Borrower or the Property may be subject to any threatened or pending investigation by any governmental agency under any current or future law, regulation or ordinance pertaining to any hazardous substance.

**9.5 Site Visits, Observations and Testing.**

The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Borrower, to enter and visit the Property and any other locations where any personal property collateral securing this Agreement is located, for the purposes of observing the Property and the personal property collateral, taking and removing environmental samples, and conducting tests on any part of the Property. The Borrower shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with the Borrower's use of the Property and the personal property collateral. The Bank is under no duty, however, to visit or observe the Property or the personal property collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of the Borrower; (ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Property or the personal property collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Borrower or any other party, the Borrower authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Borrower further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Borrower by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Borrower) by the Borrower without advice or assistance from the Bank.

**9.6 Definition of Hazardous Substance.**

"Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

## 10. DEFAULT AND REMEDIES

### 10.1 Events of Default.

The Borrower will be in default under this Agreement upon the occurrence of any one or more of the following events of default:

(a) Failure to Pay. The Borrower fails to make a payment under this Agreement when due.

(b) Covenants. Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article).

(c) Other Bank Agreements. Any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank. For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

(d) Cross-default. Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

(e) False Information. The Borrower or any Obligor has given the Bank false or misleading information or representations.

(f) Bankruptcy. The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors.

(g) Receivers. A receiver or similar official is appointed for any portion of the Borrower's or any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

(h) Revocation or Termination. If the Borrower is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Borrower's assets are distributed or otherwise disposed of.

(i) Lien Priority. The Bank fails to have a valid and enforceable perfected security interest in or lien on the Property or any other collateral securing the Borrower's obligations under this Agreement, or such security interest or lien fails to be prior to the rights and interest of others (except for any prior liens to which the Bank has consented in writing).

(j) Progress of Construction. Construction of the Improvements is abandoned or, in the Bank's reasonable estimation, cannot be completed on or before the last day of the Construction Period.

(k) Damage to Improvements. The Improvements are substantially damaged or destroyed by fire or other casualty and the Bank determines that the Improvements cannot be restored and completed in accordance with the terms and provision of this Agreement and the Real Estate Security Instrument.

(l) Judgments. Any notice of judgment lien is filed against the Borrower or any Obligor; or a notice of levy and/or of a writ of attachment or execution, or other like process, is served against the assets of the Borrower or any Obligor in an aggregate amount of $250,000.00 or more; or any lawsuit or lawsuits are filed against the Borrower or any Obligor in which the claim for damages is in an aggregate amount of $250,000.00 or more.

(m) Death. If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent.

(n) Material Adverse Change. A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Loan.

(o) Government Action. Any government authority takes action that the Bank believes materially adversely affects the construction of the Improvements, the Borrower's intended use of the Property, or the Borrower's or any Obligor's financial condition or ability to repay the Loan.

(p) Default under Related Documents. Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any representation or warranty made by any guarantor is false when made or deemed to be made.

(q) ERISA Plans. Any one or more of the following events occurs with respect to a Plan subject to Title IV of ERISA, provided such event or events could reasonably be expected, in the judgment of the Bank, to have a material adverse effect:

(i) A reportable event shall occur under Section 4043(c) of ERISA.

(ii) Any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan under Section 4041 or 4042 of ERISA.

**10.2 Remedies.**

(a) If any of the events of default set forth above occurs, the Bank may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make disbursements of Loan funds under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy," above, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

(b) Also upon any event of default, the Bank will have the right, in its sole discretion, to enter the Property and take possession of it, whether in person, by agent or by court-appointed receiver (which may be done on an ex-parte basis), collect rents, and take any and all actions which it may, in its sole discretion, consider necessary to complete the Improvements or otherwise preserve its collateral, including making changes in plans, specifications, work or materials and entering into, modifying or terminating any contractual arrangements, all subject to the Bank's right at any time to discontinue any work without liability. If the Bank chooses to complete the Improvements, it will not assume any liability to the Borrower or any other person for completing the Improvements, or for the manner or quality of construction. If the Bank exercises any of the rights or remedies provided in this clause (b), that exercise will not make the Bank a partner or joint venturer of the Borrower. All sums which are expended by the Bank in completing construction of the Improvements or otherwise preserving its collateral will be considered an additional loan to the Borrower bearing interest at the default rate set forth in this Agreement and secured by the Real Estate Security Instrument.

## 11. ENFORCING THIS AGREEMENT; MISCELLANEOUS

### 11.1 GAAP.

Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank.

### 11.2 Governing Law.

Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

### 11.3 Venue and Jurisdiction.

The Borrower agrees that any action or suit against the Bank arising out of or relating to this Agreement shall be filed in federal court or state court located in the Governing Law State. The Borrower agrees that the Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If the Bank does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Bank reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by the Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to the Bank's acceptance of this Agreement.

### 11.4 Successors and Assigns.

This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent.

### 11.5 Waiver of Jury Trial.

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

### 11.6 Waiver of Class Actions.

The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any

other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

**11.7 Severability; Waivers.**

If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**11.8 Attorneys' Fees.**

The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Bank is entitled to recover costs and reasonable attorneys' fees incurred by the Bank related to the preservation, protection, or enforcement of any rights of the Bank in such a case. To the extent permitted by law, as used in this paragraph, "attorneys' fees" includes the allocated costs of the Bank's in-house counsel.

**11.9 Individual Liability.**

If the Borrower is a natural person, the Bank may proceed against the Borrower's business and non-business property in enforcing this and other agreements relating to this loan. If the Borrower is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower in enforcing this and other agreements relating to this loan.

**11.10 Joint and Several Liability.**

If two or more Borrowers sign this Agreement, each Borrower agrees that it is jointly and severally liable to the Bank for the payment of all obligations arising under this Agreement, and that such liability is independent of the obligations of the other Borrowers.

**11.11 Set-Off.**

(a) In addition to any rights and remedies of the Bank provided by law, upon the occurrence and during the continuance of any event of default under this Agreement, the Bank is authorized, at any time, to set off and apply any and all Deposits of the Borrower or any Obligor held by the Bank or its affiliates against any and all Obligations owing to the Bank. The set-off may be made irrespective of whether or not the Bank shall have made demand under this Agreement or any guaranty, and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable Deposits and without regard for the availability or adequacy of other collateral. Any Deposits may be converted, sold or otherwise liquidated at prevailing market prices in order to effect such set-off.

(b) The set-off may be made without prior notice to the Borrower or any other party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Obligor) to the fullest extent permitted by law. The Bank agrees promptly to notify the Borrower after any such set-off

and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.

(c) For the purposes of this paragraph, "Deposits" means any deposits (general or special, time or demand, provisional or final, individual or joint) as well as any money, instruments, securities, credits, claims, demands, income or other property, rights or interests owned by the Borrower or any Obligor which come into the possession or custody or under the control of the Bank or its affiliates. "Obligations" means all obligations, now or hereafter existing, of the Borrower to the Bank under this Agreement and under any other agreement or instrument executed in connection with this Agreement, and the obligations to the Bank of any Obligor.

**11.12 One Agreement.**

This Agreement and any related security or other agreements required by this Agreement, collectively:

(a) represent the sum of the understandings and agreements between the Bank and the Borrower concerning this credit;

(b) replace any prior oral or written agreements between the Bank and the Borrower concerning this credit; and

(c) are intended by the Bank and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**11.13 Indemnification.**

The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Bank to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Bank, its parent, subsidiaries, affiliates and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrower's obligations to the Bank. All sums due to the Bank hereunder shall be obligations of the Borrower, due and payable immediately without demand.

