# APPENDIX 1 (part 2)

disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all guarantors as is consistent with the Bank's policies and practices from time to time in effect.

**10.15 Amendments.**

This Agreement may be amended or modified only in writing signed by each party hereto.

[Signature Page Follows]

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**Bank of America, N.A.**

By________________________
Typed Name_______________
Title______________________

Address where notices to the Bank are to be sent:
Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

**Greg Beeche, Logistics, LLC**

By________________________
Typed Name: **Gregory L. Beeche**
Title: Managing Member

Address where notices to the Borrower are to be sent:
Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

[Signature Page - Loan Agreement]

The Borrower executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**Bank of America, N.A.**

By_______________
Typed Name_Tim Kensky_
Title_Vice President_

Address where notices to the Bank are to be sent:
Bank of America, N.A.
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

**Greg Beeche, Logistics, LLC**

By_______________
Typed Name: **Gregory L. Beeche**
Title: Managing Member

Address where notices to the Borrower are to be sent:
Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, NY 12188
Facsimile: 518-237-8448

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following three notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

**(1) USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

***Notices #2 and #3 apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(2) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #3 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(3) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #3.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

## SCHEDULE A

## FEES

(a) Unused Commitment Fee. The Borrower agrees to pay a fee on any difference between the Facility No. 1 Commitment and the amount of credit it actually uses, determined by the daily amount of credit outstanding during the specified period. The fee will be calculated at 0.25% per year.

This fee is due on June 1, 2017, and on the same day of each following quarter until the expiration of the availability period.

(b) Waiver Fee. If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(c) Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

Case 1:25-cv-00944-AMN-TWD Document 149-3 Filed 01/23/26 Page 1 of 3

# EXHIBIT H

Bank of America

**SECURITY AGREEMENT**
**(Multiple Use)**

1. THE SECURITY. The undersigned **Greg Beeche, Logistics, LLC** and **Greg Logistics, LLC** (jointly, the "Pledgor") hereby assigns and grants to **Bank of America, N.A.**, its successors and assigns ("BANA"), and to Bank of America Corporation and its subsidiaries and affiliates (BANA and all such secured parties, collectively, the "Bank") a security interest in the following described property now owned or hereafter acquired by the Pledgor (the "Collateral"):

(a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account.

(b) All inventory.

(c) All equipment and fixtures now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).

(d) All of the Pledgor's deposit accounts with the Bank. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e) All instruments, chattel paper, documents, certificates of deposit, securities and investment property of every type.

(f) All general intangibles. The Collateral shall include all good will connected with or symbolized by any of such general intangibles.

(g) All negotiable and nonnegotiable documents of title covering any Collateral.

(h) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.

(j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("Books and Records").

2. THE INDEBTEDNESS. The obligations secured by this Agreement are the payment and performance of (a) all present and future Indebtedness of the Pledgor to the Bank; (b) all obligations of the Pledgor and rights of the Bank under this Agreement; and (c) all present and future obligations of the Pledgor to the Bank of other kinds. Each party obligated under any Indebtedness is referred to in this Agreement as a "Debtor." "Indebtedness" is used in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of the Debtor, now or hereafter existing, absolute or

contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, including under any swap, derivative, foreign exchange, hedge, or other arrangement ("Swap"), deposit, treasury management or other similar transaction or arrangement, and whether the Debtor may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. "Indebtedness" secured by the Collateral of such Pledgor shall not include obligations arising under any Swap to which it is not party if, and to the extent that, all or a portion of the guaranty by such Pledgor to the Bank of, or the grant by such Pledgor of a security interest to the Bank to secure, such Swap, would violate the Commodity Exchange Act (7 U.S.C., Sec. 1. et. seq.) by virtue of such Pledgor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap.

Except as otherwise agreed in writing by the Bank and the Pledgor, if the Indebtedness includes, now or hereafter, any Special Flood Zone Loan, then the following shall apply: The Special Flood Zone Loan shall not be secured under this Agreement by any Collateral which would constitute "contents" located within the Flood Zone Improvements. Notwithstanding the foregoing, all of the Collateral covered by this Agreement, including "contents," shall secure the following specific loan which is secured by improved real property, including any amendments, renewals or replacements thereof: Loan Agreement among Pledgor and Bank dated on even date herewith. For the purposes of this subparagraph, (a) "Flood Zone Improvements" means any "improved" real property that is located within a Special Flood Hazard Area; (b) a "Special Flood Zone Loan" means a loan or line of credit which is secured by Flood Zone Improvements; and (c) the terms "improved" real property, "Special Flood Hazard Area," and "contents" shall have the meaning ascribed to them by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001 *et seq.*, and implementing regulations, 44 C.F.R. Parts 59 *et seq.,* and/or the Federal Emergency Management Agency ("FEMA").

3. PLEDGOR'S COVENANTS. The Pledgor represents, covenants and warrants that unless compliance is waived by the Bank in writing:

(a) The Pledgor agrees: (i) to indemnify the Bank against all losses, claims, demands, liabilities and expenses of every kind caused by any Collateral; (ii) to permit the Bank to exercise its rights under this Agreement; (iii) to execute and deliver such documents as the Bank deems necessary to create, perfect and continue the security interests contemplated by this Agreement; (iv) not to change its name (including, for an individual, the Pledgor's name on any driver's license or special identification card issued by any state), and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered or its business structure without giving the Bank at least 30 days prior written notice; (v) not to change the places where the Pledgor keeps any Collateral or the Pledgor's Books and Records concerning the Collateral without giving the Bank prior written notice of the address to which the Pledgor is moving same; and (vi) to cooperate with the Bank in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as the Bank deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights under this Agreement.

(b) The Pledgor agrees with regard to the Collateral, unless the Bank agrees otherwise in writing: (i) that the Bank is authorized to file financing statements in the name of the Pledgor to perfect the Bank's security interest in the Collateral; (ii) that the Bank is authorized to notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral; (iii) where applicable, to operate the Collateral in accordance with all applicable statutes, rules and regulations relating to the use and control of the Collateral, and not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried; (iv) not to remove the Collateral from the Pledgor's premises except in the ordinary course of the Pledgor's business; (v) to pay when due all license fees, registration fees

and other charges in connection with any Collateral; (vi) not to permit any lien on the Collateral, including without limitation, liens arising from repairs to or storage of the Collateral, except in favor of the Bank; (vii) not to sell, hypothecate or dispose of, nor permit the transfer by operation of law of, any Collateral or any interest in the Collateral, except sales of inventory to buyers in the ordinary course of the Pledgor's business; (viii) to permit the Bank to inspect the Collateral at any time; (ix) to keep, in accordance with generally accepted accounting principles, complete and accurate Books and Records regarding all the Collateral, and to permit the Bank to inspect the same and make copies at any reasonable time; (x) if requested by the Bank, to receive and use reasonable diligence to collect the Collateral consisting of accounts and other rights to payment and proceeds, in trust and as the property of the Bank, and to immediately endorse as appropriate and deliver such Collateral to the Bank daily in the exact form in which they are received together with a collection report in form satisfactory to the Bank; (xi) not to commingle the Collateral, or collections with respect to the Collateral, with other property; (xii) to give only normal allowances and credits and to advise the Bank thereof immediately in writing if they affect any rights to payment or proceeds in any material respect; (xiii) from time to time, when requested by the Bank, to prepare and deliver a schedule of all the Collateral subject to this Agreement and to assign in writing and deliver to the Bank all accounts, contracts, leases and other chattel paper, instruments, and documents; (xiv) in the event the Bank elects to receive payments or rights to payment or proceeds hereunder, to pay all expenses incurred by the Bank, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and other expenses; and (xv) to provide any service and do any other acts which may be necessary to maintain, preserve and protect all the Collateral and, as appropriate and applicable, to keep all the Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all the Collateral free and clear of all defenses, rights of offset and counterclaims.

(c) If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Pledgor shall immediately deliver such document to the Bank, together with any necessary endorsements.

(d) The Pledgor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation flood, windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to the Bank, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to the Bank and include a lender loss payable endorsement and additional insured endorsement in favor of the Bank in a form acceptable to the Bank. Upon the request of the Bank, the Pledgor will deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

(e) The Pledgor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless the Pledgor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by the Bank of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to the Bank and shall provide that the Bank has no liability to such owner, holder of any lien, or any other person.

4. <u>BANK RIGHTS</u>. The Pledgor appoints the Bank its attorney in fact to perform any of the following rights, which are coupled with an interest, are irrevocable until termination of this Agreement

and may be exercised from time to time by the Bank's officers and employees, or any of them, whether or not the Pledgor is in default: (a) to perform any obligation of the Pledgor hereunder in the Pledgor's name or otherwise; (b) to release persons liable on the Collateral and to give receipts and acquittances and compromise disputes; (c) to release or substitute security; (d) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like documents to perfect, preserve or release the Bank's interest in the Collateral; (e) to take cash, instruments for the payment of money and other property to which the Bank is entitled; (f) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (g) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (h) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by the Bank, at the Bank's sole option, toward repayment of the Indebtedness or, where appropriate, replacement of the Collateral; (i) to enter onto the Pledgor's premises in inspecting the Collateral; (j) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (j) to preserve or release the interest evidenced by chattel paper to which the Bank is entitled and to endorse and deliver any evidence of title; and (k) to do all acts and things and execute all documents in the name of the Pledgor or otherwise, deemed by the Bank as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights.

5. DEFAULTS. Any one or more of the following shall be a default hereunder:

(a) The occurrence of any defined or described event of default under, or any default in the performance of or compliance with any obligation, agreement, representation, warranty, or other provision contained in (i) this Agreement, or (ii) any other contract or instrument evidencing the Indebtedness.

(b) Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

6. BANK'S REMEDIES AFTER DEFAULT. In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:

(a) Declare any Indebtedness immediately due and payable, without notice or demand.

(b) Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c) Enforce the security interest of the Bank in any deposit account of the Pledgor maintained with the Bank by applying such account to the Indebtedness.

(d) Require the Pledgor to obtain the Bank's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e) Require the Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind.

(f) Require the Pledgor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Bank's exclusive control.

(g) Give notice to others of the Bank's rights in the Collateral, to enforce or forebear from enforcing the same and make extension and modification agreements.

(h) Require the Pledgor to assemble the Collateral, including the Books and Records, and make them available to the Bank at a place designated by the Bank.

(i) Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of the Pledgor's equipment, if the Bank deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(j) Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Pledgor irrevocably authorizes the Bank to endorse or sign the Pledgor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Pledgor and remove therefrom any payments and proceeds of the Collateral.

(k) Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Pledgor.

(l) Use or transfer any of the Pledgor's rights and interests in any Intellectual Property now owned or hereafter acquired by the Pledgor, if the Bank deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Pledgor agrees that any such use or transfer shall be without any additional consideration to the Pledgor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Pledgor has any right or interest, whether by ownership, license, contract or otherwise.

(m) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(n) Take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Pledgor hereby irrevocably constitutes and appoints the Bank as the Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(o) Without notice or demand to the Pledgor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Bank or any of the Bank's agents or affiliates to or for the credit of the account of the Pledgor or any guarantor or endorser of the Pledgor's Indebtedness.

(p) Exercise all rights, powers and remedies which the Pledgor would have, but for this Agreement, with respect to all Collateral.

(q) Receive, open and read mail addressed to the Pledgor.

(r) Resort to the Collateral under this Agreement, and any other collateral related to the Indebtedness, in any order.

(s) Exercise any other remedies available to the Bank at law or in equity.

7. <u>ENVIRONMENTAL MATTERS</u>.

(a) The Pledgor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b) The Pledgor shall deliver to the Bank, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to the Pledgor's property, activities, or operations, or (ii) any claim against the Pledgor regarding hazardous substances.

(c) The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Pledgor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests. The Pledgor shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with the Pledgor's use of the Collateral. The Bank is under no duty to observe the Collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") will (i) result in a waiver of any default of the Pledgor; (ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Pledgor or any other party, the Pledgor authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Pledgor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Pledgor by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Pledgor) by the Pledgor without advice or assistance from the Bank.

(d) The Pledgor will indemnify and hold harmless the Bank from any loss or liability the Bank incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about the Pledgor's property or operations or

property leased to the Pledgor. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

**8. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

9. WAIVER OF CLASS ACTIONS. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

10. MISCELLANEOUS.

(a) Any waiver, express or implied, of any provision hereunder and any delay or failure by the Bank to enforce any provision shall not preclude the Bank from enforcing any such provision thereafter.

(b) The Pledgor shall, at the request of the Bank, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as the Bank may reasonably deem necessary.

(c) All notes, security agreements, subordination agreements and other documents executed by the Pledgor or furnished to the Bank in connection with this Agreement must be in form and substance satisfactory to the Bank.

(d) Governing Law. Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

(e) The Pledgor agrees that the Collateral may be sold as provided for in this Security Agreement and expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law, including the New York Lien Law.

**11. FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

12 NOTICES. Unless otherwise provided in this Agreement or in another agreement between the Bank and the Pledgor, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as the Bank and the Pledgor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

13. COUNTERPARTS. This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

14. AMENDMENTS. This Agreement may only be amended by a writing signed by the parties hereto.

Doc #01-3009560.1

[Signature Page Follows]

**GREG BEECHE, LOGISTICS, LLC**

By: ______________________ [(Seal)]
Name: Gregory L. Beeche
Title: Managing Member

**GREG LOGISTICS, LLC**

By: ______________________ [(Seal)]
Name: Gregory L. Beeche
Title: Managing Member

Pledgor's Location:
356 Hudson River Road
Waterford, New York 12188

Pledgor's state of incorporation
or organization: New York.

The parties executed this Agreement as of April 13, 2017, intending to create an instrument executed under seal.

**BANK OF AMERICA, N.A.**

By: [signature]
Name: Tim Kensky
Title: Vice President

Address for Notices:
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT 06032

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank toll-free at 888.341.5000, (2) visiting the Bank online at bankofamerica.com/privacy, or (3) contacting the Obligor's client manager or local financial center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:

- Managed Account Advisors LLC
- General Fidelity Life Insurance Company
- NationsCredit Financial Services Corporation
- BAL Corporate Aviation, LLC
- BAL Energy Holding, LLC
- BAL Energy Management II, LLC
- BAL Investment & Advisory, Inc.
- BAL Solar I, LLC
- BAL Solar II, LLC
- BAL Solar III, LLC

# EXHIBIT I

**SARATOGA COUNTY – STATE OF NEW YORK**
**SARATOGA COUNTY CLERK**
**CRAIG A. HAYNER**
**40 MCMASTER STREET, BALLSTON SPA, NY 12020**

**COUNTY CLERK'S RECORDING PAGE**
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2024022252

Receipt#: 2024212546959
Clerk: GW
Rec Date: 09/06/2024 03:01:25 PM
Doc Grp: X
Descrip: MORTGAGE
Num Pgs: 27

Party1: BEECHE GREGORY L
Party2: BANK OF AMERICA NA
Town: HALFMOON

Recording:

| | |
|---|---|
| Pages | 130.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 1.00 |
| Sub Total: | 176.00 |
| Mortgage Tax | |
| Basic | 7500.00 |
| SONYMA | 3750.00 |
| CDTA | 3750.00 |
| Local | 0.00 |
| Sub Total: | 15000.00 |
| Total: | 15176.00 |

**** NOTICE: THIS IS NOT A BILL ****

***** Mortgage Tax *****
Serial #: DP-2458
Commercial
Mtg Amt: 1500000.00

| | |
|---|---|
| Basic | 7500.00 |
| SONYMA | 3750.00 |
| CDTA | 3750.00 |
| Total: | 15000.00 |

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Craig A. Hayner
Saratoga County Clerk

Record and Return To:

ELECTRONICALLY RECORDED BY CSC INGEO

2024022252
09/06/2024 03:01:25 PM
27 Pages RECORDED
MORTGAGE
Saratoga County Clerk

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Chapman and Cutler LLP
Attn: Daniel F. Flores, Esq.
Attn: Timothy R. Wheeler, Esq.
1270 Avenue of the Americas, 30th Floor
New York, New York 10020-1708

**MORTGAGE, ASSIGNMENT OF RENTS,**
**SECURITY AGREEMENT AND FIXTURE FILING**

This Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (as the same may be modified, supplemented, amended or amended and restated from time to time, the "Mortgage"), dated as of July 6, 2021, is given by Gregory L. Beeche, as mortgagor ("Mortgagor"), to Bank of America, N.A., a national banking association, as mortgagee ("Mortgagee").

1. GRANT.

1.1 The Property. For the purpose of securing payment and performance of the Secured Obligations defined in Section 2 below, Mortgagor does hereby irrevocably and unconditionally grant, bargain, sell, alien, demise, convey, assign, transfer, mortgage, grant a security interest in, hypothecate, pledge and set over to Mortgagee, with power of sale, all right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "Property"):

(a) All that certain plot, piece or parcel of land located in the County of Saratoga, State of New York, as described in Exhibit A hereto (the "Land");

(b) All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

(c) All easements, rights of way, servitudes, privileges, interests, tenements, hereditaments, and appurtenances relating or appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all development rights or credits and air rights; all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d) All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e) All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Mortgagee, and all

condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f) All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

TO HAVE AND TO HOLD the above-described Property unto Mortgagee, its successors and assigns, in fee simple, forever, and to warrant and defend the title thereto.

1.2 Fixture Filing. This Mortgage constitutes a financing statement filed as a fixture filing under the New York Uniform Commercial Code, as amended or recodified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2. THE SECURED OBLIGATIONS.

2.1 Purpose of Securing. Mortgagor makes the grant, conveyance, transfer and assignment set forth in Section 1, makes the irrevocable and absolute assignment set forth in Section 3, and grants the security interest set forth in Section 4, all for the purpose of securing the following obligations (the "Secured Obligations") in any order of priority that Mortgagee may choose:

(a) Payment of all obligations of Greg Beeche, Logistics, LLC ("Obligor") to Mortgagee arising under the following instrument(s) or agreement(s) (collectively, the "Debt Instrument"):

(i) A certain Loan Agreement dated as of April 20, 2017 (as modified or amended), between Obligor and Mortgagee.

(ii) A certain Continuing and Unconditional Guaranty dated as of April 20, 2017 executed by Mortgagor unconditionally guaranteeing and promising to pay promptly to Mortgagee when due any and all indebtedness of Obligor.

(iii) the obligations secured under the Debt Instrument shall be limited in amount to the aggregate principal sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), together with any and all interest, fees, and expenses (including but not limited to attorneys' fees and expenses) due and owing under the terms of the Debt Instrument and as further described in Section 2.3, below.

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument that arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument that amends and restates or otherwise supersedes the Debt Instrument in its entirety;

(b) Payment and performance of all obligations of Mortgagor under this Mortgage;

(c) Payment and performance of all obligations of Obligor under any Swap Contract with respect to which there is a writing evidencing the parties' agreement that said Swap Contract shall be secured by this Mortgage. "Swap Contract" means any document, instrument or agreement with Mortgagee, now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master

agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time; and

(d) Payment and performance of all future advances and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument.

Notwithstanding any provision to the contrary, "Secured Obligations" secured hereby shall not include obligations arising under any Swap Contract to the extent that the grant of a lien hereunder to secure such Swap Contract would violate the Commodity Exchange Act by virtue of the Mortgagor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such grant of such lien becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.,* as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto.