**11.14 Notices.**

Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as the Bank and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**11.15 Headings.**

Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**11.16 Counterparts.**

This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

**11.17 Borrower Information; Reporting to Credit Bureaus.**

The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports. The Borrower agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all guarantors as is consistent with the Bank's policies and practices from time to time in effect.

**11.18 Limitation of Interest and Other Charges.**

If, at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Bank as compensation for fees, services or expenses incidental to the making, negotiating or collection of the loan evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Bank to the Borrower under applicable law, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Agreement shall be governed by such new law as of its effective date.

**11.19 Amendments.**

This Agreement may be amended or modified only in writing signed by each party hereto.

**11.20 Compliance with Section 22 of the New York Lien Law.**

A true statement under oath verified by Borrower, as required by Section 22 of the New York Lien Law, is attached hereto and made a part hereof as Exhibit A.

[Signature Page Follows]



Doc #01-3013919.5

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**SIGNATURES**

**Bank of America, N.A.**

By_______________________
Typed Name_______________
Title_____________________

**Gregory L. Beeche**

______________________

Address where notices to the Bank are to be sent:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

Address where notices to the Borrower are to be sent:
Gregory L. Beeche
C/O Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

**AUTHORIZATION TO DEBIT ACCOUNT**

The undersigned acknowledges the provisions of Paragraph 5.3 of this Agreement, and agrees that the account shown therein may be debited as set forth therein. The undersigned is the owner of the account.

**Greg Beeche, Logistics, LLC**

By ______________________
Typed Name: Gregory L. Beeche
Title: Managing Member

**ACKNOWLEDGEMENT**

State of New York )
) ss.:
County of Albany )

On the 13 day of April, in the year 2017 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

______________________________________
(Signature and office of individual taking acknowledgment)

DAVID L. EVANS
Notary Public, State of New York
Qualified in Saratoga County
No. 4695246
Commission Expires April 30, 2017

[Signature Page - Construction Loan Agreement]

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**SIGNATURES**

**Bank of America, N.A.**

By________________________
Typed Name Tim Kersky
Title Vice President

**Gregory L. Beeche**

________________________

Address where notices to
the Bank are to be sent:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

Address where notices to the Borrower
are to be sent:
Gregory L. Beeche
C/O Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

**AUTHORIZATION TO DEBIT ACCOUNT**

The undersigned acknowledges the provisions of Paragraph 5.3 of this Agreement, and agrees that the account shown therein may be debited as set forth therein. The undersigned is the owner of the account.

**Greg Beeche, Logistics, LLC**

By ________________________
Typed Name: Gregory L. Beeche
Title: Managing Member

**ACKNOWLEDGEMENT**

State of New York )
) ss.:
County of ____________________)

On the _______ day of April, in the year 2017 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

________________________________________
(Signature and office of individual taking acknowledgment)

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following three notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

**(1) USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

***Notices #2 and #3 apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(2) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #3 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(3) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #3.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

**Exhibit A**

Lien Law Affidavit

STATE OF NEW YORK )
COUNTY OF____________ ) ss.:

Gregory L. Beeche, being duly sworn, deposes and says that:

I am the Borrower mentioned in the Construction Loan Agreement to which this statement is annexed.

The amount of the Loan is **$1,150,000.00**.

There is no closing advance.

The net sum available to the Borrower for the improvement is **$1,150,000.00** less such amounts as may not be advanced under the Building Loan Agreement due to the non-satisfaction of conditions contained herein.

This statement is made pursuant to New York Lien Law and is hereby made a part of the Building Loan Agreement.

The facts herein stated are true to the knowledge of the deponent.

[Signature Page Follows]

G. L. Beeche

**Gregory L. Beeche**

ADDRESS:
365 Hudson River Road
Waterford, New York 12188

Sworn to before me this
13 day of April, 2017

David L. Evans
Notary Public

DAVID L. EVANS
Notary Public, State of New York
Qualified in Saratoga County
No. 4695246
Commission Expires April 30, 2019

[Signature Page - Lien Law Affidavit]

**Exhibit B**

**[To Be Provided By Swap Department]**

# EXHIBIT E

**SARATOGA COUNTY – STATE OF NEW YORK**
**SARATOGA COUNTY CLERK**
**CRAIG A. HAYNER**
**40 MCMASTER STREET, BALLSTON SPA, NY 12020**

**COUNTY CLERK'S RECORDING PAGE**
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2017014777

Receipt#: 2017212115066
Clerk: GB
Rec Date: 05/15/2017 09:42:45 AM
Doc Grp: X
Descrip: MORTGAGE
Num Pgs: 21

Party1: BEECHE GREGORY L AKA
Party2: BANK OF AMERICA
Town: HALFMOON

Recording:

| | |
|---|---|
| Pages | 100.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.00 |
| Sub Total: | 145.00 |
| Mortgage Tax | |
| Basic | 5750.00 |
| SONYMA | 2875.00 |
| CDTA | 2875.00 |
| Local | 0.00 |
| Sub Total: | 11500.00 |
| Total: | 11645.00 |

**** NOTICE: THIS IS NOT A BILL ****

***** Mortgage Tax *****
Serial #: DI-0876
Commercial
Mtg Amt: 1150000.00

| | |
|---|---|
| Basic | 5750.00 |
| SONYMA | 2875.00 |
| CDTA | 2875.00 |
| Total: | 11500.00 |

Record and Return To:

BANK OF AMERICA NA
DOC RETENTION - GCF
CT2-515-BB-03
70 BATTERSON PARK ROAD
FARMINGTON CT 06032

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

**2017014777**
05/15/2017 09:42:45 AM
21 Pages RECORDED
MORTGAGE
Saratoga County Clerk

## CONSTRUCTION LOAN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Construction Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (as the same may be modified, supplemented, amended or amended and restated from time to time, the "Mortgage"), dated as of April 20, 2017, is given by **Gregory L. Beeche**, as mortgagor ("Mortgagor"), to **Bank of America, N.A.**, a national banking association, as mortgagee ("Mortgagee").

1. GRANT.

1.1 The Property. For the purpose of securing payment and performance of the Secured Obligations defined in Section 2 below, Mortgagor does hereby irrevocably and unconditionally grant, bargain, sell, alien, demise, convey, assign, transfer, mortgage, grant a security interest in, hypothecate, pledge and set over to Mortgagee, with power of sale, all right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "Property"):

(a) All that certain plot, piece or parcel of land located in the County of Saratoga, State of New York, as described in Exhibit A hereto (the "Land");

(b) All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

(c) All easements, rights of way, servitudes, privileges, interests, tenements, hereditaments, and appurtenances relating or appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all development rights or credits and air rights; all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d) All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e) All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Mortgagee, and all

condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f) All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

TO HAVE AND TO HOLD the above-described Property unto Mortgagee, its successors and assigns, in fee simple, forever, and to warrant and defend the title thereto.

1.2 Fixture Filing. This Mortgage constitutes a financing statement filed as a fixture filing under the New York Uniform Commercial Code, as amended or recodified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2. THE SECURED OBLIGATIONS.

2.1 Purpose of Securing. Mortgagor makes the grant, conveyance, transfer and assignment set forth in Section 1, makes the irrevocable and absolute assignment set forth in Section 3, and grants the security interest set forth in Section 4, all for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Mortgagee may choose:

(a) Payment of all obligations of Gregory L. Beeche ("Obligor") to Mortgagee arising under the following instrument(s) or agreement(s) (collectively, the "Debt Instrument"):

(i) A certain Construction Loan Agreement dated on even date herewith, between Obligor and Mortgagee which provides for a building loan mortgage in the maximum principal amount of One Million One Hundred Fifty Thousand and 00/100 Dollars ($1,150,000.00).