2.2 Terms of Secured Obligations. All persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in Paragraph 2.1(a) and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instrument which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3 Maximum Principal Amount. NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN OR IN THE DEBT INSTRUMENT AND ALL OTHER DOCUMENTS RELATING TO, GUARANTEEING OR OTHERWISE GIVEN IN CONNECTION WITH THE SECURED OBLIGATIONS (THE "LOAN DOCUMENTS") TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) PLUS ALL INTEREST PAYABLE UNDER THE DEBT INSTRUMENT AND ALL AMOUNTS EXPENDED BY MORTGAGEE AFTER DEFAULT BY OBLIGOR (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS MORTGAGE; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE PROPERTY AND UPHOLDING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY.

2.4 Future Advances. This Mortgage permits and secures any and all current and future advances to Obligor evidenced by or made pursuant to the Debt Instrument described in Paragraph 2.1(a).

3. ASSIGNMENT OF RENTS.

3.1 Assignment. Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "Rents"), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property. In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also

be considered Rents assigned under this Paragraph.

3.2 Grant of License. Notwithstanding the provisions of Paragraph 3.1, Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Paragraph 6.2, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

4. SECURITY INTEREST IN RELATED PERSONALTY.

4.1 Grant of Security Interest. This Mortgage is intended to be a security agreement pursuant to the New York Uniform Commercial Code for all items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the New York Uniform Commercial Code. Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "Personalty"):

(a) All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b) All crops growing or to be grown on the Land (and after severance from the Land); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c) All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them;

(d) All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without limitation, all general intangibles related to any of the above property and all proceeds of the above property.

5. RIGHTS AND DUTIES OF THE PARTIES.

5.1 Representations and Warranties. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements.

5.2 Taxes, Assessments, Liens and Encumbrances. Mortgagor shall pay or cause to be paid prior to the due date therefor all taxes, levies, charges and assessments, now or hereafter levied, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property which Mortgagee has not consented to in writing, and

shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3 Damages and Insurance and Condemnation Proceeds.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "Claims"):

(i) all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

(iv) all interest which may accrue on any of the foregoing.

(b) Mortgagor shall immediately notify Mortgagee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Mortgagor in adjusting any loss covered by insurance.

(c) All proceeds of the Claims assigned to Mortgagee under this Paragraph shall be paid to Mortgagee. In each instance, Mortgagee shall apply those proceeds first toward reimbursement of all of Mortgagee's costs and expenses of recovering the proceeds, including attorneys' fees. Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor. If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds. If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such

plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

5.4 Insurance. Mortgagor shall provide and maintain in force at all times all risk property damage insurance (including without limitation windstorm coverage, and hurricane coverage as applicable) on the Property and such other type of insurance on the Property as may be required by Mortgagee in its reasonable judgment. At Mortgagee's request, Mortgagor shall provide Mortgagee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in an amount, for a term, and in form and content satisfactory to Mortgagee, and shall be written only by companies approved by Mortgagee. In addition, each policy of hazard insurance shall include a Form 438BFU or equivalent loss payable endorsement and a standard "non-contributory mortgagee" endorsement, each in favor of Mortgagee.

5.5 Maintenance and Preservation of Property.

(a) Mortgagor shall keep the Property in good condition and repair and shall not commit or allow waste of the Property. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance.

(b) If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under Paragraph 5.3.

(c) Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable law or order of any governmental authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property. Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d) If the Property is agricultural, Mortgagor shall farm the Property in a good and husbandlike manner. Mortgagor shall keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees or vines with new ones. Mortgagor shall prepare for harvest, harvest, remove and sell any crops growing on the Property. Mortgagor shall keep all buildings, fences, ditches, canals, wells and other farming improvements on the Property in first class condition, order and repair.

(e) Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6 Releases, Extensions, Modifications and Additional Security. Without affecting the personal liability of any person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a) release any person liable for payment of any Secured Obligation;

(b) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d) alter, substitute or release any property securing the Secured Obligations;

(e) consent to the making of any plat or map of the Property or any part of it;

(f) join in granting any easement or creating any restriction affecting the Property;

(g) join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h) release the Property or any part of it from the lien of this Mortgage.

5.7 Satisfaction of Mortgage. Upon Mortgagee's determination in its sole good faith discretion that all sums secured hereby have been indefeasibly paid in full and no further commitment to extend credit continues, Mortgagee shall execute and deliver a satisfaction of the Mortgage to Mortgagor or, upon Mortgagor's written request, an assignment of Mortgage in recordable form to a party designated by Mortgagor, which assignment shall be made without any representation or warranty by Mortgagee. Mortgagor shall pay Mortgagee's costs incurred in connection with such assignment of this Mortgage.

5.8 Compensation and Reimbursement of Costs and Expenses.

(a) Mortgagor agrees to pay fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Mortgagee when the law provides no maximum limit, for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services.

(b) Mortgagor further agrees to pay or reimburse Mortgagee for all costs, expenses and other advances which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under Paragraph 6.3, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs and disbursements, costs of any sale of the Property and any cost of any appraisal and evidence of title.

(c) Mortgagor shall pay all obligations arising under this Paragraph immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations. If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9 Exculpation and Indemnification.

(a) Mortgagee shall not be directly or indirectly liable to Mortgagor or any other person as a consequence of any of the following:

(i) Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii) Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii) Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv) any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v) any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the rights or remedies afforded Mortgagee under Paragraph 6.3, unless the loss is caused by the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b) Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of any appraisal or other evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by law or because of any failure of Mortgagor to perform any of its obligations. This agreement by Mortgagor to indemnify Mortgagee shall survive the release and cancellation of any or all of the Secured Obligations and the satisfaction or partial release of this Mortgage.

5.10 Defense and Notice of Claims and Actions. At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11 Representation and Warranty Regarding Hazardous Substances. Before signing this Mortgage, Mortgagor performed an environmental site assessment of, and researched and inquired into the previous uses and ownership of the Property. Based on that due diligence, Mortgagor represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as Mortgagor has disclosed to Mortgagee in writing. Mortgagor further represents and warrants that Mortgagor has complied, and will comply and cause all occupants of the Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). Mortgagor shall promptly, at Mortgagor's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. Mortgagor acknowledges that hazardous substances may permanently and materially impair the value and use of the Property. "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

5.12 Site Visits, Observation and Testing. Mortgagee and its agents and representatives

shall have the right at any reasonable time, after giving reasonable notice to Mortgagor, to enter and visit the Property for the purposes of performing appraisals, observing the Property, taking and removing environmental samples, and conducting tests on any part of the Property. Mortgagor shall reimburse Mortgagee on demand for the costs of any such environmental investigation and testing. Mortgagee will make reasonable efforts during any site visit, observation or testing conducted pursuant this Paragraph to avoid interfering with Mortgagor's use of the Property. Mortgagee is under no duty, however, to visit or observe the Property or to conduct tests, and any such acts by Mortgagee will be solely for the purposes of protecting Mortgagee's security and preserving Mortgagee's rights under this Mortgage. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of Mortgagor; (ii) impose any liability on Mortgagee; or (iii) be a representation or warranty of any kind regarding the Property (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Mortgagee has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Mortgagor or any other party, Mortgagor authorizes Mortgagee to make such a disclosure. Mortgagee may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Mortgagee's judgment. Mortgagor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Mortgagor by Mortgagee or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Mortgagor) by Mortgagor without advice or assistance from Mortgagee.

5.13 Additional Provisions Relating to Condominiums. If the Property is subject to a condominium declaration of conditions, covenants and restrictions recorded in the official records of the county in which the Property is located (the "Declaration"), the following provisions shall apply.

(a) The provisions contained in this Mortgage are obligations of Mortgagor in addition to Mortgagor's obligations under the Declaration with respect to similar matters, and shall not restrict or limit Mortgagor's duties and obligations to keep and perform promptly all of its obligations as unit owner under the Declaration.

(b) Mortgagor shall at all times fully perform and comply with all the agreements, covenants, terms and conditions imposed upon unit owners under the Declaration, and if Mortgagor fails to do so, Mortgagee may (but shall not be obligated to) take any action Mortgagee deems necessary or desirable to prevent or cure any default thereunder. Mortgagee may also take such action as it deems necessary or desirable to cure a default under the Declaration by Mortgagor or any other party occupying the unit(s) (a "Unit Occupant") encumbered by this Mortgage, upon receipt by Mortgagee from the condominium association under the Declaration (the "Association") of written notice of such default, even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor. Mortgagee may pay and expend such sums of money as Mortgagee in its sole discretion deems necessary to prevent or cure any default by Mortgagor or a Unit Occupant, and Mortgagor hereby agrees to pay to Mortgagee, immediately and without demand, all such sums so paid and expended by Mortgagee, together with interest thereon from the date of each such payment at the rate (the "Demand Rate") of two percent (2%) in excess of the then current rate of interest under the Debt Instrument. All sums so paid and expended by Mortgagee, and the interest thereon, shall be added to and be secured by the lien of this Mortgage. At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(c) At Mortgagee's request, Mortgagor will submit satisfactory evidence of payment of all of its monetary obligations under the Declaration (including but not limited to rents, taxes, assessments, insurance premiums and operating expenses).

(d) Mortgagor shall advise Mortgagee in writing of the giving of any notice to Mortgagor by the Association under the Declaration of any default by Mortgagor as unit owner or

by a Unit Occupant thereunder in the performance or observance of any of the terms, conditions and covenants to be performed or observed by Mortgagor or such Unit Occupant thereunder, and Mortgagor shall deliver to Mortgagee a true copy of each such notice.

(e) If any action, proceeding, motion or notice shall be commenced or filed in respect of the Association in connection with any case (including a case commenced or filed under the Bankruptcy Code), Mortgagee shall have the option, to the exclusion of Mortgagor, exercisable upon notice from Mortgagee to Mortgagor, to conduct and control any such litigation with counsel of Mortgagee's choice. Mortgagee may proceed in its own name or in the name of Mortgagor in connection with any such litigation, and Mortgagor agrees to execute any and all powers, authorizations, consents or other documents required by Mortgagee in connection therewith. Mortgagor shall, upon demand, pay to Mortgagee all costs and expenses (including attorneys' fees) paid or incurred by Mortgagee in connection with the prosecution or conduct of any such proceedings. Any such costs or expenses not paid by Mortgagor as aforesaid shall be secured by the lien of this Mortgage and shall be added to the principal amount of the indebtedness secured hereby. Mortgagor shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Declaration in any such case without the prior written consent of Mortgagee.

(f) Mortgagor will use its best efforts to obtain and deliver to Mortgagee within twenty (20) days after written request by Mortgagee, an estoppel certificate from the Association setting forth (i) the name of the unit owner, (ii) that the Declaration has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the amount of common expenses and other assessments payable by Mortgagor as unit owner under the Declaration, (iv) the date to which all common expenses and other assessments have been paid by Mortgagor as unit owner under the Declaration, (v) whether there are any alleged defaults by Mortgagor or a Unit Occupant under the Declaration and, if so, setting forth the nature thereof in reasonable detail, and (vi) as to such other matters as Mortgagee may reasonably request.

(g) Mortgagor represents and warrants to Mortgagee that as of the date hereof, no default under the Declaration has occurred and is continuing.

(h) Mortgagor shall take such actions as may be reasonable to insure that the Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

(i) Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the condominium(s) encumbered by this Mortgage, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the Declaration, the Association's bylaws or articles or any rules and regulations promulgated by the Association;

(iii) termination of professional management and assumption of self-management of the Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Association unacceptable to Mortgagee.

6. ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

6.1 Accelerating Transfers

(a) "Accelerating Transfer" means any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property. If Mortgagor is a corporation, "Accelerating Transfer" also means any transfer or transfers of shares possessing, in the aggregate, more than fifty percent (50%) of the voting power. If Mortgagor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the partnership interests. If Mortgagor is a limited liability company, "Accelerating Transfer" also means withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of, in the aggregate, more than fifty percent (50%) of the voting power or in the aggregate more than fifty percent of the ownership of the economic interest in the Mortgagor.

(b) Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by Paragraph 6.3 of this Mortgage.

6.2 Events of Default. The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("Event of Default") under this Mortgage:

(a) Obligor fails to make any payment, when due, under the Debt Instrument (after giving effect to any applicable grace period), or any other default occurs under and as defined in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations and such default continues beyond any applicable cure period;

(b) Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c) Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of Paragraph 6.1;

(d) Any representation or warranty made in connection with this Mortgage, the Secured Obligations, or in any Debt Instrument proves to have been false or misleading in any material respect when made;

(e) Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage; or

(f) An event occurs which gives Mortgagee the right or option to terminate any Swap Contract secured by this Mortgage.

6.3 Remedies. At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a) Mortgagee may declare any or all of the Secured Obligations to be due and payable immediately, and/or may terminate any Swap Contract secured by this Mortgage in accordance with its terms.

(b) Mortgagee may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for all or any portion of the Property.

(c) Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security or lien of this Mortgage. Such other things may include: entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property. Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments. Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Paragraph.

(d) Mortgagee may cure any breach or default of Mortgagor (without waiving such breach or default), and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any person.

(e) Mortgagee may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Mortgage.

(f) Mortgagee may exercise the remedies contained in any Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g) Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties.

(h) Mortgagee may foreclose on this Mortgage non-judicially pursuant to the provisions of Article 14 of the Real Property Actions and Proceedings Law of New York, as such provisions may be extended, renewed, modified or replaced from time to time.

6.4 Application of Sale Proceeds and Rents.

(a) Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto.

(b) Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of any sale of the Property which Mortgagee may receive or collect under Paragraph 6.3, in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the person or persons entitled thereto. Mortgagee shall have no liability for any funds which it does not actually receive.

7. MISCELLANEOUS PROVISIONS

7.1 No Waiver or Cure.

(a) Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b) If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i) Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii) Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii) Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv) Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v) Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more

Secured Obligations;

(vi) Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2 Powers of Mortgagee. Mortgagee may take any of the actions permitted under Paragraphs 6.3(b) and/or 6.3(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3 Nonborrower Mortgagor.

(a) If any Mortgagor ("Nonborrower Mortgagor") is not the Obligor under the Debt Instrument described in Paragraph 2.1(a), such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i) Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

(ii) Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii) Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv) Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v) Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi) Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b) Nonborrower Mortgagor waives:

(i) Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii) Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii) All presentments, demands for performance, notices of

nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv) Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v) Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c) Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d) No provision or waiver in this Mortgage shall be construed as limiting the generality of any other provision or waiver contained in this Mortgage.

(e) For purposes of this Paragraph 7.3, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of Paragraphs 2.1(c) and 2.1(d).

7.4 Merger. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5 Joint and Several Liability. If Mortgagor consists of more than one person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6 Applicable Law. This Mortgage shall be governed by the laws of the State of New York.

7.7 Successors in Interest. The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties. However, this Paragraph does not waive the provisions of Paragraph 6.1.

**7.8 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

7.9 <u>Waiver of Class Actions</u>. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10 <u>Interpretation</u>. Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage. The Exhibits to this Mortgage are hereby incorporated in this Mortgage.

7.11 <u>In-House Counsel Fees</u>. Whenever Mortgagor is obligated to pay or reimburse Mortgagee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel to the extent permitted by applicable law.

7.12 <u>Waiver of Marshaling</u>. Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.13 <u>Severability</u>. If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.14 <u>Notices</u>. Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below. That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code. Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

| | |
|---|---|
| Addresses for Notices to Mortgagor: | Gregory L. Beeche<br>356 Hudson River Road<br>Waterford, New York 12188 |
| Address for Notices to Mortgagee: | Bank of America, N.A.<br>Attn: Anthony Varone, SVP SAG<br>101 East River Drive<br>Mail Code: CT2-550-04-02<br>East Hartford, CT 06108 |

8. NEW YORK STATE SPECIFIC PROVISIONS

8.1 Inconsistencies. In the event of any inconsistencies between the terms and conditions of this Section 8 and the other provisions of this Mortgage, the terms and conditions of this Section 8 shall control.

8.2 Trust Fund. In compliance with Section 13 of the New York Lien Law, as the same may be amended from time to time (the "Lien Law"), Obligor shall receive the advances secured hereby, and shall hold the right to receive such advances, as a trust fund to be applied first for the purpose of paying the cost of the improvement, and shall apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. Obligor shall comply strictly with Section 13-f of the Lien Law.

8.3 Real Property Law Section 291-f. The provisions of this Mortgage and/or the Loan Documents restrict (in accordance with their terms) the right or power of the Mortgagor, as against the holder of this Mortgage, without such holder's consent, to cancel, abridge, or otherwise modify tenancies, subtenancies, leases or subleases in existence on the date hereof (the "Existing Leases"), and the tenants or subtenants thereunder, (the "Existing Tenants"), or to accept prepayments of installments of rent to become due under the Existing Leases. Mortgagee shall have all of the rights as against the Existing Tenants as set forth in Section 291-f of the Real Property Law of the State of New York. Mortgagor covenants and agrees to send to each Existing Tenant on the date hereof, either by recognized overnight courier or by certified or registered mail, return receipt requested (and to provide promptly to Mortgagee copies of such letters and receipts) notice of the existence of this Mortgage, together with a copy of this Paragraph 8.3. Any cancellation, abridgment, modification or prepayment made by any Existing Tenant of an Existing Lease in violation of the provisions of this Paragraph 8.3, after the written notice provided for herein, without the consent of Mortgagee shall be voidable by the holder of the Mortgage, as such holder may elect.

8.4 Type of Property. Mortgagor represents and warrants that this Mortgage does not cover real property principally improved by one or more structures containing in the aggregate not more than six residential units, each bearing its own cooking facilities.

8.5 Section 254 of the RPL. In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

8.6 Transfer Taxes.

(a) For as long as this Mortgage remains outstanding, Mortgagor covenants and agrees that, in the event of a sale of the Property or other Accelerating Transfer, it will duly complete, execute and deliver to Mortgagee contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate Accelerating Transfer taxes, including, without limitation, any real estate transfer taxes payable under Article 31 of the New York State Tax Law or under Title 11, Chapter 21 of the Administrative Code of the City of New York, if applicable, or any successor provisions thereto (collectively, "Transfer Taxes") by reason of such sale or other Accelerating Transfer or recording of the deed evidencing such sale or other Accelerating Transfer.

(b) Mortgagor shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Accelerating Transfer, and in default thereof Mortgagee may (but shall have no obligation to) pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage. The provisions of this Paragraph 8.6(b) shall survive any Accelerating Transfer and the delivery of the deed in connection with any Accelerating Transfer.

8.7 Covenants in Addition to RPL. All covenants hereof shall be construed as affording to Mortgagee rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable legal requirement.

[Signature Pages Follow]

IN WITNESS WHEREOF, this Mortgage has been entered into by Mortgagor on the day and year above written.

MORTGAGOR:

**Gregory L. Beeche**

By: ______________________________ (Seal)
Gregory L. Beeche, Individually

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

The undersigned Obligors sign below for the purposes of agreeing to Paragraphs 7.8 and 8.2 of this Mortgage.