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument which arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument which amends and restates or otherwise supersedes the Debt Instrument in its entirety;

(b) Payment and performance of all obligations of Mortgagor under this Mortgage;

(c) Payment and performance of all obligations of Obligor under any Swap Contract with respect to which there is a writing evidencing the parties' agreement that said Swap Contract shall be secured by this Mortgage. "Swap Contract" means any document, instrument or agreement with Mortgagee, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time; and

(d) Payment and performance of all future advances and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument.

Notwithstanding any provision to the contrary, "Secured Obligations" secured hereby shall not include obligations arising under any Swap Contract to the extent that the grant of a lien hereunder to secure such Swap Contract would violate the Commodity Exchange Act by virtue of the Mortgagor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such grant of such lien becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.*, as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto.

2.2 Terms of Secured Obligations. All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in Paragraph 2.1(a) and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instrument which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3 Maximum Principal Amount. NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN OR IN THE DEBT INSTRUMENT AND ALL OTHER DOCUMENTS RELATING TO, GUARANTEEING OR OTHERWISE GIVEN IN CONNECTION WITH THE SECURED OBLIGATIONS (THE "LOAN DOCUMENTS") TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS **ONE MILLION ONE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($1,150,000.00)** PLUS ALL INTEREST PAYABLE UNDER THE DEBT INSTRUMENT AND ALL AMOUNTS EXPENDED BY MORTGAGEE AFTER DEFAULT BY OBLIGOR (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS MORTGAGE; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE PROPERTY AND UPHOLDING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY.

3. ASSIGNMENT OF RENTS.

3.1 Assignment. Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "Rents"), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property. In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also be considered Rents assigned under this Paragraph.

3.2 Grant of License. Notwithstanding the provisions of Paragraph 3.1, Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Paragraph 6.2, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

4. SECURITY INTEREST IN RELATED PERSONALTY.

4.1 Grant of Security Interest. This Mortgage is intended to be a security agreement pursuant to the New York Uniform Commercial Code for all items specified above as part of the Property

which, under applicable law, may be subject to a security interest pursuant to the New York Uniform Commercial Code. Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "Personalty"):

(a) All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b) All crops growing or to be grown on the Land (and after severance from the Land); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c) All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them;

(d) All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without limitation, all general intangibles related to any of the above property and all proceeds of the above property.

5. <u>RIGHTS AND DUTIES OF THE PARTIES</u>.

5.1 <u>Representations and Warranties</u>. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements.

5.2 <u>Taxes, Assessments, Liens and Encumbrances</u>. Mortgagor shall pay or cause to be paid prior to the due date therefor all taxes, levies, charges and assessments, now or hereafter levied, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property which Mortgagee has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3 <u>Damages and Insurance and Condemnation Proceeds</u>.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "Claims"):

(i) all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

(iv) all interest which may accrue on any of the foregoing.

(b) Mortgagor shall immediately notify Mortgagee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Mortgagor in adjusting any loss covered by insurance.

(c) All proceeds of the Claims assigned to Mortgagee under this Paragraph shall be paid to Mortgagee. In each instance, Mortgagee shall apply those proceeds first toward reimbursement of all of Mortgagee's costs and expenses of recovering the proceeds, including attorneys' fees. Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor. If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds. If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

5.4 Insurance. Mortgagor shall provide and maintain in force at all times all risk property damage insurance (including without limitation windstorm coverage, and hurricane coverage as applicable) on the Property and such other type of insurance on the Property as may be required by Mortgagee in its reasonable judgment. At Mortgagee's request, Mortgagor shall provide Mortgagee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in an amount, for a term, and in form and content satisfactory to Mortgagee, and shall be written only by companies approved by Mortgagee. In addition, each policy of hazard insurance shall include a

Form 438BFU or equivalent loss payable endorsement and a standard "non-contributory mortgagee" endorsement, each in favor of Mortgagee.

5.5 Maintenance and Preservation of Property.

(a) Mortgagor shall keep the Property in good condition and repair and shall not commit or allow waste of the Property. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance.

(b) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under Paragraph 5.3.

(c) Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable law or order of any governmental authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d) If the Property is agricultural, Mortgagor shall farm the Property in a good and husbandlike manner. Mortgagor shall keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees or vines with new ones. Mortgagor shall prepare for harvest, harvest, remove and sell any crops growing on the Property. Mortgagor shall keep all buildings, fences, ditches, canals, wells and other farming improvements on the Property in first class condition, order and repair.

(e) Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6 Releases, Extensions, Modifications and Additional Security. Without affecting the personal liability of any person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a) release any person liable for payment of any Secured Obligation;

(b) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) alter, substitute or release any property securing the Secured Obligations;

(e) consent to the making of any plat or map of the Property or any part of it;

(f) join in granting any easement or creating any restriction affecting the Property;

(g) join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h) release the Property or any part of it from the lien of this Mortgage.

5.7 Satisfaction of Mortgage. Upon Mortgagee's determination in its sole good faith discretion that all sums secured hereby have been indefeasibly paid in full and no further commitment to extend credit continues, Mortgagee shall execute and deliver a satisfaction of the Mortgage to Mortgagor or, upon Mortgagor's written request, an assignment of Mortgage in recordable form to a party designated by Mortgagor, which assignment shall be made without any representation or warranty by Mortgagee. Mortgagor shall pay Mortgagee's costs incurred in connection with such assignment of this Mortgage.

5.8 Compensation and Reimbursement of Costs and Expenses.

(a) Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Mortgagee when the law provides no maximum limit, for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services.

(b) Mortgagor further agrees to pay or reimburse Mortgagee for all costs, expenses and other advances which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under Paragraph 6.3, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs and disbursements, costs of any sale of the Property and any cost of any appraisal and evidence of title.

(c) Mortgagor shall pay all obligations arising under this Paragraph immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations. If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9 Exculpation and Indemnification.

(a) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following:

(i) Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii) Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii) Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv) any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v) any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the

rights or remedies afforded Mortgagee under Paragraph 6.3, unless the loss is caused by the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b) Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of any appraisal or other evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by law or because of any failure of Mortgagor to perform any of its obligations. This agreement by Mortgagor to indemnify Mortgagee shall survive the release and cancellation of any or all of the Secured Obligations and the satisfaction or partial release of this Mortgage.

5.10 Defense and Notice of Claims and Actions. At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11 Representation and Warranty Regarding Hazardous Substances. Before signing this Mortgage, Mortgagor performed an environmental site assessment of, and researched and inquired into the previous uses and ownership of the Property. Based on that due diligence, Mortgagor represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as Mortgagor has disclosed to Mortgagee in writing. Mortgagor further represents and warrants that Mortgagor has complied, and will comply and cause all occupants of the Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). Mortgagor shall promptly, at Mortgagor's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. Mortgagor acknowledges that hazardous substances may permanently and materially impair the value and use of the Property. "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

5.12 Site Visits, Observation and Testing. Mortgagee and its agents and representatives shall have the right at any reasonable time, after giving reasonable notice to Mortgagor, to enter and visit the Property for the purposes of performing appraisals, observing the Property, taking and removing environmental samples, and conducting tests on any part of the Property. Mortgagor shall reimburse Mortgagee on demand for the costs of any such environmental investigation and testing. Mortgagee will make reasonable efforts during any site visit, observation or testing conducted pursuant this Paragraph to avoid interfering with Mortgagor's use of the Property. Mortgagee is under no duty, however, to visit or observe the Property or to conduct tests, and any such acts by Mortgagee will be solely for the purposes of protecting Mortgagee's security and preserving Mortgagee's rights under this Mortgage. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of Mortgagor; (ii) impose any liability on Mortgagee; or (iii) be a representation or warranty of any kind regarding the Property (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Mortgagee has a duty or obligation under applicable laws, regulations or other requirements to

disclose an Environmental Report to Mortgagor or any other party, Mortgagor authorizes Mortgagee to make such a disclosure. Mortgagee may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Mortgagee's judgment. Mortgagor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Mortgagor by Mortgagee or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Mortgagor) by Mortgagor without advice or assistance from Mortgagee.