OBLIGORS:

**Greg Beeche, Logistics, LLC**

By: ______________________________ (Seal)
Gregory L. Beeche, Managing Member

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

**Greg Logistics, LLC**

By: ______________________________ (Seal)
Gregory L. Beeche, Managing Member

______________________________ (Seal)
**Gregory L. Beeche**, Individually

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) U.S. AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers, and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000.**

**Bank of America Companies:**

This notice applies to all Bank of America U.S. legal entities that utilize the names:

Bank of America
Banc of America
U.S. Trust
Merrill

These entities include banks and trust companies; credit card companies; brokerage and investment companies; and insurance and securities companies. In addition, this notice applies to the following Bank of America U.S. companies:

Managed Account Advisors LLC
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

State of New York )
) ss.:
County of Saratoga )

2024 (PS)

On the 28 day of August, in the year ~~2021~~ before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her individual capacity as **Mortgagor**, and that by his/her signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

(Signature and office of individual taking acknowledgment)

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

State of New York )
) ss.:
County of Saratoga )

2024 (PS)

On the 28 day of August, in the year ~~2021~~ before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity as **Managing Member of Obligor Greg Beeche, Logistics, LLC**, and that by his/her signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

(Signature and office of individual taking acknowledgment)

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

State of New York )
) ss.:
County of Saratoga )

2024 (PS)

On the 28 day of August, in the year ~~2021~~ before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity as **Managing Member of Obligor Greg Logistics, LLC**, and that by his/her signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

(Signature and office of individual taking acknowledgment)

PARASRAM A. SOOKNANAN
Notary Public, State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

State of New York )
) ss.:
County of Saratoga )

On the 28 day of Agust, in the year ~~2024~~ 2024 before me, the undersigned, personally appeared **Gregory L. Beeche**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her individual capacity as **Guarantor**, and that by his/her signature on the instrument, the individual, or the person, or entity upon behalf of which the individual acted, executed the instrument.

______________________________
(Signature and office of individual taking acknowledgment)

PARASRAM A. SOOKNANAN
Notary Public. State of New York
No. 01SO6405234
Qualified in Schenectady County
Commission Expires March 2, 2028

EXHIBIT A TO MORTGAGE

Exhibit A to MORTGAGE dated as of July 6, 2021, given by Gregory L. Beeche as "Mortgagor" to Bank of America, N.A., a national banking association, as "Mortgagee."

Description of Property

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45' W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet (405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N 80 degrees 45' W) four hundred ninety feet (490') to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 1912 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-) to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon,

Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast corner of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest corner of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 feet (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty-five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly corner of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' 00"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) one hundred ninety-two and 76/100 feet (192.76') to the southwesterly corner of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly corner of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>:
356 Hudson River Road
Waterford, New York 12188

County: Saratoga

Municipality: Halfmoon

SBL: 286.-1-22.1

# EXHIBIT J

Case 1:25-cv-00944-AMN-PJWD Document 1-10 Filed 07/18/26 Page 2 of 3

[redacted]

415743 2017 Apr 20 AM11:51

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Aidan Campbell, 716-847-8302

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Phillips Lytle LLP**
**One Canalside, 125 Main Street**
**Buffalo, NY 14203, USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME **Greg Logistics, LLC** | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS **356 Hudson River Road** | | CITY **Waterford** | STATE **NY** | POSTAL CODE **12188** | COUNTRY **USA** |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION **limited liability** | 1f. JURISDICTION OF ORGANIZATION **New York** | 1g. ORGANIZATIONAL ID #, if any **NONE** | [X] NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | [ ] NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME **Bank of America, N.A.** | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX | |
| 3c. MAILING ADDRESS **70 Batterson Park Road** | CITY **Farmington** | STATE **CT** | POSTAL CODE **06032** | COUNTRY **USA** | |

4. This FINANCING STATEMENT covers the following collateral:

**All of Debtor's assets, including but not limited to, all now owned or hereafter acquired, created or arising accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts and investment property, and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds.**

5. ALTERNATIVE DESIGNATION [if applicable]: [ ] LESSEE/LESSOR [ ] CONSIGNEE/CONSIGNOR [ ] BAILEE/BAILOR [ ] SELLER/BUYER [ ] AG. LIEN [ ] NON-UCC FILING

6. [ ] This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] [ ] All Debtors [ ] Debtor 1 [ ] Debtor 2

8. OPTIONAL FILER REFERENCE DATA **NY SOS; #3031704.1**

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Filing Number-201704208164087**

[redacted]

415741 2017 Apr 20 AM11:49

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Aidan Campbell, 716-847-8302**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Phillips Lytle LLP**
**One Canalside, 125 Main Street**
**Buffalo, NY 14203, USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME **Greg Beeche, Logistics, LLC** | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS **356 Hudson River Road** | | CITY **Waterford** | STATE **NY** | POSTAL CODE **12188** | COUNTRY **USA** |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION **limited liability** | 1f. JURISDICTION OF ORGANIZATION **New York** | 1g. ORGANIZATIONAL ID #, if any **NONE** | [X] NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | [ ] NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME **Bank of America, N.A.** | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS **70 Batterson Park Road** | | CITY **Farmington** | STATE **CT** | POSTAL CODE **06032** | COUNTRY **USA** |

4. This FINANCING STATEMENT covers the following collateral:
**All of Debtor's assets, including but not limited to, all now owned or hereafter acquired, created or arising accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts and investment property, and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) and proceeds of proceeds.**

5. ALTERNATIVE DESIGNATION [if applicable]: [ ] LESSEE/LESSOR [ ] CONSIGNEE/CONSIGNOR [ ] BAILEE/BAILOR [ ] SELLER/BUYER [ ] AG. LIEN [ ] NON-UCC FILING

6. [ ] This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] [ ] All Debtors [ ] Debtor 1 [ ] Debtor 2

8. OPTIONAL FILER REFERENCE DATA **NY SOS; #3031698.1**

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Filing Number-201704208164063**

# EXHIBIT K

Bank of America

# AMENDMENT TO LOAN AGREEMENT

This Amendment (the "Amendment") dated as of November 8, 2017, is between **BANK OF AMERICA, N.A.** (the "Bank") and **GREG BEECHE, LOGISTICS, LLC** (the "Borrower").

## RECITALS

A. The Bank and the Borrower entered into a certain Loan Agreement dated as of April 20, 2017 (as it may be amended from time to time, the "Agreement") pursuant to which the Bank extended various credit facilities to the Borrower.

B. The Bank and the Borrower desire to amend the Agreement to (i) increase the maximum principal amount of the Line of Credit to Six Million and 00/100 Dollars ($6,000,000.00) and (ii) provide a new equipment line of credit in the maximum principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00), which facility shall convert into a permanent term loan after an initial draw period.

## AGREEMENT

1. Definitions. Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2. Amendments. The Agreement is hereby amended as follows:

A. Subsection 1.1(a) of the Agreement is hereby amended and restated in its entirety and shall read as follows:

"During the availability period described below, the Bank will provide a line of credit to the Borrower (the "Line of Credit"). The amount of the Line of Credit (the "Facility No. 1 Commitment") is Six Million and 00/100 Dollars ($6,000,000.00)."

B. New Section 2A is hereby added to the Agreement and shall read as follows.

**"2A. FACILITY NO. 3: THE EQUIPMENT LINE OF CREDIT**

**2A.1 Equipment Line of Credit Amount.**

(a) During the availability period described below, the Bank will provide an equipment line of credit to the Borrower. The amount of the equipment line of credit (the "Facility No. 3 Commitment" or "Equipment Line of Credit") is Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00).

(b) This Equipment Line of Credit is a non-revolving line of credit. Any amount borrowed, even if repaid before the expiration date of the Equipment Line of Credit, permanently reduces the remaining available Equipment Line of Credit.

(c) Each equipment loan shall be used to purchase equipment for use in the Borrower's business. All equipment acquired with the proceeds of such loans shall be free and clear of any security interests, liens, encumbrances or rights of others except the security

interests of the Bank under any security agreements required under this Agreement. Each request for an equipment loan must be accompanied by a copy of the purchase order or invoice for the equipment to be purchased with the proceeds of the loan, together with a security agreement and such other documentation reasonably requested by the Bank to perfect the Bank's security interest in such equipment. The amount of each loan shall not exceed 100% of the purchase price of such equipment, if it is new, or 80% of the purchase price if the equipment is used, excluding all freight, sales and use taxes, and installation costs which are included in the purchase price.

(e) The Borrower agrees not to permit the outstanding principal balance of equipment loans under the Equipment Line of Credit to exceed the Facility No. 3 Commitment.

**2A.2 Availability Period.**

The Equipment Line of Credit is available between November 8, 2017 and November 30, 2018 (the "Availability Period"), or such earlier date as the availability may terminate as provided in this Agreement (the "Facility No. 3 Expiration Date").

**2A.3 Repayment Terms.**

(a) The Borrower will pay interest on December 1, 2017, and then on the same day of each month thereafter until payment in full of any principal outstanding under this facility.

(b) The Borrower will repay the principal amount outstanding on the Facility No. 3 Expiration Date in equal installments beginning on December 1, 2018, and on the same day of each month thereafter, and ending on November 1, 2023 (the "Repayment Period"). Each principal installment shall be in an amount sufficient to fully amortize the principal amount over the Repayment Period. In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due.

**2A.4 Interest Rate.**

(a) During the Availability Period, interest shall accrue at the LIBOR Daily Floating Rate (as defined below) plus three and one-quarter percentage points (3.25%).

The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day. The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

(b) During the Repayment Period, the interest rate will be a rate per year equal to the LIBOR Rate (Adjusted Periodically)(as defined below) plus three and one-quarter percentage points (3.25%).

The LIBOR Rate (Adjusted Periodically) is a rate of interest equal to the rate per annum equal to the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank), as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Rate (Adjusted Periodically) is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

During the Repayment Period, the interest rate will be adjusted on the first day of every month (the "Adjustment Date") and remain fixed until the next Adjustment Date. If the Adjustment Date in any particular month would otherwise fall on a day that is not a banking day then, at the Bank's option, the Adjustment Date for that particular month will be the first banking day immediately following thereafter.

**2A.5 <u>Prepayments</u>.**

For any period that a loan is bearing interest at a rate that can fluctuate daily, the Borrower may prepay principal in whole or in part without any prepayment premium fee. For any period that the interest rate is fixed (whether for the term of any loan or for a specified interest period), any prepayment prior to the scheduled maturity date or the last day of the interest period, respectively, (whether by acceleration or otherwise) will result in a prepayment fee. The calculation of the prepayment fee shall include any loss or expense which the Bank may incur or sustain as a result of the prepayment, including reimbursement of the Bank's breakage costs. In the event an interest rate swap is entered into with the Bank in connection with any loan, the terms of the swap will be governed by the swap documents. Early termination of a swap (in advance of its scheduled termination date) will require payment of an early termination fee. The termination fee may be owed by the Borrower to the Bank or by the Bank to the Borrower, depending on the interest rate environment on the date of termination. The Borrower can discuss potential early termination scenarios with the Bank's interest rate derivatives associates. "

C. New Subsection 6.17 is hereby added to the Agreement and shall read as follows.

**"6.17 <u>No Plan Assets</u>.**

The Borrower represents that, as of the date hereof and throughout the term of this Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA."

D. Subsection 7.1 of the Agreement is hereby amended and restated in its entirety and shall read as follows:

"**Use of Proceeds.**

(a) To use the proceeds of Facility No. 1 only for general working capital purposes.

(b) To use the proceeds of Facility No. 2 only for the purchase of equipment.

(c) To use the proceeds of Facility No. 3 only for the purchase of equipment.

(d) The proceeds of the credit extended under this Loan Agreement may not be used directly or indirectly to purchase or carry any "margin stock" as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System, or extend credit to or invest in other parties for the purpose of purchasing or carrying any such "margin stock," or to reduce or retire any indebtedness incurred for such purpose."

E. Subsection 7.4 of the Agreement is hereby amended and restated in its entirety and shall read as follows:

"**Funded Debt to EBITDA Ratio.**

To maintain on a consolidated basis a ratio of Funded Debt to EBITDA not exceeding 5.75:1.00, with annual step down ratios indicated for each period specified below:

| Period | Ratios |
|---|---|
| From November 8, 2017 until December 30, 2018 | 5.75: 1.00 |
| From December 31, 2018 until December 30, 2019 | 5.25: 1.00 |
| From December 31, 2019 until December 30, 2020 | 4.75: 1.00 |
| From December 31, 2020 until December 30, 2021 | 4.25: 1.00 |
| From December 31, 2021 and thereafter | 4.00: 1.00 |

"Funded Debt" means all outstanding liabilities for borrowed money.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization, plus Paid in Capital contributed during the trailing twelve month period.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the last day of the calculation period."

3. Conditions Precedent. The effectiveness of this Amendment is conditioned upon the Bank's receipt of:

   a. a fully executed counterpart of this Amendment from the Borrower,
   b. a fully executed counterpart of the Amendment to Construction Loan Agreement between the Bank and Gregory L. Beeche ("Beeche"), dated as of the date hereof, from Beeche,
   c. a fully executed counterpart of the Amendment to Loan Agreement between the Bank and Beeche, dated as of the date hereof, from Beeche, and
   d. corporate resolutions from the Borrower authorizing this Amendment and the transactions contemplated herein.

4. Condition Subsequent. The obligation of the Bank to honor any request for an extension of credit after the date for performance set forth in Subsection 4.a. below is subject to satisfaction of the following condition subsequent, and the Borrower acknowledges that (i) the Bank is relying on the Borrower's agreement to cause this condition subsequent to be fulfilled in agreeing to the terms of Amendment becoming effective, and (ii) the failure to satisfy this condition subsequent shall constitute an Event of Default.

   a. Field Examination. Not later than December 31, 2017, a certified field exam to be ordered by the Bank shall be conducted at the Borrower's cost, the results of which shall be acceptable to the Bank in its sole discretion.

5. Fees and Expenses. The Borrower acknowledges and confirms that the Bank has incurred certain fees in connection with this Amendment. The Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees.

6. Representations and Warranties. When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, and (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers.

7. Effect of Amendment. Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to the Waiver of Jury Trial provision, shall remain in full force and effect.

8. Counterparts. This Amendment may be executed in multiple counterparts, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically, and each such executed counterpart (and any copy of an executed counterpart that is an electronic record) shall be deemed an original of this Amendment.

9. **FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR**

SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

The parties executed this Amendment as of the date stated at the beginning of this Amendment, intending to create an instrument executed under seal.

**BANK OF AMERICA, N.A.**

By [signature]
Typed Name Tim Kenskey
Title V.P. K

**GREG BEECHE, LOGISTICS, LLC**

By [signature], POWER OF ATTORNEY
Typed Name KIRK P. BEECHE
Title DIRECTOR

# EXHIBIT L

**Bank of America**

BORROWER: Greg Beeche, Logistics, LLC or Gregory L. Beeche

GUARANTOR: Greg Logistics, LLC

## CONTINUING AND UNCONDITIONAL GUARANTY

1. The Guaranty. For valuable consideration, the undersigned (whether one or more than one "Guarantor") hereby unconditionally guarantees and promises to pay promptly to **Bank of America, N.A.**, its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of **Gregory L. Beeche** or **Greg Beeche, Logistics, LLC** (each, a "Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, derivative, foreign exchange or hedge or other similar transaction or arrangement ("Swap Obligations") now or hereafter owing from Borrower to Bank. No Guarantor will be deemed to be a guarantor of any Swap Obligation to the extent that such Guarantor is not an Eligible Contract Participant at the time such guaranty becomes effective with respect to such Swap Obligations as set forth in the Commodities Exchange Act (7 U.S.C., Sec. 1, et. seq.). The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. "Indebtedness" shall mean and includes any and all advances, debts, obligations and liabilities of Borrower, or any of them, previously, now or later made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including Swap Obligations and obligations under any deposit, treasury management or other similar transaction or arrangement, and whether any of the Borrowers may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or later becomes unenforceable.

2. Obligations Independent. The obligations under this Guaranty are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

3. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

4. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full in immediately available funds and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner vary, discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. This is a guaranty of payment and not merely a guaranty of collection. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation; and any guaranty of any indemnities, shall survive any termination of this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness later incurred by Borrower to Bank. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

5. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to:

(i) proceed against Borrower or any other person;

(ii) marshal assets or proceed against or exhaust any security held from any of the Borrowers or any other person;

(iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person;

(iv) take any other action or pursue any other remedy in Bank's power; or

(v) make any presentment or demand for performance, or give any notice of nonperformance, acceleration, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness, or give any notice of acceptance of this Guaranty, or notices of any fact that might increase Guarantor's risk.

(b) any defense to its obligations under this Guaranty based upon or arising by

reason of:

(i) any disability or other defense of Borrower or any other person;

(ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of Borrower or any other person;

(iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower;

(iv) the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor;

(v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower;

(vi) any impairment of the value of any interest in any security for the Indebtedness, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security;

(vii) any modification of the Indebtedness, in any form whatsoever, including any modification made after revocation hereof to any Indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Indebtedness, including increase or decrease of the rate of interest;

(viii) any requirement that Bank give any notice of acceptance of this Guaranty;

(ix) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower;

(x) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty; or

(xi) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement.

(c) until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, to the extent permitted by applicable law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise).

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. Lien and Setoff. Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank, whether now existing or later arising, upon and against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank or any entity under the control of Bank of America Corporation and its successors and assigns or in transit to any of them. At any time, without further demand or notice (any such notice being expressly waived by Guarantor), Bank may set off the same or any part thereof and apply the same to any liability or obligation of Guarantor even though unmatured and regardless of the adequacy of any other collateral securing this Guaranty. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SET OFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF GUARANTOR, ARE VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

8. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

9. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, nor shall it affect Guarantor's obligations with respect to any indemnities, executed prior to Bank's receipt of such notice.

(b) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, ownership or composition or structure of Borrower, or the dissolution of Borrower.

10. Extent of Guaranty. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

11. Taxes.

(a) Guarantor represents and warrants that it is organized and resident in the United States of America. All payments by Guarantor hereunder shall be paid in full, without setoff or counterclaim or any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes. If Guarantor must make a payment under this Guaranty, Guarantor represents and warrants that it will make the payment from one of its U.S. resident

offices to Bank so that no withholding tax is imposed on the payment. Notwithstanding the foregoing, if Guarantor makes a payment under this Guaranty to which withholding tax applies or if any taxes (other than taxes on net income (i) imposed by the country or any subdivision of the country in which Bank's principal office or actual lending office is located and (ii) measured by the United States taxable income Bank would have received if all payments under or in respect of this Guaranty were exempt from taxes levied by Guarantor's country) are at any time imposed on any payments under or in respect of this Guaranty including, but not limited to, payments made pursuant to this paragraph, Guarantor shall pay all such taxes to the relevant authority in accordance with applicable law such that Bank receives the sum it would have received had no such deduction or withholding been made (or, if Guarantor cannot legally comply with the foregoing, Guarantor shall pay to Bank such additional amounts as will result in Bank receiving the sum it would have received had no such deduction or withholding been made). Further, Guarantor shall also pay to Bank, on demand, all additional amounts that Bank specifies as necessary to preserve the after-tax yield Bank would have received if such taxes had not been imposed.

(b) Guarantor shall promptly provide Bank with an original receipt or certified copy issued by the relevant authority evidencing the payment of any such amount required to be deducted or withheld.

12. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications to the Bank Agreements. Guarantor further acknowledges that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower. "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

13. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty, subject to any limitations on Guarantor's liability set forth in this Guaranty.

14. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor shall provide such financial statements and other financial information about Guarantor as Bank may request from time to time. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

15. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantors' obligations under this Guaranty are assumed by the new business entity.

16. Remedies. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder or shall breach or fail to comply with any term or provision of this Guaranty, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided in this Guaranty; and

(c) set off and apply any and all deposit accounts of Guarantor held by Bank or its affiliates against any and all obligations of Guarantor owing to Bank. The set-off may be made irrespective of whether or not Bank shall have made demand under this Guaranty, and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit accounts and without regard for the availability or adequacy of other collateral. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books after such default.

17. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as Guarantor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

18. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations, sell participations in, or assign the Indebtedness and this Guaranty, in whole or in part and may exchange information about Guarantor to any actual or potential participants or assignees.

19. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver of such rights, remedies or powers, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

20. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against

Guarantor under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

21. Representations and Warranties. When Guarantor signs this Guaranty, and until the Indebtedness is repaid in full and any commitments or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor makes the following representations and warranties:

(a) If Guarantor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

(b) This Guaranty, and any instrument or agreement required hereunder, are within Guarantor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

(c) In each state in which Guarantor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

(d) All financial and other information that has been or will be supplied to Bank is sufficiently complete to give Bank accurate knowledge of Guarantor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Guarantor. If Guarantor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

(e) There is no lawsuit, tax claim or other dispute pending or threatened against Guarantor which, if lost, would impair Guarantor's financial condition or ability to repay the Indebtedness, except as have been disclosed in writing to Bank.

(f) Guarantor is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Bank.

(g) Guarantor has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Bank.

(h) There is no event which is, or with notice or lapse of time or both would be, a default by Guarantor under this Guaranty or under any other instrument or agreement executed in connection with the Indebtedness or this Guaranty.

(i) Guarantor will not be rendered insolvent by the execution, delivery, and performance of its obligations under this Guaranty.

(j) Guarantor, if a natural person, has obtained any spousal or other consents or waivers which may be required by applicable law.

(k) All collateral pledged by Guarantor to secure the Indebtedness or this Guaranty is owned by Guarantor free of any title defects or any liens or interests of others, except those which have been approved by Bank in writing.

(l) The place of business of Greg Logistics, LLC is located at the address listed on the signature page of this Guaranty.

22. Governing Law. Except to the extent that any law of the United States may apply, this Guaranty shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of Bank under federal law.

23. Venue and Jurisdiction. Guarantor agrees that any action or suit against Bank arising out of or relating to this Guaranty shall be filed in federal court or state court located in the Governing Law State. Guarantor agrees that Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against Guarantor in a venue outside of the Governing Law State. If Bank does commence an action or suit arising out of or relating to this Guaranty, Guarantor agrees that the case may be filed in federal court or state court in the Governing Law State. Bank reserves the right to commence an action or suit in any other jurisdiction where Borrower, any Guarantor, or any collateral has any presence or is located. Guarantor consents to personal jurisdiction and venue in such forum selected by Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to Bank's acceptance of this Guaranty.

**24. Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

25. Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the parties to this Guaranty, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

26. Counterparts. This Guaranty may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Guaranty (or of any agreement or document required by this Guaranty and any amendment to this Guaranty) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Guaranty; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

27. Application of Singular and Plural. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" or "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

28. Final Agreement. This Agreement and any related security agreements or other agreements required by this Agreement constitute the entire agreement between Guarantor and Bank with respect to the subject matter of this Guaranty and with respect to the credit facilities provided by Bank to Borrower and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

[Signature Pages Follow]

The parties executed this agreement as of April 20, 2017, intending to create an instrument executed under seal.

Business Entity Guarantor:

**GREG LOGISTICS, LLC**

By: G. L. Beeche [(Seal)]

Printed Name: Gregory L. Beeche

Title: Managing Member

[Signature Page - Continuing and Unconditional Guaranty]

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

# EXHIBIT M

**Bank of America**

BORROWER: Gregory L. Beeche

GUARANTOR: Greg Beeche, Logistics, LLC

CONTINUING AND UNCONDITIONAL GUARANTY

1. The Guaranty. For valuable consideration, the undersigned (whether one or more than one "Guarantor") hereby unconditionally guarantees and promises to pay promptly to **Bank of America, N.A.**, its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of **Gregory L. Beeche** ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, derivative, foreign exchange or hedge or other similar transaction or arrangement ("Swap Obligations") now or hereafter owing from Borrower to Bank. No Guarantor will be deemed to be a guarantor of any Swap Obligation to the extent that such Guarantor is not an Eligible Contract Participant at the time such guaranty becomes effective with respect to such Swap Obligations as set forth in the Commodities Exchange Act (7 U.S.C., Sec. 1, et. seq.). The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. "Indebtedness" shall mean and includes any and all advances, debts, obligations and liabilities of Borrower, or any of them, previously, now or later made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including Swap Obligations and obligations under any deposit, treasury management or other similar transaction or arrangement, and whether any of the Borrowers may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or later becomes unenforceable.

2. Obligations Independent. The obligations under this Guaranty are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

3. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

4. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full in immediately available funds and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner vary, discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. This is a guaranty of payment and not merely a guaranty of collection. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation; and any guaranty of any indemnities, shall survive any termination of this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness later incurred by Borrower to Bank. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

5. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to:

(i) proceed against Borrower or any other person;

(ii) marshal assets or proceed against or exhaust any security held from any of the Borrowers or any other person;

(iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person;

(iv) take any other action or pursue any other remedy in Bank's power; or

(v) make any presentment or demand for performance, or give any notice of nonperformance, acceleration, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness, or give any notice of acceptance of this Guaranty, or notices of any fact that might increase Guarantor's risk.

(b) any defense to its obligations under this Guaranty based upon or arising by

reason of:

(i) any disability or other defense of Borrower or any other person;

(ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of Borrower or any other person;

(iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower;

(iv) the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor;

(v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower;

(vi) any impairment of the value of any interest in any security for the Indebtedness, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security;

(vii) any modification of the Indebtedness, in any form whatsoever, including any modification made after revocation hereof to any Indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Indebtedness, including increase or decrease of the rate of interest;

(viii) any requirement that Bank give any notice of acceptance of this Guaranty;

(ix) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower;

(x) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty; or

(xi) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement.

(c) until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, to the extent permitted by applicable law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise).

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. Lien and Setoff. Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank, whether now existing or later arising, upon and against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank or any entity under the control of Bank of America Corporation and its successors and assigns or in transit to any of them. At any time, without further demand or notice (any such notice being expressly waived by Guarantor), Bank may set off the same or any part thereof and apply the same to any liability or obligation of Guarantor even though unmatured and regardless of the adequacy of any other collateral securing this Guaranty. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SET OFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF GUARANTOR, ARE VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

8. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

9. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, nor shall it affect Guarantor's obligations with respect to any indemnities, executed prior to Bank's receipt of such notice.

(b) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, ownership or composition or structure of Borrower, or the dissolution of Borrower.

10. Extent of Guaranty. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

11. Taxes.

(a) Guarantor represents and warrants that it is organized and resident in the United States of America. All payments by Guarantor hereunder shall be paid in full, without setoff or counterclaim or any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes. If Guarantor must make a payment under this Guaranty, Guarantor represents and warrants that it will make the payment from one of its U.S. resident

offices to Bank so that no withholding tax is imposed on the payment. Notwithstanding the foregoing, if Guarantor makes a payment under this Guaranty to which withholding tax applies or if any taxes (other than taxes on net income (i) imposed by the country or any subdivision of the country in which Bank's principal office or actual lending office is located and (ii) measured by the United States taxable income Bank would have received if all payments under or in respect of this Guaranty were exempt from taxes levied by Guarantor's country) are at any time imposed on any payments under or in respect of this Guaranty including, but not limited to, payments made pursuant to this paragraph, Guarantor shall pay all such taxes to the relevant authority in accordance with applicable law such that Bank receives the sum it would have received had no such deduction or withholding been made (or, if Guarantor cannot legally comply with the foregoing, Guarantor shall pay to Bank such additional amounts as will result in Bank receiving the sum it would have received had no such deduction or withholding been made). Further, Guarantor shall also pay to Bank, on demand, all additional amounts that Bank specifies as necessary to preserve the after-tax yield Bank would have received if such taxes had not been imposed.

(b) Guarantor shall promptly provide Bank with an original receipt or certified copy issued by the relevant authority evidencing the payment of any such amount required to be deducted or withheld.

12. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications to the Bank Agreements. Guarantor further acknowledges that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower. "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

13. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty, subject to any limitations on Guarantor's liability set forth in this Guaranty.

14. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor shall provide such financial statements and other financial information about Guarantor as Bank may request from time to time. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

15. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantors' obligations under this Guaranty are assumed by the new business entity.

16. Remedies. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder or shall breach or fail to comply with any term or provision of this Guaranty, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided in this Guaranty; and

(c) set off and apply any and all deposit accounts of Guarantor held by Bank or its affiliates against any and all obligations of Guarantor owing to Bank. The set-off may be made irrespective of whether or not Bank shall have made demand under this Guaranty, and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit accounts and without regard for the availability or adequacy of other collateral. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books after such default.

17. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as Guarantor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

18. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations, sell participations in, or assign the Indebtedness and this Guaranty, in whole or in part and may exchange information about Guarantor to any actual or potential participants or assignees.

19. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver of such rights, remedies or powers, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

20. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against

Guarantor under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

21. Representations and Warranties. When Guarantor signs this Guaranty, and until the Indebtedness is repaid in full and any commitments or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor makes the following representations and warranties:

(a) If Guarantor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

(b) This Guaranty, and any instrument or agreement required hereunder, are within Guarantor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

(c) In each state in which Guarantor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

(d) All financial and other information that has been or will be supplied to Bank is sufficiently complete to give Bank accurate knowledge of Guarantor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Guarantor. If Guarantor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

(e) There is no lawsuit, tax claim or other dispute pending or threatened against Guarantor which, if lost, would impair Guarantor's financial condition or ability to repay the Indebtedness, except as have been disclosed in writing to Bank.

(f) Guarantor is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Bank.

(g) Guarantor has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Bank.

(h) There is no event which is, or with notice or lapse of time or both would be, a default by Guarantor under this Guaranty or under any other instrument or agreement executed in connection with the Indebtedness or this Guaranty.

(i) Guarantor will not be rendered insolvent by the execution, delivery, and performance of its obligations under this Guaranty.

(j) Guarantor, if a natural person, has obtained any spousal or other consents or waivers which may be required by applicable law.

(k) All collateral pledged by Guarantor to secure the Indebtedness or this Guaranty is owned by Guarantor free of any title defects or any liens or interests of others, except those which have been approved by Bank in writing.

(l) The place of business of Greg Logistics, LLC is located at the address listed on the signature page of this Guaranty.

22. Governing Law. Except to the extent that any law of the United States may apply, this Guaranty shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of Bank under federal law.

23. Venue and Jurisdiction. Guarantor agrees that any action or suit against Bank arising out of or relating to this Guaranty shall be filed in federal court or state court located in the Governing Law State. Guarantor agrees that Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against Guarantor in a venue outside of the Governing Law State. If Bank does commence an action or suit arising out of or relating to this Guaranty, Guarantor agrees that the case may be filed in federal court or state court in the Governing Law State. Bank reserves the right to commence an action or suit in any other jurisdiction where Borrower, any Guarantor, or any collateral has any presence or is located. Guarantor consents to personal jurisdiction and venue in such forum selected by Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to Bank's acceptance of this Guaranty.

**24. Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

25. Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the parties to this Guaranty, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

26. Counterparts. This Guaranty may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Guaranty (or of any agreement or document required by this Guaranty and any amendment to this Guaranty) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Guaranty; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

27. Application of Singular and Plural. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" or "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

28. Final Agreement. This Agreement and any related security agreements or other agreements required by this Agreement constitute the entire agreement between Guarantor and Bank with respect to the subject matter of this Guaranty and with respect to the credit facilities provided by Bank to Borrower and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

Doc #01-3018586.1

[Signature Pages Follow]

The parties executed this agreement as of April 20, 2017, intending to create an instrument executed under seal.

Business Entity Guarantor:

**GREG BEECHE, LOGISTICS, LLC**

By: G.L. Beeche **[(Seal)]**

Printed Name: Gregory L. Beeche

Title: Managing Member

[Signature Page - Continuing and Unconditional Guaranty]

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

# EXHIBIT N

Bank of America

BORROWER: Greg Beeche, Logistics, LLC

GUARANTOR: Gregory L. Beeche

## CONTINUING AND UNCONDITIONAL GUARANTY

1. The Guaranty. For valuable consideration, the undersigned (whether one or more than one "Guarantor") hereby unconditionally guarantees and promises to pay promptly to **Bank of America, N.A.**, its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of **Greg Beeche, Logistics, LLC** ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, derivative, foreign exchange or hedge or other similar transaction or arrangement ("Swap Obligations") now or hereafter owing from Borrower to Bank. No Guarantor will be deemed to be a guarantor of any Swap Obligation to the extent that such Guarantor is not an Eligible Contract Participant at the time such guaranty becomes effective with respect to such Swap Obligations as set forth in the Commodities Exchange Act (7 U.S.C., Sec. 1, et. seq.). The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. "Indebtedness" shall mean and includes any and all advances, debts, obligations and liabilities of Borrower, or any of them, previously, now or later made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including Swap Obligations and obligations under any deposit, treasury management or other similar transaction or arrangement, and whether any of the Borrowers may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or later becomes unenforceable.

2. Obligations Independent. The obligations under this Guaranty are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

3. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or

other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

4. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full in immediately available funds and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner vary, discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. This is a guaranty of payment and not merely a guaranty of collection. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation; and any guaranty of any indemnities, shall survive any termination of this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness later incurred by Borrower to Bank. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

5. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to:

(i) proceed against Borrower or any other person;

(ii) marshal assets or proceed against or exhaust any security held from any of the Borrowers or any other person;

(iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person;

(iv) take any other action or pursue any other remedy in Bank's power; or

(v) make any presentment or demand for performance, or give any notice of nonperformance, acceleration, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness, or give any notice of acceptance of this Guaranty, or notices of any fact that might increase Guarantor's risk.

(b) any defense to its obligations under this Guaranty based upon or arising by reason of:

(i) any disability or other defense of Borrower or any other person;

(ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of Borrower or any other person;

(iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower;

(iv) the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor;

(v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower;

(vi) any impairment of the value of any interest in any security for the Indebtedness, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security;

(vii) any modification of the Indebtedness, in any form whatsoever, including any modification made after revocation hereof to any Indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Indebtedness, including increase or decrease of the rate of interest;

(viii) any requirement that Bank give any notice of acceptance of this Guaranty;

(ix) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower;

(x) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty; or

(xi) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement.

(c) until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, to the extent permitted by applicable law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise).

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

6. Lien and Setoff. Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank, whether now existing or later arising, upon and against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank or any entity under the control of Bank of America Corporation and its successors and assigns or in transit to any of them. At any time, without further demand or notice (any such notice being expressly waived by Guarantor), Bank may set off the same or any part thereof and apply the same to any liability or obligation of Guarantor even though unmatured and regardless of the adequacy of any other collateral securing this Guaranty. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SET OFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF GUARANTOR, ARE VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

7. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

8. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, nor shall it affect Guarantor's obligations with respect to any indemnities, executed prior to Bank's receipt of such notice.

(b) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, ownership or composition or structure of Borrower, or the dissolution of Borrower.

9. Extent of Guaranty. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

10. Taxes.

(a) Guarantor represents and warrants that it is organized and resident in the United States of America. All payments by Guarantor hereunder shall be paid in full, without setoff or counterclaim or any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes. If Guarantor must make a payment under this Guaranty, Guarantor represents and warrants that it will make the payment from one of its U.S. resident

offices to Bank so that no withholding tax is imposed on the payment. Notwithstanding the foregoing, if Guarantor makes a payment under this Guaranty to which withholding tax applies or if any taxes (other than taxes on net income (i) imposed by the country or any subdivision of the country in which Bank's principal office or actual lending office is located and (ii) measured by the United States taxable income Bank would have received if all payments under or in respect of this Guaranty were exempt from taxes levied by Guarantor's country) are at any time imposed on any payments under or in respect of this Guaranty including, but not limited to, payments made pursuant to this paragraph, Guarantor shall pay all such taxes to the relevant authority in accordance with applicable law such that Bank receives the sum it would have received had no such deduction or withholding been made (or, if Guarantor cannot legally comply with the foregoing, Guarantor shall pay to Bank such additional amounts as will result in Bank receiving the sum it would have received had no such deduction or withholding been made). Further, Guarantor shall also pay to Bank, on demand, all additional amounts that Bank specifies as necessary to preserve the after-tax yield Bank would have received if such taxes had not been imposed.

(b) Guarantor shall promptly provide Bank with an original receipt or certified copy issued by the relevant authority evidencing the payment of any such amount required to be deducted or withheld.

11. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications to the Bank Agreements. Guarantor further acknowledges that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower. "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

12. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty, subject to any limitations on Guarantor's liability set forth in this Guaranty.

13. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor shall provide such financial statements and other financial information about Guarantor as Bank may request from time to time. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

14. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantors' obligations under this Guaranty are assumed by the new business entity.

15. Remedies. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder or shall breach or fail to comply with any term or provision of this Guaranty, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided in this Guaranty; and

(c) set off and apply any and all deposit accounts of Guarantor held by Bank or its affiliates against any and all obligations of Guarantor owing to Bank. The set-off may be made irrespective of whether or not Bank shall have made demand under this Guaranty, and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit accounts and without regard for the availability or adequacy of other collateral. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books after such default.

16. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as Guarantor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

17. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations, sell participations in, or assign the Indebtedness and this Guaranty, in whole or in part and may exchange information about Guarantor to any actual or potential participants or assignees.

18. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver of such rights, remedies or powers, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

19. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against

Guarantor under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

20. Representations and Warranties. When Guarantor signs this Guaranty, and until the Indebtedness is repaid in full and any commitments or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor makes the following representations and warranties:

(a) If Guarantor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

(b) This Guaranty, and any instrument or agreement required hereunder, are within Guarantor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

(c) In each state in which Guarantor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

(d) All financial and other information that has been or will be supplied to Bank is sufficiently complete to give Bank accurate knowledge of Guarantor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Guarantor. If Guarantor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

(e) There is no lawsuit, tax claim or other dispute pending or threatened against Guarantor which, if lost, would impair Guarantor's financial condition or ability to repay the Indebtedness, except as have been disclosed in writing to Bank.

(f) Guarantor is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Bank.

(g) Guarantor has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Bank.

(h) There is no event which is, or with notice or lapse of time or both would be, a default by Guarantor under this Guaranty or under any other instrument or agreement executed in connection with the Indebtedness or this Guaranty.

(i) Guarantor will not be rendered insolvent by the execution, delivery, and performance of its obligations under this Guaranty.

(j) Guarantor, if a natural person, has obtained any spousal or other consents or waivers which may be required by applicable law.

(k) All collateral pledged by Guarantor to secure the Indebtedness or this Guaranty is owned by Guarantor free of any title defects or any liens or interests of others, except those which have been approved by Bank in writing.

(l) The place of business of Greg Logistics, LLC is located at the address listed on the signature page of this Guaranty.

21. Governing Law. Except to the extent that any law of the United States may apply, this Guaranty shall be governed and interpreted according to the laws of New York (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of Bank under federal law.

22. Venue and Jurisdiction. Guarantor agrees that any action or suit against Bank arising out of or relating to this Guaranty shall be filed in federal court or state court located in the Governing Law State. Guarantor agrees that Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against Guarantor in a venue outside of the Governing Law State. If Bank does commence an action or suit arising out of or relating to this Guaranty, Guarantor agrees that the case may be filed in federal court or state court in the Governing Law State. Bank reserves the right to commence an action or suit in any other jurisdiction where Borrower, any Guarantor, or any collateral has any presence or is located. Guarantor consents to personal jurisdiction and venue in such forum selected by Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to Bank's acceptance of this Guaranty.