5.13 Additional Provisions Relating to Condominiums. If the Property is subject to a condominium declaration of conditions, covenants and restrictions recorded in the official records of the county in which the Property is located (the "Declaration"), the following provisions shall apply.

(a) The provisions contained in this Mortgage are obligations of Mortgagor in addition to Mortgagor's obligations under the Declaration with respect to similar matters, and shall not restrict or limit Mortgagor's duties and obligations to keep and perform promptly all of its obligations as unit owner under the Declaration.

(b) Mortgagor shall at all times fully perform and comply with all the agreements, covenants, terms and conditions imposed upon unit owners under the Declaration, and if Mortgagor fails to do so, Mortgagee may (but shall not be obligated to) take any action Mortgagee deems necessary or desirable to prevent or cure any default thereunder. Mortgagee may also take such action as it deems necessary or desirable to cure a default under the Declaration by Mortgagor or any other party occupying the unit(s) (a "Unit Occupant") encumbered by this Mortgage, upon receipt by Mortgagee from the condominium association under the Declaration (the "Association") of written notice of such default, even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary to prevent or cure any default by Mortgagor or a Unit Occupant, and Mortgagor hereby agrees to pay to Mortgagee, immediately and without demand, all such sums so paid and expended by Mortgagee, together with interest thereon from the date of each such payment at the rate (the "Demand Rate") of two percent (2%) in excess of the then current rate of interest under the Debt Instrument. All sums so paid and expended by Mortgagee, and the interest thereon, shall be added to and be secured by the lien of this Mortgage. At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(c) At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(d) Mortgagor shall advise Mortgagee in writing of the giving of any notice to Mortgagor by the Association under the Declaration of any default by Mortgagor as unit owner or by a Unit Occupant thereunder in the performance or observance of any of the terms, conditions and covenants to be performed or observed by Mortgagor or such Unit Occupant thereunder, and Mortgagor shall deliver to Mortgagee a true copy of each such notice.

(e) If any action, proceeding, motion or notice shall be commenced or filed in respect of the Association in connection with any case (including a case commenced or filed under the Bankruptcy Code), Mortgagee shall have the option, to the exclusion of Mortgagor, exercisable upon notice from Mortgagee to Mortgagor, to conduct and control any such litigation with counsel of Mortgagee's choice. Mortgagee may proceed in its own name or in the name of Mortgagor in connection with any such litigation, and Mortgagor agrees to execute any and all powers, authorizations, consents or other documents required by Mortgagee in connection therewith. Mortgagor shall, upon demand, pay to Mortgagee all costs and expenses (including attorneys' fees) paid or incurred by Mortgagee in connection with the prosecution or conduct of

any such proceedings. Any such costs or expenses not paid by Mortgagor as aforesaid shall be secured by the lien of this Mortgage and shall be added to the principal amount of the indebtedness secured hereby. Mortgagor shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Declaration in any such case without the prior written consent of Mortgagee.

(f) Mortgagor will use its best efforts to obtain and deliver to Mortgagee within twenty (20) days after written request by Mortgagee, an estoppel certificate from the Association setting forth (i) the name of the unit owner, (ii) that the Declaration has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the amount of common expenses and other assessments payable by Mortgagor as unit owner under the Declaration, (iv) the date to which all common expenses and other assessments have been paid by Mortgagor as unit owner under the Declaration, (v) whether there are any alleged defaults by Mortgagor or a Unit Occupant under the Declaration and, if so, setting forth the nature thereof in reasonable detail, and (vi) as to such other matters as Mortgagee may reasonably request.

(g) Mortgagor represents and warrants to Mortgagee that as of the date hereof, no default under the Declaration has occurred and is continuing.

(h) Mortgagor shall take such actions as may be reasonable to insure that the Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

(i) Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the condominium(s) encumbered by this Mortgage, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the Declaration, the Association's bylaws or articles or any rules and regulations promulgated by the Association;

(iii) termination of professional management and assumption of self-management of the Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Association unacceptable to Mortgagee.

6. ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

6.1 Accelerating Transfers

(a) "Accelerating Transfer" means any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property. If Mortgagor is a corporation, "Accelerating Transfer" also means any transfer or transfers of shares possessing, in the aggregate, more than fifty percent (50%) of the voting power. If Mortgagor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the partnership interests. If Mortgagor is a limited

liability company, "Accelerating Transfer" also means withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the voting power or in the aggregate more than fifty percent of the ownership of the economic interest in the Mortgagor.

(b) Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by Paragraph 6.3 of this Mortgage.

6.2 Events of Default. The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("Event of Default") under this Mortgage:

(a) Obligor fails to make any payment, when due, under the Debt Instrument (after giving effect to any applicable grace period), or any other default occurs under and as defined in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations and such default continues beyond any applicable cure period;

(b) Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c) Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of Paragraph 6.1;

(d) Any representation or warranty made in connection with this Mortgage, the Secured Obligations, or in any Debt Instrument proves to have been false or misleading in any material respect when made;

(e) Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage; or

(f) An event occurs which gives Mortgagee the right or option to terminate any Swap Contract secured by this Mortgage.

6.3 Remedies. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately, and/or may terminate any Swap Contract secured by this Mortgage in accordance with its terms.

(b) Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security or lien of this Mortgage. Such other things may include: entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and

evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments. Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Paragraph.

(d) Mortgagee may cure any breach or default of Mortgagor (without waiving such breach or default), and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any person.

(e) Mortgagee may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Mortgage.

(f) Mortgagee may exercise the remedies contained in any Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g) Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties.

(h) Mortgagee may foreclose on this Mortgage non-judicially pursuant to the provisions of Article 14 of the Real Property Actions and Proceedings Law of New York, as such provisions may be extended, renewed, modified or replaced from time to time.

6.4 <u>Application of Sale Proceeds and Rents</u>.

(a) Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto.

(b) Mortgagee shall apply any and all Rents collected by it, and any and all sums

other than proceeds of any sale of the Property which Mortgagee may receive or collect under Paragraph 6.3, in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto. Mortgagee shall have no liability for any funds which it does not actually receive.

7. MISCELLANEOUS PROVISIONS

7.1 No Waiver or Cure.

(a) Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b) If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i) Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii) Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii) Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv) Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v) Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations;

(vi) Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2 Powers of Mortgagee. Mortgagee may take any of the actions permitted under Paragraphs 6.3(b) and/or 6.3(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3 Nonborrower Mortgagor.

(a) If any Mortgagor ("Nonborrower Mortgagor") is not the Obligor under the

Debt Instrument described in Paragraph 2.1(a), such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i) Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

(ii) Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii) Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv) Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v) Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi) Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b) Nonborrower Mortgagor waives:

(i) Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii) Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii) All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv) Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v) Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c) Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d) No provision or waiver in this Mortgage shall be construed as limiting the generality of any other provision or waiver contained in this Mortgage.

(e) For purposes of this Paragraph 7.3, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of Paragraphs 2.1(c) and 2.1(d).

7.4 Merger. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5 Joint and Several Liability. If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6 Applicable Law. This Mortgage shall be governed by the laws of the State of New York.