**23. Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

24. Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the parties to this Guaranty, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

25. Counterparts. This Guaranty may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Guaranty (or of any agreement or document required by this Guaranty and any amendment to this Guaranty) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Guaranty; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

26. Application of Singular and Plural. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" or "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

27. Final Agreement. This Agreement and any related security agreements or other agreements required by this Agreement constitute the entire agreement between Guarantor and Bank with respect to the subject matter of this Guaranty and with respect to the credit facilities provided by Bank to Borrower and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

[Signature Pages Follow]

The parties executed this agreement as of April 20, 2017, intending to create an instrument executed under seal.

Individual Guarantor:

**GREGORY L. BEECHE**

G. L. Beeche

[Signature Page - Continuing and Unconditional Guaranty]

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:
Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

# EXHIBIT O

**BILL OF SALE**
**Offering #BOA-02-052025**

This Bill of Sale is by and between Bank of America, N. A. ("Seller") and McCormick 103, LLC ("Buyer"). For value received, Seller does hereby sell, assign and convey to Buyer, all right, title and interest of Seller in and to those certain loans, judgments or evidences of debt described in the Asset Schedule attached hereto and made a part hereof.

This Bill of Sale is executed "AS IS", "WHERE IS", "WITH ALL FAULTS", without recourse, and without representation of or warranty of title, collectability, or otherwise, express or implied, oral or written.

EXECUTED on the date below-indicated to be effective May 21, 2025.

**BANK OF AMERICA, N. A.**

By: ______________________
Tamara J. Laughinghouse
Director

ACCEPTED and AGREED:

**MCCORMICK 103, LLC**

By: ______________________
Name: Sean Schroeder
Title: Managing Director

[*Notary Acknowledgments on Following Page*]

313378812v.1

STATE OF NORTH CAROLINA )
)
COUNTY OF MECKLENBURG )

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction, that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

Peggy Ardrey
NOTARY PUBLIC

PEGGY ARDREY
NOTARY PUBLIC
MECKLENBURG COUNTY, NC
MY COMMISSION EXPIRES JULY 30, 2027

STATE OF Maryland )
)
COUNTY OF Baltimore )

I CERTIFY that on June 6, 2025, Sean Schroeder personally came before me and this person acknowledged to my satisfaction, that: (a) this person signed, sealed and delivered the attached document as Managing Director of McCormick 103, LLC named in this document; and (b) this document was signed and made by McCormick 103, LLC as its voluntary act and deed.

Brandelyn Marie Haynes
NOTARY PUBLIC

BRANDELYN MARIE HAYNES
Notary Public
Baltimore County, Maryland
My Commission Expires 10/26/2026

313378812v.1

**Asset Schedule**
**Offering #BOA-02-052025**

Subject to that Loan Sale Agreement dated as of May 21, 2025, between Seller and Buyer, Seller's right, title and interest in the following:

Pool 1 – Greg Beeche, Logistics, LLC

1. Loan Agreement dated April 20, 2017 by and between Greg Beeche, Logistics, LLC ("Borrower Logistics") and Bank of America, N.A. ("Seller"), evidencing a $4,000,000.00 line of credit and $1,350,000.00 term loan;

2. Security Agreement (Multiple Use) dated April 13, 2017 by and between Seller, Borrower Logistics and Greg Logistics, LLC ("Guarantor LLC");

3. Continuing and Unconditional Guaranty dated April 20, 2017 of Gregory L. Beeche ("Guarantor Gregory", and, together with Guarantor LLC, the "Logistics Guarantors") in favor of Seller regarding indebtedness of Borrower Logistics;

4. Continuing and Unconditional Guaranty dated April 20, 2017 of Guarantor LLC in favor of Seller regarding indebtedness of Borrower Logistics;

5. UCC-1 Financing Statement 201704208164063 filed April 20, 2017 with the New York Department of State naming Borrower Logistics as debtor, and Seller as secured party (the "Logistics UCC");

6. UCC-3 UCC Financing Statement Amendment 202110256709994 filed with the New York Department of State October 25, 2021 regarding the Logistics UCC;

7. UCC-1 Financing Statement 201704208164087 filed April 20, 2017 with the New York Department of State naming Guarantor LLC as debtor, and Seller as secured party (the "LLC UCC");

8. UCC-3 UCC Financing Statement Amendment 202110256710101 filed with the New York Department of State October 25, 2021 regarding the LLC UCC;

9. Amendment to Loan Agreement dated November 8, 2017 by and between Seller and Borrower Logistics;

10. Second Amendment to Loan Agreement dated September 25, 2019 by and between Seller and Borrower Logistics;

11. Third Amendment to Loan Agreement dated March 11, 2020 by and between Seller and Borrower Logistics, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Logistics Guarantors;

12. Payment Deferral Letter dated May 1, 2020 from Seller to Borrower Logistics regarding term loan;

13. Payment Deferral Letter dated May 1, 2020 from Seller to Borrower Logistics regarding line of credit;

14. Amendment No. 4 to Loan Agreement dated July 6, 2021 by and between Seller and Borrower Logistics, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Logistics Guarantors and Guarantor Gregory as mortgagor;

15. Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated July 6, 2021 granted by Guarantor Gregory, as mortgagor, to Seller, as mortgagee, filed of record on September 6, 2024 in the Official Records of Saratoga County, New York as Instrument # 2024022252;

16. Amendment No. 5 to Loan Agreement dated May 31, 2023 by and between Seller and Borrower Logistics, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Logistics Guarantors and Guarantor Gregory as mortgagor;

17. Transition of Interest Rate Letter dated October 7, 2024 from Seller to Borrower Logistics;

18. Implementation of Default Interest Rate Letter dated May 15, 2025 from Chapman and Cutler LLP, as counsel to Seller, to Borrower Logistics;

19. Construction Loan Agreement dated April 20, 2017 by and between Seller and Guarantor Gregory, in the original principal amount of $1,150,000.00, as filed of record May 15, 2017 in the Official Records of Saratoga County, New York as Item # 2017014779;

20. Continuing and Unconditional Guaranty dated April 20, 2017 of Guarantor LLC in favor Seller regarding indebtedness of Guarantor Gregory;

21. Continuing and Unconditional Guaranty dated April 20, 2017 of Borrower Logistics in favor Seller regarding indebtedness of Guarantor Gregory;

22. Construction Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 granted by Guarantor Gregory, as mortgagor, to Seller, as mortgagee filed of record on May 15, 2017 in the Official Records of Saratoga County, New York as Instrument #2017014777 (the "Beeche Mortgage");

23. Chicago Title Insurance Company Loan Policy of Title Insurance No. 7230732-211125969 issued April 20, 2017 to Seller, its successors and or assigns, as insured, insuring the Beeche Mortgage;

24. Assignment of Leases and Rents dated April 20, 2017 granted by Guarantor Gregory, as assignor, to Seller as assignee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York as Instrument #2017014778;

25. Amendment to Construction Loan Agreement dated November 8, 2017 by and between Seller and Guarantor Gregory, with Consent and Reaffirmation of Guarantors and Pledgors executed by Borrower Logistics and Guarantor LLC (together, the "Beeche Guarantors");

26. Second Amendment to Construction Loan Agreement effective as of April 1, 2018 by and between Seller and Guarantor Gregory, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Beeche Guarantors;

27. Third Amendment to Construction Loan Agreement effective as of October 11, 2018 by and between Seller and Guarantor Gregory, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Beeche Guarantors;

28. Fourth Amendment to Construction Loan Agreement effective as of September 25, 2019 by and between Seller and Guarantor Gregory;

29. Payment Deferral Letter dated May 2, 2020 from Seller to Guarantor Gregory;

30. Amendment No. 5 to Loan Agreement dated May 31, 2023 by and between Seller and Guarantor Gregory, with Consent and Reaffirmation of Guarantors and Pledgors executed by the Beeche Guarantors;

31. Loan Agreement dated as of April 20, 2017 by and between Guarantor Gregory and Seller in the original principal amount of $3,600,000.00;

32. Environmental Indemnity Agreement dated April 20, 2017 granted by Guarantor Gregory, as borrower and the Beeche Guarantors, as guarantors, in favor of Seller;

33. Amendment to Loan Agreement dated as of November 8, 2017 by and between Guarantor Gregory and Seller, with Consent and Reaffirmation of Guarantors and Pledgors, executed by the Beeche Guarantors;

34. Assignment of Leases and Rents dated April 20, 2017 from Guarantor Gregory, as assignor, to Seller, as assignee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York as Instrument #2017014775;

35. Mortgage dated November 4, 2008 granted by Guarantor Gregory, as mortgagor, to HSBC Bank USA National Association ("HSBC"), as mortgagee, filed of record on November 6, 2008 in the Official Records of Saratoga County, New York as Instrument #2008037652;

36. Assignment of Mortgage Without Covenant dated March 18, 2013 of HSBC, as assignor, to First Niagara Bank, National Association ("FNB"), as assignee, filed of record on June 5, 2013 in the Official Records of Saratoga County, New York, as Instrument #2013024019;

37. Assignment of Mortgage dated April 19, 2017 from Keybank National Association, as successor by merger to FNB ("KeyBank"), as assignor, to Seller, as assignee filed of record on May 15, 2017 in the Official Records of Saratoga County, New York, as Instrument #2017014771;

38. Note Endorsement Allonge dated April 19, 2017 from KeyBank to Seller in the original principal amount of $696,991.77;

39. Mortgage and Security Agreement (with Assignment of Leases and Rents) dated November 4, 2008 granted by Guarantor Gregory, as mortgagor, to Empire State Certified Development Corporation ("Empire"), as mortgagee, filed of record on November 10, 2008 in the Official Records of Saratoga County, New York, as Instrument #2008038022;

40. Assignment of Mortgage dated November 4, 2008 from Empire, as assignor, to U.S. Small Business Administration ("SBA"), as assignee, filed of record on November 10, 2008 in the Official Records of Saratoga County, New York, as Instrument #2008038023;

41. Assignment of Mortgage dated April 19, 2017 from SBA, as assignor, to Bank of America, as assignee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York, as Instrument #2017014772;

42. Mortgage and Security Agreement dated December 12, 2014 granted by Guarantor Gregory, as mortgagor, to FNB, as mortgagee, filed of record on February 6, 2015 in the Official Records of Saratoga County, New York, as Instrument #2015003570;

43. Mortgage Reduction Certificate dated February 12, 2016 of FNB, filed of record on March 1, 2016 in the Official Records of Saratoga County, New York, as Instrument #2016006284;

44. Note Endorsement Allonge dated April 19, 2017 from KeyBank to Seller in the original principal amount of $1,384,242.00;

45. Assignment of Mortgage dated April 19, 2017 from Keybank, as assignor, to Seller, as assignee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York, as Instrument #2017014770;

46. Mortgage and Security Agreement (with Assignment of Leases and Rents) dated December 12, 2014 granted by Guarantor Gregory, as mortgagor, to NYBDC Local Development Corporation ("NYBDC"), as mortgagee, filed of record on February 6, 2015 in the Official Records of Saratoga County, New York, as Instrument #2015003572;

47. Assignment of Mortgage dated February 12, 2016 from NYBDC, as assignor, to Empire, as assignee, filed of record on March 1, 2016 in the Official Records of Saratoga County, New York, as Instrument #2016006281;

48. Mortgage Reduction Certificate dated February 12, 2016 of NYBDC, filed of record on March 1, 2016 in the Official Records of Saratoga County, New York, as Instrument #2016006285;

49. Assignment of Mortgage dated April 19, 2017 from SBA, as assignor, to Bank of America, as assignee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York, as Instrument #2017014773;

50. Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 granted by Guarantor Gregory, as mortgagor, to Seller, as mortgagee, filed of record on May 15, 2017 in the in the Official Records of Saratoga County, New York, as Instrument #2017014774;

51. Mortgage Consolidation, Modification and Extension Agreement, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 granted by Guarantor Gregory, as mortgagor, to Seller, as mortgagee, filed of record on May 15, 2017 in the Official Records of Saratoga County, New York, as Instrument #2017014776 (the "Consolidated Mortgages");

52. Chicago Title Insurance Company ALTA Loan Policy of Title Insurance No. 7230732-211126091 issued April 20, 2017 to Seller, its successors and or assigns, as insured, insuring the Consolidated Mortgages;

53. Payment Deferral Letter dated May 2, 2020 from Seller to Guarantor Gregory;

54. UCC-1 Financing Statement filed September 16, 2024 with Official Records of Saratoga County, New York, as Instrument #2024022936, naming Guarantor Greg as debtor, and Seller as secured party;

55. Demand Letter dated May 17, 2024 from Chapman and Cutler LLP, as counsel to Seller, to Borrower Logistics; and

56. Default and Reservation of Rights letter dated May 5, 2025 from Chapman and Cutler LLP, as counsel to Seller, to Borrower Logistics.

# Exhibit P

SARATOGA COUNTY – STATE OF NEW YORK
SARATOGA COUNTY CLERK
CRAIG A. HAYNER
40 MCMASTER STREET, BALLSTON SPA, NY 12020

**COUNTY CLERK'S RECORDING PAGE**
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2025015799

Receipt#: 2025212583295
Clerk: MW
Rec Date: 06/17/2025 10:55:05 AM
Doc Grp: R
Descrip: ASSIGNMENT OF MORTGAGE
Num Pgs: 7

Party1: BANK OF AMERICA NA
Party2: MCCORMICK 103 LLC

Recording:

| | |
|---|---|
| Pages | 30.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.50 |
| Markoffs | 12.50 |
| Total: | 88.00 |

**** NOTICE: THIS IS NOT A BILL ****

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Craig A. Hayner

Saratoga County Clerk

2025015799
06/17/2025 10:55:05 AM
7 Pages RECORDED
ASSIGNMENT OF MORTGAGE
Saratoga County Clerk

Return Recorded Copy To:

Patricia Kreusser, Paralegal
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

**ASSIGNMENT OF MORTGAGE CONSOLIDATION, MODIFICATION AND EXTENSION AGREEMENT, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

STATE OF NEW YORK §
§
COUNTY OF SARATOGA §

**Holder of Debt and Lien ("Holder"):** BANK OF AMERICA, N.A.
Asset Sales Management Group
Attn: Tamara J. Laughinghouse
100 N. Tryon Street
NC1-007-31-05
Charlotte, NC 28255

**Assignee:** MCCORMICK 103, LLC
Attn. Sean Schroeder
Executive Plaza II, Suite 902
11350 McCormick Road
Hunt Valley, MD 21031

**Lien:** The mortgages described in Schedule 1 attached hereto and made a part hereof, granted by Gregory L. Beeche, as mortgagor, and filed of record with the Clerk of the County of Saratoga, State of New York in respect of certain indebtedness described therein (the "**Debt**") and currently held by Holder.

The property subject to Lien (the "**Property**") is described in Exhibit A attached hereto and incorporated herein for all purposes.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

As used herein, Lien shall include all liens relating to the Debt held by Holder against the Property, as renewed, extended and/or modified.

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Holder hereby transfers and assigns the Debt and Lien to Assignee as of May 21, 2025, such assignment is made **WITHOUT RECOURSE, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN.**

IN WITNESS WHEREOF, this document is executed as of 2 day of June 2025.

WITNESSES:

Print Name: Mirth ST. Suste

Print Name: Gregorne Anthony Jr.

BANK OF AMERICA, N.A.

By: ______________________
Tamara J. Laughinghouse
Director

**STATE OF NORTH CAROLINA** §
§
**COUNTY OF MECKLENBURG** §

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

NOTARY PUBLIC

PEGGY ARDREY
MY COMMISSION EXPIRES
NOTARY PUBLIC
JULY 30, 2027
MECKLENBURG COUNTY, NC

# EXHIBIT A

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier, thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 463; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street, thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hemberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hemberg; thence along the same South 10 degrees 13' 00" West, 188 62 feet to the point or place of beginning

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon,

Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast corner of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1957 and recorded in the Saratoga County Clerk's Office November 13, 1957; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest corner of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188 26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly corner of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly corner of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly corner of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

Street Address of Property
356 Hudson River Road
Waterford, New York 12188

As may be affected by instruments of record.

SCHEDULE 1

(a) Mortgage dated November 4, 2008, made by Gregory L. Beeche to HSBC Bank USA, National Association, in the principal sum of $950,000.00, and recorded in the Office of the Saratoga County Clerk on November 6, 2008, as Instrument # 2008037652;

which said Mortgage (a) was assigned by instrument of assignment dated March 18, 2013, made by HSBC Bank USA, National Association to First Niagara Bank, National Association and recorded in the Office of the Saratoga County Clerk on June 5, 2013, as Instrument # 2013024019;

which said Mortgage (a) was further assigned by instrument of assignment dated April 19, 2017, made by KeyBank National Association, as successor by merger to First Niagara Bank, N.A., to Bank of America, N.A., and recorded in the Office of the Saratoga County Clerk on May 15, 2017, as Instrument # 2017014771;

(b) Mortgage and Security Agreement (with Assignment of Leases and Rents) dated November 4, 2008, made by Gregory L. Beeche to Empire State Certified Development Corporation, in the principal sum of $783,000.00, and recorded in the Office of the Saratoga County Clerk on November 10, 2008, as Instrument # 2008038022;

which said Mortgage (b) was assigned by instrument of assignment dated November 4, 2008 made by Empire State Certified Development Corporation to the U.S. Small Business Administration and recorded in the Office of the Saratoga County Clerk on November 10, 2008, as Instrument # 2008038023;

which said Mortgage (b) was further assigned by instrument of assignment dated April 19, 2017 made by U.S. Small Business Administration., to Bank of America, and recorded in the Office of the Saratoga County Clerk on May 15, 2017, as Instrument # 2017014772;

(c) Mortgage and Security Agreement dated December 12, 2014, made by Gregory L. Beeche to First Niagara Bank, N.A., in the principal sum of $1,448,575.00, and recorded in the Office of the Saratoga County Clerk on February 6, 2015, as Instrument # 2015003570;

which said Mortgage (c) was reduced by a Mortgage Reduction Certificate dated February 12, 2015 of First Niagara Bank, N.A. to the sum of $1,422,600.00, and recorded in the Office of the Saratoga County Clerk on March 1, 2016 as Instrument # 2016006284;

which said Mortgage (c) was assigned by instrument of assignment dated April 19, 2017 made by KeyBank National Association, as successor by merger to First Niagara Bank, N.A., to Bank of America, N.A., and recorded in the Office of the Saratoga County Clerk on May 15, 2017, as Instrument # 2017014770;

(d) Mortgage and Security Agreement (with Assignment of Leases and Rents) dated December 12, 2014, made by Gregory L. Beeche, to NYBDC Local Development Corporation, in the principal sum of $1,346,000.00, and recorded in the Office of the Saratoga County Clerk on February 6, 2015, as Instrument # 2015003572;

which said Mortgage (d) was assigned by instrument of assignment dated February 12, 2016 made by NYBDC Local Development Corporation to the U.S. Small Business Administration by and through its duly qualified certified development company, Empire State Certified Development Corporation, and recorded in the Office of the Saratoga County Clerk on March 1, 2016, as Instrument # 2016006281;

which said Mortgage (d) was reduced by a Mortgage Reduction Certificate dated February 12, 2015 of First Niagara Bank, N.A. to the sum of $952,000.00, and recorded in the Office of the Saratoga County Clerk on March 1, 2016 as Instrument # 2016006285;

which said Mortgage (d) was further assigned by instrument of assignment dated April 19, 2017 made by U.S. Small Business Administration, to Bank of America, and recorded in the Office of the Saratoga County Clerk on May 15, 2017, as Instrument # 2017014773;

(e) Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 made by Gregory L. Beeche to Bank of America. N.A. in the principal sum of $45,412.84, and recorded in the Office of the Saratoga County Clerk on May 15, 2017 as Instrument # 2017014774: and

(f) Mortgage Consolidation, Modification and Extension Agreement, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017, made by Gregory L. Beeche to Bank of America, N.A., and recorded in the Office of the Saratoga County Clerk on May 15, 2017 as Instrument # 2017014776, and consolidating Mortgages (a), (b), (c), (d), and (e) to form a single lien of $3,600,000.00.