7.7 Successors in Interest. The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties. However, this Paragraph does not waive the provisions of Paragraph 6.1.

**7.8 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

7.9 Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10 Interpretation. Whenever the context requires, all words used in the singular will be

construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage. The Exhibits to this Mortgage are hereby incorporated in this Mortgage.

7.11 In-House Counsel Fees. Whenever Mortgagor is obligated to pay or reimburse Mortgagee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel to the extent permitted by applicable law.

7.12 Waiver of Marshaling. Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.13 Severability. If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.14 Notices. Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below. That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code. Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

| | |
|---|---|
| Addresses for Notices to Mortgagor: | Gregory L. Beeche<br>356 Hudson River Road<br>Waterford, New York 12188 |
| Address for Notices to Mortgagee: | Bank of America, N.A.<br>Doc Retention - GCF<br>CT2-515-BB-03<br>70 Batterson Park Road<br>Farmington, CT 06032 |

8. NEW YORK STATE SPECIFIC PROVISIONS

8.1 Inconsistencies. In the event of any inconsistencies between the terms and conditions of this Section 8 and the other provisions of this Mortgage, the terms and conditions of this Section 8 shall control.

8.2 Trust Fund. In compliance with Section 13 of the New York Lien Law, as the same may be amended from time to time (the "Lien Law"), Obligor shall receive the advances secured hereby, and shall hold the right to receive such advances, as a trust fund to be applied first for the purpose of paying the cost of the improvement, and shall apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. Obligor shall comply strictly with Section 13-f of the Lien Law.

8.3 Real Property Law Section 291-f. The provisions of this Mortgage and/or the Loan Documents restrict (in accordance with their terms) the right or power of the Mortgagor, as against the holder of this Mortgage, without such holder's consent, to cancel, abridge, or otherwise modify tenancies, subtenancies, leases or subleases in existence on the date hereof (the "Existing Leases"), and the tenants or subtenants thereunder, (the "Existing Tenants"), or to accept prepayments of installments of rent to become due under the Existing Leases. Mortgagee shall have all of the rights as against the Existing Tenants as set forth in Section 291-f of the Real Property Law of the State of New York. Mortgagor covenants and agrees to send to each Existing Tenant on the date hereof, either by recognized overnight courier or by certified or registered mail, return receipt requested (and to provide promptly to Mortgagee copies of such letters and receipts) notice of the existence of this Mortgage, together with a copy of this Paragraph 8.3. Any cancellation, abridgment, modification or prepayment made by any Existing Tenant of an Existing Lease in violation of the provisions of this Paragraph 8.3, after the written notice provided for herein, without the consent of Mortgagee shall be voidable by the holder of the Mortgage, as such holder may elect.

8.4 Type of Property. Mortgagor represents and warrants that this Mortgage does not cover real property principally improved by one or more structures containing in the aggregate not more than six residential units, each bearing its own cooking facilities.

8.5 Section 254 of the RPL. In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

8.6 Transfer Taxes.

(a) For as long as this Mortgage remains outstanding, Mortgagor covenants and agrees that, in the event of a sale of the Property or other Accelerating Transfer, it will duly complete, execute and deliver to Mortgagee contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate Accelerating Transfer taxes, including, without limitation, any real estate transfer taxes payable under Article 31 of the New York State Tax Law or under Title 11, Chapter 21 of the Administrative Code of the City of New York, if applicable, or any successor provisions thereto (collectively, "Transfer Taxes") by reason of such sale or other Accelerating Transfer or recording of the deed evidencing such sale or other Accelerating Transfer.

(b) Mortgagor shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Accelerating Transfer, and in default thereof Mortgagee may (but shall have no obligation to) pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage. The provisions of this Paragraph 8.6(b) shall survive any Accelerating Transfer and the delivery of the deed in connection with any Accelerating Transfer.

8.7 Covenants in Addition to RPL. All covenants hereof shall be construed as affording to Mortgagee rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable legal requirement.

8.8 Subject to Construction Loan Agreement. This Mortgage is subject to that certain Construction Loan Agreement between Mortgagor and Mortgagee dated on even date herewith, all the terms and conditions of which are hereby incorporated into this Mortgage.

Doc #01-3013189.2

[Signature Page Follows]

IN WITNESS WHEREOF, this Mortgage has been entered into by Mortgagor on the day and year above written.

MORTGAGOR:

**GREGORY L. BEECHE**

G. L. Beeche

_______________________________

State of New York )
) ss.:
County of Albany )

On the 13 day of April, in the year 2017 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

David L. Evans

DAVID L. EVANS
Notary Public, State of New York
Qualified in Saratoga County
No. 4605246
Commission Expires April 30, 2019

(Signature and office of individual taking acknowledgment)

[Signature Page - Construction Loan Mortgage]

**EXHIBIT A TO MORTGAGE**

Exhibit A to MORTGAGE dated as of April 20, 2017, given by **Gregory L. Beeche** as "Mortgagor" to **Bank of America, N.A.**, a national banking association, as "Mortgagee."

Description of Property

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N,Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being

where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast comer of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest comer of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly comer of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly comer of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly comer of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>

356 Hudson River Road
Waterford, New York 12188

# EXHIBIT F

[redacted]

445861 2014 Dec 16 AM11:47

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Kirby W. DiLorenzo, Esq. (518) 272-6565

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

MARTIN, SHUDT, WALLACE, DiLORENZO
258 Hoosick Street, Suite 201
Troy, NY 12180, USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | |
| OR 1b. INDIVIDUAL'S LAST NAME BEECHE | FIRST NAME GREGORY | MIDDLE NAME L | SUFFIX |

| | | | | |
|---|---|---|---|---|
| 1c. MAILING ADDRESS 356 Hudson River Road | CITY Waterford | STATE NY | POSTAL CODE 12188 | COUNTRY USA |

| | | | | |
|---|---|---|---|---|
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| | | | | |
|---|---|---|---|---|
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| | | | | |
|---|---|---|---|---|
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME FIRST NIAGARA BANK, N.A. | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| | | | | |
|---|---|---|---|---|
| 3c. MAILING ADDRESS P.O. BOX 28 | CITY BUFFALO | STATE NY | POSTAL CODE 14240-0028 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:

**All of the following personal property, whether now owned or hereafter acquired, and all proceeds thereof:**
**(A)All furniture, fixtures and equipment in connection with the Project including all proceeds and products thereof, all insurance and condemnation claims and proceeds with respect to the Project and all building materials whether on or off the Property.**
**(B) All lease, rental and sale agreements covering any of the Project;**
**(C) All security deposits, down payments and other payments with respect to the sale or rental of any of the Project;**

**(D) All construction, marketing, management, engineering, architectural, service, and maintenance contracts and all other contracts relating to the Project;**
**(E) All books and records relating to the Project;**
**(F) All plans, specifications and permits for the construction of the Improvements;**
**(G) All options and agreements with respect to additional real property for use or development in connection with the Project; and**
**(H) All insurance proceeds and condemnation awards from the Project.**

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Filing Number-201412168491664**

# EXHIBIT G

Bank of America

# Loan Agreement

This Agreement dated as of April 20, 2017, is between **Bank of America, N.A.** (the "Bank") and **Greg Beeche, Logistics, LLC** (the "Borrower").

## 1. FACILITY NO. 1: LINE OF CREDIT AMOUNT AND TERMS

### 1.1 Line of Credit Amount.

(a) During the availability period described below, the Bank will provide a line of credit to the Borrower (the "Line of Credit"). The amount of the Line of Credit (the "Facility No. 1 Commitment") is Four Million and 00/100 Dollars ($4,000,000.00).