# EXHIBIT Q

# SARATOGA COUNTY – STATE OF NEW YORK

SARATOGA COUNTY CLERK
CRAIG A. HAYNER
40 MCMASTER STREET, BALLSTON SPA, NY 12020

## COUNTY CLERK'S RECORDING PAGE

***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2025015802

Receipt#: 2025212583295
Clerk: MW
Rec Date: 06/17/2025 10:55:05 AM
Doc Grp: R
Descrip: ASSIGNMENT OF MORTGAGE
Num Pgs: 5

Party1: BANK OF AMERICA NA
Party2: MCCORMICK 103 LLC

Recording:

| | |
|---|---|
| Pages | 20.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.50 |
| Markoffs | 0.50 |
| Total: | 66.00 |

**** NOTICE: THIS IS NOT A BILL ****

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Craig A. Hayner
Saratoga County Clerk

Return Recorded Copy To:

Patricia Kreusser, Paralegal
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

2025015802
06/17/2025 10:55:05 AM
5 Pages RECORDED
ASSIGNMENT OF MORTGAGE
Saratoga County Clerk

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

STATE OF NEW YORK §
§
COUNTY OF SARATOGA §

**Holder of Debt and Lien ("Holder"):** BANK OF AMERICA, N.A.
Asset Sales Management Group
Attn: Tamara J. Laughinghouse
100 N. Tryon Street
NC1-007-31-05
Charlotte, NC 28255

**Assignee:** MCCORMICK 103, LLC
Attn. Sean Schroeder
Executive Plaza II, Suite 902
11350 McCormick Road
Hunt Valley, MD 21031

**Lien:** That certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated July 6, 2021, granted by Gregory L. Beeche, as mortgagor, to Bank of America, N.A., as mortgagee, filed of record on September 6, 2024 with the Official Records of Saratoga County, New York as Instrument 2024022252, in respect of certain indebtedness described therein (the "**Debt**") and currently held by Holder.

The property subject to Lien (the "**Property**") is described in Exhibit A attached hereto and incorporated herein for all purposes.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

As used herein, Lien shall include all liens relating to the Debt held by Holder against the Property, as renewed, extended and/or modified.

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Holder hereby transfers and assigns the Debt and Lien to Assignee as of May 21, 2025, such assignment is made **WITHOUT RECOURSE, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN**.



313871246v.1

IN WITNESS WHEREOF, this document is executed on June 2, 2025.

WITNESSES:

Print Name: Mirth St. Juste

Print Name: Gerome Anthony Jr.

BANK OF AMERICA, N.A.

By: ______________________
Tamara J. Laughinghouse
Director

**STATE OF NORTH CAROLINA** §
§
**COUNTY OF MECKLENBURG** §

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

______________________
NOTARY PUBLIC

PEGGY ARDREY
NOTARY PUBLIC
MECKLENBURG COUNTY, NC
MY COMMISSION EXPIRES JULY 30, 2027

Exhibit A

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being

where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast comer of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest comer of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly comer of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly comer of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly comer of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>

356 Hudson River Road
Waterford, New York 12188

As may be affected by instruments of record.

# EXHIBIT R

**SARATOGA COUNTY – STATE OF NEW YORK**
**SARATOGA COUNTY CLERK**
**CRAIG A. HAYNER**
**40 MCMASTER STREET, BALLSTON SPA, NY 12020**

**COUNTY CLERK'S RECORDING PAGE**
*****THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH*****

INSTRUMENT #: 2025015802

Receipt#: 2025212583295
Clerk: MW
Rec Date: 06/17/2025 10:55:05 AM
Doc Grp: R
Descrip: ASSIGNMENT OF MORTGAGE
Num Pgs: 5

Party1: BANK OF AMERICA NA
Party2: MCCORMICK 103 LLC

Recording:

| | |
|---|---|
| Pages | 20.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.50 |
| Markoffs | 0.50 |
| Total: | 66.00 |

**** NOTICE: THIS IS NOT A BILL ****

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

Craig A. Hayner
Saratoga County Clerk

Return Recorded Copy To:

2025015802
06/17/2025 10:55:05 AM
5 Pages RECORDED
ASSIGNMENT OF MORTGAGE
Saratoga County Clerk

Patricia Kreusser, Paralegal
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

**ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

STATE OF NEW YORK §
§
COUNTY OF SARATOGA §

**Holder of Debt and Lien ("Holder"):** BANK OF AMERICA, N.A.
Asset Sales Management Group
Attn: Tamara J. Laughinghouse
100 N. Tryon Street
NC1-007-31-05
Charlotte, NC 28255

**Assignee:** MCCORMICK 103, LLC
Attn. Sean Schroeder
Executive Plaza II, Suite 902
11350 McCormick Road
Hunt Valley, MD 21031

**Lien:** That certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated July 6, 2021, granted by Gregory L. Beeche, as mortgagor, to Bank of America, N.A., as mortgagee, filed of record on September 6, 2024 with the Official Records of Saratoga County, New York as Instrument 2024022252, in respect of certain indebtedness described therein (the "**Debt**") and currently held by Holder.

The property subject to Lien (the "**Property**") is described in Exhibit A attached hereto and incorporated herein for all purposes.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

As used herein, Lien shall include all liens relating to the Debt held by Holder against the Property, as renewed, extended and/or modified.

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Holder hereby transfers and assigns the Debt and Lien to Assignee as of May 21, 2025, such assignment is made **WITHOUT RECOURSE, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN.**



313871246v.1

IN WITNESS WHEREOF, this document is executed on June 2, 2025.

WITNESSES:

Print Name: Mirth ST. Suste

Print Name: Gerome Anthony Jr.

BANK OF AMERICA, N.A.

By: ______________________
Tamara J. Laughinghouse
Director

**STATE OF NORTH CAROLINA** §
§
**COUNTY OF MECKLENBURG** §

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

______________________
NOTARY PUBLIC

PEGGY ARDREY
MY COMMISSION EXPIRES
NOTARY
PUBLIC
JULY 30, 2027
MECKLENBURG COUNTY, NC

Exhibit A

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being

where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast comer of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest comer of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly comer of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly comer of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly comer of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>

356 Hudson River Road
Waterford, New York 12188

As may be affected by instruments of record.

# Exhibit S

# SARATOGA COUNTY – STATE OF NEW YORK

SARATOGA COUNTY CLERK
CRAIG A. HAYNER
40 MCMASTER STREET, BALLSTON SPA, NY 12020

COUNTY CLERK'S RECORDING PAGE
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

INSTRUMENT #: 2025015801

Receipt#: 2025212583295
Clerk: MW
Rec Date: 06/17/2025 10:55:05 AM
Doc Grp: R
Descrip: ASSIGNMENT OF RENT/ASSIGNMENT
Num Pgs: 5

Party1: BANK OF AMERICA NA
Party2: MCCORMICK 103 LLC

Recording:

| | |
|---|---|
| Pages | 20.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.50 |
| Markoffs | 0.50 |
| Total: | 66.00 |

**** NOTICE: THIS IS NOT A BILL ****

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Craig A. Hayner
Saratoga County Clerk

2025015801
06/17/2025 10:55:05 AM
5 Pages RECORDED
ASSIGNMENT OF RENT/ASSIGNME
Saratoga County Clerk

Return Recorded Copy To:

Patricia Kreusser, Paralegal
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

STATE OF NEW YORK §
§
COUNTY OF SARATOGA §

**Holder of Debt and Lien ("Holder"):** BANK OF AMERICA, N.A.
Asset Sales Management Group
Attn: Tamara J. Laughinghouse
100 N. Tryon Street
NC1-007-31-05
Charlotte, NC 28255

**Assignee:** MCCORMICK 103, LLC
Attn. Sean Schroeder
Executive Plaza II, Suite 902
11350 McCormick Road
Hunt Valley, MD 21031

**Lien:** That certain Assignment of Leases and Rents dated April 20, 2017, granted by Gregory L. Beeche, as assignor, to Bank of America, N.A., as assignee, filed of record on May 15, 2017 with the Official Records of Saratoga County, New York as Instrument 2017014775, in respect of certain indebtedness described therein (the "**Debt**") and currently held by Holder.

The property subject to Lien (the "**Property**") is described in Exhibit A attached hereto and incorporated herein for all purposes.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

As used herein, Lien shall include all liens relating to the Debt held by Holder against the Property, as renewed, extended and/or modified.

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Holder hereby transfers and assigns the Debt and Lien to Assignee as of May 21, 2025, such assignment is made **WITHOUT RECOURSE, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN.**

IN WITNESS WHEREOF, this document is executed on June 2, 2025.

WITNESSES:

Print Name: Mirth ST. Juste

Print Name: George Anthony Jr.

BANK OF AMERICA, N.A.

By: ______________________
Tamara J. Laughinghouse
Director

**STATE OF NORTH CAROLINA** §
§
**COUNTY OF MECKLENBURG** §

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

______________________
NOTARY PUBLIC

PEGGY ARDREY
MY COMMISSION EXPIRES
NOTARY PUBLIC
JULY 30, 2027
MECKLENBURG COUNTY, NC

Exhibit A

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hemberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being

where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast corner of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest corner of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly corner of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly corner of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly corner of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>

356 Hudson River Road
Waterford, New York 12188

As may be affected by instruments of record.

# EXHIBIT T

# SARATOGA COUNTY – STATE OF NEW YORK

**SARATOGA COUNTY CLERK**
**CRAIG A. HAYNER**
**40 MCMASTER STREET, BALLSTON SPA, NY 12020**

**COUNTY CLERK'S RECORDING PAGE**
*****THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH*****

INSTRUMENT #: 2025015800

Receipt#: 2025212583295
Clerk: MW
Rec Date: 06/17/2025 10:55:05 AM
Doc Grp: R
Descrip: ASSIGNMENT OF MORTGAGE
Num Pgs: 5

Party1: BANK OF AMERICA NA
Party2: MCCORMICK 103 LLC

Recording:

| | |
|---|---|
| Pages | 20.00 |
| Cover Sheet Fee | 5.00 |
| Recording Fee | 20.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Names | 0.50 |
| Markoffs | 0.50 |
| Total: | 66.00 |

**** NOTICE: THIS IS NOT A BILL ****

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

This page constitutes the Clerk's endorsement, required by section 316-a (5) & 319 of the Real Property Law of the State of New York with a stamped signature underneath.

Craig A. Hayner

Saratoga County Clerk

2025015800
06/17/2025 10:55:05 AM
5 Pages RECORDED
ASSIGNMENT OF MORTGAGE
Saratoga County Clerk

Return Recorded Copy To:

Patricia Kreusser, Paralegal
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

**ASSIGNMENT OF CONSTRUCTION LOAN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

STATE OF NEW YORK §
§
COUNTY OF SARATOGA §

**Holder of Debt and Lien ("Holder"):** BANK OF AMERICA, N.A.
Asset Sales Management Group
Attn: Tamara J. Laughinghouse
100 N. Tryon Street
NC1-007-31-05
Charlotte, NC 28255

**Assignee:** MCCORMICK 103, LLC
Attn. Sean Schroeder
Executive Plaza II, Suite 902
11350 McCormick Road
Hunt Valley, MD 21031

**Lien:** That certain Construction Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017, granted by Gregory L. Beeche, as mortgagor, to Bank of America, N.A., as mortgagee, filed of record on May 15, 2017 with the Official Records of Saratoga County, New York as Instrument 2017014777, in respect of certain indebtedness described therein (the "**Debt**") and currently held by Holder.

The property subject to Lien (the "**Property**") is described in Exhibit A attached hereto and incorporated herein for all purposes.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

As used herein, Lien shall include all liens relating to the Debt held by Holder against the Property, as renewed, extended and/or modified.

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Holder hereby transfers and assigns the Debt and Lien to Assignee as of May 21, 2025, such assignment is made **WITHOUT RECOURSE, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN.**

IN WITNESS WHEREOF, this document is executed on June 2, 2025.

WITNESSES:

Print Name: Mirth ST. Suste

Print Name: Jerome Anthony Jr.

BANK OF AMERICA, N.A.

By: 
Tamara J. Laughinghouse
Director

**STATE OF NORTH CAROLINA** §
§
**COUNTY OF MECKLENBURG** §

I CERTIFY that on June 2, 2025, Tamara J. Laughinghouse personally came before me and this person acknowledged to my satisfaction that: (a) this person signed, sealed and delivered the attached document as Director of Bank of America, N.A. named in this document; and (b) this document was signed and made by Bank of America, N.A. as its voluntary act and deed by virtue of authority from its Board of Directors.

NOTARY PUBLIC

PEGGY ARDREY
MY COMMISSION EXPIRES
NOTARY
PUBLIC
JULY 30, 2027
MECKLENBURG COUNTY, NC

Exhibit A

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at an iron pipe stake in the southerly line of Crystal Street, as said street is indicated on a "MAP OF NORTH WATERFORD IN THE TOWN OF HALFMOON, SARATOGA COUNTY, N.Y." dated August 12, 1909 by John Flynn, Jr. C.E., distant along said southerly line on a course North 80 degrees forty five minutes West (N 80 degrees 45'W), one hundred sixty feet (160') from the westerly line of the Waterford-Mechanicville State Highway; and running thence from said point of beginning North nine degrees fifteen minutes East (N 9 degrees 15' E) four hundred five feet ( 405') to an iron pipe stake in the southerly boundary of the lands now or formerly of Bellerose Brothers Realty Company, Inc. which is also the northerly boundary of the lands now or formerly of Pellitier; thence North eighty degrees forty five minutes West (N. 80 degrees 45'W) four hundred ninety feet (490')to an iron pipe stake in the easterly line of a plot conveyed to Arthur Clement by Peter Carroll and wife by deed dated July 16, 112 and recorded in Book 280 of Deeds at page 483; thence along said easterly line of the Clement plot, South nine degrees fifteen minutes West (S. 9 degrees 15' W), one hundred twenty feet (120') to the southeasterly corner thereon; thence along the southerly line of the same north eighty degrees forty-five minutes W (N 80 degrees 45' W), seventy-six feet, more or less (76' +/-)to the easterly right of way boundary of the Delaware and Hudson Railroad Co; thence southwesterly along the easterly right of way boundary of said railroad on a curve of about one degrees (1 degrees 00') of curvature a distance of two hundred eighty-eight feet, more or less, (288'+/-) to the point of its intersection with the aforementioned southerly line of Crystal Street; thence along the southerly line of Crystal Street South eighty degrees forty-five minutes East (S 80 degrees 45' E) five hundred eighty five feet (585') to the point or place of beginning.

EXCEPTING from the above described premises lands previously conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1300 of Deeds at Page 148, and more particularly described as follows:

Beginning at a point in the southwesterly corner of lands now or formerly of Hernberg conveyed by a deed recorded in the Saratoga County Clerk's Office in Liber 1014 of Deeds at Page 535, said point of beginning also being located 160 feet measured westerly along the southerly line of lands of said Hernberg from its intersection with the westerly line of Route 4 & 32; running thence from said westerly prolongation of said southerly line of the same north 79 degrees 47' 00" West, 57.00 feet to a point; thence North 10 degrees 13' 00" East 192.80 feet to a point in the southerly line of proposed Town Highway; thence along the same South 75 degrees 35' 00" East, 57.15 feet to a point in the westerly line of lands of Hernberg; thence along the same South 10 degrees 13' 00" West, 188.62 feet to the point or place of beginning.

FURTHER EXCEPTING from the above described premises that portion which lies within the bounds of the lands previously conveyed by a deed from Bellerose Brothers Realty Company, Inc. to the town of Halfmoon dated October 26, 1990 and recorded in the Saratoga County Clerk's Office on December 13, 1990 in Liber 1300 of Deeds at page 751.

Also all that lot, piece or parcel of land, situate, lying and being in the Town of Halfmoon, County of Saratoga and State of New York, more particularly bounded and described as follows:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (Waterford-Mechanicville State Highway) as said Turnpike is indicated in a "Map of North Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated April12, 1909, made by John Flynn, Jr., C.E., said point of beginning being

where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map; thence along the southerly line of Crystal Street, north 80 degrees 45' West a distance of 160 feet to the southeast corner of lands conveyed by Joseph E. Pelletier and Antoinette L. Pelletier, his wife to Bellerose Brothers Realty Company, Inc., by deed dated November 10, 1967 and recorded in the Saratoga County Clerk's Office November 13, 1967; thence along the easterly line of the lands of the lands of Bellerose Brothers Realty Company, Inc., north 9 degrees 15' East 44 feet more or less, to the southwest corner of Lot No. 19 in Block A as laid down on said map; thence along the southerly line of lots numbered 19, 20, and 1 as laid down on said map; South 80 degrees 45' East a distance of 160 feet to a point where the northerly line of Crystal Street meets the westerly line of the Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike, South 9 degrees 15' West, a distance of 44 feet, more or less, to the point or place of beginning.

SAID LANDS TOGETHER BEING BOUNDED AND DESCRIBED AS FOLLOWS:

Beginning at a point in the westerly line of the Waterford and Whitehall Turnpike (also known as the Waterford-Mechanicville State Highway and as Routes 4 and 32) as said Turnpike is indicated in a "Map of north Waterford in the Town of Halfmoon, Saratoga County, N.Y." dated August 12, 1909, made by John Flynn, Jr. C.E., said point of beginning being where the southerly line of Crystal Street meets the westerly line of said Turnpike, as laid down on said Map, and also being where the northerly line of lands now or formerly of Stephanowski meets the westerly line of said Turnpike; running thence along the southerly line of said Crystal Street and the northerly line of said lands of Stephanowski north eighty degrees forty-five minutes West (N 80 degrees 45' 00" W) seven hundred sixty-one and 39/100 feet (761.39') to the easterly right of way boundary of the Delaware & Hudson Railroad Co.; thence northeasterly along the easterly right of way boundary of said railroad on a curve having a radius of eleven thousand four hundred ninety-three and 00/100 feet (11,493.00') a chord distance of one hundred eighty-eight and 26/100 feet (188.26') to a point, which point is located north fifteen degrees forty seven minutes twenty-seconds East (N 15 degrees 47' 20" E) one hundred eighty-eight and 26/100 (188.26') from the previous point; thence continuing along the easterly right of way boundary of said railroad on a curve having a radius of seven thousand nine and 69/100 feet (7,009.69') a chord distance of one hundred two and 47/100 feet (102.47') to a point, which point is located north fourteen degrees fifty-four minutes East (N 14 degrees 54' 00" E) one hundred two and 47/100 feet (102.47') from the previous point; thence along the southerly line of the lands now or formerly of Soucy South eighty degrees forty five minutes East (S 80 degrees 45' 00" E) seventy-nine and 86/100 feet (79.86') to the southeasterly corner of said lands of Soucy; thence along the easterly line of lands of Soucy north nine degrees fifteen minutes East (N 09 degrees 15' OO"E) one hundred nine and 98/100 feet (109.98') to a point; thence along the southerly line of lands now or formerly of the Town of Halfmoon (Briggs Lane) South eighty-one degrees forty-four minutes thirty seconds East (S 81 degrees 44' 30" E) two hundred fifty-one and 23/100 feet (251.23 ') to a point; thence continuing along the southerly line of said lands of the Town of Halfmoon South seventy-six degrees thirty-five minutes thirty seconds East (S. 76 degrees 35' 30" E) one hundred eighty-two and 29/100 feet (182.29') to the northwesterly corner of the lands now or formerly of Carnevale; thence along the westerly line of said lands of Carnevale South nine degrees fifteen minutes West(S 09 degrees 15' 00" W) one hundred ninety-two and 761100 feet (192.76') to the southwesterly corner of said lands of Carnevale; thence along the southerly line of said lands of Carnevale South eighty degrees forty-five minutes East (S 80 degrees 45'00" E) fifty-seven feet (57.00') to a point; thence along the westerly line of the lands now or formerly of Bishop and continuing along the westerly line of the lands now or formerly of Watson South nine degrees fifteen minutes West (S 09 degree 15' 00" W) one hundred fifty-three and 35/100 feet (153 .35') to the southwesterly corner of said lands of Watson; thence along the southerly line of said lands of Watson South eighty degrees forty-five minutes East (S. 80 degrees 45' 00" E) one hundred sixty and 00/100 feet (160.00') to a point where the northerly line of said Crystal Street meets the westerly line of said Waterford and Whitehall Turnpike; thence along the westerly line of said Turnpike South nine degrees fifteen minutes West (S 09 degrees 15' 00" W) forty-four and 00/100 feet (44.00') to the point or place of beginning.