(b) This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

(c) The Borrower agrees not to permit the principal balance outstanding to exceed the Facility No. 1 Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Bank upon the Bank's demand.

### 1.2 Availability Period.

The Line of Credit is available between the date of this Agreement and August 31, 2019, or such earlier date as the availability may terminate as provided in this Agreement (the "Facility No. 1 Expiration Date").

### 1.3 Repayment Terms.

(a) The Borrower will pay interest on May 1, 2017, and then on the same day of each month thereafter until payment in full of any principal outstanding under this facility.

(b) The Borrower will repay in full any principal, interest or other charges outstanding under this facility no later than the Facility No. 1 Expiration Date.

(c) The Borrower may prepay the loan in full or in part at any time.

### 1.4 Interest Rate.

(a) The LIBOR Daily Floating Rate plus 2.75 percentage points during the availability period.

The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day. The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the

LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

## 2. FACILITY NO. 2: VARIABLE RATE TERM LOAN AMOUNT AND TERMS

### 2.1 Loan Amount.

The Bank agrees to provide a term loan to the Borrower in the amount of One Million Three Hundred Fifty Thousand and 00/100 Dollars ($1,350,000.00) (the "Facility No. 2 Commitment").

### 2.2 Availability Period.

The loan is available in one disbursement from the Bank on the date of this Agreement.

### 2.3 Repayment Terms.

(a) The Borrower will pay interest on May 1, 2017, and then on the same day of each month thereafter until payment in full of any principal outstanding under this facility.

(b) The Borrower will repay principal in equal installments of Twenty Two Thousand Five Hundred and 00/100 Dollars ($22,500.00) beginning on June 1, 2017, and on the same day of each month thereafter, and ending on May 1, 2022 (the "Repayment Period"). In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due.

(c) The Borrower may prepay the loan in full or in part at any time. The prepayment will be applied to the most remote payment of principal due under this Agreement.

### 2.4 Prepayments.

(a) The Borrower may prepay the Facility No. 2 Commitment in full or in part at any time without premium or penalty. The prepayment will be applied to the most remote payment of principal due under this Agreement. Each prepayment, whether voluntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid.

### 2.5 Interest Rate.

(a) The LIBOR Rate plus 2.25 percentage points. The interest rate will be adjusted on May 1, 2017 and remain fixed until the next Adjustment Date.

The LIBOR Rate (Adjusted Periodically) is a rate of interest equal to the rate per annum equal to the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank), as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Rate (Adjusted Periodically) is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

## 3. COLLATERAL

**3.1 Personal Property.**

The personal property listed below now owned or owned in the future by the parties listed below will secure the Borrower's obligations to the Bank under this Agreement or, if the collateral is owned by a guarantor, will secure the guaranty, if so indicated in the security agreement. The collateral is further defined in security agreement(s) executed by the owners of the collateral.

(a) Equipment and fixtures owned by Borrower and Greg Logistics, LLC.

(b) Inventory owned by Borrower and Greg Logistics, LLC.

(c) Receivables owned by Borrower and Greg Logistics, LLC.

(d) Patents, trademarks and other general intangibles owned by Borrower and Greg Logistics, LLC.

## 4. LOAN ADMINISTRATION AND FEES

**4.1 Fees.**

The Borrower will pay to the Bank the fees set forth on Schedule A.

**4.2 Collection of Payments.**

(a) Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement, or by such other method as may be permitted by the Bank.

(b) Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Bank.

(c) All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.

**4.3 Borrower's Instructions.**

Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Bank may honor instructions for advances or repayments and any other instructions under this Agreement given by the Borrower (if an individual), or by any one of the individuals the Bank reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "Authorized Individual"). The Bank may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank.

**4.4 Direct Debit.**

(a) The Borrower agrees that on the due date of any amount due under this Agreement, the Bank will debit the amount due from deposit account number 483043630494 (NY) owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account"). Should there be insufficient funds in the Designated Account to pay

all such sums when due, the full amount of such deficiency shall be immediately due and payable by the Borrower.

(b) The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.00) percentage point higher than the rate of interest otherwise provided under this Agreement.

**4.5 Banking Days.**

Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due or which are received on a day which is not a banking day will be due or applied, as applicable, on the next banking day.

**4.6 Interest Calculation.**

Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

**4.7 Default Rate.**

Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Bank bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

**4.8 Additional Costs.**

The Borrower will pay the Bank, on demand, for the Bank's costs or losses arising from any Change in Law which are allocated to this Agreement or any credit outstanding under this Agreement. The allocation will be made as determined by the Bank, using any reasonable method. The costs include, without limitation, the following:

(a) any reserve or deposit requirements (excluding any reserve requirement already reflected in the calculation of the interest rate in this Agreement); and

(b) any capital requirements relating to the Bank's assets and commitments for credit.

"Change in Law" means the occurrence, after the date of this Agreement, of the adoption or taking effect of any new or changed law, rule, regulation or treaty, or the issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued in connection with that Act, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States regulatory authorities, in each case pursuant to Basel III,

shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

## 5. CONDITIONS

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

### 5.1 Authorizations.

If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

### 5.2 Governing Documents.

If required by the Bank, a copy of the Borrower's organizational documents.

### 5.3 Guaranties.

Guaranties signed by each of (i) Gregory L. Beeche, and (ii) Greg Logistics, LLC.

### 5.4 Security Agreements.

Signed original security agreements covering the personal property collateral which the Bank requires.

### 5.5 Perfection and Evidence of Priority.

Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Bank's interest.

### 5.6 Payment of Fees.

Payment of all fees and other amounts due and owing to the Bank, including without limitation payment of all accrued and unpaid expenses incurred by the Bank as required by the paragraph entitled "Expenses."

### 5.7 Good Standing.

Certificates of good standing for the Borrower from its state of formation and from any other state in which the Borrower is required to qualify to conduct its business.

### 5.8 Legal Opinion.

A written opinion from the Borrower's legal counsel, covering such matters as the Bank may require. The legal counsel and the terms of the opinion must be acceptable to the Bank.

### 5.9 Landlord Agreement.

For any personal property collateral located on real property which is subject to a mortgage or deed of trust or which is not owned by the Borrower (or the grantor of the security interest), an agreement from the owner of the real property and the holder of any such mortgage or deed of trust.

### 5.10 Insurance.

Evidence of insurance coverage, as required in the "Covenants" section of this Agreement.

## 6. REPRESENTATIONS AND WARRANTIES

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

### 6.1 Formation.

If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

### 6.2 Authorization.

This Agreement, and any instrument or agreement required under this Agreement, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

### 6.3 Enforceable Agreement.

This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required under this Agreement, when executed and delivered, will be similarly legal, valid, binding and enforceable.

### 6.4 Good Standing.

In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

### 6.5 No Conflicts.

This Agreement does not conflict with any law, agreement, or obligation by which the Borrower is bound.

### 6.6 Financial Information.

All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the above representations shall also pertain to the trustor(s) of the trust.

### 6.7 Lawsuits.

There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

**6.8 Collateral.**

All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

**6.9 Permits, Franchises.**

The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

**6.10 Other Obligations.**

The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

**6.11 Tax Matters.**

The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

**6.12 No Event of Default.**

There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

**6.13 Insurance.**

The Borrower has obtained, and maintained in effect, the insurance coverage required in the "Covenants" section of this Agreement, including flood insurance to the extent required by the Bank under Section 7.16 hereof.

**6.14 ERISA Plans.**

(a) Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b) With respect to any Plan subject to Title IV of ERISA:

(i) No reportable event has occurred under Section 4043(c) of ERISA which requires notice.