<u>Street Address of Property</u>

356 Hudson River Road
Waterford, New York 12188

As may be affected by instruments of record.

# EXHIBIT U

FILED

2025 JUN 23 AM 10: 58
SARATOGA COUNTY
CLERK
BALLSTON SPA, NY

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation - Brandi Kirsch
4400 Easton Commons, Suite 125
Columbus, Ohio 43219

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2024022936 filed 09/16/24

1b. [X] This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. [ ] TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. [ ] CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. [X] ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
[ ] CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
[ ] DELETE name: Give record name to be deleted in item 6a or 6b.
[ ] ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| **OR** 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| McCormick 103, LLC | | | | | |
| **OR** 7b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | | |
| 7c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| Executive Plaza II, Suite 902, 11350 McCormick Road | | Hunt Valley | MD | 21031 | USA |
| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
| Not Applicable | | | | | [ ] NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral [ ] deleted or [ ] added, or give entire [ ] restated collateral description, or describe collateral [ ] assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A. | | | |
| **OR** 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA
Debtor: Gregory L. Beeche — SARATOGA COUNTY, NEW YORK CLERK'S OFFICE

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

11. INITIAL FINANCING STATEMENT FILE # (same as item 1a on Amendment form)

**2024022936 filed 09/16/24**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT (same as item 9 on Amendment form)

| 12a. ORGANIZATION'S NAME | | |
|---|---|---|
| **Bank of America, N.A.** | | |
| OR 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
| | | |

13. Use this space for additional information

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**Street Address:**
**356 Hudson River Road**
**Waterford, NY 12188**

**County: Saratoga**
**Municipality: Halfmoon**

**SBL: 286. - 1 22.1**

STATE OF NEW YORK
DEPARTMENT OF STATE
ONE COMMERCE PLAZA, 99 WASHINGTON AVENUE
ALBANY, NY 12231-0001

KATHY HOCHUL
GOVERNOR

WALTER T. MOSLEY
SECRETARY OF STATE

**FILING ACKNOWLEDGMENT**
June 30, 2025

**RETURN TO CUSTOMER SERVICE COUNTER**

DELANEY CORPORATE SERVICES LTD.
99 WASHINGTON AVENUE, SUITE 805A
ALBANY NY 12207-0000

Attached is the acknowledgment copy of your recently submitted filing. This filing consists of a total of one page, which is represented in this acknowledgment. This document has been filed with the New York State Department of State, Uniform Commercial Code Division.

The Financing Statement Amendment (Assignment) has been assigned Filing Number:202506200222820 , Filing Date:06/20/2025 . This document has been appended to initial Financing Statement Filing Number: 201704208164087, which was filed on 04/20/2017. This action added the following Assignee(s) as a Secured Party of Record on this Financing Statement.

**Assignee's Name & Address**

MCCORMICK 103, LLC
EXECUTIVE PLAZA II, SUITE 902
11350 MCCORMICK ROAD
HUNT VALLEY MD 21031

The initial Financing Statement will lapse on 04/20/2027 unless continued.

If you have any concerns regarding the way this document is recorded, please contact one of our Customer Service Representatives at (518) 473-2492, or respond in writing to the UCC Data Processing Unit at the address indicated above.

Sincerely,

Uniform Commercial Code Division
Data Processing Unit

REF #: 209906

[redacted]

209906

2025 JUN 20 PM 1:30

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation - Brandi Kirsch
4400 Easton Commons, Suite 125
Columbus, Ohio 43219

**Drawdown #30**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
201704208164087 filed 04/20/17

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McCormick 103, LLC | | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| Executive Plaza II, Suite 902, 11350 McCormick Road | Hunt Valley | MD | 21031 | USA |
| 7d. SEE INSTRUCTIONS: Not Applicable; ADD'L INFO RE ORGANIZATION DEBTOR; 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA
Debtor: Greg Logistics, LLC

NEW YORK DEPARTMENT OF STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

NYUCC3PNAT - 7/15/2014 Wolters Kluwer Online

**FILING NUMBER: 202506200222820**

STATE OF NEW YORK
DEPARTMENT OF STATE
ONE COMMERCE PLAZA, 99 WASHINGTON AVENUE
ALBANY, NY 12231-0001

KATHY HOCHUL
GOVERNOR

WALTER T. MOSLEY
SECRETARY OF STATE

**FILING ACKNOWLEDGMENT**
June 30, 2025

**RETURN TO CUSTOMER SERVICE COUNTER**

DELANEY CORPORATE SERVICES LTD.
99 WASHINGTON AVENUE, SUITE 805A
ALBANY NY 12207-0000

Attached is the acknowledgment copy of your recently submitted filing. This filing consists of a total of one page, which is represented in this acknowledgment. This document has been filed with the New York State Department of State, Uniform Commercial Code Division.

The Financing Statement Amendment (Assignment) has been assigned Filing Number:202506200222832 , Filing Date:06/20/2025 . This document has been appended to initial Financing Statement Filing Number: 201704208164063, which was filed on 04/20/2017. This action added the following Assignee(s) as a Secured Party of Record on this Financing Statement.

**Assignee's Name & Address**

MCCORMICK 103, LLC
EXECUTIVE PLAZA II, SUITE 902
11350 MCCORMICK ROAD
HUNT VALLEY MD 21031

The initial Financing Statement will lapse on 04/20/2027 unless continued.

If you have any concerns regarding the way this document is recorded, please contact one of our Customer Service Representatives at (518) 473-2492, or respond in writing to the UCC Data Processing Unit at the address indicated above.

Sincerely,

Uniform Commercial Code Division
Data Processing Unit

REF #: 209907

[redacted]

209907

2025 JUN 20 PM 1:30

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation - Brandi Kirsch
4400 Easton Commons, Suite 125
Columbus, Ohio 43219

Drawdown #30

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
201704208164063 filed 04/20/17

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME

OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

7. CHANGED (NEW) OR ADDED INFORMATION:

7a. ORGANIZATION'S NAME
McCormick 103, LLC

OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Executive Plaza II, Suite 902, 11350 McCormick Road | Hunt Valley | MD | 21031 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

9a. ORGANIZATION'S NAME
Bank of America, N.A.

OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

10. OPTIONAL FILER REFERENCE DATA
Debtor: Greg Beeche, Logistics, LLC

NEW YORK DEPARTMENT OF STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

NYUCC3PNAT - 7/15/2014 Wolters Kluwer Online

**FILING NUMBER: 202506200222832**

# EXHIBIT V

Daniel F. Flores
Partner

Chapman and Cutler LLP
1270 Avenue of the Americas, 30th Floor
New York, New York 10020-1708

T 212.655.6000
D 212.655.2554
F 646.862.9047
dflores@@chapman.com

CHAPMAN
Focused on Finance

May 17, 2024

**BY OVERNIGHT DELIVERY, REGULAR MAIL AND E MAIL**

Greg Beeche, Logistics, LLC
Attn: Kirk Beeche, Director
356 Hudson River Road
Waterford, NY 12188

Re: (i) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***Loan Agreement***") providing for a Facility No. 1 line of credit loan (the "***LOC Loan***") between Bank of America, N.A. (the "***Bank***") and Greg Beeche, Logistics, LLC ("***Greg Beeche Logistics***"), secured by Security Agreement (Multiple Use) dated April 13, 2017 (the "***Security Agreement***") executed by Greg Beeche Logistics and Greg Logistics, LLC ("***Greg Logistics***") and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***Guaranties***") executed by Greg Logistics and Gregory L. Beeche, indivdually (collectively, the "***Guarantors***"; and together with Greg Beeche Logistics, collectively, the "***Obligors***");

(ii) Amendment to Loan Agreement dated as of November 8, 2017 (the "***Amendment***") amending the Loan Agreement to add a $2,500,000.00 Facility No. 3 equipment line of credit which converted to a term loan (the "***Equipment Loan***") between the Bank and Greg Beeche Logistics, secured by the Security Agreement and the Guaranties. The Loan Agreement, Amendment, Security Agreement, Guaranties and any other documents related to the Loan Agreement, Equipment Loan and/or the LOC Loan shall be referred to herein as the "***GBL Loan Documents***";

(iii) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL1 Agreement***") providing for a mortgage term loan in the original amount of $3,600,000.00 (the "***MTL1***") between the Bank and Gregory L. Beeche, individually, ecured by a first priority lien on certain real property located at 356 Hudson River Road, Waterford New York 12188 (the "***Real Property***"), as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***First Mortgage***") executed by Gregory L. Beeche and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL1 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL1 Agreement, First Mortgage, MTL1 Guaranties and any other documents related to the MTL1 shall be referred to herein as the "***MTL1 Documents***";

(iv) Construction Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL2 Agreement***") providing for a mortgage term loan in the original amount of $1,150,000.00 (the "***MTL2***") between the Bank and Gregory L. Beeche, individually, secured by a second priority lien on the Real Property, as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***Second Mortgage***"), executed by Gregory L. Beeche and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL2 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL2 Agreement, Second Mortgage, MTL2 Guaranties and any other documents related to the MTL2 shall be referred to herein as the "***MTL2 Documents***". The LOC Loan, the Equipment Loan, MTL1 and MTL2 shall be referred to herein as the "***Loans***". The GBL Loan Documents, MTL1 Documents and MTL2 Documents shall be referred to herein as the "***Loan Documents***".

Dear Obligors:

This firm has been retained as counsel for the Bank with respect to the referenced Loans and the related Loan Documents. We write to you today to inform you that certain events of default have occurred under the Loan Documents.

<u>The LOC Loan and Equipment Loan Defaults</u>

As you are aware, both the LOC Loan and the Equipment Loan expired by their respective terms on September 30, 2023, but the Obligors failed to pay all amounts due thereunder, each of which constitutes an event of default under Section 9.1 of the Loan Agreement (the "***Maturity Defaults***"). The LOC Loan and the Equipment Loan remain due and payable in full. In addition, we are informed that Greg Beeche Logistics failed to comply with Loan Agreement Section 7.5 Basic Fixed Charge Coverage Ratio for the periods ending March 31, 2023 and June 30, 2023, each of which constitutes a default under Loan Agreement Section 9.2 Covenants (the "***Covenant Defaults***").

<u>The Cross Defaults</u>

The Maturity Defaults and Covenant Defaults also each constitute an event of default under (i) MTL1 Agreement Section 8.4 Cross-default, and (ii) MTL2 Agreement Section 10.1(d) Cross-default (collectively the "***Cross-Defaults***" and together with the Maturity Defaults, and the Covenant Defaults the "***Events of Default***"), which Events of Default are continuing.

As a result of the occurrence of the Events of Default, the Bank is presently entitled to exercise any and all rights and remedies that it may have under the applicable Loan Documents or at law or in equity, in such manner as the Bank in its sole and exclusive discretion determines.

**Please be advised that the Bank hereby demands payment in full by the Obligors of all outstanding sums due in connection with the matured LOC Loan and the matured**

**Equipment Loan by no later than May 31, 2024**, including all principal, accrued interest, legal fees, costs and expenses (all sums due in connection with the GBL Loan Documents shall be referred to collectively herein as the "***GBL Obligations***").

**Please be further advised that as a result of the Events of Default, the Bank hereby accelerates both the MTL1 and the MTL2, and demands payment in full by the Obligors of all outstanding sums due in connection with the MTL1 and the MTL2 by no later than May 31, 2024**, including all principal, accrued interest, default interest (if any), legal fees, costs and expenses (all sums due in connection with the MTL1 Loan Documents and the MTL2 Loan Documents shall be referred to collectively herein as the "***MTL Obligations***" and together with the GBL Obligations, the "***Obligations***"). If payment in full of the Obligations is not received on or before **May 31, 2024,** the Bank will proceed without further notice to take all measures necessary to collect the Loans, including but not limited to the commencement of legal proceedings to collect the outstanding and unpaid Obligations.

The balances due under the LOC Loan as of May 13, 2024 are as follows: the principal sum of $6,550,000.00, accrued contract rate interest of $377,097.37, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the LOC Loan after May 13, 2024 at the rate of $1,473.50.

The balances due under the Equipment Loan as of May 13, 2024 are as follows: the principal sum of $323,989.98, accrued contract rate interest of $21,189.85, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the Equipment Loan after May 13, 2024 at the rate of $78.17.

The balances due under the MTL1 as of May 13, 2024 are as follows: the principal sum of $2,748,122.18, accrued contract rate interest of $4,488.60, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the MTL1 after May 13, 2024 at the rate of $374.05.

The balances due under the MTL2 as of May 13, 2024 are as follows: the principal sum of $848,124.79, accrued contract rate interest of $2,170.54, prepayment penalty of $1,166.42, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the MTL2 after May 13, 2024 at the rate of $180.88.

Please note that the Bank will also require payment of all of the Bank's fees, costs and expenses incurred through the date of payoff, including but not limited to all attorneys' fees incurred by the Bank in connection with the defaulted Loans. **Because additional interest, fees, costs and expenses continue to accrue, please contact the undersigned for updated pay-off information prior to tendering payment**.

CHAPMAN
Focused on Finance



**Notwithstanding the above, the Bank remains willing to consider possible forbearance terms (subject, of course, to Bank Senior Management approval) to provide the Obligors with additional time to make any arrangements necessary to repay all of the defaulted Obligations, in full. If you would like to discuss possible forbearance terms, please feel free to contact the undersigned or the Bank officer in charge of the Loan, Matt Hyland at 860-244-5005.**

While the Bank has not yet chosen to exercise any of its other rights and remedies under the Loan Documents or applicable law as a consequence of the Events of Default, please be advised that the Bank expressly reserves the right to do so at any time in the future without further written notice to the Obligors. This also includes the Bank's right to retroactively impose the Default Rate of interest set forth at Section 4.7 of the Loan Agreement, Section 3.7 of the MTL1 Agreement and/or Section 5.6 of the MTL2 Agreement.

Nothing herein, in any prior communications (oral or written), in the Bank's election of remedies or in the Bank's timing of its election of remedies, is or shall be deemed to be a waiver, release, forbearance or forgiveness of any rights, claims, remedies, defenses and objections of the Bank under the Loan Documents, or of any rights, claims, remedies, defenses and objections with respect to any other events of default or defaults or failed conditions, whether known or unknown to Bank, all of which are expressly preserved. No forbearance, delay or inaction by the Bank in the exercise of its rights and remedies, and no continuing performance by the Bank or Greg Beeche Logistics or any of the other Obligors under the Loan Documents: (a) shall constitute: (i) a modification or an alteration of the terms, conditions or covenants of the Loan Documents, all of which remain in full force and effect; or (ii) a waiver, release or limitation upon the Bank's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved; or (b) shall relieve or release Greg Beeche Logistics or any of the other Obligors in any way from any of its or their duties, obligations, covenants or agreements under the Loan Documents to which they are a party or from the consequences of the Events of Default or any other event of default. The Bank is not obligated to waive the Events of Default or any other event of default, whether now existing or which may occur after the date of this letter. Furthermore, for the avoidance of doubt, the Bank is under no obligation to enter into an amendment to any of the Loan Documents or to otherwise extend any financial accommodation to Greg Beeche Logistics or any of the other Obligors.

The Obligors are hereby further notified that any past or future negotiations between the Obligors or their representatives or agents on the one hand and the Bank and its representatives or agents on the other hand do not and shall not constitute a waiver of the Bank's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of the Bank's rights shall not be effective unless in writing duly executed by an authorized representative of the Bank. The Obligors shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank or its representatives or agents in connection with any alleged agreement by or on behalf of the Bank to refrain from exercising any of its rights under the Loan Documents or otherwise at law or in equity.

CHAPMAN
Focused on Finance



Please note that all payments of any amount due may, at the Bank's option, be accepted and applied on account of the unpaid obligations under the Loan Documents, whether any such payments were received prior to the date of this letter or hereafter. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to the Bank on account of unpaid amounts.

Sincerely,

Daniel F. Flores

Daniel F. Flores

Cc:

Greg Logistics, LLC
356 Hudson River Road
Waterford, NY 12188

Gregory L. Beeche
356 Hudson River Road
Waterford, NY 12188

Daniel F. Flores
Partner

CHAPMAN
Focused on Finance

Chapman and Cutler LLP
1270 Avenue of the Americas, 30th Floor
New York, New York 10020-1708

T 212.655.6000
D 212.655.2554
F 646.862.9047
dflores@@chapman.com

May 5, 2025

**BY OVERNIGHT DELIVERY AND REGULAR MAIL**

Greg Beeche, Logistics, LLC
Attn: Kirk Beeche, Director
356 Hudson River Road
Waterford, NY 12188

Re: (i) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***Loan Agreement***") providing for a Facility No. 1 line of credit loan (the "***LOC Loan***") between Bank of America, N.A. (the "***Bank***") and Greg Beeche, Logistics, LLC ("***Greg Beeche Logistics***"), secured by Security Agreement (Multiple Use) dated April 13, 2017 (the "***Security Agreement***") executed by Greg Beeche Logistics and Greg Logistics, LLC ("***Greg Logistics***") and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***Guaranties***") executed by Greg Logistics and Gregory L. Beeche, individually (collectively, the "***Guarantors***"; and together with Greg Beeche Logistics, collectively, the "***Obligors***"), and further secured by a Mortgage Assignment of Rents, Security Agreement and Fixture Filing dated as of July 6, 2021 (the "***Third Mortgage***");

(ii) Amendment to Loan Agreement dated as of November 8, 2017 (the "***Amendment***") amending the Loan Agreement to add a $2,500,000.00 Facility No. 3 equipment line of credit which converted to a term loan (the "***Equipment Loan***") between the Bank and Greg Beeche Logistics, secured by the Security Agreement and the Guaranties. The Loan Agreement, Amendment, Security Agreement, Guaranties, Third Mortgage and any other documents related to the Loan Agreement, Equipment Loan and/or the LOC Loan shall be referred to herein as the "***GBL Loan Documents***";

(iii) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL1 Agreement***") providing for a mortgage term loan in the original amount of $3,600,000.00 (the "***MTL1***") between the Bank and Gregory L. Beeche, individually, secured by a first priority lien on certain real property located at 356 Hudson River Road, Waterford New York 12188 (the "***Real Property***"), as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***First Mortgage***") executed by Gregory L. Beeche and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL1 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL1 Agreement, First Mortgage, MTL1 Guaranties and any other documents related to the MTL1 shall be referred to herein as the "***MTL1 Documents***";

CHAPMAN
Focused on Finance



(iv) Construction Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL2 Agreement***") providing for a mortgage term loan in the original amount of $1,150,000.00 (the "***MTL2***") between the Bank and Gregory L. Beeche, individually, secured by a second priority lien on the Real Property, as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***Second Mortgage***"), executed by Gregory L. Beeche, individually, and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL2 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL2 Agreement, Second Mortgage, MTL2 Guaranties and any other documents related to the MTL2 shall be referred to herein as the "***MTL2 Documents***". The LOC Loan, the Equipment Loan, MTL1 and MTL2 shall be referred to herein as the "***Loans***". The GBL Loan Documents, MTL1 Documents and MTL2 Documents shall be referred to herein as the "***Loan Documents***".