(ii) No action by the Borrower or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

(c) The following terms have the meanings indicated for purposes of this Agreement:

(i) "Code" means the Internal Revenue Code of 1986, as amended.

(ii) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(iii) "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code.

(iv) "Plan" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA

**6.15 <u>Government Sanctions</u>.**

(a) The Borrower represents that neither the Borrower, any Obligor, nor any of their respective affiliated entities, including in the case of any Borrower or Obligor that is not a natural person, subsidiaries nor, to the knowledge of the Borrower, any owner, trustee, director, officer, employee, agent, affiliate or representative of the Borrower or any Obligor is an individual or entity ("Person") currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is the Borrower or any Obligor located, organized or resident in a country or territory that is the subject of Sanctions.

(b) The Borrower represents and covenants that it will not, directly or indirectly, use the proceeds of the credit provided under this Agreement, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

**6.16 <u>Location of Borrower</u>.**

The place of business of the Borrower (or, if the Borrower has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Agreement.

## 7. COVENANTS

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

**7.1 <u>Use of Proceeds</u>.**

(a) To use the proceeds of Facility No. 1 only for general working capital purposes.

(b) To use the proceeds of Facility No. 2 only for the purchase of equipment.

(c) The proceeds of the credit extended under this Loan Agreement may not be used directly or indirectly to purchase or carry any "margin stock" as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System, or extend credit to or invest in other parties for the purpose of purchasing or carrying any such "margin stock," or to reduce or retire any indebtedness incurred for such purpose.

**7.2 Financial Information - Entities.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of the fiscal year end, the annual financial statements of Borrower, certified and dated by an authorized financial officer. These financial statements must be reviewed (with an opinion satisfactory to the Bank) by a Certified Public Accountant acceptable to the Bank. The statements shall be prepared on a consolidated/consolidating basis.

(b) Within 60 days after each period's end (excluding the last period in each fiscal year), quarterly financial statements of Borrower, certified and dated by an authorized financial officer. These financial statements may be company-prepared. The statements shall be prepared on a consolidated/consolidating basis.

(c) Within 120 days of the end of each fiscal year and within 60 days of the end of each quarter end (excluding the last quarter in each fiscal year), a compliance certificate of the Borrower, signed by an authorized financial officer and setting forth (i) the information and computations (in sufficient detail) to establish compliance with all financial covenants at the end of the period covered by the financial statements then being furnished and (ii) whether there existed as of the date of such financial statements and whether there exists as of the date of the certificate, any default under this Agreement applicable to the party submitting the information and, if any such default exists, specifying the nature thereof and the action the party is taking and proposes to take with respect thereto.

(d) A detailed receivables aging of the Borrower by invoice or a summary aging by account debtor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(e) A detailed accounts payable aging of the Borrower by invoice or a summary aging by account creditor, as specified by the Bank, within 120 days after the end of each fiscal year and within 60 days after the end of each fiscal quarter except for the quarter ending with the fiscal year.

(f) A detailed contracts in progress report of the Borrower within 120 days after the end of each fiscal year.

(g) Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each guarantor of the Borrower's obligations to the Bank as the Bank may request.

**7.3 Financial Information - Individuals.**

To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.

(a) Within 120 days of each calendar year-end, the annual financial statements of Gregory L. Beeche.

(b) Within 120 days of the calendar year end, copies of the federal income tax return(s) of Gregory L. Beeche, including copies of any K-1s and all other schedules, in the form filed with the Internal Revenue Service (as well as any subsequent amendments or supplements); and if requested by the Bank, authentications of such documents (whether in the form of signed copies or otherwise) satisfactory to the Bank or copies of any extensions of the filing date.

(c) Such additional financial information regarding the Borrower or any guarantor, pledgor, accommodation party or other obligor with respect to the loan as the Bank shall request.

The financial statements required above shall include a properly completed signed and dated personal financial statement on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the Borrower or other party uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

**7.4 Funded Debt to EBITDA Ratio.**

To maintain on a consolidated basis a ratio of Funded Debt to EBITDA not exceeding 3.75:1.00, with annual step down ratios indicated for each period specified below:

| Period | Ratios |
|---|---|
| From date hereof through December 30, 2017 | 3.75: 1.00 |
| From January 1, 2018 until December 30,2018 | 3.50: 1.00 |
| From January 1, 2019 and thereafter | 3.00: 1.00 |

"Funded Debt" means all outstanding liabilities for borrowed money.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization, plus Paid in Capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**7.5 Basic Fixed Charge Coverage Ratio.**

To maintain on a consolidated basis a Basic Fixed Charge Coverage Ratio of at least 1.25:1.00.

"Basic Fixed Charge Coverage Ratio" means the ratio of Cash Flow to the sum of the current portion of long-term debt and the current portion of capitalized lease obligations, plus interest expense on all obligations, plus lease and rent expense.

"Cash Flow" is defined as (a) net income, after income tax, (b) less income or plus loss from discontinued operations and extraordinary items, (c) plus depreciation, depletion, and amortization, (d) plus interest expense on all obligations, (e) minus dividends, withdrawals, and other distributions, (f) plus lease and rent expense, (g) minus unfinanced capital expenditures and non-cash income, and (h) plus paid in capital.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period.

**7.6 Bank as Principal Depository.**

To maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

**7.7 Other Debts.**

Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a) Acquiring goods, supplies, or merchandise on normal trade credit.

(b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank in the Borrower's most recent financial statement.

(c) If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

**7.8 Other Liens.**

Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a) Liens and security interests in favor of the Bank or any affiliate of the Bank.

(b) Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

(c) Additional purchase money security interests in assets acquired after the date of this Agreement.

**7.9 Maintenance of Assets.**

(a) Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except inventory sold in the ordinary course of the Borrower's business.

(b) Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c) Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d) To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e) To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

**7.10 Investments.**

Not to have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

(a) Existing investments disclosed to the Bank in writing.

(b) Investments in any of the following:

(i) certificates of deposit;

(ii) U.S. treasury bills and other obligations of the federal government;

(iii) readily marketable securities (including commercial paper, but excluding restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission).

### 7.11 Loans.

Not to make any loans, advances or other extensions of credit to any individual or entity, except for:

(a) Existing extensions of credit disclosed to the Bank in writing.

(b) Extensions of credit to the Borrower's current subsidiaries.

(c) Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

### 7.12 Change of Management.

Not to make any substantial change in the present executive or management personnel of the Borrower.

### 7.13 Change of Ownership.

Not to cause, permit, or suffer any change in capital ownership such that there is a change of more than twenty-five percent (25%) in the direct or indirect capital ownership of the Borrower.

### 7.14 Additional Negative Covenants.

Not to, without the Bank's written consent:

(a) Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b) Acquire or purchase a business or its assets.

(c) Engage in any business activities substantially different from the Borrower's present business.

(d) Liquidate or dissolve the Borrower's business.

### 7.15 Notices to Bank.

To promptly notify the Bank in writing of:

(a) Any lawsuit in which the claim for damages exceeds $250,000.00 against the Borrower or any Obligor.

(b) Any substantial dispute between any governmental authority and the Borrower or any Obligor.

(c) Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(d) Any change in the Borrower's or any Obligor's name, legal structure, principal residence, or name on any driver's license or special identification card issued by any state (for an individual), state of registration (for a registered entity), place of business, or chief executive office if the Borrower or any Obligor has more than one place of business.

For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**7.16 Insurance.**

(a) General Business Insurance. To maintain insurance satisfactory to the Bank as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of the Borrower's properties, business interruption insurance, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for the Borrower's business. Each policy shall provide for at least thirty (30) days prior notice to the Bank of any cancellation thereof.

(b) Insurance Covering Collateral. To maintain all risk property damage insurance policies (including without limitation windstorm coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral. Each insurance policy must be in an amount acceptable to the Bank. The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c) Evidence of Insurance. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

**7.17 Compliance with Laws.**

To comply with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to cause a material adverse change in any Obligor's business condition (financial or otherwise), operations or properties, or ability to repay the credit, or, in the case of the Controlled Substances Act, result in the forfeiture of any material property of any Obligor.

**7.18 Books and Records.**

To maintain adequate books and records and allow the Bank and its agents to examine, audit and make copies of books and records at any reasonable time. If any of the Borrower's books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform examinations or audits and to respond to the Bank's requests for information concerning such books and records.

**7.19 Audits.**

To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

**7.20 Perfection of Liens.**

To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

### 7.21 Cooperation.

To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

## 8. HAZARDOUS SUBSTANCES

### 8.1 Indemnity Regarding Hazardous Substances.

The Borrower will indemnify and hold harmless the Bank from any loss or liability the Bank incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about the Borrower's property or operations or property leased to the Borrower. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

### 8.2 Compliance Regarding Hazardous Substances.

The Borrower represents and warrants that the Borrower has complied with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances.

### 8.3 Notices Regarding Hazardous Substances.

Until full repayment of the loan, the Borrower will promptly notify the Bank in writing of any threatened or pending investigation of the Borrower or its operations by any governmental agency under any current or future law, regulation or ordinance pertaining to any hazardous substance.

### 8.4 Site Visits, Observations and Testing.

The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Borrower, to enter and visit any locations where the collateral securing this Agreement (the "Collateral") is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests. The Borrower shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with the Borrower's use of the Collateral. The Bank is under no duty to observe the Collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of the Borrower; (ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Borrower or any other party, the Borrower authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Borrower further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Borrower by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Borrower) by the Borrower without advice or assistance from the Bank.

### 8.5 Definition of Hazardous Substance.

"Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

## 9. DEFAULT AND REMEDIES

If any of the following events of default occurs, the Bank may do one or more of the following: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately and without prior notice. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy/Receivers," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

### 9.1 Failure to Pay.

The Borrower fails to make a payment under this Agreement when due.

### 9.2 Covenants.

Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article).

### 9.3 Other Bank Agreements.

Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty; or any representation or warranty made by any guarantor is false when made or deemed to be made; or any default occurs under any other agreement the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has with the Bank or any affiliate of the Bank.

### 9.4 Cross-default.

Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

### 9.5 False Information.

The Borrower or any Obligor has given the Bank false or misleading information or representations.

### 9.6 Bankruptcy/Receivers.

The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties and such petition is not dismissed within a period of forty-five (45) days after the filing, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors;

or a receiver or similar official is appointed for a substantial portion of Borrower's or any Obligor's business; or the business is terminated, or such Obligor is liquidated or dissolved.

**9.7 Lien Priority.**

The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**9.8 Judgments.**

Any notice of judgment lien is filed against the Borrower or any Obligor; or a notice of levy and/or of a writ of attachment or execution, or other like process, is served against the assets of the Borrower or any Obligor in an aggregate amount of $250,000.00 or more; or any lawsuit or lawsuits are filed against the Borrower or any Obligor in which the claim for damages is in an aggregate amount of $250,000.00 or more.

**9.9 Death.**

If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent.

**9.10 Material Adverse Change.**

A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations or properties, or ability to repay the credit; or the Bank determines that it is insecure for any other reason.

**9.11 Government Action.**

Any government authority takes action that the Bank believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**9.12 Forfeiture.**

A judicial or nonjudicial forfeiture or seizure proceeding is commenced by a government authority and remains pending with respect to any property of Borrower or any part thereof, on the grounds that the property or any part thereof had been used to commit or facilitate the commission of a criminal offense by any person, including any tenant, pursuant to any law, including under the Controlled Substances Act or the Civil Asset Forfeiture Reform Act, regardless of whether or not the property shall become subject to forfeiture or seizure in connection therewith.

**9.13 ERISA Plans.**

A reportable event occurs under Section 4043(c) of ERISA, or any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan under Section 4041 or 4042 of ERISA occurs; provided such event or events could reasonably be expected, in the judgment of the Bank, to have a material adverse effect.

## 10. ENFORCING THIS AGREEMENT; MISCELLANEOUS

### 10.1 GAAP.

Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied; provided, however, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the financial statements of the Borrower for the fiscal year ended December 31, 2016 for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes.

### 10.2 Governing Law.

Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

### 10.3 Venue and Jurisdiction.

The Borrower agrees that any action or suit against the Bank arising out of or relating to this Agreement shall be filed in federal court or state court located in the Governing Law State. The Borrower agrees that the Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Borrower in a venue outside of the Governing Law State. If the Bank does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Bank reserves the right to commence an action or suit in any other jurisdiction where the Borrower, any Guarantor, or any collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by the Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to the Bank's acceptance of this Agreement.

### 10.4 Successors and Assigns.

This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent. The Bank may sell participations in or assign this loan and the related loan documents, and may exchange information about the Borrower and any Obligor (including, without limitation, any information regarding any hazardous substances) with actual or potential participants or assignees. If a participation is sold or the loan is assigned, the purchaser will have the right of set-off against the Borrower.

### 10.5 Waiver of Jury Trial.

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND**

**CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

**10.6 Waiver of Class Actions.**

The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

**10.7 Severability; Waivers.**

If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**10.8 Expenses.**

(a) The Borrower shall pay to the Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Bank in connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Bank's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any Obligor, (iii) the Bank's costs or losses arising from any changes in law which are allocated to this Agreement or any credit outstanding under this Agreement], and (iv) costs or expenses required to be paid by the Borrower or any Obligor that are paid, incurred or advanced by the Bank.

(b) The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by the Bank to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from the Bank complying with instructions the Bank reasonably believes are made by any Authorized Individual. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents.

(c) The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with (i) the enforcement or preservation of the Bank's rights and remedies and/or the collection of any obligations of the Borrower which become due to the Bank and in connection with any "workout" or restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Bank or any other person) relating to the Borrower or any other person or entity.

**10.9 Set-Off.**

Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes the Bank at any time without notice and whether or not the Bank shall have declared any amount owing by the Borrower to be due and payable, to set off against, and to apply to the payment of, the Borrower's indebtedness and obligations to the Bank under this Agreement and all related agreements, whether matured or unmatured, fixed or contingent, liquidated or unliquidated, any and all amounts owing by the Bank to the Borrower, and in the case of deposits, whether general or special (except trust and escrow accounts), time or demand and however evidenced, and (b) pending any such action, to hold such amounts as collateral to secure such indebtedness and obligations of the Borrower to the Bank and to return as unpaid for insufficient funds any and all checks and other items drawn against any deposits so held as the Bank, in its sole discretion, may elect. The Borrower hereby grants to the Bank a security interest in all deposits and accounts maintained with the Bank to secure the payment of all such indebtedness and obligations of the Borrower to the Bank.

**10.10 One Agreement.**

This Agreement and any related security or other agreements required by this Agreement constitute the entire agreement between the Borrower and the Bank with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**10.11 Notices.**

Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Bank and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**10.12 Headings.**

Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**10.13 Counterparts.**

This Agreement may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

**10.14 Borrower Information; Reporting to Credit Bureaus.**

The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports and other credit bureau information from time to time in connection with the administration, servicing and collection of the loans under this Agreement. The Borrower agrees that the Bank shall have the right at all times to