Dear Obligors:

As you know, this firm has been retained as counsel for the Bank with respect to the referenced Loans and the related Loan Documents. We write to you today to inform you that certain events of default have occurred under the Loan Documents. In light of the events of default defined below, and at the Bank's request, all further communications between the Obligors and the Bank will be directed through counsel. If you have retained counsel to represent you in this matter, feel free to forward this letter to such counsel, and please provide us with appropriate contact information for such counsel so that we may reach out to them directly.

Reference is hereby made to that certain default and reservation of rights notice from this firm to the Obligors dated May 17, 2024 (the "***Beeche Default Notice***"), wherein we notified you of the following defaults, some or all of which remain continuing and uncured:

- Both the LOC Loan and the Equipment Loan expired by their respective terms on September 30, 2023, but the Obligors failed to pay all amounts due thereunder, each of which constitutes an event of default under Section 9.1 of the Loan Agreement (the "***Maturity Defaults***"). The LOC Loan and the Equipment Loan remain due and payable in full.
- Greg Beeche Logistics failed to comply with Loan Agreement Section 7.5 Basic Fixed Charge Coverage Ratio for the periods ending March 31, 2023 and June 30, 2023, each of which constitutes a default under Loan Agreement Section 9.2 Covenants (the "***Covenant Defaults***").
- The Maturity Defaults and Covenant Defaults also each constitute an event of default under (i) MTL1 Agreement Section 8.4 Cross-default, and (ii) MTL2 Agreement Section 10.1(d) Cross-default (collectively the "***Cross-Defaults***" and together with the Maturity Defaults, and the Covenant Defaults the "***2024 Defaults***"), which 2024 Defaults are continuing.

CHAPMAN
Focused on Finance



In addition, on behalf of the Bank, we demanded payment in full by the Obligors of all outstanding sums due in connection with the matured LOC Loan and the matured Equipment Loan by no later than May 31, 2024, including all principal, accrued interest, legal fees, costs and expenses (all sums due in connection with the GBL Loan Documents shall be referred to collectively herein as the "***GBL Obligations***").

We further advised you that because of the 2024 Defaults, the Bank accelerated both the MTL1 and the MTL2. On behalf of the Bank, we demanded payment in full by the Obligors of all outstanding sums due in connection with the MTL1 and the MTL2 by no later than May 31, 2024, including all principal, accrued interest, default interest (if any), legal fees, costs and expenses (all sums due in connection with the MTL1 Loan Documents and the MTL2 Loan Documents shall be referred to collectively herein as the "***MTL Obligations***" and together with the GBL Obligations, the "***Obligations***"). To date, the Obligors have not repaid the Obligations.

In addition, since the Beeche Default Notice, the Bank has learned that the taxes on the Real Property were not paid for tax years 2023, 2024 and 2025 in the aggregate total amount of approximately $400,000.00, as required under the First Mortgage and the Second Mortgage, each of which constitutes a default or cross-default under MTL1 Agreement Sections 8.3 and 8.4, MTL2 Agreement Sections 10.1(c) and (d) and/or the Loan Agreement Section 9.4 (the "***Taxes Defaults***" and together with the 2024 Defaults, the "***Events of Default***").

As a result of the occurrence of the Events of Default, the Bank is presently entitled to exercise any and all rights and remedies that it may have under the applicable Loan Documents or at law or in equity, in such manner as the Bank in its sole and exclusive discretion determines.

**Please understand it is imperative that we speak to you no later than May 12, 2025 to discuss the payment in full by the Obligors of all the Obligations. While the Bank remains willing at this time to consider forbearance, the Bank will only do so if the Obligors present a viable plan for payment in full of all the Obligations. In the event we do not hear from you on or before May 12, 2025, the Bank reserves its right to proceed without further notice to take all measures necessary to collect the Loans, including but not limited to the commencement of legal proceedings to collect the outstanding and unpaid Obligations.**

The balances due under the LOC Loan as of April 21, 2025 are as follows: the principal sum of $6,550,000.00, accrued contract rate interest of $851,758.48, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the LOC Loan after April 21, 2025 at the rate of $1,306.02.

The balances due under the Equipment Loan as of April 21, 2025 are as follows: the principal sum of $323,989.98, accrued contract rate interest of $46,347.39, plus default interest (if any), fees,

costs and expenses. Per diem interest continues to accrue on the Equipment Loan after April 21, 2025 at the rate of $69.23.

The balances due under the MTL1 as of April 21, 2025 are as follows: the principal sum of $2,609,482.55, accrued contract rate interest of $7,103.59, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the MTL1 after April 21, 2025 at the rate of $355.18.

The balances due under the MTL2 as of April 21, 2025 are as follows: the principal sum of $795,416.42, accrued contract rate interest of $2,955.47, plus default interest (if any), fees, costs and expenses. Per diem interest continues to accrue on the MTL2 after April 21, 2025 at the rate of $147.77.

Please note that the Bank will also require payment of all of the Bank's fees, costs and expenses incurred through the date of payoff, including but not limited to all attorneys' fees incurred by the Bank in connection with the defaulted Loans. **Because additional interest, fees, costs and expenses continue to accrue, please contact the undersigned for updated pay-off information prior to tendering payment**.

**Notwithstanding the above, the Bank remains willing to consider possible forbearance terms (subject, of course, to Bank Senior Management approval) to provide the Obligors with additional time to make any arrangements necessary to repay all of the defaulted Obligations, in full. If you would like to discuss possible forbearance terms, please feel free to contact the undersigned.**

While the Bank has not yet chosen to exercise any of its other rights and remedies under the Loan Documents or applicable law as a consequence of the Events of Default, please be advised that the Bank expressly reserves the right to do so at any time in the future without further written notice to the Obligors. This also includes the Bank's right to retroactively impose the Default Rate of interest set forth at Section 4.7 of the Loan Agreement, Section 3.7 of the MTL1 Agreement and/or Section 5.6 of the MTL2 Agreement.

Nothing herein, in any prior communications (oral or written), in the Bank's election of remedies or in the Bank's timing of its election of remedies, is or shall be deemed to be a waiver, release, forbearance or forgiveness of any rights, claims, remedies, defenses and objections of the Bank under the Loan Documents, or of any rights, claims, remedies, defenses and objections with respect to any other events of default or defaults or failed conditions, whether known or unknown to Bank, all of which are expressly preserved. No forbearance, delay or inaction by the Bank in the exercise of its rights and remedies, and no continuing performance by the Bank or Greg Beeche Logistics or any of the other Obligors under the Loan Documents: (a) shall constitute: (i) a modification or an alteration of the terms, conditions or covenants of the Loan Documents, all of which remain in full force and

CHAPMAN
Focused on Finance



effect; or (ii) a waiver, release or limitation upon the Bank's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved; or (b) shall relieve or release Greg Beeche Logistics or any of the other Obligors in any way from any of its or their duties, obligations, covenants or agreements under the Loan Documents to which they are a party or from the consequences of the Events of Default or any other event of default. The Bank is not obligated to waive the Events of Default or any other event of default, whether now existing or which may occur after the date of this letter. Furthermore, for the avoidance of doubt, the Bank is under no obligation to enter into an amendment to any of the Loan Documents or to otherwise extend any financial accommodation to Greg Beeche Logistics or any of the other Obligors.

The Obligors are hereby further notified that any past or future negotiations between the Obligors or their representatives or agents on the one hand and the Bank and its representatives or agents on the other hand do not and shall not constitute a waiver of the Bank's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of the Bank's rights shall not be effective unless in writing duly executed by an authorized representative of the Bank. The Obligors shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank or its representatives or agents in connection with any alleged agreement by or on behalf of the Bank to refrain from exercising any of its rights under the Loan Documents or otherwise at law or in equity.

Please note that all payments of any amount due may, at the Bank's option, be accepted and applied on account of the unpaid obligations under the Loan Documents, whether any such payments were received prior to the date of this letter or hereafter. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to the Bank on account of unpaid amounts.

Sincerely,

*Daniel F. Flores*

Daniel F. Flores

Cc: VIA OVERNIGHT DELIVERY AND REGULAR MAIL

Greg Logistics, LLC
356 Hudson River Road
Waterford, NY 12188

Gregory L. Beeche, Individually
356 Hudson River Road
Waterford, NY 12188

Daniel F. Flores
Partner

Chapman and Cutler LLP
1270 Avenue of the Americas, 30th Floor
New York, New York 10020-1708

T 212.655.6000
D 212.655.2554
F 646.862.9047
dflores@@chapman.com

**CHAPMAN**
**Focused on Finance**

May 15, 2025

**BY OVERNIGHT DELIVERY AND REGULAR MAIL**

Greg Beeche, Logistics, LLC
Attn: Kirk Beeche, Director
356 Hudson River Road
Waterford, NY 12188

Re: (i) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***Loan Agreement***") providing for a Facility No. 1 line of credit loan (the "***LOC Loan***") between Bank of America, N.A. (the "***Bank***") and Greg Beeche, Logistics, LLC ("***Greg Beeche Logistics***"), secured by Security Agreement (Multiple Use) dated April 13, 2017 (the "***Security Agreement***") executed by Greg Beeche Logistics and Greg Logistics, LLC ("***Greg Logistics***") and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***Guaranties***") executed by Greg Logistics and Gregory L. Beeche, individually (collectively, the "***Guarantors***"; and together with Greg Beeche Logistics, collectively, the "***Obligors***"), and further secured by a Mortgage Assignment of Rents, Security Agreement and Fixture Filing dated as of July 6, 2021 (the "***Third Mortgage***");

(ii) Amendment to Loan Agreement dated as of November 8, 2017 (the "***Amendment***") amending the Loan Agreement to add a $2,500,000.00 Facility No. 3 equipment line of credit which converted to a term loan (the "***Equipment Loan***") between the Bank and Greg Beeche Logistics, secured by the Security Agreement and the Guaranties. The Loan Agreement, Amendment, Security Agreement, Guaranties, Third Mortgage and any other documents related to the Loan Agreement, Equipment Loan and/or the LOC Loan shall be referred to herein as the "***GBL Loan Documents***";

(iii) Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL1 Agreement***") providing for a mortgage term loan in the original amount of $3,600,000.00 (the "***MTL1***") between the Bank and Gregory L. Beeche, individually, secured by a first priority lien on certain real property located at 356 Hudson River Road, Waterford New York 12188 (the "***Real Property***"), as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***First Mortgage***") executed by Gregory L. Beeche and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL1 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL1 Agreement, First Mortgage, MTL1 Guaranties and any other documents related to the MTL1 shall be referred to herein as the "***MTL1 Documents***";

CHAPMAN
Focused on Finance



(iv) Construction Loan Agreement dated as of April 20, 2017 (as amended, restated, extended or renewed, the "***MTL2 Agreement***") providing for a mortgage term loan in the original amount of $1,150,000.00 (the "***MTL2***") between the Bank and Gregory L. Beeche, individually, secured by a second priority lien on the Real Property, as evidenced by Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 (the "***Second Mortgage***"), executed by Gregory L. Beeche, individually, and Continuing and Unconditional Guaranties dated April 20, 2017 (the "***MTL2 Guaranties***") executed by Greg Beeche Logistics and Greg Logistics. The MTL2 Agreement, Second Mortgage, MTL2 Guaranties and any other documents related to the MTL2 shall be referred to herein as the "***MTL2 Documents***". The LOC Loan, the Equipment Loan, MTL1 and MTL2 shall be referred to herein as the "***Loans***". The GBL Loan Documents, MTL1 Documents and MTL2 Documents shall be referred to herein as the "***Loan Documents***".

Dear Obligors:

As you know, this firm has been retained as counsel for the Bank with respect to the referenced Loans and the related Loan Documents. Reference is hereby made to that certain default and reservation of rights notice from this firm to the Obligors dated May 17, 2024 (the "***05.14.24 Default Notice***"), wherein we notified you of the 2024 Defaults (as defined therein), and demanded payment in full of the Obligations (as defined therein). To date, the Obligors have not repaid the Obligations.

In addition, reference is hereby made to that certain default and reservation of rights notice from this firm to the Obligors dated May 5, 2025 (the "***05.05.25 Default Notice***" and together with the 05.14.24 Default Notice, the "***Default Notices***"), wherein we notified you of the Taxes Defaults (as defined therein, and together with the 2024 Defaults, the "***Events of Default***"). Further, in the 05.05.25 Default Notice we requested that you contact us no later than May 12, 2025 to discuss your plan for repayment of the Obligations. To date, the Obligors have not presented a viable plan for repayment of the Obligations.

As a result of the occurrence of the Events of Default, the Bank is presently entitled to exercise any and all rights and remedies that it may have under the applicable Loan Documents or at law or in equity, in such manner as the Bank in its sole and exclusive discretion determines.

**Based on the continuing Events of Default, the Bank has implemented the default rate of interest on the Loans, effective May 13, 2025. Pursuant to Section 4.7 of the Loan Agreement, Section 3.7 of the MTL1 Agreement and Section 5.6 of the MTL2 Agreement, the default rate is 6.0 percentage points higher on each of the respective Loans than the rates otherwise provided therein (the "*Default Rate*"). All future payments and interest accruals on the Loans will include interest accruing at the Default Rate.**

**Notwithstanding the above, the Bank remains willing to consider possible forbearance terms (subject, of course, to Bank Senior Management approval) to provide the Obligors with additional time to make any arrangements necessary to repay all of the defaulted Obligations, in full. If you would like to discuss possible forbearance terms, please feel free to contact the undersigned.**

While the Bank has not yet chosen to exercise any of its other rights and remedies under the Loan Documents or applicable law as a consequence of the Events of Default, please be advised that the Bank expressly reserves the right to do so at any time in the future without further written notice to the Obligors.

Nothing herein, in any prior communications (oral or written), in the Bank's election of remedies or in the Bank's timing of its election of remedies, is or shall be deemed to be a waiver, release, forbearance or forgiveness of any rights, claims, remedies, defenses and objections of the Bank under the Loan Documents, or of any rights, claims, remedies, defenses and objections with respect to any other events of default or defaults or failed conditions, whether known or unknown to Bank, all of which are expressly preserved. No forbearance, delay or inaction by the Bank in the exercise of its rights and remedies, and no continuing performance by the Bank or Greg Beeche Logistics or any of the other Obligors under the Loan Documents: (a) shall constitute: (i) a modification or an alteration of the terms, conditions or covenants of the Loan Documents, all of which remain in full force and effect; or (ii) a waiver, release or limitation upon the Bank's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved; or (b) shall relieve or release Greg Beeche Logistics or any of the other Obligors in any way from any of its or their duties, obligations, covenants or agreements under the Loan Documents to which they are a party or from the consequences of the Events of Default or any other event of default. The Bank is not obligated to waive the Events of Default or any other event of default, whether now existing or which may occur after the date of this letter. Furthermore, for the avoidance of doubt, the Bank is under no obligation to enter into an amendment to any of the Loan Documents or to otherwise extend any financial accommodation to Greg Beeche Logistics or any of the other Obligors.

The Obligors are hereby further notified that any past or future negotiations between the Obligors or their representatives or agents on the one hand and the Bank and its representatives or agents on the other hand do not and shall not constitute a waiver of the Bank's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of the Bank's rights shall not be effective unless in writing duly executed by an authorized representative of the Bank. The Obligors shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of the Bank or its representatives or agents in connection with any alleged agreement by or on behalf of the Bank to refrain from exercising any of its rights under the Loan Documents or otherwise at law or in equity.

Please note that all payments of any amount due may, at the Bank's option, be accepted and applied on account of the unpaid obligations under the Loan Documents, whether any such payments were

CHAPMAN
Focused on Finance



received prior to the date of this letter or hereafter. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to the Bank on account of unpaid amounts.

Sincerely,

*Daniel F. Flores*

Daniel F. Flores

Cc: VIA OVERNIGHT DELIVERY AND REGULAR MAIL

Greg Logistics, LLC
356 Hudson River Road
Waterford, NY 12188

Gregory L. Beeche, Individually
356 Hudson River Road
Waterford, NY 12188

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

MCCORMICK 103, LLC,

*Plaintiff(s)*

v.

GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Greg Beeche, Logistics, LLC
356 Hudson River Road
Waterford, New York 12188

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher P. Schueller
Buchanan Ingersoll & Rooney PC
640 5th Avenue, 9th Floor
New York, NY 10019

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ______________________

______________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

MCCORMICK 103, LLC,

*Plaintiff(s)*

v.

GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Greg Logistics, LLC
356 Hudson River Road
Waterford, New York 12188

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher P. Schueller
Buchanan Ingersoll & Rooney PC
640 5th Avenue, 9th Floor
New York, NY 10019

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* __________
was received by me on *(date)* __________ .

❒ I personally served the summons on the individual at *(place)* __________
__________ on *(date)* __________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* __________
__________ , a person of suitable age and discretion who resides there,
on *(date)* __________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* __________ , who is
designated by law to accept service of process on behalf of *(name of organization)* __________
__________ on *(date)* __________ ; or

❒ I returned the summons unexecuted because __________ ; or

❒ Other *(specify):*

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: __________

__________
*Server's signature*

__________
*Printed name and title*

__________
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

MCCORMICK 103, LLC,

*Plaintiff(s)*

v.

GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Gregory L. Beeche
356 Hudson River Road
Waterford, New York 12188

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher P. Schueller
Buchanan Ingersoll & Rooney PC
640 5th Avenue, 9th Floor
New York, NY 10019

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ________________

*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ____________________

was received by me on *(date)* ____________ .

❒ I personally served the summons on the individual at *(place)* ____________________

____________________ on *(date)* ____________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ____________

____________________ , a person of suitable age and discretion who resides there,

on *(date)* ____________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ____________________ , who is

designated by law to accept service of process on behalf of *(name of organization)* ____________

____________________ on *(date)* ____________ ; or

❒ I returned the summons unexecuted because ____________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

____________________
*Server's signature*

____________________
*Printed name and title*

____________________
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

MCCORMICK 103, LLC,

*Plaintiff(s)*

v.

GREG BEECHE, LOGISTICS, LLC; GREG LOGISTICS, LLC; GREGORY L. BEECHE; and NEW YORK STATE DEPARTMENT OF TAXATION, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* New York State Department of Taxation and Finance
Harriman Campus Road
Albany, NY 12227

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher P. Schueller
Buchanan Ingersoll & Rooney PC
640 5th Avenue, 9th Floor
New York, NY 10019

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc: